| | |
|---|---|
| **DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO**<br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: November 17, 2023 4:50 PM |
| **Petitioners:**<br>NORMA ANDERSON, MICHELLE PRIOLA, CLAUDINE CMARADA, KRISTA KAFER, KATHI WRIGHT, and CHRISTOPHER CASTILIAN<br><br>v.<br><br>**Respondent:**<br>JENA GRISWOLD, in her official capacity as Colorado Secretary of State<br><br>**and**<br><br>**Intervenors:**<br>COLORADO REPUBLICAN STATE CENTRAL COMMITTEE and DONALD J. TRUMP | **Δ COURT USE ONLY Δ**<br><br>Case No.: 2023CV32577<br><br>Division: 209 |
| **FINAL ORDER** | |

This matter came before the Court from October 30, 2023 to November 3, 2023 pursuant to a C.R.S. § 1-1-113 proceeding. Petitioners Norma Anderson, Michelle Priola, Claudine Cmarada, Krista Kafer, Kathi Wright, and Christopher Castilian ("Petitioners") were represented by Eric Olson, Sean Grimsley, Jason Murray, Martha Tierney, Mario Nicolais, and Nikhel Sus. Respondent Jena Griswold, in her official capacity as Colorado Secretary of State ("Secretary"), was represented by Jennifer Sullivan, Grant Sullivan, and Michael Kotlarczyk. Intervenor Donald J. Trump was represented by Scott Gessler, Geoffrey Blue, Justin North, Johnathan Shaw, Christpher Halbohn, Mark

Meuser, and Jacob Roth.  The Colorado Republican State Central Committee ("CRSCC") was represented by Jane Raskin, Michael Melito, Robert Kitsmiller, Nathan Moelker, and Benjamin Sisney.  The Court, having considered the evidence, the extensive briefing, the proposed findings of fact and conclusions of law, and applicable legal authority, makes the following findings of fact and conclusions of law and issues the following order:

I.      **PROCEDURAL BACKGROUND**[1]

1.      On September 6, 2023, Petitioners filed their Verified Petition under C.R.S. §§ 1-4-1204, 1-1-113, 13-51-105 and C.R.C.P. 57(a). Petitioners alleged two claims for relief.  First, they asserted a claim against the Secretary pursuant to C.R.S. § 1-4-1204 and § 1-1-113.  Second, they requested declaratory relief against both the Secretary and Trump.  The declaratory relief requested included a declaration that Trump was not constitutionally eligible for the office of the presidency.

2.      On September 7, 2023, Trump filed a notice of removal to the United States District Court for the District of Colorado.  On September 12, 2023, the United States District Court for the District of Colorado remanded the case, finding that the Secretary was not a nominal party whose consent to remove was permissive.

3.      CRSCC filed a motion to intervene on September 14, 2023.  This Court granted that motion on September 18, 2023.

4.      On September 22, 2023, Trump filed a Special Motion to Dismiss Pursuant to C.R.S. § 13-20-1101(3)(a) ("Trump Anti-SLAPP Motion").  In that motion,

---

[1] The Court adopts and incorporates all its prior rulings in this Order.

Trump argued that this case is subject to Colorado's anti-SLAPP statute because Petitioners' claims all stem from protected speech or the refusal to speak and because the speech concerned election fraud and a hard-fought election, they are the epitome of public issues.  Trump further argued Petitioners were unable to establish a reasonable likelihood of success on their claims.  As a result, Trump argued, the Court must dismiss the claims.

5.      Also on September 22, 2023, Trump separately moved to dismiss Petitioners' claims ("Trump Procedural Motion to Dismiss"). Specifically, Trump argued: (1) Petitioners may not litigate constitutional claims in a C.R.S. § 1-1-113 proceeding; (2) the C.R.S. § 1-4-1204 claim was not ripe; (3) C.R.S. § 1-4-1204 does not provide grounds to use the Fourteenth Amendment to bar candidates; and (4) there is no standing on the declaratory judgment claim because there is no particularized or concrete injury.  On September 29, 2023, the Petitioners responded to the Trump Procedural Motion to Dismiss.  In that Response, the Petitioners agreed to dismiss their declaratory judgment claim.  This Court has since dismissed Petitioners' claim for declaratory judgment.

6.      Also, on September 22, 2023, CRSCC filed a Motion to Dismiss Pursuant to Colorado Rule of Civil Procedure 12(b)(5) ("CRSCC Motion to Dismiss").  In that motion, CRSCC argued: (1) the Petition infringes on CRSCC's first amendment rights; (2) the Secretary's role in enforcing C.R.S. § 1-4-1204 is ministerial; and (3) the C.R.S. § 1-4-1204 claim is not ripe.  The motion also previewed additional arguments that Trump

made in a subsequent motion to dismiss on whether the Fourteenth Amendment can be used to keep Trump off the ballot.

7.     Finally, also on September 22, 2023, Petitioners moved to dismiss CRSCC's First Claim for Relief ("Petitioners' Motion to Dismiss"). The Petitioners argued that the CRSCC's First Claim for Relief was inappropriate in a C.R.S. § 1-1-113 proceeding because it is a constitutional challenge to the election code.

8.     On September 29, 2023, Trump filed an additional motion to dismiss. This motion to dismiss addressed various constitutional arguments regarding why the Petitioners' Fourteenth Amendment arguments fail ("Fourteenth Amendment Motion to Dismiss"). In that motion, Trump argues: (1) this case presents a nonjusticiable political question; (2) Section Three of the Fourteenth Amendment is not self-executing; (3) Congress has preempted states from judging presidential qualifications; (4) Section Three does not apply to Trump; (5) Petitioners fail to allege that Trump "engaged" in an "insurrection;" and (6) this is an inconvenient forum under C.R.S. § 13-20-1004.

9.     Finally, on September 29, 2023, CRSCC filed a Motion for Judgment on the Pleadings under Rule 12/Judgment as a Matter of Law Under Rule 56 ("CRSCC Motion for Judgment"). This motion essentially argued that this Court should grant all the relief CRSCC requested in its Petition based on the Petition alone. This included its requests that this Court declare: (1) the relief Petitioners request is a violation of their First Amendment rights; (2) the Secretary does not have authority to preclude the placement of Trump on Colorado's ballot pursuant to the Fourteenth Amendment; and

(3) only the CRSCC has the authority to determine who is qualified to be on Colorado's ballot as a Republican candidate.

10.     On October 5, 2023, the Court granted Donald J. Trump's motion to intervene.

11.     On October 11, 2023, the Court denied the Trump Anti-SLAPP Motion on the basis that the anti-SLAPP statute did not apply to this case.

12.     On October 20, 2023, the Court issued its Omnibus Ruling on the Pending Dispositive Motions.  The Court denied the Trump Procedural Motion to Dismiss, finding Petitioners' claim procedurally proper under C.R.S. § 1-1-113 and ripe for decision under C.R.S. § 1-4-1204.  The Court further found that the issue of whether an elector can make a Fourteenth Amendment challenge under C.R.S. § 1-4-1204 was an issue to be preserved for trial.  The Court denied the CRSCC Motion to Dismiss, finding that if a political party puts forth a constitutionally ineligible candidate, and if the Secretary of State has the legal authority to vet candidate fitness, the First Amendment is not violated if the State disqualifies that candidate on the grounds of his ineligibility. The Court denied the CRSCC Motion for Judgment, finding it premature. Finally, the Court granted Petitioners' Motion to Dismiss, finding the only relief the Court can afford in a C.R.S. § 1-1-113 proceeding is an order to comply with the Election Code and that the CRSCC's request for declaratory judgment was improper.

13.     On October 25, 2023, by separate order, this Court denied Trump's Fourteenth Amendment Motion to Dismiss.  First, the Court declined to dismiss the case under the political question doctrine, reserving the issue of whether presidential

eligibility has been delegated to the United States Congress for its final ruling following the presentation of evidence and argument at trial.[2]  Next, the Court held that to the extent the Court holds that C.R.S. § 1-4-1204 allows the Court to order the Secretary to exclude a candidate under the Fourteenth Amendment, states can, and have, applied Section Three pursuant to state statutes without federal enforcement legislation.  As to Trump's argument that Congress has preempted states from judging presidential qualifications, the Court further declined to dismiss the action based on field preemption.  Finally, the Court found Trump had failed to establish dismissal based on *forum non conveniens*.  The Court reserved the issues of whether Section Three of the Fourteenth Amendment applies to Trump and whether Trump engaged in an insurrection for its ruling following trial.

14.     Trump filed a Motion to Realign the Secretary as a Petitioner, arguing that the Secretary was acting as a Petitioner and should be realigned so that Trump could appeal her decisions, ensure a proper order of proof, and, if necessary, cross-examine the Secretary's witnesses.  On October 23, 2023, this Court held that the Secretary, in the context of this litigation, is not antagonistic such that a realignment was

---

[2] The Court held it would revisit this ruling to the extent that there was any evidence or argument at trial that provided the Court with additional guidance on whether the issue of presidential eligibility has been delegated to the United States Congress.  The Court holds that no evidence or arguments made since its initial ruling on this issue has changed its analysis. Specifically, the Court has reviewed the Honorable Judge Redford's rulings in *LaBrant v. Benson*, Case No. 23-137-MZ (Mich. Ct. Cl. November 14, 2023) and *Castro v. New Hampshire Sec'y of State*, No. 23-CV-416-JL, 2023 WL 7110390 (D.N.H. Oct. 27, 2023) and notes that they rely heavily on certain constitutional provisions and 3 U.S.C. § 15 as providing a textual commitment to a coordinate political branch.  This Court has already undertaken that analysis and disagrees.  If Intervenors could point to a *clear* textual commitment to Congress, this Court would readily hold that the questions this case presents have been delegated in the Constitution to Congress.

appropriate.  The Court further noted it had previously held the Secretary's time would be counted against Petitioners, that Trump was permitted to put on a case, and that all Parties would further be allowed to cross-examine all other Parties' witnesses, except for Intervenors cross-examining each other's witnesses.

15.    On October 25, 2023, Trump filed a brief regarding the standard of proof for trial.  Petitioners filed a response brief on October 27, 2023.  This Court addressed those briefs in its October 28, 2023 Order, holding that pursuant to *Santosky v. Kramer*, 455 U.S. 745, 754 (1982), while Intervenor Trump has a clear interest in being on Colorado's ballot, that interest does not rise to the level of a fundamental liberty interest.  The Court thus determined to apply the burden of proof prescribed in C.R.S. § 1-4- 1204(4) at trial.

16.    In its Order re: Donald J. Trump's Motion *in limine* to Exclude Petitioners' Anticipated Exhibits issued October 27, 2023 ("Exhibits MIL Order"), this Court held that the Final Report, Select Committee to Investigate the January 6th Attack on the United States Capitol, HR 117-663, 117th Cong., 2d Sess. (Dec. 22, 2022) ("January 6th Report") was conditionally admissible in this matter subject to the information elicited from the cross-examination of Timothy Heaphy and the testimony of Congressman Troy Nehls.[3]

17.    The Court issued its Order Re: Intervenor Trump's Objections to Specific Findings Contained in January 6th Report on October 29, 2023.  In that Order, the Court made specific and conditional determinations as to which findings were excluded

---

[3] Intervenors ultimately did not call Congressman Nehls, but the Court did consider his previously submitted declaration.

pursuant to the Colorado Rules of Evidence, further stating that "[t]o the extent the parties believe the Court has egregiously or inadvertently erred in its ruling here, they can still argue for admissibility or inadmissibility in their proposed findings of fact, conclusions of law."

18.     The matter proceeded to a five-day trial beginning on October 30, 2023 and concluding on November 3, 2023 (the "Hearing").  On November 15, 2023, the parties presented their closing arguments.

19.     Petitioners, the Secretary, and the Intervenors provided this Court with proposed findings of fact and conclusions of law.  The Court has incorporated some of the Parties' proposed findings of fact and conclusions of law, in whole or in part, but only after careful consideration and adoption.

## II.     JANUARY 6TH REPORT

20.     At the Hearing and in their proposed findings of fact and conclusions of law, Intervenors renewed their objections to the admission of the January 6th Report into evidence.  The Court hereby makes its final decision regarding the admissibility of the January 6th Report.

21.     C.R.E. 803(8) excludes from the hearsay rule "factual findings resulting from an investigation made pursuant to authority granted by law."  C.R.E. 803(8) is nearly identical to its federal counterpart, F.R.E. 803(8), and "[c]ases interpreting a similar federal rule of evidence are instructive" in Colorado.  *Leiting v. Mutha*, 58 P.3d 1049, 1052 (Colo. App. 2002). As such, federal law is instructive when interpreting C.R.E. 803(8) here.

22.     Citing to *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167 (1988) and the Federal Advisory Committee Notes to C.R.E. 803(8)'s federal analogue, the Court in *Barry v. Tr. of Int'l Ass'n Full-Time Salaried Officers & Emps. of Outside Local Unions & Dist. Counsel's (Iron Workers) Pension Plan*, 467 F.Supp.2d 91, 96 (D.D.C. 2006) noted that the Rule assumes admissibility in the first instance.  "Hence, the party challenging the admissibility of a public or agency report. . . bears the burden of demonstrating that the report is not trustworthy."  *Barry*, 467 F.Supp.2d at 96.  The Court then examined four factors first articulated in *Beech Aircraft Corp.*, 488 U.S. at 167, n. 11 which are meant to assist courts in assessing a report's trustworthiness: "(1) the timeliness of the investigation; (2) the special skill or expertise of the investigating official; (3) whether a hearing was held and the level at which it was conducted; and (4) possible motivation problems."  *Barry*, 467 F.Supp.2d at 97.  The Court in *Barry* further instructed that when examining the factors, a court must focus on whether the report was prepared in a reliable manner instead of whether the Court agrees with the conclusions.  467 F.Supp.2d at 97 (ci*ting Moss v. Ole S. Real Estate, Inc.*, 933 F.2d 1300, 1306-07 (5th Cir. 1991)).

23.     In addition to the four factors, *Barry* instructs that "Congressional reports are not entitled to an additional presumption of trustworthiness or reliability–beyond the one already established in the Advisory Committee Notes—simply by virtue of having been produced by Congress."  *Id*. at 98.  Further, courts should look to whether members of both parties joined in the report.  *Id*.

24.     The question before this Court is whether Intervenors have overcome the presumptive admissibility of the January 6th Report.  The Court holds that the first three *Barry* factors weigh strongly in favor of reliability.  The investigation started approximately six months after the events of January 6, 2021 and ended less than two years after the events took place.  As a result, "the passage of time in no way detracts from the report's reliability."  *Id.* at 100.  The investigation was conducted by a well-staffed, highly skilled group of lawyers (including a Republican U.S. Attorney) and led by a former U.S. Attorney.  There was a hearing conducted over ten days and 70 witnesses testified—all of whom testified under oath.  The Select Committee had large volumes of records that it independently evaluated when crafting its final report.  None of these findings were contradicted by evidence presented at the Hearing.

25.     Much of the evidence and argument presented at the Hearing centered around the fourth *Barry* factor: possible motivation problems.  Intervenors' arguments against the admissibility of the January 6th Report are that: (1) all nine members of the committee were biased against Trump and held a "deep personal animus" towards him; and (2) there was a lack of involvement by the minority party (the Republican Party in this instance) and therefore a lack of opportunity for effective dissent.

26.     Through his cross-examination of Mr. Heaphy, Trump presented evidence that prior to the formation of the January 6th Committee numerous members of the January 6th Committee had expressed disdain for Trump and indicated that they believed that he was responsible for the events of January 6, 2021. Mr. Heaphy confirmed that the January 6th Committee members made these statements but

testified that these statements merely indicated that the committee members had formed a hypothesis as to what had led to the events of January 6, 2021. 11/03/2023 Tr. 186:2-7. Mr. Heaphy further testified that although the committee members had developed this hypothesis, they remained open to whatever conclusions were supported by the evidence uncovered in the investigation. 11/03/2023 Tr. 210:11-19. The Court finds Mr. Heaphy's testimony on this subject to be credible and holds that any perceived animus of the committee members towards Trump did not taint the conclusions of the January 6th Report in such a way that would render them unreliable.[4]

27.     Furthermore, the idea that any amount of political bias would render the January 6th Report untrustworthy for the purposes of C.R.E. 803(8) is incompatible with the case law surrounding the admissibility of Congressional reports.

28.     As Congressman Ken Buck testified, all (or at least nearly all) Congressional investigations have some measure of political bias or motivation underlying them. 11/02/2023 Tr. 229:4-10. However, courts have admitted Congressional reports subject to their reliability for decades. *See Barry*, 467 F.Supp.2d at 101 (admitting report from a Senate investigation); *Mariani v. United States*, 80 F.Supp.2d 352, 361 (M.D. Pa. 1999) (admitting minority report from a Congressional investigation); *Hobson v. Wilson*, 556 F. Supp. 1157, 1183 (D.D.C. 1982), *aff'd in part, rev'd in part*, 737 F.2d 1 (D.C. Cir. 1984) (admitting Congressional Committee report);

---

[4] The Court further notes that nearly all Congressional investigations are initiated because there is something to investigate, *i.e.*, Congress does not investigate events where it does not think something wrong occurred. In this way, Congressional investigations operate somewhat like a police investigation. The fact that the Committee members thought that Trump had instigated the attacks does not necessarily translate to the Committee not turning over every stone and thoroughly investigating the events before reaching its ultimate conclusions.

*McFarlane v. Ben-Menashe*, No. 93-1304(TAF), 1995 WL 129073, at *5 (D.D.C. Mar. 16, 1995), *withdrawn in part on reconsideration*, No. 93-1304(TAF), 1995 WL 799503 (D.D.C. June 13, 1995), *aff'd sub nom. McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501 (D.C. Cir. 1996) (admitting Congressional Task Force report).  Based on the foregoing case law, it would be inappropriate to exclude the January 6th Report simply because it was in part politically motivated.  The relevant inquiry is instead whether the report is reliable and trustworthy based upon the factors articulated in *Barry*.

29.     Intervenors argue that the composition of the January 6th Committee demonstrates underlying motivation problems. Specifically, Intervenors argue that because the January 6th Committee was made up of 7 Democrats and only 2 Republicans (who, as previously discussed, Trump argues were biased against him), there was no meaningful input from the minority party in the investigation. Petitioners respond that the composition of the January 6th Committee was the result of two events: (1) Senate Republicans' refusal to vote for an independent and bipartisan commission; and (2) Republicans' decision to boycott the January 6th Committee altogether when then-Speaker of the House Nancy Pelosi refused to seat two of the five choices Republicans put forth to sit on the January 6th Committee.

30.     While the Court agrees with Intervenors that the January 6th Report would have further reliability had there been greater Republican participation, the events pointed to by Petitioners demonstrate that the Republicans had a meaningful opportunity to participate but simply chose not to do so. While the Court is cognizant that then-Speaker Pelosi rejected two of the five recommended Republicans for the

Committee that the Minority Leader put forth and that she admitted this decision was "unprecedented," the fact that the congressional Republicans chose not to seat the three Republican members that Speaker Pelosi was agreeable to seating or to nominate a new slate of potential members and instead chose to boycott the Committee is not a valid reason to reject the January 6th Report in total. This is especially true where Congressman Buck testified that he had asked to be placed on the January 6th Committee after then-Speaker Pelosi rejected two of the five Republican nominees, but his request was turned down by Republican Party leadership. 11/02/2023 Tr. 213:3-14.

31.     Furthermore, the two Republicans who did sit on the January 6th Committee – Former Reps. Elizabeth Cheney and Adam Kinzinger – were both duly elected Republicans; Congressman Kinzinger was elected six times and Congresswoman Cheney was elected three times. Prior to January 6, 2021, Congresswoman Cheney also served as the chair of the House Republican Conference which is the third highest position in House Republican Leadership.

32.     The investigative counsel for the January 6th Committee was also highly qualified. Mr. Heaphy was the chief investigative counsel for the Select Committee. Mr. Heaphy is a former U.S. Attorney with significant experience. The investigative staff included 20 lawyers which Mr. Heaphy noted included many Republicans. Importantly, the staffing decisions did not include any inquiry into political affiliation. 11/03/2023 Tr. 153:24-154:9.

33.     The Committee and its investigative staff interviewed or deposed more than 1,000 witnesses, collected, and reviewed over 1 million documents, reviewed

hundreds of hours of video footage, and reviewed 60 federal and state court rulings related to the 2020 election.  Trump was subpoenaed, and he refused to comply with the subpoena. The overwhelming majority of witnesses who the January 6th Committee interviewed or deposed were Trump administration officials and Republicans.  These witnesses included many of the witnesses that testified at the Hearing.

34.     The findings of the January 6th Committee were unanimous, which is why there was not a minority report.  This includes the two Republicans who sat on the Committee.  These facts all cut against Intervenors' argument that lack of participation of the minority party resulted in the January 6th Report reaching unreliable conclusions.

35.     As to Intervenors' arguments that the January 6th Committee's disregard of certain evidence indicates that the investigators were prejudiced against him, the Court finds such arguments unavailing.  No evidence was presented at the Hearing that the January 6th Committee or its staff coerced witness testimony, refused to hear testimony they did not want to hear, or disregarded credible exculpatory evidence. Instead, the evidence presented at the Hearing demonstrated that the January 6th Committee heard and reviewed all evidence put before it.  The only evidence presented at the Hearing that could arguably show a disregard of certain evidence by the Committee is the fact that the Committee simply chose not to credit certain testimony as credible.[5]

---

[5] The only potential evidence presented at the Hearing of the Committee disregarding testimony is Mr. Patel's testimony concerning the authorization of 10,000-20,000 National Guardsmen (which the Court has found incredible for reasons detailed below) and Congressman Buck's testimony that apparently Congressman Jim Jordan told Congressman Buck, when courting his

36.     However, as is the case in judicial proceedings and administrative law, such a determination is the purpose of a factfinder.  *See*, *e.g.*, *People ex rel. S.G.*, 91 P.3d 443, 452 (Colo. App. 2004) ("The fact finder is entitled to reject part of a witness's testimony that it finds to be untruthful and still accept other parts that it finds to be credible."); *People v. Liggett*, 114 P.3d 85, 90 (Colo. App. 2005) ("A fact finder may believe all, some, or none of a witness's testimony.").

37.     Furthermore, while Trump spent much time contesting potential biases of the Committee members and their staff, he spent almost no time attacking the credibility of the Committee's findings themselves.  The Hearing provided Trump with an opportunity to subject these findings to the adversarial process, and he chose not to do so, despite frequent complaints that the Committee investigation was not subject to such a process.[6]  Because Trump was unable to provide the Court with any credible evidence which would discredit the factual findings of the January 6th Report, the Court has difficulty understanding the argument that it should not consider its findings which are admissible under C.R.E. 803(8).

---

vote for Speaker of the House, that he did not refuse to sit for an interview with the January 6th Select Committee.  The Court did not consider this testimony because it is hearsay and the Court cannot think of any possible exception to the hearsay rule that would allow its consideration.

[6] The Court notes that while Trump has repeatedly suggested he was not afforded due process, at no point did he ask the Court for any relief on this basis that the Court denied and in fact only used approximately twelve hours and fifteen minutes of the eighteen hours provided to him at the Hearing (or, approximately two-thirds of the allotted time).  Further, the Court offered to hear additional witness testimony outside the 5-day hearing if there were any witnesses who were not able to testify between October 30, 2023 and November 3, 2023.

38.     Considering the foregoing, the Court holds that the January 6th Report is reliable and trustworthy and thereby admissible pursuant to C.R.E. 803(8). Despite this ruling, the Court wishes to emphasize that it has only considered those portions of the January 6th Report which are referenced in this Order and has considered no other portions in reaching its decision.[7]

### III.   HEARING TESTIMONY

39.     Officer Daniel Hodges testified on behalf of the Petitioners. Daniel Hodges is an officer with the Metropolitan Police Department of Washington, D.C. Daniel Hodges was on duty on January 6, 2021 and testified to his experiences on January 6, 2021 where he was initially monitoring the Stop the Steal Rally at the Ellipse. He ultimately was deployed to the Capitol to reinforce the defenses there—to prevent people from gaining entry to the Capitol. Officer Hodges testified in detail regarding being attacked with a variety of weapons including flagpoles, stolen riot batons, police shields, bike rack barriers, pepper spray, and chemical irritants. Officer Hodges walked the Court through a variety of videos from the body camera he wore that day. The Court found Officer Hodges's testimony to be credible. The Court gave weight to Officer Hodges's testimony in finding that there was an insurrection and that the mob was there on Trump's behalf.

---

[7] The Court notes that the Petitioners originally submitted 411 findings from the January 6th Report. The Court previously held that 143 of those findings were inadmissible. In their proposed findings of fact and conclusions of law, Petitioners submitted 98 findings. The Court has considered and cited 31 of those findings in this Order.

40.     Congressman Eric Swalwell testified on behalf of the Petitioners. Congressman Swalwell testified regarding his experience with two prior electoral college certifications as well as the 2020 electoral college certification. He also recounted his experience on the house floor during the attack on the Capitol on January 6, 2021 which took place during the electoral college certification.  He recounted his role in the impeachment of Trump for the events of January 6, 2021.  The Court holds that Congressman Swalwell's testimony regarding his experience during the attack on the Capitol was credible.  The Court gave weight to Congressman Swalwell's testimony in finding that there was an insurrection.

41.     Officer Winston Pingeon testified on behalf of the Petitioners.  Officer Pingeon was a police officer for the United States Capitol Police on January 6, 2021. That day, he was assigned to the Civil Disturbance Unit with a group of about 25 officers. He was originally staged in what he described as the truck tunnel, but the group was told to put on their riot gear because the outer perimeter lines of the Capitol had been breached. When they arrived, members of the mob assaulted, pushed, and pepper sprayed him and his fellow officers. Officer Pingeon described engaging in hand-to-hand combat for up to three hours while he and the other officers tried to fend off the attackers.  The Court holds that Officer Pingeon's testimony was credible.  The Court gave weight to Officer Pingeon's testimony in finding that there was an insurrection and that the mob was there on Trump's behalf.

42.     Professor Peter Simi testified on behalf of the Petitioners.  Professor Simi is a professor of sociology at Chapman University.  The Court qualified Professor Simi as

an expert in political extremism, including how extremists communicate, and how the events leading up to and including the January 6, 2021 attack relate to longstanding patterns of behavior and communication by political extremists.  Professor Simi has been studying political extremism, political violence, and the communication styles of far-right political extremists for twenty-seven years.  He has conducted these studies in three ways: (1) fieldwork (which is spending time embedded with extremists in their natural environments); (2) formal interviews; and (3) archival (collecting information).  He testified that he has spent thousands of hours doing fieldwork including with the three primary perpetrators of the January 6, 2021 attack: Oath Keepers, Proud Boys, and Three Percenters.  He further testified that he has interviewed 217 right wing extremists and that fourteen of those interviews were with Oath Keepers, Proud Boys, and Three Percenters.  Finally, he testified he's spent thousands of hours doing archival research and that research included all three groups. The Court finds that Professor Simi's testimony was credible and helped the Court understand that while Trump's words both before and after January 6, 2021 might seem innocuous to the average listener, they would be interpreted differently by political extremists.   The Court gave weight to Professor Simi's testimony in finding that Trump intended and incited the violence on January 6, 2021.

43.   Professor William Banks testified on behalf of the Petitioners.  Professor Banks is a law professor at Syracuse University teaching classes in constitutional law, national security law, counterterrorism law, and the domestic role of the military. In 2003, he founded the Institute for National Security and Counterterrorism.  He has also

advised the Department of Defense and civilian agencies providing for emergency

preparedness and response exercises to better prepare for crisis situations. He has

written between thirty and forty books and articles on the President's authority to

respond to domestic security threats. The Court qualified Professor Banks as an expert

on the President's powers to stop domestic attacks on the government and the

authorities that then-President Trump had to call on to stop the attack on January 6,

2021. The Court finds that Professor Banks's testimony was credible and helpful to

understand the authority then-President Trump had over the D.C. National Guard as

well as any authority he had over the National Guard in the adjoining states. The Court

gave weight to Professor Banks's testimony in finding that Trump had the authority to

call in reinforcements on January 6, 2021, and chose not to exercise it, thereby

recklessly endangering the lives of law enforcement, Congress, and the attackers on

January 6, 2021.

      44.     Professor Gerard Magliocca testified on behalf of the Petitioners.

Professor Magliocca is a law professor at the Indiana University, Robert H. McKinney

School of Law with a focus on constitutional history.  Professor Magliocca has been

studying the history of the Fourteenth Amendment for several years and in 2020 wrote

a paper on Section Three of the Fourteenth Amendment.  The Court qualified Professor

Magliocca as an expert in the history of Section Three of the Fourteenth Amendment.

The Court finds that Professor Magliocca's testimony clarified the history of Section

Three of the Fourteenth Amendment.  The Court gave weight to Professor Magliocca's

testimony in finding that Trump engaged in insurrection.  The Court gave weight to

Professor Magliocca's testimony, but ultimately rejected it, regarding whether Section Three of the Fourteenth Amendment applies to former President Trump.

45.     Hilary Rudy testified on behalf of the Petitioners.  Ms. Rudy is Colorado's Deputy Elections Director.  She has held that position since 2013 and has worked full time for the Secretary of State since 2006.  The Court finds that Ms. Rudy was knowledgeable about how the Secretary of State's office has traditionally handled qualification issues.  Her demeanor was very matter of fact, and it was clear that her goals were apolitical. [8]  She was extremely credible.  The Court gave weight to Ms. Rudy's testimony regarding the historical practices of the Secretary of State's office including when it would traditionally prevent ballot access and when it would not.

46.     Timothy Heaphy testified on behalf of the Petitioners.  Mr. Heaphy was the former chief investigative counsel for the January 6th Select Committee.  Mr. Heaphy was an assistant U.S. Attorney from 1991-2006, moved to private practice where he did white-collar defense until President Obama appointed him as U.S. Attorney for the Western District of Virginia–a position he held from 2009-2015.  In 2017, the City of Charlottesville hired him to investigate the deadly Unite the Right rally. He worked for the January 6th Select Committee from June 2021 through December 2022.  The Court found Mr. Heaphy to be a qualified and seasoned investigator.  The Court found his testimony regarding the inner workings of the Select Committee to be credible.  The Court gave weight to Mr. Heaphy's testimony in deciding to admit specific findings in the January 6th Report.

---

[8] The Court notes that Ms. Rudy was not made available to the Petitioners prior to the hearing. She prepared for her testimony with the Deputy Secretary of State.

47.     Kash Patel testified on behalf of Intervenor Trump.  Mr. Patel was the

former Chief of Staff to the acting Secretary of Defense on January 6, 2021.  Mr. Patel

testified that on January 3, 2021, then-President Trump authorized 10,000-20,000

National Guard forces.  He also testified about his experiences with the January 6th

Select Committee including that he gave a deposition to the Committee. The Court finds

that Mr. Patel was not a credible witness.  His testimony regarding Trump authorizing

10,000-20,000 National Guardsmen is not only illogical (because Trump only had

authority over about 2,000 National Guardsmen) but completely devoid of any evidence

in the record.[9]  Further, his testimony regarding the January 6th Committee refusing to

release his deposition and refusing his request to speak at a public hearing was refuted

by Mr. Heaphy who was a far more credible witness.  The Court did not give any weight

to Mr. Patel's testimony other than as evidence that the January 6th Select Committee

interviewed many of Trump's supporters as part of its extensive investigation.

48.     Katrina Pierson testified on behalf of Intervenor Trump.  Katrina Pierson

was a senior advisor to both of Trump's presidential campaigns.  Ms. Pierson tried to

intervene regarding internal disputes that had arisen regarding the January 6, 2021

rally.  According to Ms. Pierson's testimony, at a January 5, 2021 meeting at the White

House, Trump agreed with her position that the speakers at the January 6, 2021 rally

should not include inflammatory speakers such as Alex Jones and Ali Alexander.  She

---

[9] Trump, as commander of the D.C. National Guard, only had direct authority over around
2,000 Guardsmen.  To mobilize 10,000-20,000 Guardsmen, he would have had to contact the
Governors of other States and they would have had to then give orders, or he would have had to
federalize the Guardsmen from those States.  In either case, there would have been significant
official action taken.  No record of such action was produced at the Hearing.

also testified that Trump told someone in the room at the same meeting that he wanted "10,000 National Guards." The Court has no reason to disbelieve this testimony but mentioning 10,000 National Guardsmen is not the same as authorizing them. Finally, she testified that she spoke with the January 6, 2021 committee for nineteen or twenty hours. The Court finds that Ms. Pierson was credible, and the Court believes her testimony that in a meeting on January 5, 2021, Trump chose the speakers for the January 6, 2021 rally. The Court gave weight to Ms. Pierson's testimony in finding that Trump chose the speakers on January 6, 2021, that he knew radical political extremists were going to be in Washington, D.C. on January 6, 2021 and likely attending his speech, and that the January 6th Committee extensively interviewed witnesses who were Trump supporters.

49.     Amy Kremer testified on behalf of Intervenor Trump. Ms. Kremer is the founder of Women for America First. Her group hosted the January 6, 2021 rally at the Ellipse. Ms. Kremer's testimony was like Ms. Pierson's in that she worked with Ms. Pierson to keep the people she described as "whackos" from speaking at the Ellipse. The reason she did not want "whackos" to speak at the Ellipse is because she was worried they might incite violence. She testified that from where she stood on the stage of the Ellipse, she did not witness any violence. Ms. Kremer acknowledged that she remained by the event stage throughout the rally, did not interact with anyone outside the security perimeter at the rally, and was unaware that in response to Trump's speech, some people in the crowd yelled "storm the Capitol," "take the Capitol," and "take the Capitol right now." She personally did not walk with the crowd to the Capitol and did not go to

the Capitol but instead returned to her hotel immediately after Trump's speech.  Ms.

Kremer also testified before the January 6th Committee.  The Court found Ms. Kremer

to be credible but found her testimony to be largely irrelevant other than that she was

concerned about speeches at the Ellipse inciting violence and that the January 6th Select

Committee interviewed many Trump supporters.

50.     Tom Van Flein testified on behalf of Intervenor Trump.  He is the chief of

staff for Congressman Paul Gosar.  He testified that he and the Congressman and his

wife attended the January 6, 2021 rally at the Ellipse from about 8:30 a.m. to 10:30 a.m.

(more than 2 full hours before Trump spoke) and did not see any violence.  The Court

found his testimony to be credible but largely irrelevant.

51.     Tom Bjorklund testified on behalf of Intervenor Trump.  He is the

Colorado Republican Party Treasurer.  Mr. Bjorklund attended the January 6, 2021 rally

at the Ellipse.  Mr. Bjorklund showed the Court several pictures and videos he took on

that day.  Mr. Bjorklund testified that he was not close to the stage at the Ellipse during

the rally.  He then marched to the Capitol and claimed he did not see any violence

despite acknowledging he saw people smashing the windows of the Capitol to gain

access. The Court found Mr. Bjorklund's testimony that he did not see any violence to be

not credible given he saw people breaching the Capitol through windows they'd

smashed.   Further, Mr. Bjorklund's testimony that Antifa was involved in the attack

lacked credibility and was evidence of his inability to discern conspiracy theory from

reality. The Court only gave weight to Mr. Bjorklund's testimony that not all the

protestors were violent and that he understood Trump to be directing the crowd to the Capitol and that he followed that direction.[10]

52.    Congressman Ken Buck testified on behalf of Intervenor Trump. Congressman Buck testified about his experience on January 6, 2021, when the Capitol was attacked as well as his views regarding the reliability of the January 6th Report. Congressman Buck also testified that he was not particularly scared during the attack on the Capitol but admitted that was because he did not have a cell phone and did not realize the extent of the attack.  The Court found Congressman Buck to be a credible witness.  The Court gave weight to Congressman Buck's testimony that Congressional reports are inherently political, and that Minority Leader Kevin McCarthy actively prevented the January 6th Committee from being bipartisan including when he rejected Congressman Buck's request to be on the Committee.

53.    Professor Robert Delahunty testified on behalf of Intervenor Trump. Professor Delahunty is a constitutional law professor.  The Court qualified Professor Delahunty as an expert in constitutional law and the application of historical documents to 19th-century statutes and constitutional provisions.  Professor Delahunty was offered to rebut the opinions of Professor Magliocca, and while he had nowhere near the expertise of Professor Magliocca, he offered opinions that were helpful to the Court in

---

[10] The Court notes that it is uncontested that not all attendees of Trump's January 6, 2021 speech heard it as a call to violence.  That is consistent with Professor Simi's testimony that the language of political extremists is coded so that there is plausible deniability.

assessing the historical context in which Section Three of the Fourteenth Amendment was ratified.[11]

## IV.    FINDINGS OF FACT[12]

### A. THE PARTIES

54.    Petitioners Norma Anderson, Michelle Priola, Claudine Cmarada, and Krista Kafer are each registered voters affiliated with the Republican Party who reside in Colorado. Joint Stipulated Facts ("Stipulation") ¶¶ 1–4. Petitioners Kathi Wright and Christopher Castilian are each registered voters unaffiliated with any political party who reside in Colorado. *Id.* ¶¶ 5–6. Each are eligible electors as defined in C.R.S. § 1-1-104(16).

55.    Respondent Jena Griswold is the Secretary of State of Colorado and is sued solely in her official capacity. *Id.* ¶ 7.

56.    Intervenor Donald J. Trump served as 45th President of the United States from January 20, 2017, to January 20, 2021. *Id.* ¶ 8. On January 20, 2017, Trump took the Presidential Oath of Office, swearing to "faithfully execute the Office of President of

---

[11] The Intervenors seem to have largely abandoned Professor Delahunty's testimony and cite it only once in their 177 pages of proposed findings of fact and conclusions of law.  The citation is for the proposition that the omission of the word "incite" from Section Three means that incitement was not meant to be a form of engagement.

[12] The Court is denying Petitioners the relief they request on legal grounds.  Because of the Parties' extraordinary efforts in this matter, the Court makes findings of facts and conclusions of law on all remaining issues before it.  The Court does so because it is cognizant that to the extent the Colorado Supreme Court decides to review this matter, it may disagree with any number of the legal conclusions contained in this Order and the Orders that precede it.  The Court has endeavored to give the Colorado Supreme Court all the information it needs to resolve this matter fully and finally without the delay of returning it to this Court.

the United States," and "to the best of [his] Ability, preserve, protect and defend the Constitution of the United States." U.S. CONST. art. II, § 1, cl. 8; Stipulation ¶ 9.

57.     Trump was a candidate for re-election in 2020. Stipulation ¶ 10.

58.     On November 15, 2022, Trump publicly announced his 2024 presidential campaign. *Id.* ¶ 16.

59.     On October 11, 2023, the Secretary received a notarized statement of intent from Trump to appear on the presidential primary ballot, along with the required filing fee and the Colorado Republican Party's approval of his candidacy as required under C.R.S. § 1-4-1204(1). *Id.* ¶ 17.

60.     Intervenor CRSCC is an unincorporated nonprofit association and political party committee in the state of Colorado, operating under Colorado law. State Party's Verified Petition in Intervention ¶ 5.

### B.  TRUMP'S HISTORY WITH POLITICAL EXTREMISTS

61.     As noted above, Petitioners called an expert in political extremism, Professor Peter Simi. Professor Simi has a Ph.D. in Sociology, teaches at Chapman University, and has spent his 27-year career focused on political violence and extremism. 10/31/23 Tr. 11:15–12:12. He has written two books on political violence and extremism—*American Swastika* and *Out of Hiding*—and published over sixty peer-reviewed articles or book chapters on different facets of political violence and extremism. 10/31/23 Tr. 21:15–23:2. He has provided training on political extremism and violence to the Federal Bureau of Investigation, Department of Homeland Security,

the Federal Bureau of Prisons, the Department of Justice, and several state and local law enforcement agencies across the country. 10/31/23 Tr. 23:20–24:6.

62.     Professor Simi reviewed Trump's relationship with his supporters over the years, identified a pattern of calls for violence that his supporters responded to, and explained how that long experience allowed Trump to know how his supporters responded to his calls for violence using a shared language that allowed him to maintain plausible deniability with the wider public. 10/31/23 Tr. 56:23–59:17, 200:22–203:12.

63.     Trump himself agrees that his supporters "listen to [him] like no one else." Ex. 134.  Amy Kremer also testified that Trump's supporters are "very reactive" to his words. 11/02/2023 Tr. 49:4–6.

64.     Professor Simi testified about the following examples of patterns of call-and-response that Trump developed and used to incite violence by his supporters.

65.     At an October 23, 2015 rally, Trump said to his supporters in response to protestors disrupting the rally, "See, the first group, I was nice . . . The second group, I was pretty nice. The third group, I'll be a little more violent. And the fourth group I'll say, 'Get the hell outta here!'" Ex. 127.

66.     The next month, Trump used this very language, telling his supporters to "get [a protester] the hell out of here" and the protester was then assaulted. When asked about the attack the next day, Trump said "maybe [the protester] should have been roughed up." Ex. 50; 10/31/2023 Tr. 70:1–4, 71:13-72:1, 235:3–10.

67.     At a February 2016 rally, Trump told his supporters to "knock the crap out of" any protesters who threw tomatoes and promised to pay the legal fees of anyone carrying out the assault. Ex. 51; 10/31/2023 Tr. 213:14–25.

68.     At another February 2016 rally, Trump told his supporters that, in the "old days" a protester would be "carried out on a stretcher," and that he would like to "punch him in the face." Ex. 52; 10/31/2023 Tr. 214:6–25.

69.     When asked about his supporters' violent acts in March 2016, Trump said the violence was "very, very appropriate" and that "we need a little bit more of" it. Ex. 53; 10/31/2023 Tr. 67:6–25.

70.     At an August 2016 rally, Trump noted "Second Amendment people" might be able to prevent Hillary Clinton (if elected President) and judges appointed by her from interpreting the Constitution in unfavorable ways. Ex. 159.

71.     In August 2017, when asked about the white supremacist Unite the Right rally in Charlottesville, Virginia, where a counter-protester was murdered, Trump stated there "was blame on both sides . . . some very fine people on both sides." Ex. 56; 10/31/2023 Tr. 68:12–20.

72.     Far-right extremists, including David Duke, Richard Spencer, and Andrew Anglin, thanked Trump for his comments and took them as an endorsement, notwithstanding Trump's condemnation of neo-Nazis and white supremacists in the same speech. Professor Simi testified that the latter statement would be understood as plausible deniability.  10/31/2023 Tr. 68:21–69:16, 74:18–75:9, 166:9–20, 226:11–227:7.

73.     At an October 2018 rally, Trump referred to a candidate who body slammed a reporter as "my kind of guy." Ex. 57; 10/31/2023 Tr. 215:22–216:5.

74.     At a May 2019 rally, when one of his supporters suggested shooting migrants, Trump stated: "That's only in the panhandle you can get away with that statement." The crowd cheered. Ex. 58.

75.     In a May 2020 tweet referring to an armed occupation of the Michigan State Capitol by anti-government extremists, Trump tweeted that the attackers were "very good people," and that the Michigan Governor should respond by appeasing them. Ex. 148, p. 3.

76.     On May 29, 2020, President Trump threatened to deploy "the Military" to Minneapolis to shoot "looters" amid protests over the police killing of George Floyd, tweeting "when the looting starts, the shooting starts." Ex. 148, p. 5.

77.     During a presidential debate on September 29, 2020, Trump refused to denounce white supremacists and violent extremists and instead told the Proud Boys to "stand back and stand by," later adding that "somebody's got to do something about Antifa and the left." Ex. 1064. [13]

78.     Trump's words "stand back and stand by" were well received and considered an endorsement.  In fact, the Proud Boys turned the phrase into a mantra

_____

[13] The Court acknowledges that the statement occurred during a debate, when the moderator had asked Trump to ask white nationalists and militias to "stand down," and further that President Biden called on Trump to disavow the Proud Boys, specifically.  Nevertheless, Trump's conduct is consistent with the pattern identified by Professor Simi in that an apparent disavowal (though the Court notes that "stand back and stand by" does not carry the same meaning as "stand down") was immediately qualified by an apparent endorsement (*i.e.* that somebody has "got to do something.").

and put it on merchandise.  10/31/2023 Tr. 77:13–21. The Proud Boys and other extremists understood this as a directive to be prepared for future violence. 10/31/2023 Tr. 78:21–23.

79.     Trump also regularly endorsed and cultivated relationships with incendiary figures connected with far-right extremists, including Alex Jones, Steve Bannon, and Roger Stone.  10/31/2023 Tr. 57:8-10, 199:23-200:4, 222:21-225:2. Katrina Pierson, a senior advisor to the Trump campaign who helped to organize the Ellipse rally, testified that Trump "likes the crazies" (referring to individuals like Alexander and Jones, whose speeches are often "incendiary" and "inflammatory") "who viciously defend him in public." 11/01/23 Tr. 287:2–12, 299:4–16; *see also* 11/02/23 Tr. 57:15–58:3 (Amy Kremer calling Jones and Alexander "flamethrowers" and "agitators" who "want to get everybody riled up").

80.     Trump retained Bannon and Stone as advisers, two individuals with very close relationships with far-right extremists. 10/31/2023 Tr. 199:23–200:8, 222:21–23, 224:2–13. Though Trump did fire Bannon, he would eventually issue a presidential pardon to him. 10/31/2023 Tr. 223:1–3. Regardless, the Court finds that Trump had courted these fringe figures for many years through activities such as endorsing far-right conspiracy theories like birtherism. 10/31/2023 Tr. 56:23–57:15.

81.     On October 30, 2020, a convoy of Trump supporters driving dozens of trucks (calling themselves a "Trump Train") surrounded a Biden-Harris campaign bus on a Texas highway. On October 31st, Trump tweeted a stylized video of the Trump Train confrontation and stated, "I LOVE TEXAS!" Exs. 71; 148, p. 8.

82.     On November 1, 2020, in response to news that the FBI was investigating the incident, Trump tweeted, "In my opinion, these patriots did nothing wrong" and indicated they should not be investigated. Ex. 148, p. 9. Later that day at a rally in Michigan, Trump again celebrated the incident boasting "they had hundreds of cars, Trump, Trump. Trump and the American flag." Ex. 67.

83.     At no point did Trump ever credibly condemn violence by his supporters but rather confirmed his supporters' violent interpretations of his directives. Professor Simi testified that through these repeated interactions, Trump developed and employed a coded language based in doublespeak that was understood between himself and far-right extremists, while maintaining a claim to ambiguity among a wider audience. 10/31/2023 Tr. 53:2–54:12, 65:20–66:20, 76:9–23, 211:13–218:24.

84.     For example, violent far-right extremists understood that Trump's calls to "fight," which most politicians would mean only symbolically, were, when spoken by Trump, literal calls to violence by these groups, while Trump's statements negating that sentiment were insincere and existed to obfuscate and create plausible deniability. 10/31/2023 Tr. 49:14–21, 59:7–17, 101:20–102:6.

85.     The Court finds that Trump knew his violent supporters understood his statements this way, and Trump knew he could influence his supporters to act violently on his behalf. 10/31/2023 Tr. 126:11–19, 221:10–21.

86.     The Court notes that Trump did not put forth any credible evidence or expert testimony to rebut Professor Simi's conclusions or to rebut the argument that Trump intended to incite violence.

## C. TRUMP'S FALSE ALLEGATIONS OF A STOLEN ELECTION

87.     Trump planted the seed well before the 2020 election that any loss would be fraudulent. 10/31/2023 Tr. 61:15–62:1, 63:3–11. He portrayed the election as being "stolen" in a way that "resonate[d]" with far-right extremists and aligned with their "perspective that . . . there's this corrupt system that's preventing them from electing somebody that they support, that the system is rigged." 10/31/2023 Tr. 64:6–16, 168:20–169:6.

88.     At an August 17, 2020 campaign rally in Wisconsin, Trump stated, "the only way we're going to lose this election is if the election is rigged. Remember that. It's the only way we're going to lose this election . . . The only way they're going to win is that way. And we can't let that happen." Ex. 61.

89.     On August 24, 2020, at the Republican National Convention, Trump called mail-in voting "the greatest scam in the history of politics," accused Democrats of "stealing millions of votes" and argued that "the only way they can take this election away from us is if this is a rigged election." Ex. 62.

90.     On September 23, 2020, when asked at a White House press briefing whether he would commit to a peaceful transfer of power after the election, President Trump refused.  Ex. 64.

91.     On November 2, 2020, the day before Election Day, Trump criticized the U.S. Supreme Court for allowing Pennsylvania to extend the time for receiving mail-in ballots, tweeting that the Court's decision was "VERY dangerous," "will allow rampant and unchecked cheating and will undermine our entire systems of laws," and "will also

induce violence in the streets," imploring that "[s]omething must be done!" Ex. 148, p. 10.

92.     On election night, Trump claimed victory, asserting from the White House: "This is a fraud on the American public. This is an embarrassment to our country. We were getting ready to win this election. Frankly, we did win this election. We did win this election." Ex. 47.

93.     On November 4, 2020, President Trump tweeted: "We are up BIG, but they are trying to STEAL the Election. We will never let them do it." Ex. 148, p. 10.

94.     On November 5, 2020, Trump tweeted "STOP THE COUNT!". Ex. 148, p. 12.

95.     On November 7, 2020, the election was called for Joe Biden Ex. 78, p. 51 (Finding # 162).

96.     On November 8, 2020 Trump tweeted, "We believe these people are thieves. The big city machines are corrupt. This was a stolen election. Best pollster in Britain wrote this morning that this clearly was a stolen election" Ex. 148, p. 12.

97.     Trump's advisors (within his administration, his campaign, and his legal team) repeatedly told him he had virtually no chance of victory, and that there was no evidence of widespread election fraud sufficient to change the election results. Ex. 78, pp. 8, 9, 22 (Finding ## 30, 36, 77).

98.     Despite his advisors telling him there was no evidence of election fraud, Trump continued to maintain the election was stolen. *See, e.g*., Exs. 99; 100; 148, pp. 13-15, 18, 20, 24, 30, 38, 47.

99.    Trump filed 62 lawsuits—61 were rejected outright.

100.    Trump put forth no evidence at the Hearing that he believed his claims of voter fraud despite the overwhelming evidence there was none.  The Court finds that Trump knew his claims of voter fraud were false.

101.    On December 13, 2020, Trump tweeted "Swing States that have found massive VOTER FRAUD, which is all of them, CANNOT LEGALLY CERTIFY these votes as complete & correct without committing a severely punishable crime." Ex. 148, p. 38.

102.    On December 14, 2020, the Electoral College met and cast their votes in the 2020 election. Stipulation ¶ 12. The certified electors voted as follows: 306 for Joe Biden and 232 for Donald Trump. *Id*. The certified Electoral College votes were then submitted to Congress. *Id.* ¶ 13.

103.    Trump further sought to corruptly overturn the election results through direct pressure on Republican officeholders in various states both before and after the Electoral College met and voted in their respective states. Ex. 78, pp. 2, 59. (Finding ## 5, 185).

104.    Many of the state officials targeted by Trump's campaign of intimidation were subject to a barrage of harassment and violent threats by Trump's supporters— prompting Georgia election official Gabriel Sterling to issue a public warning to Trump to "stop inspiring people to commit potential acts of violence" or "[s]omeone's going to get killed." Ex. 126.

105.    Trump saw and retweeted a video of that press conference with a message repeating the very rhetoric Sterling warned would cause violence. Exs. 126; 148, p. 27.

Far-right extremists understood Trump's refusal to condemn the violence cited in the video and his doubling down on the motivation for that violence as an endorsement of the use of violence to prevent the transfer of presidential power. 10/31/2023 Tr. 92:8–94:6.

106.   Trump propelled the "Stop the Steal" movement and cross-country rallies in the lead-up to January 6, 2021 with continued false assertions of election fraud. Ex. 78, p. 82 (Finding # 263).

107.   Between Election Day 2020 and January 6, 2021, Stop the Steal organizers held dozens of rallies around the country, inflaming Trump supporters with election disinformation and recruiting them to travel to Washington, D.C. on January 6, 2021. The rallies brought together many groups, including violent extremists such as the Proud Boys, Oath Keepers, and Three Percenters; QAnon conspiracy theorists; and white nationalists. *Id.*; 10/31/2023 Tr. 61:4–14.

108.   These same Stop the Steal leaders joined two "Million MAGA Marches" in Washington, D.C. on November 14, 2020, and December 12, 2020. Tens of thousands of Trump supporters attended the events, with protests focused on the Supreme Court building. 11/02/23 Tr. 20:20–22:17, 37:22–38:21.

109.   After the November rally turned violent, Trump acknowledged his supporters' violence, but justified it as self-defense against "ANTIFA SCUM." Ex. 148, p. 17. Far-right extremists understood Trump's statement as another endorsement of the use of violence against his political opponents. 10/31/2023 Tr. 91:10–23.

110.     As the crowds gathered in Washington, D.C. on December 12, 2020 Trump publicly assailed the Supreme Court for refusing to hear his fictitious claims of election fraud. Ex. 78, p. 83 (Finding # 267); 148, pp. 32-36. Stop the Steal organizers Alex Jones, Owen Shroyer, and Ali Alexander understood his communications as a call to action and thereafter led a march on the Supreme Court, where the crowd chanted slogans such as "Stop the Steal!"; "1776!"; "Our revolution!"; and "The fight has just begun!" Ex. 78, p. 83 (Finding # 268).

111.     During the November rally, Trump passed through the crowd in his presidential motorcade. 11/01/23 Tr. 306:8–14. Then, on the morning of December 12, 2020, Trump tweeted: "Wow! Thousands of people forming in Washington (D.C.) for Stop the Steal. Didn't know about this, but I'll be seeing them! #MAGA." Ex. 148, p. 36. Later that day, Trump flew over the protestors in Marine One. Ex. 148, p. 37; 11/01/23 Tr. 306:8–24.

112.     Trump sent a tweet at 1:42 a.m. on December 19, 2020, urging his supporters to travel to Washington, D.C. on January 6, 2021: "Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6. Be there, will be wild!" Ex. 148, p. 41.

113.     Trump's "plan" was that when Congress met to certify the election results, Vice President Pence could reject the true electors that voted for Biden and certify Trump's fake slate of electors or return the slates to the States for further proceedings. Exs. 78, p. 13 (Finding #50); 148, pp. 75, 80.

114.    Under the Twelfth Amendment and the Electoral Count Act, 3 U.S.C. § 15 (2018), electoral votes are sent to Congress for a joint session on January 6 where Congress counts the votes from the states. If a Representative objects to the counting of electoral votes from a state, they need a Senator to join in the objection. If that happens, the joint session recesses and goes back to each chamber. The Vice President has no role in the objections other than presiding over the proceedings. 10/30/2023 Tr. 131:17-133:25; 11/02/23 Tr. 187:3–188:15.

115.    The Court finds that on December 19, 2020, when Trump tweeted "Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6. Be there, will be wild!" he knew he had lost the election, and he knew there was no basis for Vice President Pence to reject the States' lawfully certified electors.

116.    The Court also finds that Trump's December 19, 2020 tweet focused the anger he had been sowing about the election being stolen on the January 6, 2021, joint session. The message he sent was that to save democracy, his supporters needed to stop the January 6, 2021 joint session.

117.    Trump's December 19, 2020 tweet had an immediate effect on far-right extremists and militias such as the Proud Boys, the Oath Keepers, and the Three Percenters, who viewed the tweet as a "call to arms" and began to plot activities to disrupt the January 6, 2021 joint session. Ex. 78, pp. 79, 85, 86, 88 (Finding ## 254, 275, 276, 280, 289); 10/31/2023 Tr. 104:18–105:4; 11/03/23 Tr. 200:3–21.

118.    Trump repeated his invitation to come to Washington, D.C. on January 6, 2021 at least a dozen times. Ex. 148, pp. 55, 60, 62, 63, 72, 75, 76, 78.

119.    On January 1, 2021, Trump retweeted a post from Kylie Jane Kremer, an organizer of March for Trump on January 6, saying "The calvary is coming, Mr. President! JANUARY 6th | Washington, DC."[14] Trump added, "A great honor!" Ex. 148, p. 64.

120.    At the same time, Trump continued to make false statements regarding voter fraud, fueling the fire of his supporters' belief that the election was somehow stolen.  Ex. 148, pp. 47, 48, 50, 61, 69, 73, 75.

121.    On December 26, 2023, he tweeted: "If a Democrat Presidential Candidate had an Election Rigged & Stolen, with proof of such acts at a level never seen before, the Democrat Senators would consider it an act of war, and fight to the death. Mitch & the Republicans do NOTHING, just want to let it pass. NO FIGHT!" Ex. 148, p. 49.

122.    With this message he justified "an act of war" by claiming that is what the Democrats would do but asserted the Republicans were too weak.

123.    Federal agencies that Trump oversaw as the Chief Executive Officer of the Executive Branch—including the Secret Service—identified significant threats of violence ahead of January 6, 2021, including threats to storm the U.S. Capitol and kill elected officials. Such threats were made openly online and widely reported in the press. *See* Ex. 32, pp. 18–26, 102–105. Agency threat assessments stated domestic violent

---

[14] A calvary is "an open-air representation of the crucifixion of Jesus." https://www.merriam-webster.com/dictionary/calvary.  The Court presumes that Ms. Kremer (and Trump when he retweeted the text) were referring to cavalry or "an army component . . . assigned to combat missions that require great mobility." https://www.merriam-webster.com/dictionary/cavalry.

extremists or militia groups planned for violence on January 6, 2021, with weapons including firearms, and enough ammunition to "win a small war." *See id.* at 103.

124.    The FBI received many tips regarding the potential for violence on January 6, 2021 following Trump's "will be wild" tweet. One such tip said, "They think they will have a large enough group to march into DC armed and will outnumber the police so they can't be stopped . . . They believe that since the election was 'stolen' it's their constitutional right to overtake the government and during this coup no U.S. laws apply. Their plan is to literally kill. Please, please take this tip seriously and investigate further." 11/03/2023 Tr. 218:7–16.

125.    Nonetheless, Trump did not advise federal law enforcement agencies that in his speech on January 6, 2021, he was going to instruct the crowd to march to the Capitol. As a result, law enforcement was not prepared for the attendees at the rally to descend on the Capitol.

126.    Trump knew that Ali Alexander and Alex Jones wanted to speak at the rally.  Katrina Pierson and Amy Kremer described those two as "flamethrowers" and "agitators" who "want to get everyone riled up."  Pierson called them "crazies" and Kremer called them "whackos."  While Trump agreed they should not speak at the rally, there is no evidence Trump discouraged their attendance at the rally or their presence at the Capitol.

127.    In the early morning of January 6, 2021 Trump tweeted, "If Vice President @Mike_Pence comes through for us, we will win the Presidency. Many States want to decertify the mistake they made in certifying incorrect & even fraudulent numbers in a

process NOT approved by their State Legislatures (which it must be). Mike can send it back!" Ex. 148, p. 80. At 8:17 a.m., Trump tweeted, "All Mike Pence has to do is send them back to the States, AND WE WIN. Do it Mike, this is a time for extreme courage!" *Id.*

128.    The Court finds that prior to the January 6, 2021 rally, Trump knew that his supporters were angry and prepared to use violence to "stop the steal" including physically preventing Vice President Pence from certifying the election.  In fact, Trump did everything in his power to fuel that anger with claims he knew were false about having won the election and with claims he knew were false that Vice President Pence could hand him the election.

### D. THE SPEECH AT THE ELLIPSE

129.    In the early morning of January 6, 2021, tens of thousands of Trump supporters began gathering around the Ellipse for Trump's speech and "wild" protest he had promoted. Ex. 133, pp. 1–7; 11/02/23 Tr. 56:22–57:10.

130.    To enter the Ellipse itself, attendees were required by the Secret Service to pass through magnetometers and to be checked for weapons. 11/02/23 Tr. 44:2–45:18, 57:5–14. Around 28,000 rally attendees passed through the security checkpoints to enter the Ellipse. Ex. 78, pp. 31-32, 102 (Finding ##107, 338).

131.    From only the attendees who went through security checkpoints at the Ellipse, the Secret Service confiscated hundreds of weapons and prohibited items, including 269 knives or blades, 242 canisters of pepper spray, 18 brass knuckles, 18

40

tasers, 6 pieces of body armor, 3 gas masks, 30 batons or blunt instruments, and 17
miscellaneous items like scissors, needles, or screwdrivers. *Id.*

132.     About 25,000 additional attendees purposely remained outside the Secret
Service perimeter at the Ellipse and avoided the magnetometers. Ex. 78, pp. 31-32
(Finding # 107); 11/02/23 Tr. 57:5–14. They formed into a large crowd that extended to
the National Mall and Washington Monument. Ex. 1003; 11/02/2023 Tr. 151:18–152:2.
Those attendees were not subject to any security screening. Ex. 78, p. 98 (Finding #
323); 11/02/23 Tr. 44:19–24, 57:5–13.

133.     Some members of the crowd wore tactical gear, including ballistic helmets
like those worn by riot police, goggles, gas masks, armored gloves, tactical boots,
earpieces for radios, and military-grade backpacks with additional gear unknown to
police. 10/30/2023 Tr. 70:6–11; 11/02/2023 Tr. 328:19–329:1.

134.     Some attendees of the January 6 Ellipse event were armed.  Ex. 78, p. 32
(Finding # 108).

135.     Despite knowing of the risk of violence and knowing that crowd members
were angry and armed, Trump still attended the rally and directed the crowd to march
to the Capitol.  The following are excerpts from his speech:

> "All of us here today do not want to see our election victory stolen by emboldened
> radical-left Democrats, which is what they're doing. And stolen by the fake news
> media. That's what they've done and what they're doing. ***We will never give
> up, we will never concede. It doesn't happen. You don't concede
> when there's theft involved.***"
>
> "***Our country has had enough. We will not take it anymore*** and that's
> what this is all about. And to use a favorite term that all of you people really came
> up with: We will stop the steal. Today I will lay out just some of the evidence

41

proving that we won this election and we won it by a landslide. This was not a close election."

"Because *if Mike Pence does the right thing, we win the election*. All he has to do, all this is, this is from the number one, or certainly one of the top, Constitutional lawyers in our country. He has the absolute right to do it."

"And I actually, I just spoke to Mike. I said: 'Mike, that doesn't take courage. What takes courage is to do nothing. That takes courage.' And then we're stuck with a president who lost the election by a lot and we have to live with that for four more years. *We're just not going to let that happen.*"

"We're gathered together in the heart of our nation's capital for one very, very basic reason: *to save our democracy.*"

"We want to go back and we want to get this right because we're going to have somebody in there that should not be in there and *our country will be destroyed and we're not going to stand for that.*"

"*For years, Democrats have gotten away with election fraud and weak Republicans*. And that's what they are. There's so many weak Republicans. And we have great ones. Jim Jordan and some of these guys, they're out there fighting. The House guys are fighting."

"*If this happened to the Democrats, there'd be hell all over the country going on. There'd be hell all over the country.* But just remember this: You're stronger, you're smarter, you've got more going than anybody. And they try and demean everybody having to do with us. *And you're the real people, you're the people that built this nation. You're not the people that tore down our nation.*"

"Republicans are constantly fighting like a boxer with his hands tied behind his back. It's like a boxer. And we want to be so nice. We want to be so respectful of everybody, including bad people. And *we're going to have to fight much harder.*"

"*And Mike Pence is going to have to come through for us,* and if he doesn't, that will be a, a sad day for our country because you're sworn to uphold our Constitution."

"Now, it is up to Congress to confront this egregious assault on our democracy. And after this, we're going to walk down, and I'll be there with you, we're going to walk down, we're going to walk down."

"Anyone you want, but I think right here, we're going to walk down to the Capitol, and we're going to cheer on our brave senators and congressmen and women, ***and we're probably not going to be cheering so much for some of them. Because you'll never take back our country with weakness. You have to show strength and you have to be strong.*** We have come to demand that Congress do the right thing and only count the electors who have been lawfully slated, lawfully slated."

"But think of what happens. Let's say they're stiffs and they're stupid people, and they say, well, we really have no choice . . . You will have a president who lost all of these states. ***Or you will have a president, to put it another way, who was voted on by a bunch of stupid people who lost all of these states. You will have an illegitimate president. That's what you'll have. And we can't let that happen.***"

"***The radical left knows exactly what they're doing. They're ruthless and it's time that somebody did something about it***. And Mike Pence, I hope you're going to stand up for the good of our Constitution and for the good of our country. And if you're not, I'm going to be very disappointed in you. I will tell you right now. I'm not hearing good stories."

"***The Republicans have to get tougher***. You're not going to have a Republican Party if you don't get tougher. They want to play so straight. They want to play so, sir, yes, the United States. The Constitution doesn't allow me to send them back to the States. Well, I say, yes it does, because the Constitution says you have to protect our country and you have to protect our Constitution, and you can't vote on fraud. ***And fraud breaks up everything, doesn't it?' When you catch somebody in a fraud, you're allowed to go by very different rules. So I hope Mike has the courage to do what he has to do. And I hope he doesn't listen to the RINOs and the stupid people that he's listening to.***"

"We won in a landslide. This was a landslide. They said it's not American to challenge the election. ***This the most corrupt election in the history, maybe of the world***. You know, you could go third-world countries, but I don't think they had hundreds of thousands of votes and they don't have voters for them. I mean no matter where you go, nobody would think this. In fact, it's so egregious, it's so bad that a lot of people don't even believe it. It's so crazy that people don't even believe it. It can't be true. So they don't believe it. This is not just a matter of domestic politics — ***this is a matter of national security.***"

"And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore."

Exs. 22, pp. B1-B23 (emphasis added); 49.

136.    Much of Trump's speech was not in Trump's prepared remarks.  For instance, Trump's speech called out Vice President Pence by name eleven times. Exs. 22, pp. B1-B23; 49. The teleprompter draft of the speech released by the National Archives contained only one reference to Vice President Pence. Ex. 157, p. 34.

137.    Trump used the word "fight" or variations of it 20 times during his Ellipse speech. Exs. 22, pp. B1-B23; 49. The teleprompter draft contained only one mention of the word fight. Ex. 157, p. 29.

138.    Trump also repeatedly insisted that the crowd cannot let the certification happen:

> "You will have an illegitimate president. . . . **_we can't let that happen_**"

> "We can't let this stuff happen. We won't have a country if it happens"
> "And then we're stuck with a president who lost the election by a lot and we have to live with that for four more years. **_We're just not going to let that happen_**"

> "They want to come in again and rip off our country. **_Can't let it happen_**"

> "We will never give up, we will never concede. **_It doesn't happen_**. You don't concede when there's theft involved."

Exs. 22, pp. B1-B23 (emphasis added); 49. The teleprompter draft contained no mention of the crowd needing to prevent something from happening. *See* Ex. 157.

139.    The statement that the alleged voter fraud "allowed" his supporters "to go by very different rules," was not in the prepared speech. Exs. 22, p. B20; 49; 157.

140.    Knowing many in the crowd were angry and armed, Trump called on them to march to the Capitol and vowed to join them. Rally attendees took Trump at his word and thought he would join them at the Capitol. 11/02/2023 Tr. 166:21–24.

141.     The crowd at the Ellipse reacted to Trump's words with calls for violence. After Trump instructed his supporters to march to the Capitol, members of the crowd responded with shouts of "storm the Capitol!" "invade the Capitol Building!" and repeated chants of "take the Capitol!" Ex. 166.

142.     As Professor Simi testified, Trump's speech took place in the context of a pattern of Trump's knowing "encouragement and promotion of violence" to develop and deploy a shared coded language with his violent supporters. 10/31/2023 Tr. 221:10–21. An understanding had developed between Trump and some of his most extreme supporters that his encouragement, for example, to "fight" was not metaphorical, referring to a political "fight," but rather as a literal "call to violence" against those working to ensure the transfer of Presidential power. 10/31/2023 Tr. 66:7–20, 101:8–102:6. While Trump's Ellipse speech did mention "peaceful" conduct in his command to march to the Capitol, the overall tenor was that to save the democracy and the country the attendees needed to fight. 10/31/2023 Tr. 101:8–102:21.

143.     Trump understood the power that he had over his supporters. Amy Kremer testified that "when [Trump] does these speeches, he plays off the crowd. And they're very reactive." 11/02/2023 Tr. 49:4–6. She also acknowledged that the rally attendees were there because they believed the lie that the election was stolen. 11/02/2023 Tr. 47:23–48:2.   Trump admitted his power over his supporters recently. Ex. 134.

144.     The Court finds that Trump's Ellipse speech incited imminent lawless violence. Trump did so explicitly by telling the crowd repeatedly to "fight" and to "fight

like hell," to "walk down to the Capitol," and that they needed to "take back our country" through "strength." He did so implicitly by encouraging the crowd that they could play by "very different rules" because of the supposed fraudulent election.

145.    In the context of the speech as a whole, as well as the broader context of Trump's efforts to inflame his supporters through outright lies of voter fraud in the weeks leading up to January 6, 2021 and his long-standing pattern of encouraging political violence among his supporters, the Court finds that the call to "fight" and "fight like hell" was intended as, and was understood by a portion of the crowd as, a call to arms. The Court further finds, based on the testimony and documentary evidence presented, that Trump's conduct and words were the factual cause of, and a substantial contributing factor to, the January 6, 2021 attack on the United States Capitol. *See also* 11/03/2023 Tr. 203:20–22; 11/02/2023 278:2–12.

### E.  THE ATTACK ON THE CAPITOL

146.    While Trump was speaking, large portions of the crowd began moving with purpose from the Ellipse rally toward the Capitol building. Exs. 22, p. 22; 1007; 10/30/2023 Tr. 71:9–21; 11/02/2023 Tr. 331:22–332.15.

147.    Around 12:53 p.m., the mob overran United States Capitol Police officers at a police barricade near the Peace Circle, breaching the Capitol's security perimeter. Ex. 133, p. 9; 10/30/2023 Tr. 194:16–195:7. The Proud Boys, who in the moments before led the mob in chants of "1776," led this initial breach. Ex. 78, pp. 25-26, 104-105; 10/31/2023 Tr. 54:24–55:3.

148.    Shortly before 1:00 p.m., Vice President Pence released a letter asserting that his "role as presiding officer is largely ceremonial" and dismissed the arguments that he could take unilateral action to overturn the election or return the Electoral College votes to the States as contrary to his oath to the Constitution. Ex. 78, p. 78 (Finding # 247); 10/30/2023 Tr. 161:5–162:15.

149.    By about 1:00 p.m., the mob had advanced to the Capitol steps and began attacking Capitol police officers there. 10/30/2023 Tr. 201:22–202:5. At 1:00 p.m., the joint session of Congress convened to count the electoral votes. Stipulation ¶ 14. After Congressman Gosar and Senator Cruz objected to the certification of Arizona's electoral votes, the House and Senate split into their respective chambers to debate them. 10/30/2023 Tr. 139:21–140:6; 11/02/23 Tr. 190:24–192:9.

150.    Trump's speech ended around 1:10 p.m. Ex. 22, p. 24. Thousands more marched toward the Capitol down Pennsylvania Avenue as Trump had instructed. Exs. 22, pp. B1-B23; 49; 10/30/2023 Tr. 199:8–200:8. The size of the mob grew by the minute. 10/30/2023 Tr. 197:8–13. The mob occupied the entire West Plaza by 1:14 p.m. Ex. 133, pp. 11, 12.

151.    At 2:13 p.m., the Capitol was breached for the first time when the Proud Boys smashed a window in the Senate wing and the mob began entering the building. Ex. 78, p. 109 (Finding # 361).

152.    The Senate recessed at 2:13 p.m., and the House suspended debate on the objections to certification at 2:18 p.m., halting the process of the electoral certification. Stipulation ¶ 14; Ex. 78, p. 113 (Finding # 374).

153.    The mob moved immediately toward its target–the certification of the election–and reached the House and Senate chambers within minutes. Ex. 78, p. 113 (Finding # 374); 10/30/2023 Tr. 142:9–143:2, 144:11–23, 146:16–18; 11/02/2023 Tr. 192:10–195:24.

154.    Some Members of Congress removed their Congressional pins so they would not be identified by the encroaching mob, others prepared to fight off the mob. 10/30/2023 Tr. 144:11–23.

155.    The mob was armed with a variety of weapons including guns, knives, tasers, sharpened flag poles, scissors, hockey sticks, pitchforks, bear spray, pepper spray, and other chemical irritants. Exs. 16; 78, pp. 103, 104, 115-116 (Finding ## 342, 346, 382); 133; 1018; 10/30/2023 Tr. 74:4–10; 75:15–76:4, 105:25–106:24, 201:22–202:5, 220:23–221:2, 224:25–225:2; 11/02/2023 Tr. 334:17–23.

156.    The mob also stole objects at the Capitol to use as weapons, including metal bars from police barricades, pieces of scaffolding, trash cans, and batons and riot shields stolen from law enforcement. Ex. 16; 10/30/2023 Tr. 74:4–10, 75:15–76:4, 201:22–202:5.

157.    The mob assaulted police officers defending the Capitol to force its way into the building. Throughout the day, police officers were tased, crushed in metal door frames, punched, kicked, tackled, shoved, sprayed with chemical irritants, struck with objects thrown by the crowd, dragged, hit with objects thrown by the crowd, gouged in the eye, attacked with sharpened flag poles, and beaten with weapons and objects that the mob brought to the Capitol or stole on site. Ex. 78, pp. 115-116 (Finding # 382);

10/30/2023 Tr. 73:19–74:10, 87:18–88:6; 103:14–104:10, 201:22–202:5, 208:8–15, 212:14–17, 220:23–221:2, 224:25–225:2. Police deployed tear gas, pepper spray, flash bangs, and a loudspeaker with a pre-recorded message instructing the mob to disperse, but the mob defied those orders and remained at the Capitol. 10/30/2023 Tr. 94:20–97:2; 11/02/2023 Tr. 176:16–177:4, 336:10–337:5.

158.    Members of law enforcement feared for their lives as well as the lives of their fellow officers, the Vice President, and the Members and staff inside the Capitol. 10/30/2023 Tr. 74:22–75:4, 210:25–211:2, 222:14–19. The attacks were deadly, resulting in the death of Capitol Police Officer Brian Sicknick. 10/30/2023 Tr. 224:23–225:2. Many other law enforcement officers were injured, some requiring hospitalization for their injuries. 10/30/2023 Tr. 230:11–14.

159.    Even though not everyone in the mob was violent, officers were unable to escape or get reinforcements. 10/30/2023 Tr. 79:9–20.  Law enforcement could not differentiate between which members of the mob were violent and which were not. *Id.*

160.    The mob's size prevented the police from carrying out arrests for fear of the safety of officers and the detainees. 10/30/2023 Tr. 81:9–22. The mob's size prevented law enforcement from using firearms or employing lethal force. 10/30/2023 Tr. 80:20–81:6. The chaos created by the mob made it futile for police to call for help when they were individually under attack. 10/30/2023 Tr. 209:11–20. The mob's size made it impossible for first responders to reach those in medical distress, and when first responders attempted to provide such aid, they were harassed by the mob and assaulted. 10/30/2023 Tr. 198:20–199:7. The presence of nonviolent members of the mob, who

refused demands to leave, contributed to these problems. Ex. 11; 10/30/2023 Tr. 82:9–
11; 90:2–93:13.

161.    The Court finds that by sending otherwise non-violent protestors to the
Capitol thereby increasing the mob's numbers through his actions and words, Trump
materially aided the attack on the Capitol.

162.    Members of the mob told officers, "Trump sent us," "we don't want to hurt
you, but we will; we're getting into that building," "you look scared and you might need
your baton," and "take off your badges, take off your helmets, and show solidarity with
we the people or we're going to run over you. . . . Do you think your little pea shooter
guns are going to stop this crowd," and "it's going to turn bad man; we have to get you
out of here. The others are coming up from the back." Exs. 11; 14; 10/30/2023 Tr.
200:25–201:11, 202:24–203:5. The mob chanted "fight for Trump" and members yelled
into bullhorns "this is not a peaceful protest!" Ex. 21. These types of statements were
repeated at multiple locations around the Capitol during the attack where the mob faced
resistance from law enforcement. Exs. 11; 14; 10/30/2023 Tr. 200:25–201:11, 212:3–13.

163.    The mob referenced war, revolution, Donald Trump, and stopping the
election certification. Members of the mob carried flags from the Revolutionary War and
the Confederate Battle Flag. Exs. 13; 133; 10/30/2023 Tr. 99:13–100:1. Their flags and
signs said, among other things, "Liberty or Death," "Certify Honesty Not Fraud," and
"Over Turn Biden Win," "Pence has the power," "Mike Pence is a bitch," and "Lynch the
Rhinos [sic]," evoking Trump's references to "RINOs" (Republicans in Name Only) at
the Ellipse speech. Ex. 133. They chanted "fight for Trump," "Stop the Steal," and "1776."

Ex. 78, pp. 104-105 (Finding # 347); 10/30/2023 Tr. 77:25–78:11. The crowd displayed a makeshift gallows. 10/31/2023 Tr. 120:19–121:18.

164.    The mob taunted law enforcement calling them "traitors" and suggesting that law enforcement was the problem. They yelled "you swore an oath," "oath breakers," "you're on the wrong team," "you're not wanted here," "what about your oath," and "you're going against our country." Ex. 10; 10/30/2023 Tr. 73:14–18, 86:5–10, 200:25–201:11; 212:3–13.

165.    Professor Simi testified that the repeated references to 1776, "revolution," and the Confederate flag, are consistent with far-right extremists' use of the terms as literal calls for violent revolution. 10/31/2023 Tr. 94:21–95:7, 107:24–108:8, 109:3–8, 120:25–121:18. The presence of weaponry and defensive gear among a significant portion of the crowd confirmed this purpose. 10/31/2023 Tr. 109:16–21. The mob at times worked together. Exs. 20; 21; 10/31/2023 Tr. 115:20–116:3.

166.    The January 6th Senate Report that Trump's counsel described as "the staff report from the Senate that was a bipartisan report" described January 6, 2021 as a "violent and unprecedented attack on the U.S. Capitol, the Vice President, Members of Congress and the democratic process" and that the attackers were "intent on disrupting the Joint Session, during which Members of Congress were scheduled to perform their constitutional obligation to count the electoral votes." Ex. 22, p. 1; 10/31/2023 Tr. 276:21–25.

167.    Amy Kremer described the event as a "horrifying" event and "an awful, awful attack on the seat of our democracy." 11/02/23 Tr. 65:14–20, 69:3–7.

168.    The Court agrees with Congressman Buck and concludes that the attack was "meant to disturb" Congress's "electoral vote count." 11/02/2023 Tr. 230:3–7, 341:24–342:8.

### F.  TRUMP'S REACTION TO THE ATTACK

169.    By 1:21 p.m., Trump was informed the Capitol was under attack. Ex. 78, p. 96 (Finding # 316).

170.    At 2:24 p.m., an hour after Trump had been informed the Capitol was under attack, Trump tweeted: "Mike Pence didn't have the courage to do what should have been done to protect our Country and our Constitution, giving States a chance to certify a corrected set of facts, not the fraudulent or inaccurate ones which they were asked to previously certify. USA demands the truth!" Ex. 148, p. 83.

171.    That tweet was read over a bullhorn to the crowd at the Capitol. Ex. 94.

172.    The Court holds that Trump's 2:24 p.m. tweet further encouraged imminent lawless violence by singling out Vice President Pence and suggesting that the attacking mob was "demand[ing] the truth." Congressman Swalwell interpreted President Trump's 2:24 p.m. tweet as painting a "target" on the Capitol and threatening the Vice President and their "personal safety and the proceedings" to certify the election. 10/30/2023 Tr. 149:2–11.

173.    The Court further holds that Trump's 2:24 p.m. tweet caused further violence at the Capitol.  Exs. 6; 15; 78, pp. 16-17 (Finding # 56); 10/30/2023 Tr. 103:14–104:5.

174.    At 2:25 p.m., the mob breached the Capitol's East Rotunda doors. Ex. 78, pp. 46-47 (Finding # 150).

175.    At 2:25 p.m., the Secret Service evacuated Vice President Pence from his Senate office to a more secure location.  Ex. 78, pp. 16-17 (Finding # 56).

176.    Around 2:30 p.m., Officer Pingeon was attacked by the mob in the Northwest Courtyard where he was forced to the ground and had his baton stolen. 10/30/2023 Tr. 208:8–210:8.

177.    Around the same time, the Senate Chamber and House floor were evacuated.  Ex. 78, pp. 35-36 (Finding # 119); 10/30/2023 Tr. 152:19–153:7.

178.    At 2:38 p.m. and 3:13 p.m. Trump sent two tweets both encouraging the mob to "remain peaceful" and "[s]tay peaceful" and asking the mob to not hurt law enforcement.  Ex. 148, pp. 83, 84.  Neither of the tweets condemned the ongoing violence or told the mob to retreat.

179.    The mob's conduct after it breached the Capitol confirmed that its common purpose was to prevent the constitutional transfer of power by targeting Vice President Pence and House Speaker Nancy Pelosi. Immediately after the first breach of the Capitol at 2:13 p.m., the mob moved to the Senate and House chambers where the certification was being debated and Pence and Pelosi were expected to preside. The mob breached the Senate gallery and the mob made a concerted and violent effort to break into the House chamber. Ex. 78, pp. 35-36 (Finding # 119); 10/30/2023 Tr. 155:14–21.

180.    Other than sending the two tweets at 2:38 p.m. and 3:15 p.m. which did not call off the attack, Trump did nothing between being informed of the attack at 1:21

p.m. and 4:17 p.m.  Instead, Trump ignored pleas to intervene and instead called

Senators urging them to help delay the electoral count. When told that the mob was

chanting "Hang Mike Pence," Trump responded that perhaps the Vice President

deserved to be hanged. Ex. 78, pp. 46-47 (Finding # 150). Trump also rebuffed pleas

from Leader McCarthy to ask that his supporters leave the Capitol stating, "Well, Kevin,

I guess these people are more upset about the election than you are." *Id.*

181.    The Court finds that Trump, as the Commander of the D.C. National

Guard, had law enforcement entities at this disposal to help stop the attack without any

further approval.  10/31/2023 Tr. 246:24-247:7, 249:6-9.

182.    Trump could have redeployed the 340 National Guard troops already

activated in Washington, D.C. to assist with traffic and other duties on January 6, 2021.

This group could have rapidly responded because riot gear was already stored at

convenient locations near their places of deployment throughout the city. Exs. 1027;

1031, p. 37; 10/31/2023 Tr. 259:25-260:8. There is no evidence that Trump made any

effort on January 6 to redeploy these troops to the Capitol once he knew the attack was

underway. 10/31/23 Tr. 259:25–260:11.

183.    In addition to the 340 National Guard troops that had already been

activated for traffic control duty or as a quick reaction force, Trump could have ordered

deployment of additional D.C. National Guard troops once he knew about the attack on

the Capitol. Ex. 1027; 10/31/2023 Tr. 252:4–10.  He could have asked the Governors of

Maryland and Virginia to authorize their state National Guards to help.  10/31/2023 Tr.

260:12–20.  He could have ordered the Department of Justice rapid response teams to

the Capitol.  10/31/2023 Tr. 262:11–16.  He could have authorized the Department of Homeland Security's rapid response team which could have deployed "in a matter of minutes from headquarters to the Capitol." 10/31/2023 Tr. 262:17–21.

184.    Trump provided no evidence that he took any action to deploy any of these authorities after learning of the attack on the Capitol. 10/31/2023 Tr. 264:5–8.[15]

185.    The Court finds Trump had the authority to call in reinforcements on January 6, 2021, and chose not to exercise it thereby recklessly endangering the lives of law enforcement, Congress, and the attackers on January 6, 2021.

186.    Finally, at 4:17 p.m. Trump called off the attack.  He released a video in which he said:

> I know your pain. I know you're hurt. We had an election that was stolen from us. It was a landslide election, and everyone knows it, especially the other side. ***But you have to go home now***. We have to have peace. We have to have law and order. We have to respect our great people in law and order. We don't want anybody hurt. It's a very tough period of time. There's never been a time like this where such a thing happened, where they could take it away from all of us, from me, from you, from our country. This was a fraudulent election. But we can't play into the hands of these people. We have to have peace. ***So go home.*** We love you. You're very special. You've seen what happens. You see the way others are treated that are so bad and so evil. I know how you feel but ***go home and go home in peace.***

Ex. 68 (emphasis added).

187.    The Court holds that Trump's 4:17 p.m. video endorsed the actions of the mob in trying to stop the peaceful transfer of power.  It did not condemn the mob but instead sympathized with them and praised them.  It did, however, instruct the mob to

---

[15] The Court considers Trump's inaction solely for the purpose of inferring that he intended for the crowd to engage in violence when he sent them to the Capitol "to fight like hell."  It does not consider his inaction as independent conduct constituting engagement in an insurrection.

go home on three occasions, emphasizing to the mob that this was an order to be followed.

188.    The mob obeyed Trump's order.  Ex. 78, p. 36 (Finding # 120); 10/31/2023 Tr. 121:19-21. The statement was understood as a clear directive to cease the attack. 10/31/2023 Tr. 122:9–23, 220:21–221:4.

189.    At 6:01 p.m. Trump tweeted again: "These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly & unfairly treated for so long. Go home with love & in peace. Remember this day forever!" Ex. 148, p. 84.

190.    The Court holds that even after the attack, Trump's tweet justified violence by calling the attackers "patriots," and continued to perpetuate the falsehood that justified the attack in the first place, his alleged "sacred landslide election victory." Ex. 148, p. 84.

191.    As Professor Simi testified, this after the fact tweet was consistent with Trump's pattern of communication related to political violence which always ended with Trump praising the violence. 10/31/2023 Tr. 123:12–15.

192.    The Court finds that the 6:01 p.m. tweet is further proof of Trump's intent to disrupt the election certification on January 6, 2021.

193.    The Court heard no evidence that Trump did not support the mob's common purpose of disrupting the constitutional transfer of power.  To the contrary, both his 4:17 p.m. video and 6:01 p.m. tweet support the opposite conclusion—that Trump endorsed and intended the actions of the mob on January 6, 2021.

## G.  SECRETARY OF STATE PRACTICES

194.    The Secretary of State is responsible for "certify[ing] the content for state and federal offices to the ballot." 11/01/2023 Tr. 91:4-5. The Secretary of State's office "is the filing office for state and federal offices for individuals seeking . . . to run for office in Colorado." 11/01/2023 Tr. 96:10-12. When the Secretary of State receives a candidate's paperwork, the office "verif[ies] the information on the application as required under state law, and then ultimately there is a deadline by which [the] office must certify all [contents] to the ballot," including candidates. 11/01/2023 Tr. 96:13-17.

195.    "The Secretary of State is responsible for ensuring that only eligible candidates are placed on the ballot." Ex. 107. In determining whether a candidate is eligible, the Secretary "must give effect to applicable federal and state law unless a court has held such law to be invalid." *Id.*; *see also* 11/01/2023 Tr. 107:24-108:3. If the Secretary of State's office has "affirmative knowledge that a candidate is ineligible for office, then [it] will not certify them to the ballot." 11/01/2023 Tr. 99:14-16.

196.    The office has also kept ineligible presidential candidates off the ballot. 11/01/2023 Tr. 104:24-105:4. One candidate, Abdul Hassan, informed the Secretary of State's office that he did not meet the constitutional requirements for the presidency because he was not a natural-born United States citizen. 11/01/2023 Tr. 106:7-107:1. The Secretary of State's office informed Mr. Hassan that he was ineligible, and a court affirmed that determination. 11/01/2023 Tr. 106:17-107:1, 108:11-17; *see also Hassan v. Colorado*, 495 F.App'x 947 (10th Cir. 2012).

197.    Other presidential candidates were excluded from the ballot in 2012, 2016, and 2023 (for the 2024 ballot) because they failed to certify their compliance with mandatory federal constitutional requirements for the presidency by completing the required paperwork that would otherwise attest to their qualifications. 11/01/2023 Tr. 151:24-153:12.

198.    Candidates, or other electors, who disagree with the Secretary of State's decision regarding whether to certify a candidate to the ballot can challenge the Secretary's decision in court. 11/01/2023 Tr. 91:18-92:2, 102:25-103:3. The office expects such challenges in every election cycle. 11/01/2023 Tr. 101:20-102:3. Accordingly, "[t]he Secretary's Office is never the final arbiter of eligibility because the Secretary's decision to either certify a candidate or not can be challenged in court." 11/01/2023 Tr. 108:7-10.

199.    The Secretary of State's office creates the forms used by candidates to access the ballot, including the presidential primary forms. *See* 11/01/2023 Tr. 111:17-22; *see also* Ex. 158.

200.    The Major Party Candidate Statement of Intent for the Presidential Primary includes, among other things, checkboxes that require the candidate to certify: "Age of 35 Years;" "Resident of the United States for at least 14 years;" and "Natural-born U.S. Citizen." Ex. 158; 11/01/2023 Tr. 113:1-5. But those qualifications are not the only qualifications for president. 11/01/2023 Tr. 113:9-12. Candidates submitting this form must also sign and notarize the following statement: "I intend to run for the office

stated above and solemnly affirm that I meet **all** qualifications for the office prescribed by law." Ex. 158 (emphasis added).

201.    For instance, the Secretary of State would not put a presidential candidate on the ballot who had already served two terms because that would be in violation of the Twenty-Second Amendment. That is true despite there not being a box to check for the Twenty-Second Amendment.

202.    When questioned by the Court, Ms. Rudy testified that should the Secretary of State desire to do so, it could revise the Statement of Intent Form to add a box confirming that the candidate had not served two terms as President.  She further testified, that should President Obama seek to be on the presidential primary ballot, that given it was "an objective, knowable fact" that he was not qualified, "it is unlikely we would certify that candidate's name to the ballot." 11/01/2023 Tr. 157:15-158:24.

203.    On October 11, 2023, the Secretary of State's office received (1) a Major Party Candidate Statement of Intent for Presidential Primary, signed by Donald J. Trump; (2) a State Party Presidential Primary Approval, signed by Dave Williams, the chair of the Colorado Republican Party, stating that the "Colorado Republican Party has determined [Donald J. Trump] is bona fide and affiliated with the party;" and (3) a $500 filing fee from Donald J. Trump for President 2024, Inc. Ex. 158.

204.    The Major Party Candidate Statement of Intent for Presidential Primary contains the following affirmation: "I intend to run for the office stated above and solemnly affirm that I meet all qualifications for the office prescribed by law.*" Id.*. Donald J. Trump signed the affirmation. *Id.*

205.    The documents contained in Exhibit 158 are facially complete. No additional paperwork is required for Trump to be certified to the 2024 presidential primary ballot. 11/01/2023 Tr. 123:8-12.

206.    The Secretary is holding Trump's application "pending further direction from the Court." *See* Notice (Oct. 11, 2023).

207.    The Secretary of State is required to certify the candidates who will be listed on the 2024 presidential primary ballot on January 5, 2024. C.R.S. § 1-4-1204(1).

208.    The Secretary does not certify candidates individually; rather, she certifies the entire contents of the ballot at once. 11/01/23 Tr. 145:7-16. The Secretary intends to certify the entire 2024 presidential primary ballot on January 5, 2024. See 11/01/2023 Tr. 145:7-16.

## V.    CONCLUSIONS OF LAW

209.    The Court previously held that pursuant C.R.S. § 1-4-1204(4) the burden of proof in this matter is preponderance of the evidence.  That is the burden the Court has applied.  However, the Court holds that the Petitioners have met the higher standard of clear and convincing evidence.

### A.  CAN THE SECRETARY OF STATE EXCLUDE TRUMP FROM THE BALLOT?

210.    The Colorado Secretary of State is charged with the duty to "supervise the conduct of primary, general, congressional vacancy, and statewide ballot issue elections" and to "enforce the provisions of [the election] code."  C.R.S. § 1-1-107(1).  When a

dispute regarding the application and enforcement of the Election Code arises,

C.R.S. § 1-1-113 is implicated.  This statute provides in part:

> When any controversy arises between any official charged with any duty or function under this code and any candidate, or any officers or representatives of a political party, or any persons who have made nominations or when any eligible elector files a verified petition in a district court of competent jurisdiction *alleging that a person charged with a duty under this code has committed or is about to commit a breach or neglect of duty or other wrongful act*, after notice to the official which includes an opportunity to be heard, upon a finding of good cause, *the district court shall issue an order requiring substantial compliance with the provisions of this code*. The order shall require the person charged to forthwith perform the duty or to desist from the wrongful act or to forthwith show cause why the order should not be obeyed.  The burden of proof is on the petitioner.

C.R.S. § 1-1-113(1) (emphasis added).

211.    After the filing of a "verified petition" by a registered elector and "notice to the official which includes an opportunity to be heard," if a court finds good cause to believe that the election official "has committed or is about to commit a breach or neglect of duty or other wrongful act," it "shall issue an order requiring substantial compliance with the provisions of [the Election Code]."  C.R.S. § 1-1-113(1).

212.    C.R.S. § 1-4-1204(1) provides that "[n]ot later than sixty days before the presidential primary election, the secretary of state shall certify the names and party affiliations of the candidates to be placed on any presidential primary election ballots." Each candidate must be:

> seeking the nomination for president of a political party as a bona fide candidate for president of the United States pursuant to political party rules and [must be] affiliated with a major political

61

> party that received at least twenty percent of the votes cast by
> eligible electors in Colorado at the last presidential election.

C.R.S. § 1-4-1204(1)(b).  C.R.S. § 1-4-1204(4) expressly incorporates section 1-1-113 for

"[a]ny challenge to the listing of any candidate on the presidential primary election

ballot."  Such challenges "must be . . . filed with the district court in accordance with

section 1-1-113(1)."  C.R.S. § 1-4-1204(4).  "Any such challenge must provide notice in a

summary manner of an alleged impropriety that gives rise to the complaint."  C.R.S. § 1-

4-1204(4).

213.    In the Court's Omnibus Ruling on Pending Dispositive Motions, the Court

left for trial the issue of whether the General Assembly has charged the Secretary of

State with the authority to investigate or enforce Section Three of the Fourteenth

Amendment.

214.    Intervenors argue that the Secretary's role is simply ministerial.  They

argue "her responsibility is to either confirm that a candidate is affiliated with a party

that is a 'major political party' according to statute and is a bona fide candidate,

pursuant to that party's rules, or to confirm that the candidate submitted a proper

notarized candidate's statement of intent."

215.    The Court will not revisit its decision from the Omnibus Ruling on

Pending Dispositive Motions rejecting CRSCC's argument that it has an unfettered right

to put constitutionally unqualified candidates on the primary ballot.  The Court has read

the opinion in *Growe v. Simon*, No. A23-1354, 2023 WL 7392541 (Minn. November 8,

2023).  C.R.S. § 1-4-1203(2)(a) provides that political parties may participate in a

presidential primary only if the party has a "qualified candidate."  C.R.S. § 1-4-1203(3)

provides the Secretary has "the same powers and shall perform the same duties for presidential primary elections as they provide by law for other primary elections and general elections."  In Colorado, the Secretary of State has, at least in some instances, kept constitutionally unqualified candidates off the ballot.  *See Hassan*, 495 F.App'x at 948 (holding that Secretary Gessler was correct in excluding a constitutionally ineligible candidate and that "a state's legitimate interest in protecting the integrity and practical functioning of the political process permits it to exclude from the ballot candidates who are constitutionally prohibited from assuming office.").

216.    However, in the Court's view there is a difference between the Secretary having the authority to prohibit a candidate from being put on the ballot based on what Ms. Rudy described as "an objective, knowable fact" and prohibiting a candidate from being put on the ballot due to potential constitutional infirmity that has yet to be determined by either a Court or Congress.   The Court holds that the Secretary cannot, on her own accord, keep a candidate from appearing on the ballot based on a constitutional infirmity unless that constitutional infirmity is "an objective, knowable fact."  Here, whether Trump is disqualified under Section Three of the Fourteenth Amendment is not "an objective, knowable fact."

217.    The question then becomes whether Petitioners can file a C.R.S. § 1-1-113 action based on the Secretary's impending failure to keep Trump off the ballot where the Court does not believe the Secretary, on her own accord, has the power to keep him off the ballot.

218.    Petitioners argue that, regardless of whether the Secretary has the power to investigate candidate qualifications, C.R.S. §§ 1-4-1204(4) and 1-1-113 authorize eligible electors to seek a Court order barring the Secretary from placing on the ballot a candidate who is constitutionally ineligible to assume the office they are seeking and that, in such a proceeding, the Court evaluates the candidate's qualifications *de novo*.

219.    The Petitioners argue that in *Hanlen v. Gessler*, 333 P.3d 41, 50 (Colo. 2014), the Colorado Supreme Court made clear that "the election code requires a court, not an election official, to determine the issue of eligibility" of a candidate. Two years later, the Colorado Supreme Court reaffirmed that holding and again declared, "when read as a whole, the statutory scheme evidences an intent that challenges to the qualifications of a candidate be resolved only by the courts." *Carson v. Reiner*, 370 P.3d 1137, 1139 (Colo. 2016). Two years after that, the Colorado Supreme Court noted that even where the paper record submitted to an election official appears sufficient on its face, courts retain the power to review extrinsic evidence in eligibility challenges. *Kuhn v. Williams*, 418 P.3d 478, 485-87 (Colo. 2018). The Court held that "judicial review" under C.R.S. § 1-1-113 is "*de novo*" and "includes the taking of evidence" and that the challengers there could "present evidence demonstrating that a petition actually fails to comply with the Election Code, even if it 'appear[ed] to be sufficient' in a paper review." *Id*. at 485-86 (quoting C.R.S. § 1-4-909(1)).

220.    *Kuhn* is particularly instructive in this regard.  There, the Court held that the Secretary properly relied on the information before him when certifying the Lamborn Campaign's petition to appear on the ballot.  *Id*. at 485.  The Court held,

64

however, that "the question becomes whether the Secretary has another relevant duty he might be 'about to' breach or neglect, or some other relevant wrongful act in which he might be 'about to' engage." *Id.* (quoting C.R.S. § 1-1-113(1)).

221.    The Court held that "[s]hould the court determine that the petition is not in compliance with the Election Code, the election official should certainly 'commit a breach or neglect of duty or other wrongful act'" and that it was proper for the district court to review evidence that was not available to the election official. *Id.* (quoting C.R.S. § 1-1-113(1)).

222.    The question before the Court then is does the Election Code incorporate Section Three of the Fourteenth Amendment?  The Election Code states that the presidential primary process is intended to "conform to the requirements of federal law," which includes the U.S. Constitution. C.R.S. § 1-4-1201. Further, C.R.S. § 1-4-1203(2)(a) provides that political parties may participate in a presidential primary only if the party has a "qualified candidate."

223.    Ms. Rudy testified that the Secretary has previously kept candidates off the ballot who do not meet the requirements of Article II, Section 1, Clause 5 of the U.S. Constitution.  She further testified that the Secretary would likely enforce the Twenty-Second Amendment should Barack Obama or George W. Bush attempt to be put on the primary ballot.

224.    While the Court agrees with Intervenors that the Secretary cannot investigate and adjudicate Trump's eligibility under Section Three of the Fourteenth Amendment, the Election Code gives this Court that authority. C.R.S. § 1-4-1204(4)

65

("[T]he district court shall hear the challenge and assess the validity of all alleged improprieties" and "issue findings of fact and conclusions of law."); *see also Hassan*, 495 F.App'x at 948 ("a state's legitimate interest in protecting the integrity and practical functioning of the political process permits it to exclude from the ballot candidates who are constitutionally prohibited from assuming office"); *Munro v. Socialist Workers Party*, 479 U.S. 189, 193-95 (1986) (affirming exclusion of candidate from ballot under state law based on compelling state interest in protecting integrity and stability of political process); *Bullock v. Carter*, 405 U.S. 134, 145 (1972) ("Moreover, a State has an interest, if not a duty, to protect the integrity of its political processes from frivolous or fraudulent candidacies").

## B.  DID PRESIDENT TRUMP ENGAGE IN AN INSURRECTION?

### 1.  Definition of Insurrection

225.    Section Three of the Fourteenth Amendment, passed in 1866 and ratified by the states in 1868, provides that:

> No Person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

U.S. CONST. amend. XIV, § 3.

226.    Section Three of the Fourteenth Amendment was primarily written to prevent officials who left to join the Confederacy from returning to office. When many former confederates sought to be seated as if nothing happened, Republicans in Congress found it necessary to act and exclude them from positions of authority unless they demonstrated repentance or deserved forgiveness. 11/1/23 Tr. 21:11–23. Congressional debates surrounding Section Three make clear that it was intended not as a punishment for crime, but to add an additional qualification for public office. 11/01/23 Tr. 22:2–6.

227.    The oath is central to Section Three. 11/01/23 Tr. 22:9–25. It served a limiting function, because Section Three only applies to those who had betrayed a previously sworn oath to the Constitution–which included those most responsible for the Civil War. 11/01/23 Tr. 22:9–25. Supporters of Section Three believed that such oathbreakers could not again take office and swear the oath without committing "moral perjury." 11/01/23 Tr. 22:9–25.

228.    The history of Section Three and its passage indicate that the provision is not limited to the events of the Civil War. The language of Section Three refers generally to insurrection or rebellion, and senators in the debate made clear their intent for it to apply to future insurrections. 11/01/23 Tr. 23:4–10; 11/03/23 Tr. 42:4–43:4.

229.    In the years following ratification of the Fourteenth Amendment, Section Three was enforced by various entities. These enforcements came before the enactment of federal implementing legislation in 1870. 11/01/23 Tr. 23:14–24:21.

230.    Congress has the power to remove the disability by a two-thirds vote, and Congress passed a series of measures that would give amnesty to people by name, then afterwards a general amnesty to all the people then covered by Section Three. 11/01/23 Tr. 25:4–19.

231.    Section Three qualifies "insurrection" by the phrase "against the same," referring to the Constitution of the United States to which the oath was sworn.  U.S. CONST. amend. XIV, § 3. That limits the scope of the provision by excluding insurrections against state or local law, and including only insurrections against the Constitution, which officials have sworn an oath to support and have now broken. 11/01/23 Tr. 36:10–37:15.

232.    As the Supreme Court declared during the Civil War, "[i]nsurrection against a government may or may not culminate in an organized rebellion, but a civil war always begins by insurrection against the lawful authority of the Government." *The Amy Warwick*, 67 U.S. 635, 666 (1862).

233.    The Court finds that an "insurrection" at the time of ratification of the Fourteenth Amendment was understood to refer to any public use of force or threat of force by a group of people to hinder or prevent the execution of law.

234.    This understanding of "insurrection" comports with the historical examples of insurrection before the Civil War, with dictionary definitions from before the Civil War, with judicial opinions during the same time, and with other authoritative legal sources. *See e.g.*, *Case of Fries*, 9 F. Cas. 924, 930 (C.C.D. Pa. 1800) ("any insurrection or rising of any body of people, within the United States, to attain or effect,

by force or violence any object of a great public nature, or of public and general (or

national) concern, is a levying war against the United States"); *United States v.*

*Hanway*, 26 F. Cas. 105, 127–28 (C.C.E.D. Pa. 1851); *Chancely v. Bailey*, 37 Ga. 532,

548–49 (1868) ("If the late war had been marked merely by the armed resistance of

some of the citizens of the State to its laws, or to the laws of the Federal Government, as

in the cases in Massachusetts in 1789, and in Pennsylvania in 1793, it would very

properly have been called an insurrection") (emphasis original).

235.   "When interpreting the text of a constitutional provision or statute,

[courts] often resort to contemporaneous dictionaries or other sources of context to

ensure that we are understanding the word in the way its drafters intended." *Bevis v.*

*City of Naperville, Illinois*, No. 23-1353, 2023 WL 7273709 at *11 (7th Cir. Nov. 3,

2023).

236.   Noah Webster's, An American Dictionary of the English Language in 1828

defined insurrection as:

> a rising against civil or political authority; the open and active
> opposition of a number of persons to the execution of law in a
> city or state.  It is the equivalent to *sedition*, except that
> *sedition* expresses a less extensive rising of citizens.  It differs
> from *rebellion*, for the latter expresses a revolt, or an attempt
> to overthrow the government, to establish a different one or
> to place the country under another jurisdiction.

NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828).  Another

contemporary dictionary from 1848, John Boag's *A Popular and Complete English*

*Dictionary*, had an identical definition.  JOHN BOAG, A POPULAR AND COMPLETE ENGLISH

DICTIONARY 727 (John Boag ed., 1848); 11/01/2023 Tr. 31:16-32:2.

237.    Trump's expert witness, Robert Delahunty, offered an opinion that the meaning of "insurrection" at the time was less clear. 11/03/23 Tr. 43:15–51:7. However, Professor Delahunty did not identify any historical sources that appeared to adopt a materially different view. In fact, Professor Delahunty acknowledges that "insurrection need not rise to the level of a rebellion" or to "the level of a civil war," which supports Magliocca's definition of "insurrection." 11/03/23 Tr. 133:8–23.[16]  Importantly, Delahunty did not offer an alternate definition of insurrection.

238.    Intervenors have offered an alternate definition of insurrection as "the taking up of arms and preparing to wage war upon the United States."

239.    However, in the context of Section Three, and in accordance with the historical understanding, the Court finds that such insurrection must be "against" the "Constitution of the United States" and not against "the United States" as the Intervenors would suggest.

240.    Considering the above, and the arguments made at the Hearing and in the Parties' proposed findings of fact and conclusions of law, the Court holds that an insurrection as used in Section Three of the Fourteenth Amendment is (1) a public use of

---

[16] The Court also considered Professor Delahunty's opinion that this definition is over inclusive and would potentially include the use of force to prevent the delivery of the U.S. Mail.  Article I, Section 8, Clause 7 gives Congress the authority to designate mail routes and construct or designate post offices, and presumably the authority to carry, deliver, and regulate the mail of the United States as a whole.  *See* U.S. CONST. art. I, § 8, cl. 7.  Professor Delahunty argued that the definition of insurrection put forth by the Petitioners would include someone preventing the mail man from delivering mail.  Even if the Court interprets delivering mail as "execution of the Constitution," preventing delivery would only be an insurrection if it was accomplished by a coordinated group of people preventing the delivery of mail and that group was preventing the delivery of mail by force.

force or threat of force (2) by a group of people (3) to hinder or prevent execution of the Constitution of the United States.

241.    The Court further concludes that the events on and around January 6, 2021, easily satisfy this definition of "insurrection."

242.    Thousands of individuals descended on the United States Capitol. Many of them were armed with weapons or had prepared for violence in other ways such as bringing gas masks, body armor, tactical vests, and pepper spray. The attackers assaulted law enforcement officers, engaging them in hours of hand-to-hand combat and using weapons such as tasers, batons, riot shields, flagpoles, poles broken apart from metal barricades, and knives against them.

243.    The mob was coordinated and demonstrated a unity of purpose. The mob overran police lines outside the Capitol, broke into the Capitol through multiple entrances, and searched out members of Congress and the Vice President who were still inside the Capitol building. They marched through the building chanting in a manner that made clear they were seeking to inflict violence against members of Congress and Vice President Pence.

244.    The mob's purpose was to prevent execution of the Constitution so that Trump remained the President. Specifically, the mob sought to obstruct the counting of the electoral votes as set out in the Twelfth Amendment and thereby prevent the peaceful transfer of power.

## 2.  Definition of Engage

245.    Section Three of the Fourteenth Amendment provides that no person shall hold certain offices who, "having previously taken an oath . . . shall have engaged in insurrection or rebellion . . . or given aid or comfort to the enemies thereof."  Petitioners argue that Trump "engaged" in insurrection in two primary ways: (1) through incitement, and (2) through his conduct, by organizing and inspiring the mob and by his inaction during the January 6, 2021 attack on the Capitol.

246.    Trump argues that "engage," as used in Section Three of the Fourteenth Amendment demands a significant level of activity beyond mere words or inaction, as alleged.  The Court therefore must resolve the meaning of "engage" as used in Section Three of the Fourteenth Amendment.  The Court first considers whether incitement qualifies as "engagement."

247.    Trump's primary argument that incitement fails to meet the constitutional standard of "engagement" stems from the Second Confiscation Act, passed in 1862.  The Second Confiscation Act, among other things, made it a crime for any person to "incite, set on foot, assist, or engage in any rebellion or insurrection against the authority of the United States, or the laws thereof, or shall give aid or comfort thereto, or shall engage in, or give aid and comfort to, any such existing rebellion or insurrection."  12 Stat. 589, 590.

248.    The argument, generally, is that the Second Confiscation Act distinguished between "incitement" and "engagement" by virtue of listing them separately, thereby suggesting that they were understood to be separate activities. Further, he argues, as

Section Three of the Fourteenth Amendment was patterned, in part, on the Second Confiscation Act, and based disqualification on "engagement," and not "incitement" or "setting on foot," Congress did not intend to disqualify those who merely incited insurrection or rebellion.  Lastly, Trump argues that certain cases in Congress in 1870 suggest that the Congressional understanding of Section Three did not include incitement as engagement.

249.    Petitioners' argument on this subject is essentially that constitutional amendments generally are less granular than criminal statutes, and so it is not surprising (or determinative) that Section Three provided only for "engagement" and did not specify incitement; further, evidence of the application, interpretation, and enforcement of the term "engage" as used exists and suggests a broader definition that encompasses incitement.  Of principal import to Petitioners' argument are the opinions of Attorney General Henry Stanbery, which, generally, described "engagement" as a voluntary, direct, overt act done with the intent to further the goals of the Confederacy, and distinguished acts of charity, compulsory acts, and the mere harboring of disloyal sentiments uncoupled from activity.  Further, Petitioners also point to Congressional actions, concerning members precluded from taking their seats due to conduct which Petitioners argue illustrates the Congressional understanding of Section Three.

250.    Having considered the arguments, the Court concludes that engagement under Section Three of the Fourteenth Amendment includes incitement to insurrection. The Court has reviewed The Congressional Globe and Hinds' Precedents regarding the cases of Representatives Rice and McKenzie, cited by Trump, and finds that they offer

little to no guidance on the question before the Court.  Both cases concerned fact questions as to whether the Representatives provided "aid or comfort" to the enemies of the United States, and not whether they had "engaged" in insurrection or rebellion. Though the Court acknowledges the adjacency of the issues, the cases remain unpersuasive as they dealt with a discrete issue in highly distinguishable circumstances from the present case.

251.    Similarly, the Court has reviewed the Congressional cases the Petitioners cite and finds that they, too, are inapposite and, therefore, unhelpful.  The cases of Philip Thomas and John Young Brown likewise considered whether aid and comfort had been given to the enemies of the United States, and both were assessed pursuant to the standard supplied by a congressional oath which required would-be congressmen to swear that they had not "voluntarily given aid, countenance, counsel, and encouragement to persons engaged in armed hostility to the United States."  Again, the issues presented by these cases go beyond the question before this Court and consequently provide little utility.

252.    Further, the Court is not convinced that the Second Confiscation Act compels the conclusion that Congress deliberately omitted other distinct unlawful acts such as incitement by requiring only that a person shall not have engaged in insurrection or rebellion.  Section Three of the Fourteenth Amendment is not a mere revision, recodification, or consolidation of the Second Confiscation Act, and so the Court finds that it has limited utility in interpretating Section Three.

253.    Further, this Court is mindful that Section Three is a constitutional provision, and as such, its provisions "naturally…must receive a broad and liberal construction."  *See Protestants & Other Ams. United for Separation of Church & State v. O'Brien*, 272 F.Supp. 712, 718 (D.D.C. 1967) (citing *M'Culloch v. Maryland*, 17 U.S. 316, 407 (1819) (nature of constitution necessarily requires "that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects, be deduced from the nature of the objects themselves."); *see also U.S. v. Classic*, 313 U.S. 299, 316 (1941) (when interpreting constitution "we read its words, not as we read legislative codes which are subject to continuous revision with the changing course of events, but as the revelation of the great purposes which were intended to be achieved by the Constitution as a continuing instrument of government.").

254.    The Court finds more persuasive the opinions of Attorney General Stanbery, which adopted an unequivocally broad interpretation of "engagement" in insurrection.  Attorney General Stanbery, on the subject, opined that "an act to fix upon a person the offence of engaging in rebellion under this law, must be an overt and voluntary act, done with the intent of aiding or furthering the common unlawful purpose."  The Reconstruction Acts, 12 Op. Att'y Gen. 182, 204 (1867). Specifically, as it relates to incitement, he opined "disloyal sentiments, opinions, or sympathies would not disqualify, but where a person has by speech or by writing, incited others to engage in rebellion, he must come under the disqualification."  *Id*. at 205; *see also United States v. Powell*, 65 N.C. 709 (C.C.D.N.C. 1871) (the Court, instructing jury, that "the word

'engage' implies, and was intended to imply, a voluntary effort to assist the Insurrection
or Rebellion, and to bring it to a successful termination.").  Stanbery further rejected the
notion that a person need levy war or take up arms to have "engaged" in insurrection or
rebellion.  The Reconstruction Acts, 12 U.S. Op. Att'y Gen. 141, 161-62 ("...it does not
follow that other classes than those who actually levied war and voluntarily joined the
ranks of the rebels are to be excluded, taking it to be clear, that in the sense of this law
persons may have engaged in rebellion without having actually levied war or taken
arms...persons who, in their individual capacity, have done any overt act for the purpose
of promoting the rebellion, may well be said, in the meaning of this law, to have engaged
in rebellion.").  The Court agrees that "engage" was not intended to be limited to the
actual physical, prosecution of combat, or likewise import a necessity that an individual
take up arms.

255.    Lastly, it would be anomalous to exclude those insurrectionists or rebels
who, having taken an oath, participated in the insurrection or rebellion through
instigation or incitement.  Instigation and incitement are typically actions taken by
those in leadership roles, and not, for example, by those on the front lines, with weapon
in hand.  To exclude from disqualification such people would seem to defeat the purpose
of disqualification, at least as it relates to potential leaders of insurrection.  Intervenors'
position that "engage" requires more than incitement, therefore, undermines a
significant purpose of the disqualification, and as such the Court cannot favor this
interpretation.  *Jarrolt v. Moberly*, 103 U.S. 580, 586 (1880) ("A constitutional
provision should not be construed so as to defeat its evident purpose, but rather so as to

give it effective operation and suppress the mischief at which it was aimed."); *Classic*, 313 U.S. at 316 (when interpreting constitution "we cannot rightly prefer, of the possible meaning of its words, that which will defeat rather than effectuate the Constitutional purpose.").

256.    The Court does not endeavor to fully define the extent to which certain conduct might qualify as "engagement" under Section Three of the Fourteenth Amendment; it is sufficient, for the Court's purposes, to find that "engagement" includes "incitement."[17]  The Court agrees with Intervenors that engagement "connotes active, affirmative involvement."  The definition of incitement meets this connotation. "Incitement," as the Court has found, requires a voluntary, intentional act in furtherance of an unlawful objective; such an act is an active, affirmative one.

257.    As discussed below, the reason incitement falls outside of First Amendment protections is because of its quality of speech as action.  Consequently, the Court sees nothing inconsistent between a requirement that a person be affirmatively, actively involved in insurrection to qualify as having engaged therein and a finding that incitement qualifies as engagement.

### 3.  Does Engage Include Inaction?

258.    Intervenors argue this Court should not consider Trump's failure to act on January 6, 2021 as evidence that he engaged in an insurrection.

---

[17] The Court does note that at no point in this proceeding has Trump (or any other party) argued that some type of appropriate criminal conviction is a necessary precondition to disqualification under Section Three.  There is nothing in the text of Section Three suggesting that such is required, and the Court has found no case law or historical source suggesting that a conviction is a required element of disqualification.

259.    Petitioners argue that Trump's intentional dereliction of duty was undertaken with the purpose of helping the mob achieve their goal of obstructing the Electoral College certification and it is therefore an independent basis for finding that Trump engaged in insurrection.

260.    The Court holds that it need not look further than the words of Section Three to conclude that a failure to act does not constitute engagement under Section Three.

261.    Section Three provides two disqualifying offenses: (1) engaging in insurrection or rebellion; or (2) giving aid or comfort to enemies of the United States. U.S. CONST. amend. XIV, §3.   Under a plain reading of the text, "engag[ing]" is distinct from" giv[ing] aid or comfort to." *Id*.  In the Court's view engaging in an insurrection requires action whereas giving aid and comfort could include taking no action.

262.    Because the Petitioners do not argue that Trump gave aid or comfort to an enemy of the United States, the Court holds that Trump's inaction as it relates to his failure to send in law enforcement reinforcements it is not an independent basis for finding he engaged in insurrection.

263.    That does not mean that Trump's failure to condemn the January 6, 2021 attackers (at any point during the attack), his failure to tell the mob to go home (for three hours), or his failure to send reinforcements to support law enforcement has no relevance.  To the contrary, the Court holds that all three of these failures are directly relevant to the question of whether the Petitioners have proven the specific intent required under Section Three.

78

### 4. The First Amendment's Application

264.    Trump has advanced the argument that the conduct at the core of this case is pure speech, and as such, is afforded robust protections under the First Amendment. Trump raised this issue in his Special Motion to Dismiss Pursuant to C.R.S. § 13-20-1101(3)(a), in his subsequent motion to dismiss, and again during his motion for a directed verdict at trial.  The argument relies heavily on *Brandenburg v. Ohio*, 395 U.S. 444 (1969) and its progeny, and (broadly speaking) contends that Trump's purported involvement in the January 6, 2021 attack amounts to nothing more than pure speech which, under the *Brandenburg* test, is only sanctionable as incitement if such speech satisfies the requirements of imminence, intention, and tendency to produce violence. In his motion for a directed verdict, Trump argued that *Brandenburg* requires an objective analysis of the speaker's words when considering the test, citing the relatively recent Sixth Circuit decision *Nwanguma v. Trump*, 903 F.3d 604 (6th Cir. 2018).

265.    Petitioners generally respond that they seek disqualification under Section Three of the Fourteenth Amendment not just for speech, but for conduct, as well, and as such, the First Amendment provides no protection.  They further argue that, even if the First Amendment would normally operate to shield Trump's conduct from sanction, it has no application here where the sanction sought is itself required by the Constitution. Lastly, they argue that, even if *Brandenburg* applies to the proceeding, Trump's conduct satisfies the test and, consequently, his speech is appropriately subject to sanction as falling outside of the First Amendment protections.

266.    Before resolving the arguments of the Parties, the Court explores the lay of the land when it comes to First Amendment jurisprudence on the question of inflammatory political speech.

### a.  Legal Backdrop

267.    The Court starts with *Brandenburg*, it being the central case at issue and providing the namesake for the test the Court is to consider employing.  The appellant in *Brandenburg* was the leader of a local Ku Klux Klan chapter, convicted under the Ohio Criminal Syndicalism statute for "advocating the duty, necessity, or propriety of crime, sabotage, violence, or unlawful methods of terrorism as a means of accomplishing industrial or political reform" and for "voluntarily assembl(ing) with any society, group, or assemblage or persons formed to teach or advocate the doctrines of criminal syndicalism."  395 U.S. at 444-45 (quoting Ohio Rev. Code Ann. § 2923.13, *repealed by* 1972 H 511).  The Supreme Court of the United States held that the Ohio Criminal Syndicalism statute was unconstitutional on its face.  *Id*. at 448-49.  The *Brandenburg* Court held that developments in First Amendment jurisprudence favored "the principle that the constitutional guarantees of free speech . . . do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."  *Id*. at 447.  The *Brandenburg* Court cited *Noto v. United States*, 367 U.S. 290, 297-98 (1961) for the proposition that "the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the

same as preparing a group for violent action and steeling it to such action." 395 U.S. at 448.

268.    Almost a decade later, the Supreme Court considered the intersection of concerted political action and violence in *Nat'l Ass'n for the Advancement of Colored People v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). The case considered the boycott of white merchants in Claiborne County, Mississippi, which began in 1966. *Id.* at 889.

269.    At the trial court level, the merchants were awarded damages for lost profits from a seven-year period on three theories. *Id.* at 893. The Mississippi Supreme Court sustained the entirety of the damages imposed on the theory that the boycotters had agreed to use force, violence, and threats to effectuate the boycott. *Id.* at 895. The theory was that the boycott employed force and threats, which caused otherwise willing patrons to forego the boycotted businesses, rendering the entire boycott unlawful and the organizers liable for the entire cost of the boycott. *Id.* The entire history of the boycott will not be recounted by this Court, here; however, there are some salient details during the boycott that are relevant to the Court's task. On April 1, 1966, the Claiborne County branch of the National Association for the Advancement of Colored People convened and unanimously voted to boycott the white merchants of Port Gibson and Claiborne County. *Id.* at 900. Charles Evers gave a speech on that occasion, and though it was not recorded, the trial court found that Evers told the audience that "they would be watched and that blacks who traded with white merchants would be *answerable to him.*" *Id.* at 900, n. 28 (emphasis original). Further, according to the Sheriff, who

attended, Evers told the crowd that "any 'uncle toms' who broke the boycott would 'have their necks broken' by their own people." *Id.* The boycott proceeded for several years. *Id.* at 893.

270.   On April 18, 1969, a young black man named Roosevelt Jackson was shot to death by the Port Gibson, Mississippi, police. *Id.* at 902. Crowds gathered and protested the killing. *Id.* On April 19, Charles Evers gave a speech during which he warned that boycott violators would be "disciplined by their own people" and that the Port Gibson Sheriff "could not sleep with boycott violators at night." *Id.* On April 21, Charles Evers (among others) gave another speech stating "if we catch any of you going in any of them racist stores, we're gonna break your damn neck." *Id.* The trial court found that several instances of boycott-related violence had occurred over the preceding three years. *Id.* at 903-06. These included, among other things, the publication of the names of boycott-violators and subsequent ostracization and name-calling, instances of shots being fired through windows of homes owned by boycott violators, bricks and stones being thrown through car windows, and the trampling of a flower garden. *Id.* All these instances of violence occurred in 1966. *Id.* at 906.

271.   The Supreme Court found that "[t]hrough speech, assembly, and petition – rather than through riot or revolution – petitioners sought to change a social order that had consistently treated them as second-class citizens." *Id.* at 912. The Supreme Court recognized that, though these activities are constitutionally protected, the Mississippi Supreme Court's ruling was not predicated on the theory that state law prohibited a nonviolent, politically-motivated boycott, but rather on the theory that it

had constituted an agreement to use violence, fear, and intimidation. *Id*. at 915. The Supreme Court was emphatic that "the First Amendment does not protect violence," however it may masquerade. *Id*. at 916. The Court found that it was undisputed that some acts of violence had occurred in the context of the boycott. *Id*. However, the Court went on to find that in such circumstances, where violence occurs "in the context of constitutionally protected activity . . . 'precision of regulation' is demanded." *Id*. (quoting *Nat'l Ass'n for the Advancement of Colored People v. Button*, 371 U.S. 415, 438 (1963)).

272.    Relevant to the question before the Court is the Supreme Court's analysis of the liability imposed on Charles Evers. After noting that Evers could not be held liable by virtue of his association with the boycott alone, the Supreme Court acknowledged that the content of Evers' speeches was the purported basis for his liability. *Id*. at 926.

273.    The Supreme Court found that Evers' speech did not meet the necessary standard. *Id*. at 929. Emphasizing the distinction between mere advocacy for violence in the abstract, which is afforded protection, and incitement, the Supreme Court found that Evers' speech "generally contained an impassioned plea for black citizens to unify, to support and respect each other, and to realize the political and economic power available to them." *Id*. at 928. Acknowledging that, during Evers' speech, "strong language was used," the Supreme Court noted that, with one possible exception, "the acts of violence identified in 1966 occurred weeks or months after [Evers'] April 1, 1966

speech" and that there was no finding "of any violence after the challenged 1969 speech." *Id.*

274.    The Supreme Court held that "Strong and effective extemporaneous rhetoric cannot be nicely channeled into purely dulcet phrases.  An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause.  When such appeals do not incite lawless action, they must be regarded as protected speech."  *Id.*  The Supreme Court qualified its findings noting that "[i]f there were other evidence of [Evers'] authorization of wrongful conduct, the references to discipline in the speeches could be used to corroborate that evidence."  *Id.* at 929.  But, because there was "no evidence--apart from the speeches themselves--," that Evers authorized, ratified, or directly threatened acts of violence, the theory failed. *Id.*

275.    In summarizing its opinion, the Supreme Court noted litigation of this type is an extremely delicate matter, as the circumstances exist on a knife's edge between fundamental rights concerning association and concerted political activity, and the "special dangers" of conspiratorial activity.  *Id.* at 932-33.

276.    This Court undertakes its task mindful of the necessity of discharging the sort of "precision of regulation" necessary to ensure that the foundational First Amendment rights Petitioners' challenge implicates are not improperly curtailed. *Button*, 371 U.S. at 438.  What is also clear, however, is that violence is not protected expression: the Constitution does not protect lawlessness masquerading as political activism.

### b.  Does *Brandenburg* Apply?

277.    The Court first considers Petitioners' contention that *Brandenburg* and its progeny have no application to this case.  Petitioners first argue that their requested relief is not based on speech, but on conduct.  Specifically, they argue that Trump's conduct, while containing elements of speech, nevertheless constituted conduct, and point to his inaction during the insurrection, despite having knowledge of the violence and the authority (and affirmative duty) to intercede.  Petitioners further distinguish *Brandenburg* and related cases by pointing out that the limitation at issue here is imposed by virtue of the Constitution itself (and not state statute or regulation), applies to a limited category of people (*i.e.* those who have taken an oath to support the Constitution) and that the "penalty" imposed is not civil or criminal liability, but merely disqualification, a standard on who may hold office, imposed only by way of Constitutional Amendment.  Lastly, they argue that any apparent conflict between Section Three of the Fourteenth Amendment and the First Amendment is easily reconciled, as disqualification for engaging in rebellion or insurrection could not reach mere disloyal sentiments or the abstract teaching of the propriety of disloyalty but instead requires something more.

278.    With respect to Petitioners argument that their request for relief is based on conduct and not speech the Court disagrees.  The Court has already ruled on the argument's that Trump's inaction constitutes "engagement."  Further, the "conduct" leading up to the events of January 6, 2021, are predicated on public speeches and statements and therefore are appropriately analyzed as "speech."  The Court

emphasizes, however, that it considers Trump's actions and inactions prior to and on January 6, 2021 as context and history to inform its understanding of his speech on January 6, 2021 and the tweets on January 6, 2021.

279.    Regarding the argument that Section Three of the Fourteenth Amendment is nonpunitive and merely imposes a qualification for office, and therefore *Brandenburg*'s exacting standard is inapplicable, there is no direct guidance.  The nearest guidance this Court can find on the question is *Bond v. Floyd*, 385 U.S. 116 (1966).  There, a duly elected state legislator was prevented from taking his seat because of certain endorsements and statements he had made concerning his opposition to the Vietnam War and the draft.  *Id*. at 118-25.  His expulsion was affirmed by a federal court on the grounds that his conduct constituted a call to action to resist the draft.  *Id*. at 127. The Supreme Court considered the intersection of a legislative oath of loyalty, the requirement under Article VI that he swear one, and the First Amendment.  *Id*. at 131-32.  The Court found that Bond's disqualification violated the First Amendment, noting the danger that a majority faction might use the oath of loyalty to suppress dissenting political views, and finding that the speech at issue did not constitute a call to unlawfully resist the draft and as such did not demonstrate any "incitement to violation of law."  *Id*. at 132-34.

280.    The *Bond* Court emphasized the distinction between discussion, contemplation, and advocacy, on one hand, and calls for lawlessness, on the other.  *Id*. at 116.  *Bond* was cited by the *Brandenburg* Court for this principle.  395 U.S. at 448.

281.    While the Court believes that there is certainly room to distinguish the conduct at issue, here, and the conduct at issue in *Bond*, and does not suggest that the factual circumstances between the two cases are at all similar, the lessons from *Brandenburg*-related cases are clear: in order for speech to lose its protection, it must cross the threshold from abstraction to action; it must be used as a means of force, not a means of contemplation of advocacy. *See, e.g.*, *U.S. v. Dellinger*, 472 F.2d 340, 360 (7th Cir. 1972) (the question at the heart of incitement is "whether particular speech is intended to and has such capacity to propel action that it is reasonable to treat such speech as action."). Speech that constitutes an integral tool in furtherance of the lawless act loses its distinction and becomes an instrument of force. *See Milk Wagon Drivers Union of Chicago, Local 753 v. Meadowmoor Dairies*, 312 U.S. 287, 293 (1941) ("Utterance in a context of violence can lose its significance as an appeal to reason and become part of an instrument of force. Such utterance was not meant to be sheltered by the Constitution."). *Bond* suggests that these same principles apply with equal force in the context of elected officials and loyalty oaths.

282.    Acknowledging the foregoing principles, in this Court's view, reconciles the First and Fourteenth Amendments to the extent there is any conflict. Applying the *Brandenburg* standard to questions of incitement as "engagement," even in the context of elected officials and loyalty oaths, ensures that mere "disloyal sentiments, opinions, or sympathies" do not result in disqualification from office. It ensures that elected officials are afforded the appropriate breathing space to discuss public policy. Therefore, to the extent the Petitioners seek Trump's disqualification on the basis that

he engaged in insurrection through incitement, it must be proven that his speech was intended to produce imminent lawless action and was likely to do so.

### c. The *Brandenburg* Standard

283.   First, before undertaking the *Brandenburg* analysis, the Court addresses the argument Trump made during its motion for a directed verdict that the Court ought to consider only the "objective meaning" of the language at issue.  The Sixth Circuit considered and rejected the importation of an "objective analysis" in *Nwanguma*, and this Court likewise finds that "objectivity" is not a required part of the *Brandenburg* test.  903 F.3d at 613.

284.   As the U.S. Supreme Court observed, the court is obligated to make an independent examination of the whole record when considering the "content, form, and context" of the speech.  *Snyder v. Phelps*, 562 U.S. 443, 453-54 (2011) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964)).  Unlike in *Nwanguma*, the "whole record" here consists of more than just the Ellipse speech and more than just the plain language used.  Ultimately, all language is, at its core, a system of signals (whether through sounds, symbols, or otherwise) designed to convey meaning from a speaker to an audience.  An inquiry into a speaker's intent can appropriately probe what the speaker understands or knows about how his audience will perceive his speech. This is not an inquiry into the "reaction of the audience," but rather asks whether, and in what way, the speaker knows how his choice of language will be understood, and, therefore, what he "intends" his speech to mean as evidenced by his use of language. *Watts v. United States*, 394 U.S. 705 (1969) ("taken in context, and regarding the expressly

conditional nature of the statement and the reaction of the listeners, we do not see how it could be interpreted otherwise."); *Hess v. Indiana*, 414 U.S. 105, 108 (1973)("there was no evidence or rational inference from the import of the language that his words were intended to produce, and likely to produce, imminent disorder.").

285.   To assess whether Trump intended to produce disorder and whether his words were likely to produce disorder, the Court must consider his knowledge or understanding of how his words would be perceived by his audience.  Such an inquiry requires the Court to consider the history of Trump's relationship to and interaction with extremist supporters and political violence.  See, *e.g.*, *Claiborne Hardware Co.*, 458 U.S. at 929 (noting that "if there were other evidence of his [Evers'] authorization of wrongful conduct, the references to discipline in the speeches could be used to corroborate that evidence.").

286.   Second, the Court addresses the issue of the intent required to establish incitement.  Trump has raised the issue of the requisite level of intent to be applied in this matter and, by the Court's reading, the parties are largely in agreement.  The Court finds that the specific intent necessary to sustain a finding of incitement is likewise sufficient to sustain the intent required by Section Three.  Under *Brandenburg*, the inquiry is whether the speech at issue is "[1] intended to produce, and [2] likely to produce, imminent disorder."  *Counterman v. Colorado*, 600 U.S. 66, 97 (Sotomayor, J., concurring in part) (citation omitted).  The U.S. Supreme Court in *Counterman* wrote "when incitement is at issue, we have spoken in terms of specific intent, presumably equivalent to purpose or knowledge."  600 U.S. at 81.  "A person acts

purposefully when he 'consciously desires' a result." *Id*. at 79 (citation omitted). "A person acts knowingly when 'he is aware that [a] result is practically certain to follow." *Id*. (citation omitted). The *Counterman* Court noted that knowledge is "not often distinguished from purpose." *Id*.; *see also Tison v. Arizona*, 481 U.S. 137, 150 (1987) ("one intends certain consequences when he desires that his acts cause those consequence or knows that those consequences are substantially certain to result from his acts.").

287.   For this Court to find that Trump incited an insurrection, the Court must first find that he had the specific intent (either purpose or knowledge) to produce the insurrection. A finding that Trump had the purpose or knowledge of producing the insurrection is sufficient to satisfy the requirement that he "engaged" in insurrection through an intentional act.

## 5. Application of *Brandenburg*

288.   The Court concludes, based on its findings of fact and the applicable law detailed above, that Trump incited an insurrection on January 6, 2021 and therefore "engaged" in insurrection within the meaning of Section Three of the Fourteenth Amendment. First, the Court concludes that Trump acted with the specific intent to disrupt the Electoral College certification of President Biden's electoral victory through unlawful means; specifically, by using unlawful force and violence. Next, the Court concludes that the language Trump employed was likely to produce such lawlessness.

289.   Regarding Trump's specific intent (either purpose or knowledge), the Court considers highly relevant Trump's history of courting extremists and endorsing

political violence as legitimate and proper, as well as his efforts to undermine the
legitimacy of the 2020 election results and hinder the certification of the Electoral
College results in Congress.  Trump's history of reacting favorably to political violence
committed at his rallies or in his name, as well as his cultivation of relationships with
extremist political actors who frequently traffic in violent rhetoric, is well-established.
Trump has consistently endorsed violence and intimidation as not only legitimate
means of political expression, but as necessary, even virtuous.  Further, the Court has
found that Trump was aware that his supporters were willing to engage in political
violence and that they would respond to his calls for them to do so.

290.    In addition to his consistent endorsement of political violence, Trump
undertook efforts to undermine the legitimacy of the 2020 presidential election well in
advance of the election, making accusations of widespread corruption, voter fraud, and
election rigging.  These efforts intensified when the election results were returned
showing that he had lost the election, despite a complete lack of evidence showing any
such fraud and his knowledge that there was no evidence.  As the electoral college votes
were cast, and the certification date drew closer, Trump further intensified his public
efforts at disrupting the certification, even as violence, intimidation, and calls for
political violence escalated.  In the wake of this, Trump supported calls for protests in
Washington, D.C., and focused his call on the date of the certification, January 6, 2021.
Trump continued to inflame his supporters with false accusations of historic levels of
election corruption.  Leading up to January 6, 2021, federal law enforcement and
security agencies identified significant threats of violence associated with the planned

January 6, 2021 rallies.  Despite these warnings, Trump undertook no effort to prepare

law enforcement or discourage violence among the prospective attendees.  Importantly,

he did not tell law enforcement he intended to direct the crowd to protest at the Capitol.

291.    On the morning of January 6, 2021, Trump focused the attention of his

supporters on Vice President Mike Pence and his role in certifying the electoral college

results, falsely claiming Vice President Pence had the authority to "send back" the

electoral votes for recertification.  Trump proceeded to give a speech at the Ellipse,

wherein he again inflamed his supporters by contending that the election was "stolen,"

that the country was in existential danger from endemic corruption, that strength and

action were needed to save the country, and that it was time to do something about it.

He continued to focus the crowd on Vice President Pence and directed the crowd to

march to the Capitol building, claiming that he would be joining them.  The crowd

reacted predictably, marched on the Capitol, violently clashed with police officers

attempting to secure the building, and breached the building with the intent to disrupt

the certification.

292.    After being informed of the attack, Trump did little.  Trump first sent out a

tweet condemning Vice President Pence for refusing to illegally interrupt the electoral

vote certification and continued to promote his false claims that the 2020 presidential

election was fraudulent.  He later sent out tweets encouraging his supporters to "remain

peaceful" and "stay peaceful" despite knowing that they were not peaceful.  Predictably,

these tweets had no effect.  Trump resisted calls from advisors and members of his party

to intercede and took no immediate action to quell the violence.  It was not until 4:17

p.m. that Trump released a video that unmistakably called for the mob to disperse while simultaneously praising their conduct.  Trump continued to praise the violent conduct of the mob after it had dispersed.

293.    The Court concludes that Trump acted with the specific intent to incite political violence and direct it at the Capitol with the purpose of disrupting the electoral certification.  Trump cultivated a culture that embraced political violence through his consistent endorsement of the same.  He responded to growing threats of violence and intimidation in the lead-up to the certification by amplifying his false claims of election fraud.  He convened a large crowd on the date of the certification in Washington, D.C., focused them on the certification process, told them their country was being stolen from them, called for strength and action, and directed them to the Capitol where the certification was about to take place.

294.    When the violence began, he took no effective action, disregarded repeated calls to intervene, and pressured colleagues to delay the certification until roughly three hours had passed, at which point he called for dispersal, but not without praising the mob and again endorsing the use of political violence.  The evidence shows that Trump not only knew about the potential for violence, but that he actively promoted it and, on January 6, 2021, incited it.  His inaction during the violence and his later endorsement of the violence corroborates the evidence that his intent was to incite violence on January 6, 2021 based on his conduct leading up to and on January 6, 2021.  The Court therefore holds that the first *Brandenburg* factor has been established.

295.     Regarding the second *Brandenburg* factor, the Court finds that the
language Trump used throughout January 6, 2021 was likely to incite imminent
violence.  The language Trump employed must be understood within the context of his
promotion and endorsement of political violence as well as within the context of the
circumstances as they existed in the winter of 2020, when calls for violence and threats
relating to the 2020 election were escalating.  For years, Trump had embraced the virtue
and necessity of political violence; for months, Trump and others had been falsely
claiming that the 2020 election had been flagrantly rigged, that the country was being
"stolen," and that something needed to be done.

296.     Knowing of the potential for violence, and having actively primed the
anger of his extremist supporters, Trump called for strength and action on January 6,
2021, posturing the rightful certification of President Biden's electoral victory as "the
most corrupt election in the history, maybe of the world" and as a "matter of national
security," telling his supporters that they were allowed to go by "very different rules" and
that if they didn't "fight like hell, [they're] not going to have a country anymore."  Such
incendiary rhetoric, issued by a speaker who routinely embraced political violence and
had inflamed the anger of his supporters leading up to the certification, was likely to
incite imminent lawlessness and disorder.  The Court, therefore, finds that the second
*Brandenburg* factor has been met.

297.     Trump has, throughout this litigation, pointed to instances of Democratic
lawmakers and leaders using similarly strong, martial language, such as calling on
supporters to "fight" and "fight like hell."  The Court acknowledges the prevalence of

martial language in the political arena; indeed, the word "campaign" itself has a military history.  *See*, *e*.*g*., *Claiborne Hardware Co*., 458 U.S. at 928 ("Strong an effective extemporaneous rhetoric cannot be nicely channeled into purely dulcet phrases.").  This argument, however, ignores both the significant history of Trump's relationship with political violence and the noted escalation in Trump's rhetoric in the lead up to, and on, January 6, 2021.  It further disregards the distinct atmosphere of threats and calls for violence existing around the 2020 election and its legitimacy.  When interpreting Trump's language, the Court must consider not only the content of his speech, but the form and context as well.  *See Id*. at 929 (noting that, if there had been "other evidence" of Evers' "authorization of wrongful conduct," the references to "discipline" in his speeches could be used to corroborate that evidence).

298.   Consequently, the Court finds that Petitioners have established that Trump engaged in an insurrection on January 6, 2021 through incitement, and that the First Amendment does not protect Trump's speech.

## C.  DOES SECTION THREE OF THE FOURTEENTH AMENDMENT APPLY TO PRESIDENT TRUMP?

299.   For Section Three of the Fourteenth Amendment to apply to Trump this Court must find both that the Presidency is an "office . . . under the United States" and that Trump took an oath as "an officer of the United States" "to support the Constitution of the United States."  U.S. CONST. amend. XIV, § 3.

300.   Professor Magliocca provided historical evidence that the Presidency was understood as an "office, civil or military, under the United States" such that

95

disqualified individuals could not assume the Presidency.  11/01/23 Tr. 59:17-62:6. The most compelling testimony to that effect was an exchange between Senators Morrill and Johnson during the Congressional Debates over Section Three, where one Senator explained to the other that the Presidency was covered by "office, civil or military, under the United States."  Professor Magliocca also testified it would be preposterous that Section Three would not cover Jefferson Davis—the President of the Confederacy— should he have wished to run for President of the United States after the civil war.  *Id.*

301.    The Court holds there is scant direct evidence regarding whether the Presidency is one of the positions subject to disqualification.  The disqualified offices enumerated are presented in descending order starting with the highest levels of the federal government and descending downwards.  It starts with "Senator or Representatives in Congress," then lists "electors of President and Vice President," and then ends with the catchall phrase of "any office, civil or military, under the United States, or under any State."  U.S. CONST. amend. XIV, § 3.

302.    To lump the Presidency in with any other civil or military office is odd indeed and very troubling to the Court because as Intervenors point out, Section Three explicitly lists all federal elected positions except the President and Vice President. Under traditional rules of statutory construction, when a list includes specific positions but then fails to include others, courts assume the exclusion was intentional.  *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391 (2015) (finding that Congress intended to exclude rules or regulations when it included only the word "law" versus elsewhere where it used the phrase "laws, rule or regulation").

303.    Finally, the Intervenors point out that an earlier version of the Amendment read "No person shall be qualified or shall hold the office of President or vice president of the United States, Senator or Representative in the national congress...." Kurt Lash, *The Meaning and Ambiguity of Section Three of the Fourteenth Amendment*, 10 (Oct. 28, 2023) (unpublished draft) (on file with the Social Science Research Network).  This fact certainly suggests that the drafters intended to omit the office of the Presidency from the offices to be disqualified.[18]

304.    The Court holds that it is unpersuaded that the drafters intended to include the highest office in the Country in the catchall phrase "office . . . under the United States."

305.    Next the Court addresses whether Trump "previously [took] an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State." U.S. CONST. amend. XIV, § 3.  Because President Trump was never a congressman, state legislator, or state officer, Section Three applies only if he was an "officer of the United States." *Id.*

306.    Professor Magliocca testified that during Reconstruction, the President of the United States was understood to be an "officer of the United States."  11/01/2023 Tr.

---

[18] In response to the argument that it would be preposterous that Section Three of the Fourteenth Amendment would not prevent Jefferson Davis from being President of the United States, the Court notes that one possible reason why the Presidency was not included in positions disqualified is that Section Three clearly disqualifies electors for the office of the President and Vice President. Perhaps, the thought process was that by excluding electors who were former oath swearing confederates, there was effectively no chance of a former confederate leader becoming President or Vice President.

51:20-52:3. He points to Attorney General Stanbery's first opinion that stated that the phrase "officer of the United States" was used "in its most general sense and without any qualification" in Section Three. 11/01/23 Tr. 53:12–54:4; The Reconstruction Acts, 12 U.S. Op. Att'y Gen. 141, 158 (1867).  The next sentence, however, would cut against including a President when Stanbery states "I think, as here used, it was intended to comprehend military as well as civil officers of the United States who had taken the prescribed oath." The Reconstruction Acts, 12 U.S. Op. Att'y Gen. 141, 158.  To refer to the President of the United States as a mere "civil officer" is counterintuitive.

307.    The Court holds that the more obvious reading of Attorney General Stanbery's opinion is that his reference to the "most general sense and without any qualification" was to make it clear that, unlike with State officers, the phrase applied to all lower-level federal officers so long as they took an oath, and did not apply only to the upper echelon of the military and civil ranks.

308.    Stanbery's second opinion likewise states that "officers of the United States" applied "without limitation" to any "person who has, at any time prior to the rebellion held any office, civil or military, under the United States and has taken an official oath to support the Constitution of the United States." The Reconstruction Acts, 12 U.S. Op. Att'y Gen. 182, 203(1867); 11/03/23 Tr. 256:22–257:13.

309.    In other words, Magliocca testified because the Presidency is an "office," the person who holds that office and swears an oath was understood to be an "officer." Stanbery's second opinion later goes on to say that the President is an "executive officer." The Reconstruction Acts, 12 U.S. Op. Att'y Gen. 182, 196 (1867); 11/01/23 Tr.

59:11–16.   But to some extent this reference cuts against the President being included because Section Three explicitly includes "executive . . . officer[s] of any State" but only includes "officer of the United States".   U.S. Const. amend. XIV, § 3.

310.   Magliocca further argued that contemporary usage supports the view that the President is an "officer of the United States." Andrew Johnson repeatedly referred to himself as such in presidential proclamations, members of Congress both during the 39th Congress that ratified the Fourteenth Amendment and during Johnson's impeachment several years later repeatedly referred to the President the same way, and earlier presidents in the Nineteenth Century were referred to the same way. 11/01/23 Tr. 56:3–59:16, 69:21–71:21.

311.   On the other hand, Intervenors argue that five constitutional provisions show that the President is not an "officer of the United States."

- The Appointments Clause in Article II, Section 2, Clause 2 distinguishes between the President and officers of the United States. Specifically, the Appointments Clause states that the President "shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law." U.S. Const. art. II, § 2, cl. 2.

- The Impeachment Clause in Article II, Section 4 separates the President and Vice President from the category of "civil Officers of the United States:" "The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors." U.S. Const. art. II, § 4.

- The Commissions Clause in Article II, Section 3 specifies that the President "shall Commission all the Officers of the United States." U.S. Const. art. II, § 3.

99

- In the Oath and Affirmation Clause of Article VI, Clause 3, the President is explicitly absent from the enumerated list of persons the clause requires to take an oath to support the Constitution. The list includes "[t]he Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States." US. CONST. art. VI, cl. 3.

- Article VI provides further support for distinguishing the President from "Officers of the United States" because the oath taken by the President under Article II, Section 1, Clause 8 is not the same as the oath prescribed for officers of the United States under Article VI, Clause 3.

312.   The Court agrees with Intervenors that all five of those Constitutional provisions lead towards the same conclusion—that the drafters of the Section Three of the Fourteenth Amendment did not intend to include the President as "an officer of the United States."

313.   Here, after considering the arguments on both sides, the Court is persuaded that "officers of the United States" did not include the President of the United States.  While the Court agrees that there are persuasive arguments on both sides, the Court holds that the absence of the President from the list of positions to which the Amendment applies combined with the fact that Section Three specifies that the disqualifying oath is one to "support" the Constitution whereas the Presidential oath is to "preserve, protect and defend" the Constitution, [19]  it appears to the Court that for

---

[19] The Court agrees with Petitioners that an oath to preserve, protect and defend the Constitution encompasses the same duties as an oath to support the Constitution.  The Court, however, agrees with Intervenors that given there were two oaths in the Constitution at the time, the fact that Section Three references the oath that applies to Article VI, Clause 3 officers suggests that that is the class of officers to whom Section Three applies.

whatever reason the drafters of Section Three did not intend to include a person who had only taken the Presidential Oath. [20]

314.    To be clear, part of the Court's decision is its reluctance to embrace an interpretation which would disqualify a presidential candidate without a clear, unmistakable indication that such is the intent of Section Three.  As Attorney General Stanbery again noted when construing the Reconstruction Acts, "those who are *expressly* brought within its operation cannot be saved from its operation.  Where, from the generality of terms of description, or for any other reason, a reasonable doubt arises, that doubt is to be resolved against the operation of the law and in favor of the voter." The Reconstruction Acts, 12 U.S. Op. Att'y Gen. 141, 160 (1867) (emphasis added).[21] Here, the record demonstrates an appreciable amount of tension between the competing interpretations, and a lack of definitive guidance in the text or historical sources.

315.    As a result, the Court holds that Section Three of the Fourteenth Amendment does not apply to Trump.

---

[20] Whether this omission was intentional, or an oversight is not for this Court to decide.  It may very well have been an oversight because to the Court's knowledge Trump is the first President of the United States who had not previously taken an oath of office.

[21] The Court is mindful that Stanbery was considering disenfranchisement, not qualification for office, and that he was interpreting a statute he considered "penal and punitive" in nature; the Court nevertheless finds that the principle articulated, that the law ought err on the side of democratic norms except where a contrary indication is clear, is appropriate and applicable to the circumstances.

## VI.    CONCLUSION

Pursuant to the above, the Court ORDERS the Secretary of State to place Donald J. Trump on the presidential primary ballot when it certifies the ballot on January 5, 2024.

DATED: November 17, 2023.

BY THE COURT:

Sarah B. Wallace
District Court Judge