# STATE OF MICHIGAN

# COURT OF CLAIMS

EXHIBIT
1

ROBERT LaBRANT, ANDREW BRADWAY,
NORAH MURPHY and WILLIAM NOWLING,

      Plaintiffs,

v

JOCELYN BENSON, in her official capacity as
Secretary of State,

      Defendant.

_____/

**OPINION AND ORDER**

Case No.  23-000137-MZ

Hon. James Robert Redford

## OPINION AND ORDER DENYING PLAINTIFFS' REQUEST
## FOR DECLARATORY AND INJUNCTIVE RELIEF

In the instant case, 23-000137-MZ, plaintiffs come before the Court seeking declaratory

and injunctive relief to:

> 1. Declare Donald J. Trump is disqualified from holding the office of President of the United States pursuant to Section 3 of the Fourteenth Amendment to the Constitution of the United States;
>
> 2. Permanently enjoin the Secretary of State from including Donald J. Trump on the ballot for the 2024 presidential primary election and;
>
> 3. Permanently enjoin the Secretary of State from including Donald J. Trump on the ballot for the November 5, 2024 general election as a candidate for the office of President of the United States.

For the reasons which will be set forth below the Court holds:

> 1. Michigan's Constitution of 1963, art 2, § 4 and MCL 168.614a and 168.615a prescribe the manner a person may have their name placed on the Michigan presidential primary ballot and in so doing direct the actions the Secretary of State shall take.

2.  The Fourteenth Amendment arguments of plaintiffs present a political question that is nonjusticiable at the present time. [1]

The Court will therefore DENY plaintiffs' prayer for declaratory relief and for a permanent injunction as relates to the Michigan primary election ballot for 2024. [2]

## I. STANDARD OF REVIEW

MCR 2.605, which affords the Court the power to enter a declaratory judgment, "incorporates the doctrines of standing, ripeness, and mootness." *Int'l Union, United Auto, Aerospace & Agricultural Implement Workers of America v Central Mich Univ Trustees*, 295 Mich App 486, 495; 815 NW2d 132 (2012). MCL 2.605(A)(1) provides, "[i]n a case of actual controversy within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted." To obtain declaratory relief, a plaintiff must thus show that he is an interested party and allege a "case of actual controversy" within the jurisdiction of the court. "An actual controversy exists when a declaratory judgment is needed to guide a party's future conduct in order to preserve that party's legal rights." *League of Women Voters of Mich v Sec'y of State*, 506 Mich 561, 586; 957 NW2d 731 (2020). A court "is not precluded from reaching issues before actual injuries or losses have occurred," but there still must be "a present legal

---

[1] The Court thanks and acknowledges the parties', proposed intervenor's, and all amicus curiae filers' thoughtful and comprehensive submissions received by the Court.

[2] The Court notes there are three cases that seek relief related to the 2024 Michigan presidential primary election: *Davis v Benson et al.*, 23-000128-MB, *LaBrant et al. v Benson*, 23-000137-MZ, and *Trump v Benson*, 23-000151-MZ. Because the cases are not consolidated and to facilitate immediate and individual appellate review of each opinion and order if desired by a litigant, while the Court may discuss some aspects of other cases in each opinion and order, the Court will seek to set forth the entire basis of the Court's rulings in each individual opinion and order, recognizing that there will be some redundancy in the respective cases.

controversy, not one that is merely hypothetical or anticipated in the future." *Id*. The bar for standing is lowered in cases concerning election laws, but even in election cases, a party may not bring a declaratory-judgment action on the basis that they "*might* affect his or her interests in the future" or because "they only want instruction going forward." *Id*. at 587-588 (emphasis added). In addition, in determining whether a present controversy exists, "[a] claim is not ripe if it rests upon contingent future events that may not occur as anticipated, or may not occur at all." *Citizens Protecting Michigan's Constitution v Sec'y of State*, 280 Mich App 273, 282; 761 NW2d 210 (2008). See also *Thomas v Union Carbide Agricultural Prod Co*, 473 US 568, 580-581; 105 S Ct 3325; 87 L Ed 2d 409 (1985).

## II. HISTORICAL INFORMATION

### A. BRIEF BACKGROUND OF THE UNITED STATES CONSTITUTION

On September 17, 1787, the Constitution of the United States was agreed upon in the Constitutional Convention and transmitted to Congress by George Washington, the President of the Constitutional Convention. See Myers, *History Of The Printed Archetype Of The Constitution Of The United States Of America,* 11 Green Bag 2d 217 (2008). The Constitution was thereafter transmitted to the several states for consideration on September 28, 1787. See *id*. Following ratification by the states, March 4, 1789, was selected as the date upon which the operation of the government under the Constitution would commence.

The Constitution has Seven Articles which generally address the following:

| Article I | The Legislature |
|---|---|
| Article II | The Executive |
| Article III | The Judiciary |
| Article IV | The Relationships between the Federal Government & States, Creation of New States |

| Article V | The Amendment Process |
| Article VI | The Supremacy Clause and the Oath required of persons holding certain offices to support the Constitution |
| Article VII | The Ratification Process for the United States Constitution |

On September 25, 1789, Congress transmitted twelve proposed Amendments to the Constitution to the states, ten of which were adopted and became the Bill of Rights, effective December 15, 1791. Since its adoption, in total, the Constitution has been amended 27 times. See US Const, Am I-XXVII. Of these amendments, the following specifically address the office of the President: the XII, XX, XXII, XXIII, and XXV. The XII, XIV and XXIII Amendments also, *inter alia*, address the office of presidential electors.

## B. POST-BILL OF RIGHTS & PRE-CIVIL WAR AMENDMENTS

The Eleventh Amendment, ratified February 7, 1795, placed certain limits on the judicial power unrelated to the matter at bar. The Twelfth Amendment, ratified June 15, 1804, set forth the process by which electors would vote for President and Vice President.

## C. CIVIL WAR

In November 1860, Abraham Lincoln was elected the Sixteenth President of the United States. Between December 20, 1860 and June 8, 1861, 11 states voted to secede from the United States.

On February 8, 1861, the Constitution for the Provisional Government of the Confederate States of America was adopted.[3] Jefferson Davis was selected to be Provisional President of the

---

[3] Yale Law School, Lillian Goldman Law Library, The Avalon Project https://avalon.law.yale.edu/19th_century/csa_csapro.asp, accessed November 13, 2023.

Confederate States of America on February 18, 1861.[4]  On March 11, 1861, the Constitution of

the Confederate States of America was adopted.[5]

On April 12, 1861, the federal enclave and military reservation at Fort Sumter, South

Carolina was bombarded by cannon fire.  On April 9, 1865, at Appomattox Court House, Virginia,

the Army of Northern Virginia surrendered to the Union Army.

### D. THE THIRTEENTH, FOURTEENTH & FIFTEENTH AMENDMENTS TO THE U.S. CONSTITUTION
### THE CIVIL WAR AMENDMENTS

The Thirteenth Amendment, ratified December 6, 1865, abolished slavery.  US Const, Am

XIII.

The Fourteenth Amendment, ratified July 9, 1868, contains five sections including Section

3, the subject of this case, referred to as the Insurrection Clause.  US Const, Am XIV.

The Fifteenth Amendment was ratified February 3, 1870, and prohibited states from

denying the right to vote on the basis of race, color, or previous condition of servitude.  US Const,

Am XV.

### III. ANALYSIS

### A. PLAINTIFFS' ALLEGATIONS

Plaintiffs filed their complaint September 29, 2023. The complaint alleges actions and

instances of inaction by Donald J. Trump, before, during, and after January 6, 2021, that plaintiffs

---

[4] https://www.britannica.com/biography/Jefferson-Davis, accessed November 10, 2023.

[5] Yale Law School, Lillian Goldman Law Library, The Avalon Project, https://avalon.law.yale.edu/19th_century/csa_csa.asp, accessed November 13, 2023.

allege make him ineligible to stand for election for the office of President of the United States, on the basis of Section 3 of the Fourteenth Amendment to the United States Constitution.

B. LEGAL ANALYSIS

1.  MICHIGAN'S CONSTITUTION AND STATUTES PRESCRIBE ELIGIBILITY TO BE PLACED ON THE MICHIGAN PRESIDENTIAL PRIMARY BALLOT

The Court finds that the statutory steps currently involved in any candidate being placed on the Michigan presidential primary ballot demonstrate that plaintiffs cannot show that they are entitled to a declaratory judgment with respect to an individual who is running in the Michigan primary election for the office of President. This is because the 1963 Michigan Constitution grants the power to the Michigan Legislature to regulate elections under Const 1963, art 2, § 4(2) and because the Legislature has specifically delineated the process by which an individual is to be placed on a presidential primary ballot.

Const 1963, art 2, § 4(2) provides the Michigan Legislature the power to "enact laws to regulate the time, place and manner of all nominations and elections, to preserve the purity of elections, to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting." The Legislature in turn has prescribed the process and eligibility for a presidential candidate to be placed on the primary ballot in the mandatory requirements set out in MCL 168.614a and MCL 168.615a. MCL 168.614a(1) requires:

> Not later than 4 p.m. of the second Friday in November of the year before the presidential election, the secretary of state *shall* issue a list of the individuals generally advocated by the national news media to be potential presidential candidates for each party's nomination by the political parties for which a presidential primary election will be held under section [MCL 168.613a]. The secretary of state *shall* make the list issued under this subsection available to the

-6-

public on an internet website maintained by the department of state. [Emphasis added.][6]

MCL 168.614a(2) provides for the state chairperson of each political party to then file a list of individuals whom they consider to be potential presidential candidates for that party and requires the Secretary to make that list available to the public. MCL 168.615a then requires the Secretary to place the candidates so identified on the presidential primary ballot unless a candidate withdraws. "Except as otherwise provided in this section, the secretary of state *shall* cause the name of a presidential candidate notified by the secretary of state under [MCL 168.614a] to be printed on the appropriate presidential primary ballot for that political party." MCL168.615a(1) (Emphasis added).

Under those requirements, while the Secretary is mandated to act, she retains discretion as to what media sources to consider when choosing which candidates to list on the notices she provides to the respective political parties under MCL 168.614a. However, the ultimate decision is made by the respective political party, with the consent of the listed candidates.[7] Given this comprehensive statutory scheme, there are substantial questions whether plaintiffs' complaint,

---

[6] The Court notes, at oral argument on November 9, 2023, in this case and Cases 23-000128-MB and 23-000151-MZ, the attorney for the Secretary of State indicated that, in accordance with the Michigan Court Rules regarding deadlines that fall upon a weekend or legal holiday, the issuance of the list of individuals described in MCL 168.614a(1) would be transmitted on Monday, November 13, 2023, instead of Friday, November 10, 2023, because November 10, 2023, was the state of Michigan holiday in observance of Veteran's Day.

[7] The Court notes that candidates seeking to be placed on the presidential primary ballot in Michigan, if not included in the process outlined above and as provided by MCL 168.614a, may seek ballot access through a nominating petition process set forth in MCL 168.15a(2).

taken in the light most favorable to plaintiffs, supports a conclusion that other qualifications to be placed on the presidential primary ballot may be imposed by the Court. [8]

The Court is further persuaded by the analysis of the Minnesota Supreme Court in its November 8, 2023 order in *Growe et al. v Simon*, ___ NW2d ___ (Minn, 2023). As in the instant case, petitioners in *Growe* asked the Court to determine that Donald Trump was disqualified from holding the office of President under Section 3, and requested that the Court direct the Minnesota Secretary of State to exclude him from Minnesota's March 5, 2024 primary ballot and from the 2024 general election ballot.

The Court first determined, as the Court does here, that any question concerning Donald Trump's placement on the general election ballot is not ripe, or "about to occur" as required for relief under Minn Stat 204B. Turning to the question of disqualification to be placed on the primary ballot, the Court discussed the steps involved in placing candidates on the presidential primary ballot. Similar to the steps in the instant case, Minnesota's procedure involves placement on the ballot after the Chair of the Republican Party of Minnesota provides his name to the Minnesota Secretary of State.

The Court determined that, although the Minnesota Secretary of State and administration officials "administer the mechanics of the election," primary elections are designed as an aid to the respective political parties in choosing their nominees at the national conventions:

> The Legislature enacted the presidential nomination primary process to allow major political parties to select delegates to the national conventions of those parties; at those conventions the selected delegates will cast votes along with delegates from all of the other

---

[8] Similarly, this is among the reasons that this Court will not order the Secretary to place former President Trump on the primary ballot. The relevant statutory provisions contain the only way set out by the Legislature for a candidate to be placed on the ballot.

states and territories and choose a presidential candidate who will subsequently appear on general election ballots. See Minn. Stat. § 207A.11(d) (2022) (explaining that the presidential nomination primary "only applies to a major political party that selects delegates at the presidential nomination primary to send to a national convention"). This is "a process that allows political parties to obtain voter input in advance of a nomination decision made at a national convention." *De La Fuente v Simon*, 940 NW2d 477, 492 (Minn, 2020). Thus, although the Secretary of State and other election officials administer the mechanics of the election, this is an internal party election to serve internal party purposes, and winning the presidential nomination primary does not place the person on the general election ballot as a candidate for President of the United States. As we explained in *De La Fuente*, in upholding the constitutionality of this statutory scheme for the presidential nomination primary, "[t]he road for any candidate's access to the ballot for Minnesota's presidential nomination primary runs only through the participating political parties, who alone determine which candidates will be on the party's ballot." 940 N.W.2d at 494-95. And there is no state statute that prohibits a major political party from placing on the presidential nomination primary ballot, or sending delegates to the national convention supporting, a candidate who is ineligible to hold office. [*Growe*, slip op pp 2-3].

Similarly, in Michigan, the procedures outlined in MCL 168.614a and MCL 168.615a provide the specific and explicit mechanism by which the Secretary of State is to place candidates on the 2024 Michigan presidential primary ballot. They are designed to assist the parties in determining their respective presidential candidates, and the Legislature has not provided any prohibition as to who may be placed on such ballots, irrespective as to whether the individual may either serve as a general election candidate or ultimately serve as President if elected.

In addition, the sheer number of steps involved in any candidate becoming a political party's candidate for President, in addition to the requirement that the candidate wins the general election, show that declaratory relief is not proper, at least at this time.

The Michigan Republican Party must list Mr. Trump as a Republican primary candidate in Michigan. Should they do so, he would then have to win said primary, which may well be affected by outside events that have occurred by that time. If he wins the Michigan primary, he would still have to prevail in primary challenges in the other states and win the vote at the Republican National

Convention to become the national Republican candidate. This process, too, is subject to the influence of outside events. Even if he prevails at that stage, he must win the general election.

If he does so, and his right to be seated as President is challenged and he is found to be under the Section 3 disability, he could then petition Congress to have that disability removed. Congress, by Section 3 of the Fourteenth Amendment, may remove the disability with a two-thirds vote of both Houses. As discussed, "[a] claim is not ripe if it rests upon contingent future events that may not occur as anticipated, or may not occur at all." *Citizens Protecting Michigan's Constitution*, 280 Mich App at 282. Whether former President Trump even becomes the President-elect is such a future event that plaintiffs cannot demonstrate that their request for a declaratory judgment is ripe at this time.

## 2. POLITICAL QUESTION

An additional reason the Court concludes that plaintiffs cannot receive the relief of preventing former President Trump from being placed on the primary ballot—should he satisfy Michigan's process of determining who should be listed as a candidate—is that a claim such as that raised by plaintiffs turns on a nonjusticiable political question.

Section 3 of the Fourteenth Amendment of the United States Constitution states:

No person shall be a Senator or Representative in Congress, or elector of President and Vice-President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

Section 5 of the Fourteenth Amendment of the United States Constitution states:

The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

In determining whether to apply the political-question doctrine, the Supreme Court identified six factors relevant to the political-question doctrine in the 1962 case, *Baker v Carr*, 369 US 186; 82 S Ct 691; 7 L Ed 2d 663 (1962).

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] or a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question. [*Id.* at 217.]

With respect to factor 1 concerning who has the responsibility of making a factual determination of whether a person can serve under Section 3, the well-thought-out analysis and conclusion in *Castro v New Hampshire Sec'y of State*, ____ F Supp 3d ___ (D NH, 2023) (Docket No. 23-CV-416-JL, issued October 27, 2023) is helpful.  This was a similar case to the matter at bar in which the plaintiff sought an injunction barring the New Hampshire Secretary of State from placing former President Trump's name on the New Hampshire Republican primary ballot because of an alleged disqualification under Section 3.

After discussing whether the plaintiff had standing, and setting out the *Baker* factors, the *Castro* Court provided the following analysis:

> The defendants contend that Castro's claim triggers the first *Baker* formulation, and they cite a number of cases that support their position.  Indeed, state and federal district courts have consistently found that the U.S. Constitution assigns to Congress and the electors, and not the courts, the role of determining if a presidential candidate or president is qualified and fit for office—at least in the first instance.  Courts that have considered the issue have found this textual

assignment in varying combinations of the Twelfth Amendment and the Electoral Count Act, 3 U.S.C. § 15, which prescribe the process for transmitting, objecting to, and counting electoral votes; the Twentieth Amendment, which authorizes Congress to fashion a response if the president elect and vice president elect are unqualified; and the Twenty-Fifth amendment and Article I impeachment clauses, which involve Congress in the removal of an unfit president from office.

For example, in *Robinson v Bowen*, the plaintiff moved for a preliminary injunction removing Senator McCain from the 2008 California general election ballot on the ground that he was not a "natural-born citizen," as required under Article II of the U.S. Constitution. 567 F Supp 2d 1144, 1145 (ND Cal 2008). The *Robinson* Court denied the motion and dismissed the case upon finding, in part, that the plaintiff's challenge raised a nonjusticiable political question. The *Robinson* Court noted that the Twelfth Amendment and the Electoral Count Act provide that "Congress shall be in session on the appropriate day to count the electoral votes," and that Congress decides upon the outcome of any objections to the electoral votes. *Id.* at 1147. The *Robinson* Court reasoned that

> It is clear that mechanisms exist under the Twelfth Amendment and [the Electoral Count Act] for any challenge to any candidate to be ventilated when electoral votes are counted, and that the Twentieth Amendment provides guidance regarding how to proceed if a president elect shall have failed to qualify. Issues regarding qualifications for president are quintessentially suited to the foregoing process . . . . Therefore, this order holds that the challenge presented by plaintiff is committed under the Constitution to the electors and the legislative branch, at least in the first instance. Judicial review—if any—should occur only after the electoral and Congressional processes have run their course.

*Id.* (citing *Texas v United States*, 523 US 296, 300-02, 118 S Ct 1257, 140 L Ed 2d 406 (1998)).

Similarly, in *Grinols v Electoral Coll*, the plaintiffs moved for a temporary restraining order halting the re-election of then-President Obama on the ground that he was ineligible for office because he was not a natural-born citizen. 2013 WL 211135, at *1. The *Grinols* Court denied the motion largely because it found the plaintiffs' claim "legally untenable." *Id.* at *2. It reasoned, in part, that "numerous articles and amendments of the Constitution," including the Twelfth Amendment, Twentieth Amendment, Twenty-Fifth Amendment, and the Article I impeachment clauses, "make it clear that the Constitution assigns to Congress, and not the Courts, the responsibility of determining whether a person is qualified to serve as President. As such, the question presented by Plaintiffs in this case—whether President Obama may legitimately run for office and serve as President—is a political question that the Court may not answer." *Id.* at * 4.

Courts across the country have reached the same conclusion, based on similar reasoning. See, e.g., *Kerchner v Obama*, 669 F Supp 2d 477, 483 n 5 (D

NJ 2009) (referencing the Twelfth and Twentieth Amendments, as well as Congress's role in counting electoral votes, and concluding that "it appears that" the plaintiffs' constitutional claims premised on President Obama's purported ineligibility are "barred under the 'political question doctrine' as a question demonstrably committed to a coordinate political department"), aff'd 612 F3d 204 (3d Cir 2010); *Taitz v Democrat Party of Mississippi*, No. 3:12-CV-280-HTW-LRA, 2015 WL 11017373, at *16 (SD Miss Mar. 31, 2015) ("find[ing] no authority in the Constitution which would permit [the court] to determine that a sitting president is unqualified for office or a president-elect is unqualified to take office[,]" and concluding that "[t]hese prerogatives are firmly committed to the legislative branch of our government"); *Jordan v Secretary of State Sam Reed*, No. 12-2-01763-5, 2012 WL 4739216, at *1 (Wash Super Aug. 29, 2012) ("The primacy of congress to resolve issues of a candidate's qualifications to serve as president is established in the U.S. Constitution.").

Critically, Castro does not present case law that contradicts the authority discussed above—nor has the court found any.

\* \* \*

In sum, the vast weight of authority has held that the Constitution commits to Congress and the electors the responsibility of determining matters of presidential candidates' qualifications. Castro provides no reason to deviate from this consistent authority. Thus, it appears to the court that Castro's claim—which challenges Trump's eligibility as a presidential candidate under Section 3 of the Fourteenth Amendment—raises a nonjusticiable political question. As such, even if Castro did have standing to assert his claim, the court would lack jurisdiction to hear it under the political question doctrine. [*Castro*, slip op pp 7-9 (footnotes omitted).]

The Court agrees with the above analysis. Additionally, the actions of those to whom Section 3's disqualification provision applied and Congress's post-civil war responses to the various problems with the way "disabilities" were initially removed support the conclusion that Congress is primarily responsible for taking actions to effectuate Section 3.

The Fourteenth Amendment was ratified July 9, 1868. After this, the 1872 General Amnesty Act and the Amnesty Act of 1898 were passed.

The 1872 General Amnesty Act provided:

> Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled (two-thirds of each house concurring therein), That all political disabilities imposed by the third section of the fourteenth article of amendments of the Constitution of the United States are hereby removed from all persons whomsoever, except Senators and Representatives of the thirty-sixth and thirty-seventh Congresses, officers in the judicial, military, and naval service of the United States, heads of departments, and foreign ministers of the United States. [17 Stat 142]

The 1872 law cleared over 150,000 former Confederate troops who had taken part in the American Civil War.   See Heritage Library, <https://heritagelib.org/amnesty-act-of-1872#>, accessed November 10, 2023

Subsequently, Congress removed the Section 3 disability from those remaining individuals, enacting the Amnesty Act of 1898. This Act provides, "[t]hat the disability imposed by section three of the Fourteenth Amendment to the Constitution of the United States heretofore incurred is hereby removed." Act of June 6, 1898, ch 389; 30 Stat 432.

That Congress could remove the Section 3 bar to serving, at least with respect to individuals barred at that time,[9] by enacting a law to "remove" the disability, en masse, even to those who could be said to be barred from service, but had not yet personally sought such relief, itself indicates that Congress not only had the power to remove the disability when asked by a specific candidate, but also possesses the broader "proactive" power to decide how to apply Section 3 in the first instance.

Arguments have been made that Congress's only role with respect to Section 3 is to remove a disability only after the judicial branch has determined that the individual cannot serve.  For

---

[9] The Court notes that there is disagreement over whether the enactment of the Amnesty Act was also intended to apply prospectively to future individuals who would otherwise be barred from holding office under Section 3.  However, the Court need not reach that issue at this time.

example, in *Anderson v Griswold*, Colorado Denver District Court, Docket No. 2023-CV-32577, issued October 25, 2023, slip op p 17, the Court stated that Congress "has disavowed any ability it once had to consider objections other than [those in 3 USC 15(d)(2)(B)(*ii*), when 1) "the electors of the State were not lawfully certified under a certificate of ascertainment of appointment of electors according to section 5(a)(1)", or 2) "where the vote of one or more electors has not been regularly given."] including any regarding the constitutional qualifications of the President-elect." However, Section 5 of the Fourteenth Amendment explicitly provides Congress with the "power to enforce, by appropriate legislation, the provisions of this article." The fact that Congress may have, at least for the moment, decided not to address this question prior to judicial intervention does not change the fact that they have the power to do so, and have certainly done so in the past.

With respect to the remaining factors set out in *Baker*, the Court notes that factors 2, 4, 5, and 6 apply to the instant case.

In Bradley and Posner, *The Real Political Question Doctrine*, Stanford Law Review, Vol. 75 (2023), the authors discuss how the "prudential" concerns in the *Baker* factors play into the use of the doctrine. Notably, two United States Supreme Court decisions after *Baker* support an analysis that some questions fall within the doctrine, at least in part, because of the related prudential concerns of causing "chaos", see *Nixon v United States*, 506 US 224, 236; 113 S Ct 732; 122 L Ed 2d 1 (1993), or because the courts would be pulled into recurring and highly partisan disputes, such as in the instant case, see *Rucho v Common Cause*, ___ US ___; 139 S Ct 2484, 2507; 204 L Ed 2d 931 (2019).

In *Nixon*, a case involving former United States District Judge Walter L. Nixon's impeachment trial before the Senate, the Court held that a challenge to the Senate's use of a

committee to receive evidence during an impeachment trial, similar to the way congressional committees investigated early Section 3 cases, raised a political question. The impeached judge in *Nixon* argued that the Senate's use of the committee was inconsistent with the Constitutional requirement that the Senate "try" impeachment cases. However, as discussed in *The Real Political Question Doctrine*, pp 1070-1072, the Court found that the first *Baker* factor applied even though the Constitution did not specify that the Senate had exclusive authority to decide the relevant trial procedures to be used for impeachments. *Nixon*, 506 US at 228-229. Its reason for doing so involved prudential concerns. In reaching its conclusion, the Court specifically tied the first and second factors together, and held "the concept of a textual commitment to a coordinate political department is not completely separate from the concept of a lack of judicially discoverable and manageable standards for resolving it; the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch." *Id.* After its analysis of Article I, § 3, cl 6, the Court further held that the "chaos" involved in attempting to fashion relief supported the finding of a political question. In doing so, this case provides support for the premise that attempting to resolve the question of whether former President Trump appears on the Michigan primary ballot, or any other ballot, is nonjusticiable.

> In addition to the textual commitment argument, we are persuaded that the lack of finality and the difficulty of fashioning relief counsel against justiciability. See *Baker v Carr*, 369 US, at 210, 82 S Ct, at 706. We agree with the Court of Appeals that opening the door of judicial review to the procedures used by the Senate in trying impeachments would "expose the political life of the country to months, or perhaps years, of chaos." 290 US App DC, at 427, 938 F2d, at 246. This lack of finality would manifest itself most dramatically if the President were impeached. The legitimacy of any successor, and hence his effectiveness, would be impaired severely, not merely while the judicial process was running its course, but during any retrial that a differently constituted Senate might conduct if its first judgment of conviction were invalidated. Equally uncertain is the question of what relief a court may give other than simply setting aside the judgment of conviction. Could it order the reinstatement of a convicted federal judge, or order Congress to

-16-

> create an additional judgeship if the seat had been filled in the interim? [*Nixon*, 506
> US at 236.]

See also *id.* at 253 (Souter, J., concurring in the judgment) (discussing that one significant

consideration was "the potentiality of embarrassment from multifarious pronouncements by

various departments on one question", and stating, "As the Court observes, judicial review of an

impeachment trial would under the best of circumstances entail significant disruption of

government." (citation omitted)).

In *Rucho*, Chief Justice Roberts wrote:

> Chief Justice Marshall famously wrote that it is "the province and duty of the
> judicial department to say what the law is." *Marbury v Madison*, 1 Cranch 137, 177, 2 L
> Ed. 60 (1803). Sometimes, however, "the law is that the judicial department has no
> business entertaining the claim of unlawfulness—because the question is entrusted to one
> of the political branches or involves no judicially enforceable rights." *Vieth v Jubelirer*,
> 541 US 267, 277; 124 S Ct 1769; 158 L Ed 2d 546 (2004) (plurality opinion). In such a
> case the claim is said to present a "political question" and to be nonjusticiable—outside the
> courts' competence and therefore beyond the courts' jurisdiction. *Baker v Carr*, 369 US
> 186, 217; 82 S Ct 691; 7 L Ed 2d 663 (1962). Among the political question cases the Court
> has identified are those that lack "judicially discoverable and manageable standards for
> resolving [them]." *Id.* [*Rucho*, 139 S Ct at 2494.]

*Rucho* involved a request to intervene in light of a complaint alleging partisan

gerrymandering by Republicans in North Carolina and Democrats in Maryland. The Supreme

Court held that the challenges raised a political question. *Id.* at 2506-2507. The Court emphasized

the difficulty that courts would have with resolving such claims using a "limited and precise

rationale" that was also "clear, manageable, and politically neutral." *Id.* at 2498 (quotation marks

and citation omitted). The Court found that intervention in "heated partisan issues" required such

constraints, *id.*, because "[w]ith uncertain limits, intervening courts—even when proceeding with

best intentions—would risk assuming political, not legal, responsibility for a process that often

produces ill will and distrust." *Id.* (quotations and citations omitted). The Court also noted that

the circumstances were such that "the Constitution provides no basis whatever to guide the exercise of judicial discretion." *Id.* at 2506.  With respect to the caution against becoming embroiled in recurring and highly partisan districting disputes, the Court further held:

> [I]ntervention would be unlimited in scope and duration—it would recur over and over again around the country with each new round of districting, for state as well as federal representatives.  Consideration of the impact of today's ruling on democratic principles cannot ignore the effect of the unelected and politically unaccountable branch of the Federal Government assuming such an extraordinary and unprecedented role. [*Id.* at 2507.]

The instant case presents the potential for running afoul of these principles.  In the companion case of 23-000128-MB, the Secretary has included in Exhibit 1, a list of active and recently dismissed state and federal cases, each involving former President Trump.  There are 37 cases on the Secretary's list, and it does not include either of the companion cases currently before this Court.  Should this trend continue, it is conceivable that there could be 50 state cases, and a number of concurrent federal ones, each with a judicial officer or officers who "even when proceeding with best intentions," have the potential to issue partial or even totally conflicting opinions on the basis of a significant number of potentially dispositive issues.  Some of these cases, such as *Anderson*, are already proceeding to trial.[10]  Prior to the United States Supreme Court's intervention, none of these opinions, or factual findings, are binding on any other court.

The questions involved are by their nature political.  The number of cases presents the risk of completely opposite and potentially confusing opinions and outcomes, which will certainly "expose the political life of the country to months, or perhaps years, of chaos."  Moreover, there

---

[10] The Court notes, *Anderson* and *Castro* discussed above reached opposite conclusions with respect to whether the question is justiciable.  This Court agrees with the *Castro* Court that it is not.

is no "limited and precise rationale" to guide this Court and the others that is also "clear, manageable, and politically neutral." Because the cases involve the office of the President, such confusion and lack of finality will be more pronounced. *Nixon*, 506 US at 236.

In determining if a question is justiciable, it is worthwhile to consider what the judiciary is asked to determine. In this case, some questions while complex, are nonetheless straightforward and embrace traditional means of legal decision-making. Is a specific office sought covered? Has a person taken a previous oath that is applicable?

Others are far more nuanced and complex. This Court recognizes the judiciary does not avoid questions because they are nuanced, complex, or difficult; however, when applying the *Baker* principles and standards, it seems appropriate in this case to ask:

What is an insurrection or a rebellion? What is it to engage in it or to give aid and comfort to the enemies of the Constitution?

Does it require a war of 1,458 days with 620,000 killed and battles throughout the land? [11] Could it be based on actions of physical violence, lawlessness, destruction, interruption of legislative sessions all of which take place on a single day even if allegedly supported by and aided by speeches and comments and actions and inactions by an individual before, during, and after that day? Could it be a political speech that some may argue encourages or incites others to act in ways they believe results in moral culpability on the part of the speaker for physical violence?

---

[11] American Battlefield Trust  https://www.battlefields.org/learn/articles/civil-war-casualties, accessed November 13, 2023.

The short answer is–there are as many answers and gradations of answers to each of these proffered examples as there are people called upon to decide them.

The inappropriateness of the judicial branch resolving these questions, tendered by Section 3 of the Fourteenth Amendment, includes that the judicial action of removing a candidate from the presidential ballot and prohibiting them from running essentially strips Congress of its ability to "by a vote of two-thirds of each House, remove such a disability." Also, it takes the decision of whether there was a rebellion or insurrection and whether or not someone participated in it from the Congress, a body made up of elected representatives of the people of every state in the nation, and gives it to but one single judicial officer, a person who no matter how well intentioned, evenhanded, fair and learned, cannot in any manner or form possibly embody the represented qualities of every citizen of the nation–as does the House of Representatives and the Senate. Nor is that judicial officer provided the "power to enforce, by appropriate legislation, the provisions of this article," Section 5. [12]

---

[12]Plaintiffs argue that the chaos created by permitting Mr. Trump to run, and become the President-elect, prior to having Congress adjudicate whether he is disqualified under Section 3, would be far worse than that which is presently occurring. Because the Constitution contains direction on what will occur should a President-elect fail to qualify for office (see US Const, Am XX, § 3) or is unable to discharge the duties of his office (see US Const, Am XXV, § 4), this Court respectfully disagrees. As unsettling as such a process could be, it is the process provided for in the Constitution and is preferable to potentially having 50 or more separate trials or evidentiary hearings, which will undoubtedly rely on nonstandard definitions of "insurrection or rebellion" or what constitutes providing "aid and comfort" to an "enemy" of the United States, where the results could then be completely contradictory and which would then have to survive the various state appellate processes—all in the extremely short time before the various state primaries. Also, the Court respectfully finds plaintiffs' argument that the United States Supreme Court would then be able to manage subsequent appeals and ultimately determine these issues in time for the effective administration of various primary elections speculative.

## IV.  CONCLUSION

For each of the reasons discussed above, the Court DENIES declaratory relief to plaintiffs in 23-000137-MZ.

IT IS SO ORDERED.

This is a final order and closes this case.


Date:  November 14, 2023



Hon. James Robert Redford
Judge, Court of Claims