# MICHAEL DENNEHY

### POLITICAL STRATEGIST

mike@dennehybouley.com    |    +603-228-1601    |    2 Shaw Divide, Bow, NH 03304


EXHIBIT A

## Profile Summary

Highly qualified political strategist with 30+ years of experience in multiple political campaign disciplines, campaign management and message development. Proven ability to establish and operate successful campaigns.

## Professional Skill

- General Consulting
- Voter Advocacy
- Campaign Strategy
- Media Relations
- Message Development
- Campaign Plans

## Education

**Bachelor of Science, Southern New Hampshire University**          *1987-1991*
Marketing

## Work Experience

**Steve Duprey for Congress, Field Manager**          *1991-1992*

**Steve Merrill for Governor, Field Manager**          *1992*

**Steve Merrill for Governor, Political Director**          *1994*

**Phil Gramm for President (Texas), Political Director**          *1995-1996*

**NH Republican Party, Executive Director**          *1996-1998*

**Lucas for Governor, Campaign Manager**          *1998*

**John McCain for President (Arizona), Campaign Manager**          *1999-2000*

**Straight Talk America, Executive Director (Washington, DC)**          *2000-2001*

**RNC, Republican National Committeeman (Washington, DC)**          *2000-2002*

**Joe Schwarz for Congress (Michigan), Strategist**          *2002*

**John McCain for President, National Political Director (Washington, DC)**          *2006-2008*

**Governor Haley Barbour (Mississipppi), Strategist**          *2012*

**Governor Rick Perry (Texas), Strategist**          *2014-2015*

**The Dennehy Group, Strategist on over 50 political campaigns**          *2004-2022*

# REPORT OF RECEIPTS AND DISBURSEMENTS

**FEC FORM 3P**

BY AN AUTHORIZED COMMITTEE OF A CANDIDATE
FOR THE OFFICE OF PRESIDENT OR VICE PRESIDENT



EXHIBIT **B**

Office Use Only

**1. NAME OF COMMITTEE** (in full, type or print)

Example: If typing, type over the lines. `12FE4M5`

Castro for America

ADDRESS (number and street)    12 Park Place

◄ Check if different than previously reported. (ACC)

Mansfield    CITY    TX    STATE    76063    ZIP CODE    –

**2. FEC IDENTIFICATION NUMBER** ▶    C    C00728097

**3. TYPE OF REPORT** *(Choose One)*

Check here if this is a Termination Report (TER) ☐

Quarterly Reports:

[x] April 15 (Q1)
☐ October 15 (Q3)
☐ July 15 (Q2)
☐ January 31 Year-End Report (YE)

Monthly Reports:

☐ Feb 20 (M2)  ☐ May 20 (M5)  ☐ Aug 20 (M8)  ☐ Nov 20 (M11)
☐ Mar 20 (M3)  ☐ Jun 20 (M6)  ☐ Sep 20 (M9)  ☐ Dec 20 (M12)
☐ Apr 20 (M4)  ☐ Jul 20 (M7)  ☐ Oct 20 (M10)  ☐ Jan 31 (YE)

☐ 12-Day Pre-Election Report for the Election on

M M / D D / Y Y Y Y    in the State of [    ]

☐ 30-Day Post-Election Report for the General Election on

M M / D D / Y Y Y Y

**4. IS THIS REPORT AN AMENDMENT?**    ☐ yes    [x] no

**5. COVERING PERIOD**    01 / 01 / 2023    THROUGH    03 / 31 / 2023

I certify that I have examined this Report and to the best of my knowledge and belief it is true, correct and complete.

Type or Print Name of Treasurer    Castro, John, Anthony, ,

Signature of Treasurer    *Castro, John, Anthony, ,*    *[Electronically Filed]*    Date    03 / 23 / 2023

NOTE: Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. §30109.
All previous versions of this form are obsolete and should no longer be used.

Office Use Only

FEC **Form 3P** (Rev. 05/2016)                                      PAGE 2 / 10

Write or Type Committee Name

# Castro for America

Report Covering the Period:    From:    M M 01 / D D 01 / Y Y Y Y 2023    To:    M M 03 / D D 31 / Y Y Y Y 2023

## SUMMARY

6.  CASH ON HAND AT BEGINNING OF REPORTING PERIOD ............................................................. | **20000000.00**

7.  TOTAL RECEIPTS THIS PERIOD
    (From Line 22, Column A, Page 3) .......................................................................................................... | **40000000.00**

8.  SUBTOTAL
    (Lines 6 and 7) ........................................................................................................................................ | **60000000.00**

9.  TOTAL DISBURSEMENTS THIS PERIOD
    (From Line 30, Column A, Page 4) ........................................................................................................ | **0.00**

10. CASH ON HAND AT CLOSE OF THE REPORTING PERIOD
    (Subtract Line 9 from 8)......................................................................................................................... | **60000000.00**

11. DEBTS AND OBLIGATIONS OWED TO THE COMMITTEE
    (Itemize All on Schedule C-P or Schedule D-P)..................................................................................... | **0.00**

12. DEBTS AND OBLIGATIONS OWED BY THE COMMITTEE
    (Itemize All on Schedule C-P or Schedule D-P)..................................................................................... | **20000000.00**

13. EXPENDITURES SUBJECT TO LIMIITATION
    (Use the worksheet on Page 8 to calculate this amount.) ................................................................... | **0.00**

## NET ELECTION CYCLE-TO-DATE CONTRIBUTIONS AND EXPENDITURES

14. NET CONTRIBUTIONS (Other than Loans)
    (Subtract Line 28d, Column B on Page 4 from 17e, Column B on Page 3).................................... | **20000000.00**

15. NET OPERATING EXPENDITURES
    (Subtract Line 20a, Column B on Page 3 from 23, Column B on Page 4)....................................... | **0.00**

# DETAILED SUMMARY PAGE
## of Receipts

FEC **Form 3P** (Rev. 05/2016)

PAGE 3 / 10

NAME OF COMMITEE (in Full)

Castro for America

Report Covering the Period:    From: M M 01 / D D 01 / Y Y Y Y 2023    To: M M 03 / D D 31 / Y Y Y Y 2023

| I. RECEIPTS | COLUMN A<br>Total This Period | COLUMN B<br>Election Cycle-to-Date |
|---|---|---|
| 16.  FEDERAL FUNDS (Itemize on Schedule A-P) ............ | 0.00 | 0.00 |
| 17.  CONTRIBUTIONS (other than loans) FROM: | | |
| (a)  Individuals/Persons Other Than Political Committees | | |
| (i) itemized ........................................ | 0.00 | 0.00 |
| (ii) unitemized ................................... | 0.00 | 0.00 |
| (iii) Total contributions ........................ | 0.00 | 0.00 |
| (b)  Political Party Committees ............................. | 0.00 | 0.00 |
| (c)  Other Political Committees ............................ | 0.00 | 0.00 |
| (d)  The Candidate ........................................... | 20000000.00 | 20000000.00 |
| (e)  TOTAL CONTRIBUTIONS (other than loans) (Add 17(a), 17(b), 17(c) and 17(d)) ..................... | 20000000.00 | 20000000.00 |
| 18.  TRANSFERS FROM OTHER AUTHORIZED COMMITTEES ............................................... | 0.00 | 0.00 |
| 19.  LOANS RECEIVED: | | |
| (a)  Loans Received From or Guaranteed by Candidate ............................................... | 20000000.00 | 20000000.00 |
| (b)  Other Loans............................................... | 0.00 | 0.00 |
| (c)  TOTAL LOANS (Add 19(a) and 19(b) ................ | 20000000.00 | 20000000.00 |
| 20.  OFFSETS TO EXPENDITURES (Refunds, Rebates, etc.): | | |
| (a)  Operating ................................................. | 0.00 | 0.00 |
| (b)  Fundraising................................................ | 0.00 | 0.00 |
| (c)  Legal and Accounting ................................. | 0.00 | 0.00 |
| (d)  TOTAL OFFSETS TO EXPENDITURES (Add 20(a), 20(b) and 20(c)) ............................. | 0.00 | 0.00 |
| 21.  OTHER RECEIPTS (Dividends, Interest, etc.)............... | 0.00 | 0.00 |
| 22.  TOTAL RECEIPTS (Add 16, 17(e), 18, 19(c), 20(d) and 21) ..................... | 40000000.00 | 40000000.00 |

# DETAILED SUMMARY PAGE
of Disbursements and Contributed Items

FEC **Form 3P** (Rev. 05/2016)

PAGE 4 / 10

NAME OF COMMITEE (in Full)

Castro for America

Report Covering the Period:    From:    M M 01 / D D 01 / Y Y Y Y 2023    To:    M M 03 / D D 31 / Y Y Y Y 2023

| **II. DISBURSEMENTS** | **COLUMN A** Total This Period | **COLUMN B** Election Cycle-to-Date |
|---|---|---|
| 23. OPERATING EXPENDITURES | 0.00 | 0.00 |
| 24. TRANSFERS TO OTHER AUTHORIZED COMMITTEES | 0.00 | 0.00 |
| 25. FUNDRAISING DISBURSEMENTS | 0.00 | 0.00 |
| 26. EXEMPT LEGAL AND ACCOUNTING DISBURSEMENTS | 0.00 | 0.00 |
| 27. LOAN REPAYMENTS MADE: | | |
| (a) Repayments of Loans made or Guaranteed by Candidate | 0.00 | 0.00 |
| (b) Other Repayments | 0.00 | 0.00 |
| (c) TOTAL LOAN REPAYMENTS MADE (Add 27(a) and 27(b)) | 0.00 | 0.00 |
| 28. REFUNDS OF CONTRIBUTIONS TO: | | |
| (a) Individuals/Persons Other Than Political Committees | 0.00 | 0.00 |
| (b) Political Party Committees | 0.00 | 0.00 |
| (c) Other Political Committees | 0.00 | 0.00 |
| (d) TOTAL CONTRIBUTION REFUNDS (Add 28(a), 28(b) and 28(c)) | 0.00 | 0.00 |
| 29. OTHER DISBURSEMENTS | 0.00 | 0.00 |
| 30. TOTAL DISBURSEMENTS (Add 23, 24, 25, 26, 27(c), 28(d) and 29) | 0.00 | 0.00 |

## III. CONTRIBUTED ITEMS
### (Stock, Art Objects, Etc.)

| | | |
|---|---|---|
| 31. ITEMS ON HAND TO BE LIQUIDATED (Attach List) | 0.00 | |

FEC **Form 3P** (Rev. 05/2016)
Federal Election Commission
999 E Street, N.W.
Washington, D.C. 20463

## ALLOCATION OF PRIMARY EXPENDITURES
## BY STATE FOR
## A PRESIDENTIAL CANDIDATE
### (Used Only by Primary Committees Receiving
### or Expecting To Receive Federal Funds)

Page 5

**1.  NAME OF COMMITTEE** (in full, type or print)       **2. FEC IDENTIFICATION NUMBER**       C    C00728097

Castro for America

ADDRESS (number and street)   12 Park Place

Mansfield                                    TX       76063       –

CITY                                              STATE          ZIP CODE

**3. NAME OF CANDIDATE**

## ALLOCATION BY STATE

| STATE | ALLOCATION This Period | TOTAL ALLOCATION To Date |
|---|---|---|
| Alabama | 0.00 | 0.00 |
| Alaska | 0.00 | 0.00 |
| Arizona | 0.00 | 0.00 |
| Arkansas | 0.00 | 0.00 |
| California | 0.00 | 0.00 |
| Colorado | 0.00 | 0.00 |
| Connecticut | 0.00 | 0.00 |
| Delaware | 0.00 | 0.00 |
| District of Columbia | 0.00 | 0.00 |
| Florida | 0.00 | 0.00 |
| Georgia | 0.00 | 0.00 |
| Hawaii | 0.00 | 0.00 |
| Idaho | 0.00 | 0.00 |
| Illinois | 0.00 | 0.00 |

| STATE | ALLOCATION This Period | TOTAL ALLOCATION To Date | Page 6 |
|---|---|---|---|
| Indiana | 0.00 | 0.00 | |
| Iowa | 0.00 | 0.00 | |
| Kansas | 0.00 | 0.00 | |
| Kentucky | 0.00 | 0.00 | |
| Louisiana | 0.00 | 0.00 | |
| Maine | 0.00 | 0.00 | |
| Maryland | 0.00 | 0.00 | |
| Massachusetts | 0.00 | 0.00 | |
| Michigan | 0.00 | 0.00 | |
| Minnesota | 0.00 | 0.00 | |
| Mississippi | 0.00 | 0.00 | |
| Missouri | 0.00 | 0.00 | |
| Montana | 0.00 | 0.00 | |
| Nebraska | 0.00 | 0.00 | |
| Nevada | 0.00 | 0.00 | |
| New Hampshire | 0.00 | 0.00 | |
| New Jersey | 0.00 | 0.00 | |
| New Mexico | 0.00 | 0.00 | |
| New York | 0.00 | 0.00 | |
| North Carolina | 0.00 | 0.00 | |
| North Dakota | 0.00 | 0.00 | |
| Ohio | 0.00 | 0.00 | |
| Oklahoma | 0.00 | 0.00 | |
| Oregon | 0.00 | 0.00 | |
| Pennsylvania | 0.00 | 0.00 | |

| STATE | ALLOCATION This Period | TOTAL ALLOCATION To Date | Page 7 |
|---|---|---|---|
| Rhode Island | 0.00 | 0.00 | |
| South Carolina | 0.00 | 0.00 | |
| South Dakota | 0.00 | 0.00 | |
| Tennessee | 0.00 | 0.00 | |
| Texas | 0.00 | 0.00 | |
| Utah | 0.00 | 0.00 | |
| Vermont | 0.00 | 0.00 | |
| Virginia | 0.00 | 0.00 | |
| Washington | 0.00 | 0.00 | |
| West Virginia | 0.00 | 0.00 | |
| Wisconsin | 0.00 | 0.00 | |
| Wyoming | 0.00 | 0.00 | |
| Puerto Rico | 0.00 | 0.00 | |
| Guam | 0.00 | 0.00 | |
| Virgin Islands | 0.00 | 0.00 | |
| TOTALS | 0.00 | 0.00 | |

# SCHEDULE A-P
# ITEMIZED RECEIPTS

Use separate schedule(s) for each category of the Detailed Summary Page

FOR LINE NUMBER: (check only one)

PAGE 8 / 10

| 16 | 17a | 17b | 17c | [x] 17d | 18 |
| 19a | 19b | 20a | 20b | 20c | 21 |

Any information copied from such Reports and Statements may not be sold or used by any person for the purpose of soliciting contributions or for commercial purposes, other than using the name and address of any political committee to solicit contributions from such committee.

NAME OF COMMITTEE (In Full)
Castro for America

---

**A.** Full Name (Last, First, Middle Initial)
Castro, John, Anthony, ,

Mailing Address  12 Park Place

| City | State | Zip Code |
| Mansfield | TX | 76063 |

FEC ID number of contributing federal political committee.   **C** P40007312

| Name of Employer | Occupation |
| AiTax.com | CEO |

Receipt For: 2024
[x] Primary  [ ] General
[ ] Other (specify) ▼

Election Cycle-to-Date ▼
40000000.00

Transaction ID : SA17D.4100

Date of Receipt
M M 03  D D 15  Y Y Y Y 2023

Amount of Each Receipt this Period
20000000.00

[ ] Memo Item

---

**B.** Full Name (Last, First, Middle Initial)

Mailing Address

| City | State | Zip Code |

FEC ID number of contributing federal political committee.   **C**

| Name of Employer | Occupation |

Receipt For:
[ ] Primary  [ ] General
[ ] Other (specify) ▼

Election Cycle-to-Date ▼

Date of Receipt
M M   D D   Y Y Y Y

Amount of Each Receipt this Period

[ ] Memo Item

---

**C.** Full Name (Last, First, Middle Initial)

Mailing Address

| City | State | Zip Code |

FEC ID number of contributing federal political committee.   **C**

| Name of Employer | Occupation |

Receipt For:
[ ] Primary  [ ] General
[ ] Other (specify) ▼

Election Cycle-to-Date ▼

Date of Receipt
M M   D D   Y Y Y Y

Amount of Each Receipt this Period

[ ] Memo Item

---

**Subtotal Of Receipts This Page** (optional).............................................. ▶  20000000.00

**Total This Period** (last page this line number only) ........................... ▶  20000000.00

FEC **Schedule A–P (Form 3P)** (Rev. 05/2016)

# SCHEDULE A-P
# ITEMIZED RECEIPTS

| Use separate schedule(s) for each category of the Detailed Summary Page | FOR LINE NUMBER: (check only one) | PAGE 9 / 10 |
|---|---|---|

FOR LINE NUMBER: (check only one)

| | | | | |
|---|---|---|---|---|
| 16 | 17a | 17b | 17c | 17d | 18 |
| x 19a | 19b | 20a | 20b | 20c | 21 |

Any information copied from such Reports and Statements may not be sold or used by any person for the purpose of soliciting contributions or for commercial purposes, other than using the name and address of any political committee to solicit contributions from such committee.

NAME OF COMMITTEE (In Full)
Castro for America

**A.** Full Name (Last, First, Middle Initial)
Castro, John, Anthony, ,

Mailing Address 12 Park Place

| City | State | Zip Code |
|---|---|---|
| Mansfield | TX | 76063 |

FEC ID number of contributing federal political committee.
C P40007312

| Name of Employer | Occupation |
|---|---|
| AiTax.com | CEO |

Receipt For: 2024
x Primary ☐ General
☐ Other (specify) ▼

Election Cycle-to-Date ▼
20000000.00

**Transaction ID : SA19A.4101**

Date of Receipt
M M 03 / D D 13 / Y Y Y Y 2023

Amount of Each Receipt this Period
20000000.00

☐ Memo Item

---

**B.** Full Name (Last, First, Middle Initial)

Mailing Address

| City | State | Zip Code |
|---|---|---|
| | | |

FEC ID number of contributing federal political committee.
C

| Name of Employer | Occupation |
|---|---|
| | |

Receipt For:
☐ Primary ☐ General
☐ Other (specify) ▼

Election Cycle-to-Date ▼

Date of Receipt
M M / D D / Y Y Y Y

Amount of Each Receipt this Period

☐ Memo Item

---

**C.** Full Name (Last, First, Middle Initial)

Mailing Address

| City | State | Zip Code |
|---|---|---|
| | | |

FEC ID number of contributing federal political committee.
C

| Name of Employer | Occupation |
|---|---|
| | |

Receipt For:
☐ Primary ☐ General
☐ Other (specify) ▼

Election Cycle-to-Date ▼

Date of Receipt
M M / D D / Y Y Y Y

Amount of Each Receipt this Period

☐ Memo Item

---

Subtotal Of Receipts This Page (optional)..................................................▶ 20000000.00

Total This Period (last page this line number only) ....................................▶ 20000000.00

FEC **Schedule A–P (Form 3P)** (Rev. 05/2016)

# SCHEDULE C–P
# LOANS

Use separate schedule(s) for each category
of the Detailed Summary Page

| PAGE | OF |
| --- | --- |

FOR LINE NUMBER:   [x] 19a   [ ] 19b
(check only one)

NAME OF COMMITTEE (In Full)

Castro for America

Transaction ID : SC/12.4101

---

**LOAN SOURCE**  Full Name (Last, First, Middle Initial)   [ ] Memo Item

Castro, John, Anthony, ,

Mailing Address
12 Park Place

| City | State | Zip Code |
| --- | --- | --- |
| Mansfield | TX | 76063 |

Election:  2024
[x] Primary
[ ] General
[ ] Other (specify) ▼
_____

[x]  Personal Funds of the Candidate

| Original Amount of Loan | Cumulative Payment To Date | Balance Outstanding at Close of This Period |
| --- | --- | --- |
| 20000000.00 | 0.00 | 20000000.00 |

**TERMS**

| Date Incurred | Date Due | Interest Rate (if none, enter 0) | Secured: |
| --- | --- | --- | --- |
| M M 03 / D D 13 / Y Y Y Y 2023 | M M / D D / Y Y Y Y 03/13/2024 | 3.71 % (apr) | [ ] Yes  [x] No |

## List All Endorsers or Guarantors (if any) to Loan Source

| 1. Full Name (Last, First, Middle Initial) | Name of Employer |
| --- | --- |
| Mailing Address | Occupation |

| City | State | ZIP Code | Amount Guaranteed Outstanding: | |
| --- | --- | --- | --- | --- |

| 2. Full Name (Last, First, Middle Initial) | Name of Employer |
| --- | --- |
| Mailing Address | Occupation |

| City | State | ZIP Code | Amount Guaranteed Outstanding: | |
| --- | --- | --- | --- | --- |

| 3. Full Name (Last, First, Middle Initial) | Name of Employer |
| --- | --- |
| Mailing Address | Occupation |

| City | State | ZIP Code | Amount Guaranteed Outstanding: | |
| --- | --- | --- | --- | --- |

| 4. Full Name (Last, First, Middle Initial) | Name of Employer |
| --- | --- |
| Mailing Address | Occupation |

| City | State | ZIP Code | Amount Guaranteed Outstanding: | |
| --- | --- | --- | --- | --- |

---

**Subtotal Of Receipts This Page** (optional).......................................►   20000000.00

**Total This Period** (last page this line number only)........................►   20000000.00

Carry outstanding balance only to Line 3, Schedule D-P, for this line. If no Schedule D-P, carry forward to appropriate line of Summary Page.

FEC **Schedule C–P (Form 3P)** (Revised 05/2016)

**EXHIBIT**

**C**

RQ-2



**FEDERAL ELECTION COMMISSION**
WASHINGTON, D.C. 20463

April 5, 2023

CASTRO FOR AMERICA
12 PARK PLACE
MANSFIELD, TX 76063

**Response Due Date**

**05/10/2023**

IDENTIFICATION NUMBER: C00728097

REFERENCE: Verification of Form 3P

Dear Treasurer:

It has come to the attention of the Federal Election Commission that you may have failed to include the true, correct, or complete itemization of receipts and/or disbursements under 52 U.S.C. § 30104(b) when you filed FEC Form 3P.

FEC Form 3P must include the identification of each individual who contributes an amount in excess of $200 to the political committee's federal account(s) within the election cycle. This includes the individual's name, mailing address, occupation, the name of his or her employer, if any, and the date of receipt and amount of any such contribution. 11 CFR § 104.8(a). Additionally, FEC Form 3P must include the full name and address of each person to whom an expenditure in an aggregate amount or value in excess of $200 within the election cycle is made by the reporting authorized committee to meet the authorized committee's operating expenses, together with the date, amount and purpose of each expenditure. 11 CFR § 104.3(b)(4).

Furthermore, the Commission requires the filing to be true, correct, and complete. When you filed FEC Form 3P, you made the following certification: "I certify that I have examined this Report and to the best of my knowledge and belief it is true, correct and complete." The Commission informed you on that form that: "Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. § 30109."

Additionally, knowingly and willfully making any materially false, fictitious, or fraudulent statement or representation to a federal government agency, including the Federal Election Commission, is punishable under the provisions of 18 U.S.C. § 1001. The Commission may report apparent violations to the appropriate law enforcement authorities. 52 U.S.C. § 30107(a)(9).

If the information you submitted in FEC Form 3P is, to the best of your knowledge and belief, true, correct, and complete, please file a response to confirm this. Electronic filers should file an FEC Form 99 (Miscellaneous Text Submission). Paper filers should

CASTRO FOR AMERICA

Page 2 of 2

send a signed letter via first class mail to the FEC Reports Analysis Division, 1050 First Street, NE, Washington, DC 20002. If the information is not true, correct, or complete, or is otherwise inaccurate, please amend your FEC Form 3P filing to reflect the correct information or, in the alternative, please file either a Form 99 or signed letter, as appropriate, indicating your intent to withdraw the Form.

Failure to respond within 30 calendar days of the date of this correspondence will result in the Commission removing your FEC Form 3P and related committee filings from the Commission's searchable candidate/committee filings database on the Commission's website and placing the filings under the unverified filings database on the Commission's website. Additionally, any response submitted by your committee will be placed on the public record and will be considered by the Commission prior to any enforcement action.

Please note that in removing the filing from the Commission's searchable database, the Commission is not waiving its authority to pursue or refer an action for false filing under 52 U.S.C. § 30109(a) or otherwise to report such filings under 52 U.S.C. § 30107(a)(9), if it decides to do so.

If you should have any questions regarding this matter or wish to verify the adequacy of your response, please contact me on our toll free number (800) 424-9530 (at the prompt press 5 to reach the Reports Analysis Division) or my local number (202) 694-1277.

Sincerely,

*Jackie Gausepohl*

Jacqueline Gausepohl
Senior Campaign Finance Analyst

901

# REPORT OF RECEIPTS AND DISBURSEMENTS

## FEC FORM 3P

BY AN AUTHORIZED COMMITTEE OF A CANDIDATE
FOR THE OFFICE OF PRESIDENT OR VICE PRESIDENT



**EXHIBIT D**

Office Use Only

---

**1. NAME OF COMMITTEE** (in full, type or print)    Example: If typing, type over the lines.    `12FE4M5`

Castro for America

ADDRESS (number and street)    12 Park Place

◄ Check if different than previously reported. (ACC)    Mansfield    CITY    TX    STATE    76063    –    ZIP CODE

**2. FEC IDENTIFICATION NUMBER** ▶    C    C00728097

---

**3. TYPE OF REPORT** (Choose One)    Check here if this is a Termination Report (TER) ☐

Quarterly Reports:    Monthly Reports:

☒ April 15 (Q1)    ☐ October 15 (Q3)    ☐ Feb 20 (M2)    ☐ May 20 (M5)    ☐ Aug 20 (M8)    ☐ Nov 20 (M11)

☐ July 15 (Q2)    ☐ January 31 Year-End Report (YE)    ☐ Mar 20 (M3)    ☐ Jun 20 (M6)    ☐ Sep 20 (M9)    ☐ Dec 20 (M12)

☐ Apr 20 (M4)    ☐ Jul 20 (M7)    ☐ Oct 20 (M10)    ☐ Jan 31 (YE)

☐ 12-Day Pre-Election Report for the Election on

M M / D D / Y Y Y Y    in the State of

☐ 30-Day Post-Election Report for the General Election on

M M / D D / Y Y Y Y

**4. IS THIS REPORT AN AMENDMENT?**    ☒ yes    ☐ no

**5. COVERING PERIOD**    M 01 M / D 01 D / Y 2023 Y    THROUGH    M 03 M / D 31 D / Y 2023 Y

---

I certify that I have examined this Report and to the best of my knowledge and belief it is true, correct and complete.

Type or Print Name of Treasurer    Castro, John, Anthony, ,

Signature of Treasurer    *Castro, John, Anthony, ,*    *[Electronically Filed]*    Date    M 05 M / D 16 D / Y 2023 Y

NOTE: Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. §30109. All previous versions of this form are obsolete and should no longer be used.

Office Use Only

FEC **Form 3P** (Rev. 05/2016)

FEC **Form 3P** (Rev. 05/2016)

Write or Type Committee Name

# Castro for America

Report Covering the Period:   From:   M M `01` / D D `01` / Y Y Y Y `2023`   To:   M M `03` / D D `31` / Y Y Y Y `2023`

## SUMMARY

| | | |
|---|---|---|
| 6. | CASH ON HAND AT BEGINNING OF REPORTING PERIOD ................................................................ | 0.00 |
| 7. | TOTAL RECEIPTS THIS PERIOD<br>(From Line 22, Column A, Page 3) ........................................................................................ | 20000000.00 |
| 8. | SUBTOTAL<br>(Lines 6 and 7) ............................................................................................................. | 20000000.00 |
| 9. | TOTAL DISBURSEMENTS THIS PERIOD<br>(From Line 30, Column A, Page 4) ........................................................................................ | 0.00 |
| 10. | CASH ON HAND AT CLOSE OF THE REPORTING PERIOD<br>(Subtract Line 9 from 8)................................................................................................... | 20000000.00 |
| 11. | DEBTS AND OBLIGATIONS OWED TO THE COMMITTEE<br>(Itemize All on Schedule C-P or Schedule D-P)........................................................................ | 0.00 |
| 12. | DEBTS AND OBLIGATIONS OWED BY THE COMMITTEE<br>(Itemize All on Schedule C-P or Schedule D-P)........................................................................ | 20000000.00 |
| 13. | EXPENDITURES SUBJECT TO LIMIITATION<br>(Use the worksheet on Page 8 to calculate this amount.) ...................................................... | 0.00 |

## NET ELECTION CYCLE-TO-DATE CONTRIBUTIONS AND EXPENDITURES

| | | |
|---|---|---|
| 14. | NET CONTRIBUTIONS (Other than Loans)<br>(Subtract Line 28d, Column B on Page 4 from 17e, Column B on Page 3)................................... | 0.00 |
| 15. | NET OPERATING EXPENDITURES<br>(Subtract Line 20a, Column B on Page 3 from 23, Column B on Page 4) ..................................... | 0.00 |

# DETAILED SUMMARY PAGE
of Receipts

FEC **Form 3P** (Rev. 05/2016)

PAGE 3 / 9

NAME OF COMMITEE (in Full)

Castro for America

Report Covering the Period: From: **01** / **01** / **2023**  To: **03** / **31** / **2023**

| I. RECEIPTS | COLUMN A<br>Total This Period | COLUMN B<br>Election Cycle-to-Date |
|---|---|---|
| 16. FEDERAL FUNDS (Itemize on Schedule A-P)............ | 0.00 | 0.00 |
| 17. CONTRIBUTIONS (other than loans) FROM: | | |
| (a) Individuals/Persons Other Than Political Committees | | |
| (i) itemized ................................................ | 0.00 | 0.00 |
| (ii) unitemized .............................................. | 0.00 | 0.00 |
| (iii) Total contributions ................................... | 0.00 | 0.00 |
| (b) Political Party Committees............................. | 0.00 | 0.00 |
| (c) Other Political Committees ............................ | 0.00 | 0.00 |
| (d) The Candidate.............................................. | 0.00 | 0.00 |
| (e) TOTAL CONTRIBUTIONS (other than loans)<br>(Add 17(a), 17(b), 17(c) and 17(d)) ..................... | 0.00 | 0.00 |
| 18. TRANSFERS FROM OTHER AUTHORIZED COMMITTEES ..... | 0.00 | 0.00 |
| 19. LOANS RECEIVED: | | |
| (a) Loans Received From or Guaranteed by Candidate ........ | 20000000.00 | 20000000.00 |
| (b) Other Loans................................................... | 0.00 | 0.00 |
| (c) TOTAL LOANS (Add 19(a) and 19(b) ................. | 20000000.00 | 20000000.00 |
| 20. OFFSETS TO EXPENDITURES<br>(Refunds, Rebates, etc.): | | |
| (a) Operating ........................................................ | 0.00 | 0.00 |
| (b) Fundraising...................................................... | 0.00 | 0.00 |
| (c) Legal and Accounting ..................................... | 0.00 | 0.00 |
| (d) TOTAL OFFSETS TO EXPENDITURES<br>(Add 20(a), 20(b) and 20(c)) ........................... | 0.00 | 0.00 |
| 21. OTHER RECEIPTS (Dividends, Interest, etc.)............ | 0.00 | 0.00 |
| 22. TOTAL RECEIPTS<br>(Add 16, 17(e), 18, 19(c), 20(d) and 21) ..................... | 20000000.00 | 20000000.00 |

# DETAILED SUMMARY PAGE

FEC **Form 3P** (Rev. 05/2016)        of Disbursements and Contributed Items                    PAGE 4 / 9

NAME OF COMMITEE (in Full)

Castro for America

Report Covering the Period:    From:  M M 01 / D D 01 / Y Y Y Y 2023    To:  M M 03 / D D 31 / Y Y Y Y 2023

| II. DISBURSEMENTS | COLUMN A Total This Period | COLUMN B Election Cycle-to-Date |
|---|---|---|
| 23.  OPERATING EXPENDITURES | 0.00 | 0.00 |
| 24.  TRANSFERS TO OTHER AUTHORIZED COMMITTEES | 0.00 | 0.00 |
| 25.  FUNDRAISING DISBURSEMENTS | 0.00 | 0.00 |
| 26.  EXEMPT LEGAL AND ACCOUNTING DISBURSEMENTS | 0.00 | 0.00 |
| 27.  LOAN REPAYMENTS MADE: | | |
| (a)  Repayments of Loans made or Guaranteed by Candidate | 0.00 | 0.00 |
| (b)  Other Repayments | 0.00 | 0.00 |
| (c)  TOTAL LOAN REPAYMENTS MADE (Add 27(a) and 27(b)) | 0.00 | 0.00 |
| 28.  REFUNDS OF CONTRIBUTIONS TO: | | |
| (a)  Individuals/Persons Other Than Political Committees | 0.00 | 0.00 |
| (b)  Political Party Committees | 0.00 | 0.00 |
| (c)  Other Political Committees | 0.00 | 0.00 |
| (d)  TOTAL CONTRIBUTION REFUNDS (Add 28(a), 28(b) and 28(c)) | 0.00 | 0.00 |
| 29.  OTHER DISBURSEMENTS | 0.00 | 0.00 |
| 30.  TOTAL DISBURSEMENTS (Add 23, 24, 25, 26, 27(c), 28(d) and 29) | 0.00 | 0.00 |

## III. CONTRIBUTED ITEMS
### (Stock, Art Objects, Etc.)

| | Total This Period | |
|---|---|---|
| 31.  ITEMS ON HAND TO BE LIQUIDATED (Attach List) | 0.00 | |

FEC **Form 3P** (Rev. 05/2016)
Federal Election Commission
999 E Street, N.W.
Washington, D.C. 20463

### ALLOCATION OF PRIMARY EXPENDITURES BY STATE FOR A PRESIDENTIAL CANDIDATE
(Used Only by Primary Committees Receiving or Expecting To Receive Federal Funds)

Page 5

**1. NAME OF COMMITTEE** (in full, type or print)

Castro for America

**2. FEC IDENTIFICATION NUMBER**

C | C00728097

ADDRESS (number and street)  12 Park Place

CITY  Mansfield

STATE  TX

ZIP CODE  76063

**3. NAME OF CANDIDATE**

### ALLOCATION BY STATE

| STATE | ALLOCATION This Period | TOTAL ALLOCATION To Date |
|---|---|---|
| Alabama | 0.00 | 0.00 |
| Alaska | 0.00 | 0.00 |
| Arizona | 0.00 | 0.00 |
| Arkansas | 0.00 | 0.00 |
| California | 0.00 | 0.00 |
| Colorado | 0.00 | 0.00 |
| Connecticut | 0.00 | 0.00 |
| Delaware | 0.00 | 0.00 |
| District of Columbia | 0.00 | 0.00 |
| Florida | 0.00 | 0.00 |
| Georgia | 0.00 | 0.00 |
| Hawaii | 0.00 | 0.00 |
| Idaho | 0.00 | 0.00 |
| Illinois | 0.00 | 0.00 |

| STATE | ALLOCATION This Period | TOTAL ALLOCATION To Date | Page 6 |
|---|---|---|---|
| Indiana | 0.00 | 0.00 | |
| Iowa | 0.00 | 0.00 | |
| Kansas | 0.00 | 0.00 | |
| Kentucky | 0.00 | 0.00 | |
| Louisiana | 0.00 | 0.00 | |
| Maine | 0.00 | 0.00 | |
| Maryland | 0.00 | 0.00 | |
| Massachusetts | 0.00 | 0.00 | |
| Michigan | 0.00 | 0.00 | |
| Minnesota | 0.00 | 0.00 | |
| Mississippi | 0.00 | 0.00 | |
| Missouri | 0.00 | 0.00 | |
| Montana | 0.00 | 0.00 | |
| Nebraska | 0.00 | 0.00 | |
| Nevada | 0.00 | 0.00 | |
| New Hampshire | 0.00 | 0.00 | |
| New Jersey | 0.00 | 0.00 | |
| New Mexico | 0.00 | 0.00 | |
| New York | 0.00 | 0.00 | |
| North Carolina | 0.00 | 0.00 | |
| North Dakota | 0.00 | 0.00 | |
| Ohio | 0.00 | 0.00 | |
| Oklahoma | 0.00 | 0.00 | |
| Oregon | 0.00 | 0.00 | |
| Pennsylvania | 0.00 | 0.00 | |

| STATE | ALLOCATION This Period | TOTAL ALLOCATION To Date | Page 7 |
|---|---|---|---|
| Rhode Island | 0.00 | 0.00 | |
| South Carolina | 0.00 | 0.00 | |
| South Dakota | 0.00 | 0.00 | |
| Tennessee | 0.00 | 0.00 | |
| Texas | 0.00 | 0.00 | |
| Utah | 0.00 | 0.00 | |
| Vermont | 0.00 | 0.00 | |
| Virginia | 0.00 | 0.00 | |
| Washington | 0.00 | 0.00 | |
| West Virginia | 0.00 | 0.00 | |
| Wisconsin | 0.00 | 0.00 | |
| Wyoming | 0.00 | 0.00 | |
| Puerto Rico | 0.00 | 0.00 | |
| Guam | 0.00 | 0.00 | |
| Virgin Islands | 0.00 | 0.00 | |
| TOTALS | 0.00 | 0.00 | |

Image# 202305169581528446

# SCHEDULE A-P
# ITEMIZED RECEIPTS

Use separate schedule(s) for each category of the Detailed Summary Page

**FOR LINE NUMBER:** (check only one)

| | | | | | |
|---|---|---|---|---|---|
| 16 | 17a | 17b | 17c | 17d | 18 |
| ✗ 19a | 19b | 20a | 20b | 20c | 21 |

PAGE 8 / 9

Any information copied from such Reports and Statements may not be sold or used by any person for the purpose of soliciting contributions or for commercial purposes, other than using the name and address of any political committee to solicit contributions from such committee.

NAME OF COMMITTEE (In Full)
Castro for America

---

**A.** Full Name (Last, First, Middle Initial)
Castro, John, Anthony, ,

Mailing Address 12 Park Place

| City | State | Zip Code |
|---|---|---|
| Mansfield | TX | 76063 |

FEC ID number of contributing federal political committee.  **C** P40007312

| Name of Employer | Occupation |
|---|---|
| AiTax.com | CEO |

Receipt For: 2024
✗ Primary   ☐ General
☐ Other (specify) ▼

Election Cycle-to-Date ▼
20000000.00

Transaction ID : SA19A.4101

Date of Receipt
M M 03   D D 13   Y Y Y Y 2023

Amount of Each Receipt this Period
20000000.00

☐ Memo Item

---

**B.** Full Name (Last, First, Middle Initial)

Mailing Address

| City | State | Zip Code |
|---|---|---|

FEC ID number of contributing federal political committee.  **C**

| Name of Employer | Occupation |
|---|---|

Receipt For:
☐ Primary   ☐ General
☐ Other (specify) ▼

Election Cycle-to-Date ▼

Date of Receipt
M M   D D   Y Y Y Y

Amount of Each Receipt this Period

☐ Memo Item

---

**C.** Full Name (Last, First, Middle Initial)

Mailing Address

| City | State | Zip Code |
|---|---|---|

FEC ID number of contributing federal political committee.  **C**

| Name of Employer | Occupation |
|---|---|

Receipt For:
☐ Primary   ☐ General
☐ Other (specify) ▼

Election Cycle-to-Date ▼

Date of Receipt
M M   D D   Y Y Y Y

Amount of Each Receipt this Period

☐ Memo Item

---

Subtotal Of Receipts This Page (optional)..............................................▶   20000000.00

Total This Period (last page this line number only) ..............................▶   20000000.00

FEC **Schedule A–P (Form 3P)** (Rev. 05/2016)

# SCHEDULE C–P
# LOANS

Use separate schedule(s) for each category
of the Detailed Summary Page

| PAGE | OF |
| --- | --- |

FOR LINE NUMBER:   [x] 19a    [ ] 19b
(check only one)

NAME OF COMMITTEE (In Full)

Castro for America

Transaction ID : SC/12.4101

---

**LOAN SOURCE**   Full Name (Last, First, Middle Initial)    [ ] Memo Item

Castro, John, Anthony, ,

Mailing Address
12 Park Place

| City | State | Zip Code |
| --- | --- | --- |
| Mansfield | TX | 76063 |

Election:   2024

[x] Primary
[ ] General
[ ] Other (specify) ▼

[x] Personal Funds of the Candidate

| Original Amount of Loan | Cumulative Payment To Date | Balance Outstanding at Close of This Period |
| --- | --- | --- |
| 20000000.00 | 0.00 | 20000000.00 |

**TERMS**

| Date Incurred | Date Due | Interest Rate (if none, enter 0) | Secured: |
| --- | --- | --- | --- |
| M M 03   D D 13   Y Y Y Y 2023 | M M   D D   Y Y Y Y 03/13/2024 | 3.71 % (apr) | [ ] Yes [x] No |

---

## List All Endorsers or Guarantors (if any) to Loan Source

| 1. Full Name (Last, First, Middle Initial) | Name of Employer |
| --- | --- |
| Mailing Address | Occupation |
| City   State   ZIP Code | Amount Guaranteed Outstanding: |

| 2. Full Name (Last, First, Middle Initial) | Name of Employer |
| --- | --- |
| Mailing Address | Occupation |
| City   State   ZIP Code | Amount Guaranteed Outstanding: |

| 3. Full Name (Last, First, Middle Initial) | Name of Employer |
| --- | --- |
| Mailing Address | Occupation |
| City   State   ZIP Code | Amount Guaranteed Outstanding: |

| 4. Full Name (Last, First, Middle Initial) | Name of Employer |
| --- | --- |
| Mailing Address | Occupation |
| City   State   ZIP Code | Amount Guaranteed Outstanding: |

---

**Subtotal Of Receipts This Page** (optional)........................................ ▶   20000000.00

**Total This Period** (last page this line number only)........................ ▶   20000000.00

Carry outstanding balance only to Line 3, Schedule D-P, for this line. If no Schedule D-P, carry forward to appropriate line of Summary Page.

FEC **Schedule C–P (Form 3P)** (Revised 05/2016)

# REPORT OF RECEIPTS AND DISBURSEMENTS

**FEC FORM 3P**

BY AN AUTHORIZED COMMITTEE OF A CANDIDATE
FOR THE OFFICE OF PRESIDENT OR VICE PRESIDENT



**EXHIBIT E**

Office Use Only

---

**1. NAME OF COMMITTEE** (in full, type or print)

Example: If typing, type over the lines. `12FE4M5`

CASTRO FOR AMERICA

ADDRESS (number and street)  12 PARK PLACE

◄ Check if different than previously reported. (ACC)

CITY MANSFIELD  STATE TX  ZIP CODE 76063 –

**2. FEC IDENTIFICATION NUMBER** ▶ C C00728097

---

**3. TYPE OF REPORT** (Choose One)

Check here if this is a Termination Report (TER) ☐

**Quarterly Reports:**

☐ April 15 (Q1)  ☐ October 15 (Q3)
☒ July 15 (Q2)  ☐ January 31 Year-End Report (YE)

**Monthly Reports:**

☐ Feb 20 (M2)  ☐ May 20 (M5)  ☐ Aug 20 (M8)  ☐ Nov 20 (M11)
☐ Mar 20 (M3)  ☐ Jun 20 (M6)  ☐ Sep 20 (M9)  ☐ Dec 20 (M12)
☐ Apr 20 (M4)  ☐ Jul 20 (M7)  ☐ Oct 20 (M10)  ☐ Jan 31 (YE)

☐ 12-Day Pre-Election Report for the Election on

M M / D D / Y Y Y Y  in the State of ☐

☐ 30-Day Post-Election Report for the General Election on

M M / D D / Y Y Y Y

**4. IS THIS REPORT AN AMENDMENT?**  ☐ yes  ☒ no

**5. COVERING PERIOD**  M M / D D 01 / Y Y Y Y 2023  **THROUGH**  M M 06 / D D 30 / Y Y Y Y 2023

---

I certify that I have examined this Report and to the best of my knowledge and belief it is true, correct and complete.

Type or Print Name of Treasurer  CASTRO, JOHN ANTHONY, , ,

Signature of Treasurer  *CASTRO, JOHN ANTHONY, , ,*  Date M M 10 / D D 12 / Y Y Y Y 2023

NOTE: Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. §30109.
All previous versions of this form are obsolete and should no longer be used.

Office Use Only

FEC **Form 3P** (Rev. 05/2016)

FEC **Form 3P** (Rev. 05/2016)

Write or Type Committee Name

# CASTRO FOR AMERICA

Report Covering the Period:    From:    M M **04** / D D **01** / Y Y Y Y **2023**    To:    M M **06** / D D **30** / Y Y Y Y **2023**

## SUMMARY

| | | |
|---|---|---|
| 6. | CASH ON HAND AT BEGINNING OF REPORTING PERIOD .............................................. | **1.00** |
| 7. | TOTAL RECEIPTS THIS PERIOD<br>(From Line 22, Column A, Page 3) .................................................................... | **1.00** |
| 8. | SUBTOTAL<br>(Lines 6 and 7) ................................................................................................. | **2.00** |
| 9. | TOTAL DISBURSEMENTS THIS PERIOD<br>(From Line 30, Column A, Page 4) .................................................................... | **0.00** |
| 10. | CASH ON HAND AT CLOSE OF THE REPORTING PERIOD<br>(Subtract Line 9 from 8) .................................................................................. | **2.00** |
| 11. | DEBTS AND OBLIGATIONS OWED TO THE COMMITTEE<br>(Itemize All on Schedule C-P or Schedule D-P) .............................................. | **0.00** |
| 12. | DEBTS AND OBLIGATIONS OWED BY THE COMMITTEE<br>(Itemize All on Schedule C-P or Schedule D-P) .............................................. | **0.00** |
| 13. | EXPENDITURES SUBJECT TO LIMIITATION<br>(Use the worksheet on Page 8 to calculate this amount.) ................................... | **0.00** |

## NET ELECTION CYCLE-TO-DATE CONTRIBUTIONS AND EXPENDITURES

| | | |
|---|---|---|
| 14. | NET CONTRIBUTIONS (Other than Loans)<br>(Subtract Line 28d, Column B on Page 4 from 17e, Column B on Page 3) ...................... | **1.00** |
| 15. | NET OPERATING EXPENDITURES<br>(Subtract Line 20a, Column B on Page 3 from 23, Column B on Page 4) ....................... | **0.00** |

# DETAILED SUMMARY PAGE

FEC **Form 3P** (Rev. 05/2016)                          of Receipts

NAME OF COMMITEE (in Full)

## CASTRO FOR AMERICA

Report Covering the Period:    From:    M M 04 / D D 01 / Y 2023 Y    To:    M M 06 / D D 30 / Y Y Y Y 2023

| I. RECEIPTS | COLUMN A Total This Period | COLUMN B Election Cycle-to-Date |
|---|---|---|
| 16. FEDERAL FUNDS (Itemize on Schedule A-P)............ | 0.00 | 0.00 |
| 17. CONTRIBUTIONS (other than loans) FROM: | | |
| (a) Individuals/Persons Other Than Political Committees | | |
| (i) itemized ............................................... | 0.00 | 0.00 |
| (ii) unitemized ......................................... | 1.00 | 1.00 |
| (iii) Total contributions ........................... | 1.00 | 1.00 |
| (b) Political Party Committees............................... | 0.00 | 0.00 |
| (c) Other Political Committees .............................. | 0.00 | 0.00 |
| (d) The Candidate................................................. | 0.00 | 0.00 |
| (e) TOTAL CONTRIBUTIONS (other than loans) (Add 17(a), 17(b), 17(c) and 17(d)) .................... | 1.00 | 1.00 |
| 18. TRANSFERS FROM OTHER AUTHORIZED COMMITTEES ...................................................... | 0.00 | 0.00 |
| 19. LOANS RECEIVED: | | |
| (a) Loans Received From or Guaranteed by Candidate................................................... | 0.00 | 0.00 |
| (b) Other Loans................................................... | 0.00 | 0.00 |
| (c) TOTAL LOANS (Add 19(a) and 19(b) ................ | 0.00 | 0.00 |
| 20. OFFSETS TO EXPENDITURES (Refunds, Rebates, etc.): | | |
| (a) Operating ........................................................ | 0.00 | 0.00 |
| (b) Fundraising...................................................... | 0.00 | 0.00 |
| (c) Legal and Accounting ..................................... | 0.00 | 0.00 |
| (d) TOTAL OFFSETS TO EXPENDITURES (Add 20(a), 20(b) and 20(c)) ........................... | 0.00 | 0.00 |
| 21. OTHER RECEIPTS (Dividends, Interest, etc.)............ | 0.00 | 0.00 |
| 22. TOTAL RECEIPTS (Add 16, 17(e), 18, 19(c), 20(d) and 21) ...................... | 1.00 | 1.00 |

# DETAILED SUMMARY PAGE
FEC **Form 3P** (Rev. 05/2016)   of Disbursements and Contributed Items

NAME OF COMMITEE (in Full)

CASTRO FOR AMERICA

Report Covering the Period: From: M 04 M / D 01 D / Y Y 2023 Y Y   To: M 06 M / D 30 D / Y Y 2023 Y Y

| **II. DISBURSEMENTS** | **COLUMN A** Total This Period | **COLUMN B** Election Cycle-to-Date |
|---|---|---|
| 23. OPERATING EXPENDITURES | 0.00 | 0.00 |
| 24. TRANSFERS TO OTHER AUTHORIZED COMMITTEES | 0.00 | 0.00 |
| 25. FUNDRAISING DISBURSEMENTS | 0.00 | 0.00 |
| 26. EXEMPT LEGAL AND ACCOUNTING DISBURSEMENTS | 0.00 | 0.00 |
| 27. LOAN REPAYMENTS MADE: | | |
| (a) Repayments of Loans made or Guaranteed by Candidate | 0.00 | 0.00 |
| (b) Other Repayments | 0.00 | 0.00 |
| (c) TOTAL LOAN REPAYMENTS MADE (Add 27(a) and 27(b)) | 0.00 | 0.00 |
| 28. REFUNDS OF CONTRIBUTIONS TO: | | |
| (a) Individuals/Persons Other Than Political Committees | 0.00 | 0.00 |
| (b) Political Party Committees | 0.00 | 0.00 |
| (c) Other Political Committees | 0.00 | 0.00 |
| (d) TOTAL CONTRIBUTION REFUNDS (Add 28(a), 28(b) and 28(c)) | 0.00 | 0.00 |
| 29. OTHER DISBURSEMENTS | 0.00 | 0.00 |
| 30. TOTAL DISBURSEMENTS (Add 23, 24, 25, 26, 27(c), 28(d) and 29) | 0.00 | 0.00 |

## III. CONTRIBUTED ITEMS
### (Stock, Art Objects, Etc.)

| | | |
|---|---|---|
| 31. ITEMS ON HAND TO BE LIQUIDATED (Attach List) | 0.00 | |

**FEC Form 3P** (Rev. 05/2016)
Federal Election Commission
1050 First Street, N.E.
Washington, D.C.

# ALLOCATION OF PRIMARY EXPENDITURES
## BY STATE FOR
## A PRESIDENTIAL CANDIDATE
(Used Only by Primary Committees Receiving
or Expecting To Receive Federal Funds)

Page 5

**1.    NAME OF COMMITTEE** (in full, type or print)          **2. FEC IDENTIFICATION NUMBER**          **C**    C00728097

CASTRO FOR AMERICA

ADDRESS (number and street)    12 PARK PLACE

MANSFIELD

|  | CITY | STATE | ZIP CODE |
|---|---|---|---|
|  | MANSFIELD | TX | 76063 |

**3. NAME OF CANDIDATE**

## ALLOCATION BY STATE

| STATE | ALLOCATION This Period | TOTAL ALLOCATION To Date |
|---|---|---|
| Alabama | 0.00 | 0.00 |
| Alaska | 0.00 | 0.00 |
| Arizona | 0.00 | 0.00 |
| Arkansas | 0.00 | 0.00 |
| California | 0.00 | 0.00 |
| Colorado | 0.00 | 0.00 |
| Connecticut | 0.00 | 0.00 |
| Delaware | 0.00 | 0.00 |
| District of Columbia | 0.00 | 0.00 |
| Florida | 0.00 | 0.00 |
| Georgia | 0.00 | 0.00 |
| Hawaii | 0.00 | 0.00 |
| Idaho | 0.00 | 0.00 |
| Illinois | 0.00 | 0.00 |

| STATE | ALLOCATION This Period | TOTAL ALLOCATION To Date | Page 6 |
|---|---|---|---|
| Indiana | 0.00 | 0.00 | |
| Iowa | 0.00 | 0.00 | |
| Kansas | 0.00 | 0.00 | |
| Kentucky | 0.00 | 0.00 | |
| Louisiana | 0.00 | 0.00 | |
| Maine | 0.00 | 0.00 | |
| Maryland | 0.00 | 0.00 | |
| Massachusetts | 0.00 | 0.00 | |
| Michigan | 0.00 | 0.00 | |
| Minnesota | 0.00 | 0.00 | |
| Mississippi | 0.00 | 0.00 | |
| Missouri | 0.00 | 0.00 | |
| Montana | 0.00 | 0.00 | |
| Nebraska | 0.00 | 0.00 | |
| Nevada | 0.00 | 0.00 | |
| New Hampshire | 0.00 | 0.00 | |
| New Jersey | 0.00 | 0.00 | |
| New Mexico | 0.00 | 0.00 | |
| New York | 0.00 | 0.00 | |
| North Carolina | 0.00 | 0.00 | |
| North Dakota | 0.00 | 0.00 | |
| Ohio | 0.00 | 0.00 | |
| Oklahoma | 0.00 | 0.00 | |
| Oregon | 0.00 | 0.00 | |
| Pennsylvania | 0.00 | 0.00 | |

| STATE | ALLOCATION This Period | TOTAL ALLOCATION To Date |
|---|---|---|
| Rhode Island | 0.00 | 0.00 |
| South Carolina | 0.00 | 0.00 |
| South Dakota | 0.00 | 0.00 |
| Tennessee | 0.00 | 0.00 |
| Texas | 0.00 | 0.00 |
| Utah | 0.00 | 0.00 |
| Vermont | 0.00 | 0.00 |
| Virginia | 0.00 | 0.00 |
| Washington | 0.00 | 0.00 |
| West Virginia | 0.00 | 0.00 |
| Wisconsin | 0.00 | 0.00 |
| Wyoming | 0.00 | 0.00 |
| Puerto Rico | 0.00 | 0.00 |
| Guam | 0.00 | 0.00 |
| Virgin Islands | 0.00 | 0.00 |
| TOTALS | 0.00 | 0.00 |

# REPORT OF RECEIPTS AND DISBURSEMENTS

**FEC FORM 3P**

BY AN AUTHORIZED COMMITTEE OF A CANDIDATE FOR THE OFFICE OF PRESIDENT OR VICE PRESIDENT



**EXHIBIT F**

Office Use Only

**1. NAME OF COMMITTEE** (in full, type or print)

Example: If typing, type over the lines.   12FE4M5

CASTRO, JOHN ANTHONY

ADDRESS (number and street)   12 PARK PLACE

☐ Check if different than previously reported. (ACC)

CITY   MANSFIELD   STATE   TX   ZIP CODE   76063   –

**2. FEC IDENTIFICATION NUMBER** ▶  C   C00728097

**3. TYPE OF REPORT** *(Choose One)*

Check here if this is a Termination Report (TER) ☐

**Quarterly Reports:**

☐ April 15 (Q1)   ☒ October 15 (Q3)
☐ July 15 (Q2)    ☐ January 31 Year-End Report (YE)

**Monthly Reports:**

☐ Feb 20 (M2)   ☐ May 20 (M5)   ☐ Aug 20 (M8)    ☐ Nov 20 (M11)
☐ Mar 20 (M3)   ☐ Jun 20 (M6)   ☐ Sep 20 (M9)    ☐ Dec 20 (M12)
☐ Apr 20 (M4)   ☐ Jul 20 (M7)   ☐ Oct 20 (M10)   ☐ Jan 31 (YE)

☐ 12-Day Pre-Election Report for the Election on
M M / D D / Y Y Y Y   in the State of ☐

☐ 30-Day Post-Election Report for the General Election on
M M / D D / Y Y Y Y

**4. IS THIS REPORT AN AMENDMENT?**   ☐ yes   ☒ no

**5. COVERING PERIOD**   M M / 01 / 2023   **THROUGH**   M M 09 / D D 30 / 2023

I certify that I have examined this Report and to the best of my knowledge and belief it is true, correct and complete.

Type or Print Name of Treasurer   CASTRO, JOHN ANTHONY, , ,

Signature of Treasurer   *CASTRO, JOHN ANTHONY, , ,*   Date   10 / 12 / 2023

NOTE: Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. §30109. All previous versions of this form are obsolete and should no longer be used.

Office Use Only

FEC **Form 3P** (Rev. 05/2016)

FEC **Form 3P** (Rev. 05/2016)

Write or Type Committee Name

## CASTRO, JOHN ANTHONY

Report Covering the Period:    From:    M M 07 / D D 01 / Y Y Y Y 2023    To:    M M 09 / D D 30 / Y Y Y Y 2023

## SUMMARY

| | | |
|---|---|---|
| 6. | CASH ON HAND AT BEGINNING OF REPORTING PERIOD ............................................... | 1.00 |
| 7. | TOTAL RECEIPTS THIS PERIOD (From Line 22, Column A, Page 3) ............................................................................ | 677.00 |
| 8. | SUBTOTAL (Lines 6 and 7) ............................................................................................... | 678.00 |
| 9. | TOTAL DISBURSEMENTS THIS PERIOD (From Line 30, Column A, Page 4) ............................................................................ | 0.00 |
| 10. | CASH ON HAND AT CLOSE OF THE REPORTING PERIOD (Subtract Line 9 from 8) ............................................................................. | 678.00 |
| 11. | DEBTS AND OBLIGATIONS OWED TO THE COMMITTEE (Itemize All on Schedule C-P or Schedule D-P) .................................................. | 0.00 |
| 12. | DEBTS AND OBLIGATIONS OWED BY THE COMMITTEE (Itemize All on Schedule C-P or Schedule D-P) .................................................. | 0.00 |
| 13. | EXPENDITURES SUBJECT TO LIMIITATION (Use the worksheet on Page 8 to calculate this amount.) ..................................... | 0.00 |

## NET ELECTION CYCLE-TO-DATE CONTRIBUTIONS AND EXPENDITURES

| | | |
|---|---|---|
| 14. | NET CONTRIBUTIONS (Other than Loans) (Subtract Line 28d, Column B on Page 4 from 17e, Column B on Page 3) .................... | 677.00 |
| 15. | NET OPERATING EXPENDITURES (Subtract Line 20a, Column B on Page 3 from 23, Column B on Page 4) .................... | 0.00 |

# DETAILED SUMMARY PAGE

FEC **Form 3P** (Rev. 05/2016)  of Receipts

NAME OF COMMITTEE (in Full)

CASTRO, JOHN ANTHONY

Report Covering the Period:  From:  M M 07 / D D 01 / Y 2023 Y  To:  M M 09 / D D 30 / Y Y Y Y 2023

| I. RECEIPTS | COLUMN A Total This Period | COLUMN B Election Cycle-to-Date |
|---|---|---|
| 16. FEDERAL FUNDS (Itemize on Schedule A-P)............ | 0.00 | 0.00 |
| 17. CONTRIBUTIONS (other than loans) FROM: | | |
| (a) Individuals/Persons Other Than Political Committees | | |
| (i) itemized ....................................... | 677.00 | 677.00 |
| (ii) unitemized ................................. | 0.00 | 0.00 |
| (iii) Total contributions ......................... | 677.00 | 677.00 |
| (b) Political Party Committees............................. | 0.00 | 0.00 |
| (c) Other Political Committees ............................ | 0.00 | 0.00 |
| (d) The Candidate................................................. | 0.00 | 0.00 |
| (e) TOTAL CONTRIBUTIONS (other than loans) (Add 17(a), 17(b), 17(c) and 17(d)) ..................... | 677.00 | 677.00 |
| 18. TRANSFERS FROM OTHER AUTHORIZED COMMITTEES ....................................................... | 0.00 | 0.00 |
| 19. LOANS RECEIVED: | | |
| (a) Loans Received From or Guaranteed by Candidate...................................................... | 0.00 | 0.00 |
| (b) Other Loans...................................................... | 0.00 | 0.00 |
| (c) TOTAL LOANS (Add 19(a) and 19(b) ................ | 0.00 | 0.00 |
| 20. OFFSETS TO EXPENDITURES (Refunds, Rebates, etc.): | | |
| (a) Operating ......................................................... | 0.00 | 0.00 |
| (b) Fundraising....................................................... | 0.00 | 0.00 |
| (c) Legal and Accounting ..................................... | 0.00 | 0.00 |
| (d) TOTAL OFFSETS TO EXPENDITURES (Add 20(a), 20(b) and 20(c)) ....................... | 0.00 | 0.00 |
| 21. OTHER RECEIPTS (Dividends, Interest, etc.)............ | 0.00 | 0.00 |
| 22. TOTAL RECEIPTS (Add 16, 17(e), 18, 19(c), 20(d) and 21) ...................... | 677.00 | 677.00 |

# DETAILED SUMMARY PAGE

FEC **Form 3P** (Rev. 05/2016)     of Disbursements and Contributed Items

NAME OF COMMITTEE (in Full)

## CASTRO, JOHN ANTHONY

Report Covering the Period:  From: M 07 M / D 01 D / Y Y 2023 Y Y   To: M 09 M / D 30 D / Y Y 2023 Y Y

| **II. DISBURSEMENTS** | COLUMN A Total This Period | COLUMN B Election Cycle-to-Date |
|---|---|---|
| 23. OPERATING EXPENDITURES | 0.00 | 0.00 |
| 24. TRANSFERS TO OTHER AUTHORIZED COMMITTEES | 0.00 | 0.00 |
| 25. FUNDRAISING DISBURSEMENTS | 0.00 | 0.00 |
| 26. EXEMPT LEGAL AND ACCOUNTING DISBURSEMENTS | 0.00 | 0.00 |
| 27. LOAN REPAYMENTS MADE: | | |
| (a) Repayments of Loans made or Guaranteed by Candidate | 0.00 | 0.00 |
| (b) Other Repayments | 0.00 | 0.00 |
| (c) TOTAL LOAN REPAYMENTS MADE (Add 27(a) and 27(b)) | 0.00 | 0.00 |
| 28. REFUNDS OF CONTRIBUTIONS TO: | | |
| (a) Individuals/Persons Other Than Political Committees | 0.00 | 0.00 |
| (b) Political Party Committees | 0.00 | 0.00 |
| (c) Other Political Committees | 0.00 | 0.00 |
| (d) TOTAL CONTRIBUTION REFUNDS (Add 28(a), 28(b) and 28(c)) | 0.00 | 0.00 |
| 29. OTHER DISBURSEMENTS | 0.00 | 0.00 |
| 30. TOTAL DISBURSEMENTS (Add 23, 24, 25, 26, 27(c), 28(d) and 29) | 0.00 | 0.00 |

## III. CONTRIBUTED ITEMS
### (Stock, Art Objects, Etc.)

| | Total This Period | |
|---|---|---|
| 31. ITEMS ON HAND TO BE LIQUIDATED (Attach List) | 0.00 | |

| FEC **Form 3P** (Rev. 05/2016)<br>Federal Election Commission<br>1050 First Street, N.E.<br>Washington, D.C. | **ALLOCATION OF PRIMARY EXPENDITURES<br>BY STATE FOR<br>A PRESIDENTIAL CANDIDATE**<br>(Used Only by Primary Committees Receiving<br>or Expecting To Receive Federal Funds) | Page 5 |

**1.   NAME OF COMMITTEE** (in full, type or print)          **2. FEC IDENTIFICATION NUMBER**    **C**  C00728097

CASTRO, JOHN ANTHONY

ADDRESS (number and street)   12 PARK PLACE

MANSFIELD                                    TX    76063    –
       CITY                                  STATE    ZIP CODE

**3. NAME OF CANDIDATE**

## ALLOCATION BY STATE

| STATE | ALLOCATION This Period | TOTAL ALLOCATION To Date |
|---|---|---|
| Alabama | 0.00 | 0.00 |
| Alaska | 0.00 | 0.00 |
| Arizona | 0.00 | 0.00 |
| Arkansas | 0.00 | 0.00 |
| California | 0.00 | 0.00 |
| Colorado | 0.00 | 0.00 |
| Connecticut | 0.00 | 0.00 |
| Delaware | 0.00 | 0.00 |
| District of Columbia | 0.00 | 0.00 |
| Florida | 0.00 | 0.00 |
| Georgia | 0.00 | 0.00 |
| Hawaii | 0.00 | 0.00 |
| Idaho | 0.00 | 0.00 |
| Illinois | 0.00 | 0.00 |

| STATE | ALLOCATION This Period | TOTAL ALLOCATION To Date | Page 6 |
|---|---|---|---|
| Indiana | 0.00 | 0.00 | |
| Iowa | 0.00 | 0.00 | |
| Kansas | 0.00 | 0.00 | |
| Kentucky | 0.00 | 0.00 | |
| Louisiana | 0.00 | 0.00 | |
| Maine | 0.00 | 0.00 | |
| Maryland | 0.00 | 0.00 | |
| Massachusetts | 0.00 | 0.00 | |
| Michigan | 0.00 | 0.00 | |
| Minnesota | 0.00 | 0.00 | |
| Mississippi | 0.00 | 0.00 | |
| Missouri | 0.00 | 0.00 | |
| Montana | 0.00 | 0.00 | |
| Nebraska | 0.00 | 0.00 | |
| Nevada | 0.00 | 0.00 | |
| New Hampshire | 0.00 | 0.00 | |
| New Jersey | 0.00 | 0.00 | |
| New Mexico | 0.00 | 0.00 | |
| New York | 0.00 | 0.00 | |
| North Carolina | 0.00 | 0.00 | |
| North Dakota | 0.00 | 0.00 | |
| Ohio | 0.00 | 0.00 | |
| Oklahoma | 0.00 | 0.00 | |
| Oregon | 0.00 | 0.00 | |
| Pennsylvania | 0.00 | 0.00 | |

| STATE | ALLOCATION This Period | TOTAL ALLOCATION To Date | Page 7 |
|---|---|---|---|
| Rhode Island | 0.00 | 0.00 | |
| South Carolina | 0.00 | 0.00 | |
| South Dakota | 0.00 | 0.00 | |
| Tennessee | 0.00 | 0.00 | |
| Texas | 0.00 | 0.00 | |
| Utah | 0.00 | 0.00 | |
| Vermont | 0.00 | 0.00 | |
| Virginia | 0.00 | 0.00 | |
| Washington | 0.00 | 0.00 | |
| West Virginia | 0.00 | 0.00 | |
| Wisconsin | 0.00 | 0.00 | |
| Wyoming | 0.00 | 0.00 | |
| Puerto Rico | 0.00 | 0.00 | |
| Guam | 0.00 | 0.00 | |
| Virgin Islands | 0.00 | 0.00 | |
| TOTALS | 0.00 | 0.00 | |

# SCHEDULE A-P
# ITEMIZED RECEIPTS

Use separate schedule(s) for each category of the Detailed Summary Page

FOR LINE NUMBER: (check only one)

| 16 | ☒ 17a | 17b | 17c | 17d | 18 |
| 19a | 19b | 20a | 20b | 20c | 21 |

Any information copied from such Reports and Statements may not be sold or used by any person for the purpose of soliciting contributions or for commercial purposes, other than using the name and address of any political committee to solicit contributions from such committee.

NAME OF COMMITTEE (In Full)

CASTRO, JOHN ANTHONY

---

**A.** Full Name (Last, First, Middle Initial)

CASTRO, JOHN ANTHONY

Mailing Address  12 PARK PLACE

| City | State | Zip Code |
|------|-------|----------|
| MANSFIELD | TX | 76063 |

FEC ID number of contributing federal political committee.   C  C00728097

| Name of Employer | Occupation |
|------------------|------------|
| | |

Receipt For:  2024
☒ Primary   ☐ General
☐ Other (specify) ▼

Election Cycle-to-Date ▼
677.00

**Transaction ID : SA17A.4099**

Date of Receipt
M M  09   D D  30   Y Y Y Y  2023

Various Contributions All Under $100

Amount of Each Receipt this Period
677.00

☐ Memo Item

---

**B.** Full Name (Last, First, Middle Initial)

Mailing Address

| City | State | Zip Code |
|------|-------|----------|
| | | |

FEC ID number of contributing federal political committee.   C

| Name of Employer | Occupation |
|------------------|------------|
| | |

Receipt For:
☐ Primary   ☐ General
☐ Other (specify) ▼

Election Cycle-to-Date ▼

Date of Receipt
M M   D D   Y Y Y Y

Amount of Each Receipt this Period

☐ Memo Item

---

**C.** Full Name (Last, First, Middle Initial)

Mailing Address

| City | State | Zip Code |
|------|-------|----------|
| | | |

FEC ID number of contributing federal political committee.   C

| Name of Employer | Occupation |
|------------------|------------|
| | |

Receipt For:
☐ Primary   ☐ General
☐ Other (specify) ▼

Election Cycle-to-Date ▼

Date of Receipt
M M   D D   Y Y Y Y

Amount of Each Receipt this Period

☐ Memo Item

---

Subtotal Of Receipts This Page (optional)...................................................▶   677.00

Total This Period (last page this line number only) ...................................▶   677.00

# REPORT OF RECEIPTS AND DISBURSEMENTS

**FEC FORM 3P**

BY AN AUTHORIZED COMMITTEE OF A CANDIDATE FOR THE OFFICE OF PRESIDENT OR VICE PRESIDENT



**EXHIBIT G**

Office Use Only

**1. NAME OF COMMITTEE** (in full, type or print)

Example: If typing, type over the lines. `12FE4M5`

Castro for America

ADDRESS (number and street) 12 Park Place

◄ Check if different than previously reported. (ACC)

| CITY | STATE | ZIP CODE |
|------|-------|----------|
| Mansfield | TX | 76063 – |

**2. FEC IDENTIFICATION NUMBER** ▶ C C00728097

**3. TYPE OF REPORT** *(Choose One)*

Check here if this is a Termination Report (TER) ☐

Quarterly Reports:

- [X] April 15 (Q1)
- [ ] July 15 (Q2)
- [ ] October 15 (Q3)
- [ ] January 31 Year-End Report (YE)

Monthly Reports:

- [ ] Feb 20 (M2)
- [ ] Mar 20 (M3)
- [ ] Apr 20 (M4)
- [ ] May 20 (M5)
- [ ] Jun 20 (M6)
- [ ] Jul 20 (M7)
- [ ] Aug 20 (M8)
- [ ] Sep 20 (M9)
- [ ] Oct 20 (M10)
- [ ] Nov 20 (M11)
- [ ] Dec 20 (M12)
- [ ] Jan 31 (YE)

[ ] 12-Day Pre-Election Report for the Election on

M M / D D / Y Y Y Y   in the State of

[ ] 30-Day Post-Election Report for the General Election on

M M / D D / Y Y Y Y

**4. IS THIS REPORT AN AMENDMENT?** [X] yes [ ] no

**5. COVERING PERIOD** M M / 01 D D / 2023 Y Y Y Y  **THROUGH**  M M 03 / D D 31 / Y Y Y Y 2023

I certify that I have examined this Report and to the best of my knowledge and belief it is true, correct and complete.

Type or Print Name of Treasurer   Castro, John, Anthony, ,

Signature of Treasurer   *Castro, John, Anthony, ,*   Date  M M 10 / D D 12 / Y Y Y Y 2023

NOTE: Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. §30109. All previous versions of this form are obsolete and should no longer be used.

Office Use Only

FEC **Form 3P** (Rev. 05/2016)

FEC **Form 3P** (Rev. 05/2016)

Write or Type Committee Name

# Castro for America

Report Covering the Period:  From:  M M / D D / Y Y Y Y   To:  M M / D D / Y Y Y Y
01 / 01 / 2023    03 / 31 / 2023

## SUMMARY

6.  CASH ON HAND AT BEGINNING OF REPORTING PERIOD ...........................................................  **0.00**

7.  TOTAL RECEIPTS THIS PERIOD
    (From Line 22, Column A, Page 3) ...........................................................................................  **0.00**

8.  SUBTOTAL
    (Lines 6 and 7) .......................................................................................................................  **0.00**

9.  TOTAL DISBURSEMENTS THIS PERIOD
    (From Line 30, Column A, Page 4) ...........................................................................................  **0.00**

10. CASH ON HAND AT CLOSE OF THE REPORTING PERIOD
    (Subtract Line 9 from 8).........................................................................................................  **0.00**

11. DEBTS AND OBLIGATIONS OWED TO THE COMMITTEE
    (Itemize All on Schedule C-P or Schedule D-P)........................................................................  **0.00**

12. DEBTS AND OBLIGATIONS OWED BY THE COMMITTEE
    (Itemize All on Schedule C-P or Schedule D-P)........................................................................  **0.00**

13. EXPENDITURES SUBJECT TO LIMIITATION
    (Use the worksheet on Page 8 to calculate this amount.) ..........................................................  **0.00**

## NET ELECTION CYCLE-TO-DATE CONTRIBUTIONS AND EXPENDITURES

14. NET CONTRIBUTIONS (Other than Loans)
    (Subtract Line 28d, Column B on Page 4 from 17e, Column B on Page 3)....................................  **0.00**

15. NET OPERATING EXPENDITURES
    (Subtract Line 20a, Column B on Page 3 from 23, Column B on Page 4) ....................................  **0.00**

# DETAILED SUMMARY PAGE

FEC **Form 3P** (Rev. 05/2016)

of Receipts

NAME OF COMMITEE (in Full)

Castro for America

Report Covering the Period:  From: M M 01 / D D 01 / Y Y Y Y 2023   To: M M 03 / D D 31 / Y Y Y Y 2023

| I. RECEIPTS | COLUMN A Total This Period | COLUMN B Election Cycle-to-Date |
|---|---|---|
| 16. FEDERAL FUNDS (Itemize on Schedule A-P)............ | 0.00 | 0.00 |
| 17. CONTRIBUTIONS (other than loans) FROM: | | |
| (a) Individuals/Persons Other Than Political Committees | | |
| (i) itemized ........................................................ | 0.00 | 0.00 |
| (ii) unitemized ................................................... | 0.00 | 0.00 |
| (iii) Total contributions ..................................... | 0.00 | 0.00 |
| (b) Political Party Committees............................... | 0.00 | 0.00 |
| (c) Other Political Committees ............................. | 0.00 | 0.00 |
| (d) The Candidate.................................................. | 0.00 | 0.00 |
| (e) TOTAL CONTRIBUTIONS (other than loans) (Add 17(a), 17(b), 17(c) and 17(d)) .................... | 0.00 | 0.00 |
| 18. TRANSFERS FROM OTHER AUTHORIZED COMMITTEES ..................................................... | 0.00 | 0.00 |
| 19. LOANS RECEIVED: | | |
| (a) Loans Received From or Guaranteed by Candidate............................................................ | 0.00 | 0.00 |
| (b) Other Loans..................................................... | 0.00 | 0.00 |
| (c) TOTAL LOANS (Add 19(a) and 19(b) ................ | 0.00 | 0.00 |
| 20. OFFSETS TO EXPENDITURES (Refunds, Rebates, etc.): | | |
| (a) Operating ........................................................ | 0.00 | 0.00 |
| (b) Fundraising...................................................... | 0.00 | 0.00 |
| (c) Legal and Accounting ..................................... | 0.00 | 0.00 |
| (d) TOTAL OFFSETS TO EXPENDITURES (Add 20(a), 20(b) and 20(c)) ........................... | 0.00 | 0.00 |
| 21. OTHER RECEIPTS (Dividends, Interest, etc.)............ | 0.00 | 0.00 |
| 22. TOTAL RECEIPTS (Add 16, 17(e), 18, 19(c), 20(d) and 21) ...................... | 0.00 | 0.00 |

# DETAILED SUMMARY PAGE
FEC **Form 3P** (Rev. 05/2016)    of Disbursements and Contributed Items

NAME OF COMMITEE (in Full)

Castro for America

Report Covering the Period:    From:  M 01 M  /  D 01 D  /  Y Y 2023 Y Y    To:  M 03 M  /  D 31 D  /  Y Y 2023 Y Y

| II. DISBURSEMENTS | COLUMN A<br>Total This Period | COLUMN B<br>Election Cycle-to-Date |
|---|---|---|
| 23. OPERATING EXPENDITURES | 0.00 | 0.00 |
| 24. TRANSFERS TO OTHER AUTHORIZED COMMITTEES | 0.00 | 0.00 |
| 25. FUNDRAISING DISBURSEMENTS | 0.00 | 0.00 |
| 26. EXEMPT LEGAL AND ACCOUNTING DISBURSEMENTS | 0.00 | 0.00 |
| 27. LOAN REPAYMENTS MADE: | | |
| (a) Repayments of Loans made or Guaranteed by Candidate | 0.00 | 0.00 |
| (b) Other Repayments | 0.00 | 0.00 |
| (c) TOTAL LOAN REPAYMENTS MADE (Add 27(a) and 27(b)) | 0.00 | 0.00 |
| 28. REFUNDS OF CONTRIBUTIONS TO: | | |
| (a) Individuals/Persons Other Than Political Committees | 0.00 | 0.00 |
| (b) Political Party Committees | 0.00 | 0.00 |
| (c) Other Political Committees | 0.00 | 0.00 |
| (d) TOTAL CONTRIBUTION REFUNDS (Add 28(a), 28(b) and 28(c)) | 0.00 | 0.00 |
| 29. OTHER DISBURSEMENTS | 0.00 | 0.00 |
| 30. TOTAL DISBURSEMENTS (Add 23, 24, 25, 26, 27(c), 28(d) and 29) | 0.00 | 0.00 |

## III. CONTRIBUTED ITEMS
### (Stock, Art Objects, Etc.)

| | | |
|---|---|---|
| 31. ITEMS ON HAND TO BE LIQUIDATED (Attach List) | 0.00 | |

**FEC Form 3P** (Rev. 05/2016)
Federal Election Commission
1050 First Street, N.E.
Washington, D.C.

## ALLOCATION OF PRIMARY EXPENDITURES
## BY STATE FOR
## A PRESIDENTIAL CANDIDATE
### (Used Only by Primary Committees Receiving
### or Expecting To Receive Federal Funds)

Page 5

1.  **NAME OF COMMITTEE** (in full, type or print)

Castro for America

2. **FEC IDENTIFICATION NUMBER**

C | C00728097

ADDRESS (number and street)   12 Park Place

| Mansfield | TX | 76063 | – |
| CITY | STATE | ZIP CODE |

3. **NAME OF CANDIDATE**

## ALLOCATION BY STATE

| STATE | ALLOCATION This Period | TOTAL ALLOCATION To Date |
|---|---|---|
| Alabama | 0.00 | 0.00 |
| Alaska | 0.00 | 0.00 |
| Arizona | 0.00 | 0.00 |
| Arkansas | 0.00 | 0.00 |
| California | 0.00 | 0.00 |
| Colorado | 0.00 | 0.00 |
| Connecticut | 0.00 | 0.00 |
| Delaware | 0.00 | 0.00 |
| District of Columbia | 0.00 | 0.00 |
| Florida | 0.00 | 0.00 |
| Georgia | 0.00 | 0.00 |
| Hawaii | 0.00 | 0.00 |
| Idaho | 0.00 | 0.00 |
| Illinois | 0.00 | 0.00 |

| STATE | ALLOCATION This Period | TOTAL ALLOCATION To Date | Page 6 |
|---|---|---|---|
| Indiana | 0.00 | 0.00 | |
| Iowa | 0.00 | 0.00 | |
| Kansas | 0.00 | 0.00 | |
| Kentucky | 0.00 | 0.00 | |
| Louisiana | 0.00 | 0.00 | |
| Maine | 0.00 | 0.00 | |
| Maryland | 0.00 | 0.00 | |
| Massachusetts | 0.00 | 0.00 | |
| Michigan | 0.00 | 0.00 | |
| Minnesota | 0.00 | 0.00 | |
| Mississippi | 0.00 | 0.00 | |
| Missouri | 0.00 | 0.00 | |
| Montana | 0.00 | 0.00 | |
| Nebraska | 0.00 | 0.00 | |
| Nevada | 0.00 | 0.00 | |
| New Hampshire | 0.00 | 0.00 | |
| New Jersey | 0.00 | 0.00 | |
| New Mexico | 0.00 | 0.00 | |
| New York | 0.00 | 0.00 | |
| North Carolina | 0.00 | 0.00 | |
| North Dakota | 0.00 | 0.00 | |
| Ohio | 0.00 | 0.00 | |
| Oklahoma | 0.00 | 0.00 | |
| Oregon | 0.00 | 0.00 | |
| Pennsylvania | 0.00 | 0.00 | |

| STATE | ALLOCATION This Period | TOTAL ALLOCATION To Date | Page 7 |
|---|---|---|---|
| Rhode Island | 0.00 | 0.00 | |
| South Carolina | 0.00 | 0.00 | |
| South Dakota | 0.00 | 0.00 | |
| Tennessee | 0.00 | 0.00 | |
| Texas | 0.00 | 0.00 | |
| Utah | 0.00 | 0.00 | |
| Vermont | 0.00 | 0.00 | |
| Virginia | 0.00 | 0.00 | |
| Washington | 0.00 | 0.00 | |
| West Virginia | 0.00 | 0.00 | |
| Wisconsin | 0.00 | 0.00 | |
| Wyoming | 0.00 | 0.00 | |
| Puerto Rico | 0.00 | 0.00 | |
| Guam | 0.00 | 0.00 | |
| Virgin Islands | 0.00 | 0.00 | |
| TOTALS | 0.00 | 0.00 | |

**EXHIBIT**

**H**

RQ-7

**FEDERAL ELECTION COMMISSION**
WASHINGTON, D.C. 20463

September 11, 2023

GARZA, ALFONSO, TREASURER
CASTRO FOR AMERICA
12 PARK PLACE
MANSFIELD, TX 76063

IDENTIFICATION NUMBER: C00728097

REFERENCE: JULY QUARTERLY REPORT (4/1/2023 - 6/30/2023)

Dear Treasurer:

It has come to the attention of the Federal Election Commission that you may have failed to file the above referenced report of receipts and disbursements or failed to file a report covering the entire reporting period as required by the Federal Election Campaign Act, as amended. 52 U.S.C. §30104(a)

It is important that you file this report immediately. The report must be filed with the Federal Election Commission, 1050 First Street, NE, Washington, DC 20002. Please note that <u>electronic filers must submit their reports electronically</u>, as per 11 CFR §104.18. A copy of the report must also be filed with the Secretary of State or equivalent State officer unless the State is exempt from the federal requirement to receive and maintain paper copies. You can verify the Commission's receipt of any documents submitted by your committee on the FEC website at www.fec.gov.

The failure to timely file a complete report may result in civil money penalties, an audit or legal enforcement action. The civil money penalty calculation for late reports does not include a grace period and begins on the day following the due date for the report. The Commission recommends that you submit your report via overnight delivery or courier service.

If you have any questions regarding this matter, please contact Chris Ritchie in the Reports Analysis Division on our toll-free number (800)424-9530. The analyst's direct number is (202)694-1146.

CASTRO FOR AMERICA

Page 2 of 2

Sincerely,

*Debbie Chacona*

Deborah Chacona
Assistant Staff Director

250

**EXHIBIT**

**I**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * * * *
                                    *
    JOHN ANTHONY CASTRO             *
                                    *    23-cv-416-JL
              v.                    *    October 20, 2023
                                    *    11:00 a.m.
NEW HAMPSHIRE SECRETARY OF STATE,   *
ET AL                               *
                                    *
* * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

APPEARANCES:


For the Plaintiff:        John Anthony Castro
                          Pro Se


For the Defendants:

 (NH Secretary of State)  Brendan Avery O'Donnell, Esq.
                          NH Department of Justice


 (Donald John Trump)      Richard J. Lehmann, Esq.
                          Lehmann Major List, PLLC

                          Jonathan Mark Shaw, Esq.
                          Dhillon Law Group


Intervenor:               Bryan K. Gould, Esq.
 (NH Republican           Cleveland, Waters & Bass, P.A.
 State Committee)


Court Reporter:           Susan M. Bateman, RPR, CRR
                          Official Court Reporter
                          United States District Court
                          55 Pleasant Street
                          Concord, NH 03301
                          (603) 225-1453

```
                           I N D E X

WITNESSES:              Direct      Cross      Redirect      Recross

MICHAEL DENNEHY

By Mr. Lehmann            25                      42

By Mr. Castro                        39                        45


JOHN ANTHONY CASTRO


By Mr. Shaw                          52


EXHIBITS                                  FOR ID          IN EVD

Plaintiff's Exhibit No. 1.                                  18

Plaintiff's Exhibit No. 2.                                  19

Defendants' Exhibit Nos. 2 through 6.                       48

Defendants' Exhibit No. 1.                                  94
```

```
 1                   P R O C E E D I N G S
 2              THE CLERK:  The Court is now in session and has
 3    before it for consideration an evidentiary hearing in
 4    23-cv-416-JL, John Castro versus New Hampshire Secretary of
 5    State, et al.
 6              THE COURT:  All right.  We are here for what I
 7    would describe as the first part of a preliminary injunction
 8    hearing which I think by agreement of the parties if it
 9    proceeds to a full hearing on that will be combined with the
10    hearing on the merits to resolve the case.
11              However, the scope of the hearing was narrowed by
12    the Court with an order, I think it was last week, to focus
13    only on the jurisdictional challenges that had been raised by
14    the defendants.  I thought it was a good idea to do that after
15    I read their challenges because they're colorable challenges.
16    They aren't just sort of pro forma, you know, reflex
17    jurisdictional arguments.  They're real arguments that need to
18    be addressed, and if there's no jurisdiction in the case, if
19    the Court lacks jurisdiction over the case, there's no real
20    reason to focus on the normal burden that the plaintiff would
21    have in a preliminary injunctive hearing or a hearing for
22    final injunctive relief.  So we're going to focus on
23    jurisdiction today.
24              The way we'll do it, the way we'll proceed, is that
25    Mr. Castro has the burden of proof, and he will put on his
```

1  evidence which I will hear.  Then the other parties will put

2  on their evidence which I will hear.  Then I'll give everybody

3  an opportunity to offer argument.  Just like a normal

4  injunction hearing, but this one is just focused on

5  jurisdiction.

6          I think the way we'll proceed, by the way -- the

7  best way to proceed -- because the two defendants have

8  launched basically overlapping but separate jurisdictional

9  challenges, I think we'll focus on traditional standing first

10 as a jurisdictional element.  Then once we do that we can

11 focus on argument regarding the political question doctrine.

12 That seems to be a lot less evidence-based and just more legal

13 argument, and I think that's a good way to proceed.

14          If anybody has a problem with that, you'll let me

15 know and we'll adjust.  Is everybody comfortable with that

16 process?

17          MR. CASTRO:  Yes, your Honor.

18          MR. O'DONNELL:  Yes, your Honor.

19          MR. LEHMANN:  Yes.

20          THE COURT:  All right.  Now as a formality, Mr.

21 Castro, you're here pro se.

22          MR. CASTRO:  Yes, your Honor.

23          THE COURT:  But you're not a standard pro se in any

24 way because you're educated and you have experience.

25          So I think what I want to do is -- although you

1  have invoked your pro se status in some of your filings, I

2  think I want to get clear on that.  I just want you to put on

3  the record -- I think it's part of the record already in your

4  written filings, but I want you to explain to the Court your

5  legal training and experience.

6          MR. CASTRO:  Yes, your Honor.

7          I earned my juris doctorate from the University of

8  New Mexico School of Law.  After that I attended Georgetown

9  University Law Center in Washington, D.C., where I earned my

10  Master of laws in taxation with particular expertise in

11  international taxation, and I've been practicing as a federal

12  practitioner tax attorney for about -- ten years?  Yeah.

13          THE COURT:  All right.  So are you admitted to

14  practice before the Tax Court of the U.S.?

15          MR. CASTRO:  No, your Honor.

16          THE COURT:  Okay.

17          By the way, you're totally entitled to proceed pro

18  se.  It's not that I have any objection to it whatsoever,

19  okay, but you just said you're a practicing tax attorney so I

20  want to understand what you mean by that.

21          MR. CASTRO:  Yeah, so it's an area of law that's a

22  little bit convoluted, but it stems from a 1964 case, Sperry

23  v. Florida.  Mr. Sperry was a patent attorney and he was

24  holding himself out as a patent attorney in the state of

25  Florida, but he wasn't licensed with the Florida state bar.

1 And so the state of Florida brought an injunction action

2 against him, and it was upheld by the Florida Supreme Court.

3 He appealed to the United States Supreme Court.  They took the

4 case.  And what they held was that because what he was doing

5 was solely within his rights under federal law, which was

6 patent law and trademark law, that the state had no

7 jurisdiction over his activities.

8          THE COURT:  I see.

9          MR. CASTRO:  And so that created a concept of

10 federal practitioners.  And so at Georgetown one of my

11 professors had addressed that and said that some states

12 administratively had recognized that, such as the state of

13 Florida because they were the ones that lost before the

14 Supreme Court, but other states were still kind of like, well,

15 it's this gray area, but it really isn't.  You know, the

16 Supreme Court made it very clear the supremacy clause applies.

17 So as long as I limit my practice to federal tax law, the

18 states have no right to require me to be barred there.

19          THE COURT:  I see.

20          MR. CASTRO:  But the question of whether a person

21 is permitted to call themself an attorney -- Mr. Sperry one

22 week before the Supreme Court was going to hear oral arguments

23 decided on the advice of his lawyers to voluntarily stop

24 referring to himself as an attorney.

25          THE COURT:  I see.

1          MR. CASTRO:  And that was mentioned in the footnote

2   in the Supreme Court's decision.  So the Supreme Court said we

3   can't rule on that because he's already agreed and signed a

4   document agreeing to voluntarily waive that.

5          So the remaining question was can a person still

6   hold themself out as an attorney or do they have to refer to

7   themselves as a patent agent.  The term agent is unique to

8   patent law, whereas in tax law there's no such terminology for

9   that.

10          THE COURT:  Designation.

11          MR. CASTRO:  So, you know, I had been contacted by

12   the Florida and Texas bars, and they said, hey, you're holding

13   yourself out as a federal tax attorney.  I explained this to

14   them, and they just decided that, well, you know, he seems to

15   really know what he's doing, he has published a book, you

16   know, and he went to Georgetown.  So it's not one of those

17   issues where there's a concern of, you know, giving bad advice

18   to the public or something.  So they decided not to make it an

19   issue.

20          THE COURT:  I see.  All right.

21          When did you graduate from law school?

22          MR. CASTRO:  2013.

23          THE COURT:  And when did you get your LLM?

24          MR. CASTRO:  Oh, I'm sorry.  I got my JD in 2012,

25   and then I got my LLM in 2013.  So it was back to back.

1          THE COURT:  So you've been at it about 10 years.

2          MR. CASTRO:  Yes.

3          THE COURT:  And how are you employed?

4          MR. CASTRO:  I have my own firm, Castro & Company.

5    We specialize in international tax cross-border advice.

6          THE COURT:  I see.  All right.

7          So you're clearly -- I mean, you clearly have --

8    you've got great experience in one area of federal law, which

9    is federal taxation.

10          MR. CASTRO:  Yes, your Honor.

11          THE COURT:  All right.  Talk to me about -- but you

12    also have some experience in the federal courts as a pro se

13    litigant.

14          MR. CASTRO:  Correct.  Yes.

15          THE COURT:  Can you describe that for me?

16          Let me try it this way.  About how many cases have

17    you put into suit in your career?

18          MR. CASTRO:  Pro se, let me see, including these

19    election related cases?

20          THE COURT:  Sure.  Yeah, those are cases.

21          MR. CASTRO:  32.

22          THE COURT:  All right.  And how many federal

23    districts have you litigated in?  Roughly the same number or

24    is it --

25          MR. CASTRO:  Currently right now it's I believe 27,

```
 1   but only about 13 are being actively pursued.
 2              THE COURT:  I see.  Okay.
 3              And you feel confident?  You're confident to
 4   practice here?
 5              MR. CASTRO:  Oh, yes.  Absolutely.  Without
 6   question.
 7              THE COURT:  Okay.  Well, thank you.
 8              All right then.  Well, you bear the burden here to
 9   establish that the Court has jurisdiction over your case, over
10   your claim.
11              MR. CASTRO:  Uh-huh.
12              THE COURT:  The quantum of evidence you have to
13   demonstrate it by is a preponderance of the evidence.
14              Any objection to that?
15              MR. CASTRO:  No, your Honor.
16              THE COURT:  All right.  So I'm going to let you put
17   on your evidence.  Proceed.  And I assume -- you know, I
18   assume you're -- whatever evidence you want to present I'm
19   going to listen to.  I'm going to let them put on their
20   evidence before we have argument.  Understand?
21              MR. CASTRO:  Yes.
22              THE COURT:  All right.  Let me ask you this.
23              Now, you did file something called a stipulation.
24              MR. CASTRO:  Yes.
25              THE COURT:  It's document No. 53, which I reviewed
```

1    of course.

2           MR. CASTRO:  Uh-huh.

3           THE COURT:  I need you to understand one thing

4    about it.  These are certainly admissions by you.  You've made

5    these statements now.  To the extent that they are admissible

6    evidence, I will consider them.  I think there's something

7    like -- there's 18 paragraphs, 18 statements, and to the

8    extent that they're admissible I'm going to consider them, but

9    a stipulation -- a stipulation becomes admissible by agreement

10   of the parties, and there are probably -- there are definitely

11   statements in here which the parties agree to I'm sure, like

12   the first few, no question about it, but there are also some

13   I'm sure that the defendants don't agree to.  So they're not

14   really stipulations in that respect.

15          Do you understand what I'm saying?

16          MR. CASTRO:  Yes.

17          THE COURT:  That said, they're admissions by you.

18   So you've made these statements.  If they are otherwise

19   admissible, in other words if they're relevant, if they're

20   based on your personal knowledge, if they're relevant under

21   the 400-series of the rules of evidence, if they're based on

22   your personal knowledge under the 600-series of rules of

23   evidence, if they're authentic, if they're based on authentic

24   evidence under the 900-series, and if they're not hearsay

25   under the 800-series, and if they are based on the best

1    evidence under the 1000-series.

2            What I'm trying to say to you is the fact that you

3    say these things might make them evidence because they are

4    admissions to you, they're admissions by you, but I can only

5    consider them as evidence if they're admissible under the

6    rules of evidence.  So just be aware of that.

7            MR. CASTRO:  Yes, your Honor.

8            THE COURT:  And if you need to lay foundations for

9    any of it, I'll let you do whatever you want, okay?

10           MR. CASTRO:  Okay.

11           THE COURT:  All right.  You may proceed.

12           MR. GOULD:  Excuse me, your Honor.

13           THE COURT:  Yes, sir.

14           MR. GOULD:  A housekeeping matter.

15           Could I have my paralegal at counsel table?

16           THE COURT:  Sure.  Do you have any objection to

17   that?

18           MR. CASTRO:  No, your Honor.

19           THE COURT:  Please.

20           MR. GOULD:  Thank you.

21           And do you need her name for the record?

22           THE COURT:  Sure.  Why don't you put it on the

23   record.

24           MR. GOULD:  It's Christina Tomao, T-O-M-A-O.

25           THE COURT:  As a matter of fact, just as a

```
 1    formality --

 2                Mr. Castro, you don't need to identify yourself for

 3    the record.  You're appearing pro se.

 4                Why don't we go around the room, we'll start in the

 5    front, and we'll have counsel identify themselves for the

 6    record.

 7                MR. O'DONNELL:  Good morning, your Honor.

 8                Brendan O'Donnell from the Department of Justice on

 9    behalf of the Secretary of State.

10                THE COURT:  Thank you, sir.

11                MR. LEHMANN:  Richard Lehmann on behalf of Donald

12    Trump.

13                MR. SHAW:  Jonathan Shaw, Dhillon Law Group, on

14    behalf of Donald Trump.

15                MR. GOULD:  Good morning, your Honor.

16                Bryan Gould from Cleveland, Waters & Bass on behalf

17    of the New Hampshire Republican State Committee, the

18    intervenor.

19                THE COURT:  Thank you, sir.

20                All right.  Mr. Castro, please proceed.

21                MR. CASTRO:  Yes, your Honor.

22                So I guess I'll just jump right in on standing.

23                There's the three elements, which is injury,

24    traceability, and redressability.

25                THE COURT:  Yeah.
```

1        MR. CASTRO:  You know, as the court filings have

2   made it very clear, there is an injury.  I understand that the

3   defendants have put forth evidence suggesting that the degree

4   of the injury would be minimal, you know, indicating that in

5   the absence of Donald Trump or Donald Trump's presence

6   currently in the election that, you know, his absence wouldn't

7   result in any significant change in votes, but what they fail

8   to realize is there's still an injury.  It doesn't matter how

9   small it is.  Degree of injury would certainly --

10       THE COURT:  Hold on a second.  You're on your feet.

11       MR. SHAW:  Is the witness going to be sworn to put

12  in this testimony or is he just going to offer a statement

13  from the counsel table?

14       THE COURT:  I view this as argumentation, not

15  evidence, but, you know, he's arguing.  He's not presenting.

16       MR. SHAW:  Okay.

17       THE COURT:  That said, you know, counsel makes a

18  decent point.

19       MR. CASTRO:  I don't mind being sworn.

20       THE COURT:  All right.

21       Kelli, swear the plaintiff.

22                     JOHN ANTHONY CASTRO

23       having been duly sworn, testified as follows:

24       THE CLERK:  State your name for the record, please.

25       MR. CASTRO:  John Anthony Castro.

```
1              THE CLERK:  Thank you.

2              THE COURT:  There you go.

3              MR. CASTRO:  Okay.  So -- yeah, so the evidence

4     they put forward actually does establish the fact that there

5     is an injury.  You know, they go to the degree of the injury,

6     but frankly it's just irrelevant.  You know, there's an

7     injury.  It's clear.  The D.C. Circuit has upheld that as

8     well.  That's been briefed.

9              Traceability.  I know that obviously defendant

10    Donald John Trump doesn't contest the traceability of the

11    injury.  Defendant Secretary of State does.  But again what

12    they fail to understand is that each step in this process is

13    an act in furtherance of a constitutional violation of Section

14    3 of the Fourteenth Amendment.  So that could be the first

15    step of accepting the application.  Thereafter, processing the

16    application.  Thereafter, printing the ballots, you know,

17    thereafter, you know, and at some point, you know, which I

18    explained in the briefing, it does in fact become a

19    nonjusticiable political question, but what the courts have

20    uniformly held is that's not until the national parties have

21    held their convention and actually nominated the individual.

22              Now, initially --

23              THE COURT:  Well, I don't think courts have held

24    that -- first of all, what you're doing right now is arguing.

25    You're not presenting evidence.  I need you to understand
```

```
 1   that.
 2           MR. CASTRO:  Oh.  Okay.
 3           THE COURT:  But since you're arguing, I want to ask
 4   you a question.
 5           I don't read the courts -- the courts have acted
 6   postconvention, but I haven't seen a case that says this
 7   question is only implicated postconventions, postnomination.
 8   I didn't see any case that said that.
 9           MR. CASTRO:  Correct.  Yes, your Honor.  And I
10   apologize for that.  That's what I deduced from all the
11   holdings was that all of them tended to occur, and they said
12   that, well, you know, they've already chosen this nominee and
13   so at that point, you know, it's for the electoral college to
14   deal with.  That is an allocation to a political branch, and
15   therefore the political question doctrine applies.
16           THE COURT:  Sure.  But when you say you deduced
17   that, and I understand how one might infer that, okay, but
18   deducing is not inferring.  A deduction is something that
19   follows logically, necessarily, and I think you would admit
20   that it doesn't necessarily follow from those cases that the
21   political question doctrine, which I thought we were going to
22   talk about -- frankly, I thought we were going to talk about
23   standing first, but that's okay.
24           MR. CASTRO:  I apologize, yes.
25           THE COURT:  It's okay.  It doesn't follow as a
```

1    matter of logic from those cases that the political question

2    doctrine is limited to postconvention, postnomination

3    litigation, does it?

4              MR. CASTRO:  Um, I think it does.

5              THE COURT:  You think it does?

6              MR. CASTRO:  Yeah.  Because at first it seemed

7    like -- well, my first initial thought process in objection to

8    that was that what the Supreme Court said was that it had to

9    be a decision, a political decision made by one of the

10   political branches, and I didn't really see that in the

11   context of a political party making a nomination, but then

12   what I realized is ultimately what they would be referring to

13   is the will of the people.  The people have collectively

14   chosen their nominee, and that is the political decision that

15   needs to be respected.

16             That's what I was able to deduce and infer from

17   that.  And, you know, post party choosing their nominee, then

18   at that point, you know, it's definitely up to the electoral

19   college.

20             But back to the standing.  I apologize.

21   Traceability, you know, and any acts, you know, in furtherance

22   of a violation of the Constitution isn't -- you know, it's

23   traceable.  So the defendant Secretary of State accepting and

24   processing the ballot application, printing, all those acts

25   are acts by the Secretary of State.  So we have traceability

1    to both defendants.

2            And then of course comes redressability which kind

3    of ties in, you know, failure to state a claim upon which

4    relief can be granted.  So that's where I wasn't really sure,

5    like, are we going there with this.  Because technically

6    redressability goes to whether there's a cause of action.  So

7    there's a little bit of overlap between a (b)(1)(B)(6) claim

8    there.

9            But, as I pointed out, there is redressability and

10   it's in the form of injunctive relief.  The Court can enjoin

11   conduct and actions that would otherwise be in violation of

12   the United States Constitution.

13           So I think all three elements for standing, you

14   know, are very clear and speak for themselves.

15           THE COURT:  All right.  Is there any other evidence

16   you want to present?

17           MR. CASTRO:  I submitted Exhibits 1 and 2.

18           Exhibit 1 is the payment for the filing fee here in

19   New Hampshire which, you know, serves as evidence that I'm

20   going to be on the ballot here in New Hampshire.

21           THE COURT:  So we'll call that Exhibit 1.

22           Any objection to the Court to this being admitted

23   into evidence, the receipt from his filing fee?

24           MR. O'DONNELL:  Your Honor, my understanding is

25   that's also ECF 45-1 and that it's filed.  No objection.

```
 1                THE COURT:  That's true.

 2                MR. GOULD:  No objection, your Honor.

 3                MR. SHAW:  No objection.

 4                THE COURT:  It's admitted.

 5                (Plaintiff's Exhibit No. 1 Admitted)

 6                All right.  And Exhibit 2 is your Nevada

 7      declaration of candidacy.

 8                MR. CASTRO:  Yes, your Honor.  So that was intended

 9      to establish the fact that I am actively pursuing ballot

10      access in every state where I see a path to achieving that.

11      The next state will be Arizona, and, you know, followed by

12      several other states, but that was just to evidence that, you

13      know, this isn't just in New Hampshire.  This is going to be

14      in multiple jurisdictions where I'm pursuing, you know, ballot

15      access.

16                THE COURT:  All right.

17                First of all, I would certainly accept a Nevada

18      declaration of candidacy for -- if there's no objection, I

19      would accept it for the proposition that you've declared a

20      candidacy in Nevada for sure.  I don't know if I would accept

21      that you're doing it everywhere, but your point is understood.

22                However, my Exhibits 1 and 2 are both New Hampshire

23      documents.  There's no Nevada here.  So both 1 and 2 are your

24      New Hampshire receipts.  So maybe it was just a mistake.

25                MR. CASTRO:  Oh, yeah.
```

1          THE COURT:  Why don't you -- have counsel for the

2    other side seen his Nevada declaration?

3          MR. O'DONNELL:  Yes.  ECF 41.  And I have no

4    objection to it even if it's through the filing system.

5          THE COURT:  Any objection?

6          MR. GOULD:  I have no objection.

7          MR. SHAW:  None, your Honor.

8          THE COURT:  All right.  And it's marked as Exhibit

9    2.  That's admitted.

10          (Plaintiff's Exhibit No. 2 Admitted)

11          MR. CASTRO:  Thank you, your Honor.

12          THE COURT:  All right.  Anything else, Mr. Castro?

13          MR. CASTRO:  With regard to standing?  No, your

14    Honor.

15          THE COURT:  Okay.  Okay.  Nothing else with regard

16    to standing.  Yeah, I'll let you argue more on political

17    question when we get to it.

18          Have defendants worked on any order they would like

19    to proceed or do you want me to just call the two?  I'll do

20    whatever you like.

21          MR. O'DONNELL:  Your Honor, I'm happy to proceed on

22    two of the elements of Article III standing on behalf of the

23    Secretary of State, and I don't mind going first or second.

24          THE COURT:  Why don't you do that.  Go ahead.

25          So what's going to happen now, Mr. Castro, is the

1    defendants are going to present their evidence.

2            By the way, I'm on evidence now.  I'm not on

3    argument.

4            MR. O'DONNELL:  Okay.

5            With respect to evidence other than what is in the

6    stipulation that Mr. Castro filed and the exhibits that have

7    been submitted by the defendant Trump, I'm not going to be

8    introducing any additional evidence.

9            THE COURT:  All right.  Well, evidence is usually

10   presented through testimony.  So unless he agrees to the

11   admissibility of your exhibits --

12           Does everybody understand this was an evidentiary

13   hearing?  The people in the back are nodding.

14           Did you understand that?

15           MR. O'DONNELL:  Yes, your Honor.

16           THE COURT:  All right.  So how do you plan to admit

17   this evidence?  Now if it's self-authenticating or whatever,

18   that's fine.

19           MR. O'DONNELL:  Your Honor, the plaintiff submitted

20   what he called a verified stipulation to certain facts.

21           THE COURT:  Yes.

22           MR. O'DONNELL:  He stated under penalty of perjury

23   what are true statements of himself.

24           THE COURT:  Sure.  Why don't you tell me -- I've

25   read them.  I assume you're not agreeing to the -- I assume

1    you're not stipulating to all 18 of them.  So if you want to

2    tell me which ones you agree to, they'll be admitted.

3              When he tells you to keep watching and learn, are

4    you stipulating to that?

5              MR. O'DONNELL:  Sure, your Honor.

6              THE COURT:  You are?

7              MR. O'DONNELL:  Paragraph 12 is what I'm referring

8    to specifically.

9              THE COURT:  Okay.  So paragraph 12 you --

10             MR. O'DONNELL:  I'm fine with paragraph 12, which

11   is the plaintiff's statement that his campaign in his opinion

12   has no serious prospect of getting any New Hampshire

13   delegates --

14             THE COURT:  Whoa, whoa, whoa, whoa.

15             Look, you've got a court reporter here.  You've got

16   to read it so she can keep up.

17             MR. O'DONNELL:  Sure.

18             THE COURT:  You're talking about paragraph 12?

19             MR. O'DONNELL:  Correct, your Honor.

20             THE COURT:  Why don't I read it for the record.

21             So the Secretary of State agrees and stipulates to

22   paragraph 12 of document No. 53 which provides:  Presently

23   plaintiff's campaign has no serious prospect of getting any

24   New Hampshire delegates to the Republican National Convention,

25   nor any significant number of votes that would otherwise have

1    gone to Donald Trump, nor any appreciable share of donations

2    that otherwise would have gone to Donald Trump as of right

3    now.

4              You stipulate to that?

5              MR. O'DONNELL:  Yes.  And with your permission --

6              THE COURT:  Time-out.

7              MR. O'DONNELL:  Sorry.

8              THE COURT:  Does Donald Trump stipulate to that?

9              MR. SHAW:  We do, your Honor.

10             THE COURT:  Not surprising.

11             Does the party stipulate to that?

12             MR. GOULD:  We do, your Honor.

13             THE COURT:  Are there any other numbered paragraphs

14   in this stipulation to which the Secretary of State

15   stipulates?

16             MR. O'DONNELL:  No, your Honor.

17             THE COURT:  Thank you.  Okay.  Thank you for that.

18             Let's get back to your presentation.

19             Now, I've got this folder here of exhibits.  Mr.

20   Castro might not object to any of them.  So let me just ask

21   him.

22             You've seen his exhibits?

23             MR. CASTRO:  Yes, your Honor.

24             THE COURT:  Any objections to them?

25             MR. CASTRO:  Yes, your Honor.

```
 1                    I'm objecting to Defense Exhibits 2 through 6 as

 2        lacking relevance.

 3                    THE COURT:  Lacking relevance?

 4                    MR. CASTRO:  Yes, your Honor.

 5                    THE COURT:  Any other objection besides relevance?

 6                    MR. CASTRO:  No, your Honor.

 7                    THE COURT:  All right.  Let me take a look.  Hold

 8        on a minute.

 9                    Do any of the co-defendants object to Exhibits 2

10        through 6 on the basis of relevance or any other reason?

11                    We'll start with Mr. Trump.

12                    MR. SHAW:  I'm a little unclear, your Honor.  Is he

13        objecting to our Exhibits 2 through 6?  I mean, I don't think

14        the state has Exhibits 2 through 6.

15                    THE COURT:  Wait a minute.  These are Trump's

16        exhibits?  All right.

17                    I'm sorry.  I thought they were your exhibits.

18                    MR. O'DONNELL:  Sorry, your Honor.

19                    THE COURT:  What are you -- anyway --

20                    MR. O'DONNELL:  Your Honor, with respect, it's the

21        plaintiff's burden of proof, and I haven't heard any evidence

22        that I wish to rebut at this point.  There's no testimony from

23        the plaintiff, and if he had, I would have asked follow-up

24        questions.

25                    THE COURT:  This is my fault, counsel.  I thought
```

1    this stack of exhibits here were your exhibits.  They're not.

2    They're Trump's exhibits.

3           MR. O'DONNELL:  No, your Honor.

4           THE COURT:  My bad.  Okay.  So there's no other

5    evidence you want to present except agreeing to paragraph 12

6    of the plaintiff's stipulation?

7           MR. O'DONNELL:  Correct, your Honor.

8           THE COURT:  Document No. 53.

9           Nothing else, counsel?

10          MR. O'DONNELL:  No, your Honor.

11          THE COURT:  Thank you.  Sorry about that.  Sorry

12    for that confusion.  I appreciate the correction.

13          So who goes next, Trump or the party?

14          MR. SHAW:  Trump, your Honor.

15          THE COURT:  Counsel, please proceed.

16          MR. SHAW:  Your Honor, in light of the essential

17    failure of proof on the plaintiff's part, I don't think we

18    have any questions of Mr. Castro.  So I think we would rest

19    our evidence.

20          THE COURT:  Okay.

21          MR. SHAW:  Other than -- well, other than --

22          MR. LEHMANN:  Your Honor, we submitted the

23    declaration of Michael Dennehy who is in the courtroom today,

24    and we're prepared to put him on the stand to testify to the

25    content of his declaration unless the other parties to the

1    case accede to its introduction as a full exhibit and the two

2    exhibits that are attached to his declaration, which are his

3    resume and a series of campaign -- FEC filings.

4              THE COURT:  I do have Mr. Dennehy's declaration

5    right here.  It's document No. 49-1.

6              Let me ask Mr. Castro.  You've read document

7    No. 49-1, the declaration of Mr. Dennehy?

8              MR. CASTRO:  No, your Honor.  I have not had a

9    chance to take a look at that.

10             THE COURT:  Oh.  All right.  Do you agree to its

11   admissibility?

12             MR. CASTRO:  No, your Honor.

13             THE COURT:  All right.  Well, it's an affidavit

14   that he doesn't agree to so I'm going to have to hear his

15   testimony.  I mean, if you want to present it, I have to hear

16   the testimony.

17             MR. LEHMANN:  Okay.

18             Mr. Dennehy, please take the stand.

19             THE COURT:  Now, Mr. Castro, it looks like Mr.

20   Lehmann here is going to conduct direct examination of this

21   witness.  You'll be entitled to cross-examine him.

22             MR. CASTRO:  Yes.  Thank you, your Honor.

23                          MICHAEL DENNEHY

24        having been duly sworn, testified as follows:

25             THE CLERK:  For the record please state your name

```
 1   and spell your name.

 2            THE WITNESS:  Michael Dennehy, M-I-C-H-A-E-L,

 3   D-E-N-N-E-H-Y.

 4                      DIRECT EXAMINATION

 5   BY MR. LEHMANN:

 6       Q.    Mr. Dennehy, can you state for the Court what you

 7   do for a living?

 8       A.    Yes, sir.  I am a political consultant, advisor,

 9   and strategist, and have been doing such for just over 32

10   years.

11       Q.    Do you have a consulting firm here in the state of

12   New Hampshire?

13       A.    Yes, I do.  I have a consulting firm, Dennehy &

14   Bouley, and I also have a separate political consulting firm.

15       Q.    And how long have you been engaged as a political

16   consultant?

17       A.    32 years.  Technically, 33.

18       Q.    I'm going to hand you a declaration that you signed

19   that was filed with the court previously in this matter.  It's

20   been identified as document 49-1.

21            MR. LEHMANN:  Is that adequate for the Court since

22   we've referenced it as a filing previously submitted?

23            (No response)

24       A.    That is mine.

25       Q.    And do you recall signing that?
```

1          A.    Yes, sir.

2          Q.    Okay.  And attached to that declaration as Exhibit

3     9 is a CV.  Is that your curriculum vitae?

4          A.    Yes, it is.

5          Q.    And could you for the benefit of the Court and the

6     parties go through your work experience and identify the

7     various individuals you've worked for and the campaigns you've

8     worked on?

9          A.    Sure.  I would be happy to.

10          My first professional job was in 1991, Steve Duprey

11     for Congress.  That carried into 1992.  And then Steve Merrill

12     for Governor in 1992 carrying through 1994.  Phil Gramm for

13     President in 1995 and '96.  Executive Director of the New

14     Hampshire Republican Party 1996 through 1998.  Campaign

15     manager for Lucas for Governor in 1998.  Campaign manager for

16     John McCain for President in 1999 through 2000.  Executive

17     Director for Straight Talk America in Washington, D.C., 2000

18     through 2001.  Republican National Committeeman for the

19     Republican National Committee from New Hampshire 2000 through

20     2002.  Campaign manager for Craig Benson for Governor in 2002.

21     National Political Director for John McCain for President 2006

22     through 2008.  New Hampshire strategist for Governor Haley

23     Barbour from Mississippi in 2012.  New Hampshire strategist

24     for Governor Rick Perry of Texas 2014 through 2015.  And also

25     as a strategist on legislative campaigns here in New Hampshire

1    throughout those -- throughout 20 years, the last 20 years.

2        Q.    So, Mr. Dennehy, by my count it appears that

3    Governor Merrill, Phil Gramm, John McCain twice, Craig Benson,

4    Haley Barbour, and Rick Perry were all involved in statewide

5    campaigns in the state of New Hampshire; is that correct?

6        A.    That is correct.

7        Q.    And in your capacity as a strategist or a campaign

8    manager or other functionary on any of these campaigns, did

9    your responsibilities include reviewing polling data?

10       A.    It did.

11       Q.    And in terms of providing advice to these clients,

12   were you required to from time to time analyze polling data

13   and make strategic decisions about what was working and what

14   wasn't working?

15       A.    Yes.  That's a necessary piece, yes.

16       Q.    And did your responsibilities include advising your

17   clients on the likelihood of their success in these statewide

18   elections based upon information you observed from these

19   polls?

20       A.    Yes.  Good or bad.

21       Q.    Did you also, Mr. Dennehy, in this capacity observe

22   political campaigns happening on the ground and in the

23   airwaves through advertising and other media?

24       A.    Yes, sir.

25       Q.    And was it your responsibility during these

1      campaigns to provide advice to your clients about what

2      appeared to be working to move people to support them and what

3      didn't?

4           A.   Definitely, yes.

5           Q.   And you've been doing this for candidates across

6      New Hampshire for it appears to me about 30 years?

7           A.   Yes, sir.

8           Q.   And this has been effectively the main source of

9      your income and your main profession during all that time?

10          A.   Yeah.  It's been my career work.

11               MR. LEHMANN:  Your Honor, I would ask that the

12     witness be declared an expert in political campaigns and

13     interpretation of political polling.

14               THE COURT:  Any objection?

15               MR. CASTRO:  No.

16               THE COURT:  I'm not going to declare him an expert,

17     but I will hear his opinion evidence under the 700 rules.

18     That's permissible.

19               No offense.

20               THE WITNESS:  None taken.

21          Q.   Mr. Dennehy, attached as Exhibit 10 to your

22     declaration, could you identify what those documents are?

23          A.   It's a report of receipts and disbursements for the

24     Federal Election Commission.

25          Q.   In the course of your career as a political

1    consultant, campaign manager, and strategist, were you

2    required to become familiar with Federal Election Commission

3    filings?

4         A.    Sadly, yes.

5         Q.    And is it fair to say that reviewing Federal

6    Election Commission filings is something you did both for your

7    own candidates and for opposition's candidates?

8         A.    That's correct as well, yes.

9         Q.    And when you're reviewing filings such as these for

10   an opposition's candidate, what would you be looking for?

11        A.    Primarily looking for receipts and disbursements,

12   what money was taken in by a campaign, what money was expended

13   and to where and how much, and then typically your bottom line

14   cash on hand.

15        Q.    Does the amount of cash on hand and other

16   observations you were able to make from filings such as these

17   influence your opinion as to whether a candidate is viable on

18   a statewide election in New Hampshire?

19        A.    That's frankly the first thing you look for and

20   $678 is --

21        Q.    I'll get to that in a second, if you will.

22        A.    Okay.  Sure.

23        Q.    And the same is true with -- is the same true with

24   polling data, Mr. Dennehy, that you look at polling data to

25   determine if there's any perceptible strength from somebody

1   you're evaluating whether it's your candidate or somebody in

2   the opposition?

3        A.   Yes.

4        Q.   And that too is something that you've done

5   repeatedly during your career?

6        A.   Yes.

7        Q.   Have you had an opportunity to look at the polling

8   data for Mr. Castro and at the FEC filings that Mr. Castro has

9   submitted to the FEC?

10        A.   Yes, sir.

11        Q.   Do you have an opinion as to what his prospects of

12   success are in the upcoming New Hampshire primary?

13        A.   Yes.   Polling data is nonexistent.

14        Q.   Well, let me ask you.   Have you reviewed some of

15   the presidential polls that have been taken by -- that have

16   been published?

17        A.   Yes.   All of them.

18        Q.   And who has published the data that you reviewed?

19   Media outlets?

20        A.   Media outlets, but then of course they now are all

21   publicly available, Suffolk University, University of New

22   Hampshire, Saint Anselm College locally, and then it is more

23   national polls.

24        Q.   How many polls have you reviewed relative to the

25   upcoming New Hampshire primary?

1     A.    Because it's my business, I review all of them.

2     Q.    Just --

3     A.    I think there's roughly --

4           THE COURT:  One at a time.

5     A.    I think there's roughly 20 polls currently in the

6  last six months.

7     Q.    In your review of the polling data have you seen

8  any indicia of strength or support for Mr. Castro?

9     A.    I have not.

10    Q.    Based on your review of the FEC filings did you see

11  any indicia of strength or viability for Mr. Castro's

12  campaign?

13    A.    I have not.

14    Q.    What's the purpose of the New Hampshire primary?

15  What are we doing in that primary?

16    A.    Sure.  I mean, the purpose and premise of the New

17  Hampshire primary is to -- it offers a candidate the ability

18  to come to New Hampshire to work hard, to present a message

19  that in many cases you're unable to do in other states.

20  That's what makes New Hampshire special.

21          THE COURT:  I don't think the question is why are

22  we first in the nation.  I think the question is what is the

23  purpose.

24    Q.    What are we selecting?

25    A.    Oh.  I'm sorry.  We're selecting a Republican

1    nominee for president.

2         Q.    And are we also selecting -- I mean, primarily

3    we're selecting delegates to the Republican National

4    Convention; is that correct?

5         A.    Ultimately, yes.

6         Q.    And is our primary a winner-take-all proposition?

7         A.    No, it's not.  It's proportional.

8         Q.    It's proportional.  So in order to -- somebody can

9    win a delegate without coming in first place overall in the

10   primary; is that correct?

11        A.    That is correct.

12        Q.    Okay.  Do you see any reason to believe in your

13   opinion as somebody who's been looking at FEC reports and at

14   polling data for 30 years, to believe that Mr. Castro has any

15   chance whatsoever of succeeding in securing eight delegates to

16   the Republican National Convention?

17        A.    I do not.

18        Q.    Not one?

19        A.    Not one.

20        Q.    Have you had a chance to review Mr. Castro's

21   campaign communications?

22        A.    His website is the only thing I could find, yes.

23        Q.    Could you describe what you found on his website

24   for the Court, please?

25              And if it will help refresh your recollection, I

1    will indicate to you that on page 3, paragraph 6, you gave a

2    narrative description that might help remind you of what the

3    question I'm asking is.

4       A.   Thank you.  Yes.

5         I found the website to be very let's say amateur.

6    It's incomplete.  It's something frankly you would see from

7    potentially a state representative candidate here in New

8    Hampshire.  It's certainly not what you would consider a

9    national campaign website.

10     Q.   So it's more akin to a state representative race to

11   be one of 400 house members over in the state house with a

12   $100 a year job as opposed to somebody who is running for

13   president of the United States?

14     A.   That's correct.

15     Q.   In your declaration you indicated that there was

16   some indication on the website that Mr. Castro was going to be

17   providing information about energy independent jobs and

18   healthcare and other issues.  Do you recall reviewing those

19   pages on his website?

20     A.   I did.  I clicked on all the links that he has

21   available, and many of these sections click to an explanation

22   of his past campaign for Congress.

23     Q.   When did he run for Congress?

24     A.   I believe it was a 2022 election, a special

25   election.

1       Q.    If I call your attention to the middle of paragraph
2   6 on page 3, it appears --
3       A.    2021.
4       Q.    Does that refresh your recollection?
5       A.    Thank you.  Yes.
6       Q.    Okay.  There was also an indication on the website
7   that there was going to be a Spanish translation?
8       A.    Yes.
9       Q.    And when you clicked on that, did you find a
10  Spanish translation?
11      A.    I did not.  Just a repeat of en español.
12      Q.    Have you had a chance to review a declaration that
13  Mr. Castro himself filed with this Court?
14      A.    I did, yes.
15      Q.    And did you see in the declaration at paragraph 8
16  where Mr. Castro wrote that the plaintiff does not yet have a
17  campaign office in New Hampshire?
18      A.    I did.
19      Q.    And is that consistent with any observations you've
20  made in this election cycle, that he in fact does not have a
21  campaign office in New Hampshire?
22      A.    Just that he's not a serious candidate.
23      Q.    But have you seen any evidence of him having a
24  campaign office in New Hampshire?
25      A.    I have not, no.

1      Q.    Have you --

2            THE COURT:  Try to let him finish the question

3      before you answer so the court reporter can keep up.

4            THE WITNESS:  Yes, sir.

5      Q.    In paragraph 9 of Mr. Castro's declaration he wrote

6      that he does not yet have employees in New Hampshire.  Do you

7      recall seeing that?

8      A.    I do.

9      Q.    And is that consistent with observations you've

10     made about Mr. Castro's presence in New Hampshire to date?

11     A.    I have not seen any.

12     Q.    You haven't seen any evidence of employees?

13     A.    Correct.

14     Q.    And Mr. Castro wrote that his campaign is not

15     running any advertisements in New Hampshire.  Do you recall

16     seeing that in his declaration?

17     A.    I have not.

18     Q.    And is that consistent with your observations of

19     the New Hampshire primary so far?

20     A.    It is.

21     Q.    So you haven't seen any Castro for President

22     advertisements run in the media?

23     A.    That is correct.

24     Q.    And did you see in paragraph 14 of Mr. Castro's

25     declaration that he wrote plaintiff understands the odds of a

1    successful campaign are low?

2         A.   I did see that.

3         Q.   Would you agree with that assessment that the

4    chances of success are low?

5         A.   I would agree.

6         Q.   Would you -- when we say that the chances are low,

7    exactly how low would you estimate them to be?

8         A.   Well, you know, anyone who gets on the ballot may

9    receive one or two votes.  So I think that would probably be

10   the bar.

11        Q.   But one or two votes is obviously not enough to win

12   a delegate to the convention, right?

13        A.   Certainly not.

14        Q.   Okay.  Do you have an opinion as to whether or not

15   Mr. Castro would fare any better in terms of winning one or

16   more delegates if President Trump were not on the primary

17   ballot?

18             MR. CASTRO:  Objection.  Speculation.

19             MR. LEHMANN:  He's offering his opinion, your

20   Honor.

21             THE COURT:  Yeah, that's the thing.  It's only

22   opinion.  He's allowed to do that and speculate a little bit,

23   but you're perfectly entitled to try to expose that as pure

24   speculation on cross.

25             Please proceed.

1        Q.    So if President Trump was not on the ballot, do you

2    think that Mr. Castro's chances of winning one or more

3    delegates would improve substantially?

4        A.    It would have no impact.

5        Q.    And why do you say it would have no impact?

6        A.    Because there is no activity to the campaign.

7        Q.    So if President Trump were not on the ballot, what

8    would happen to his voters?  Who would they vote for then?

9        A.    They would vote for the candidates who are running

10   active campaigns in New Hampshire, who have campaign offices,

11   who are running advertisements, who are here every other week

12   campaigning, meeting voters, and developing that relationship.

13       Q.    And presumably some of them would still vote for

14   President Trump as a write-in, right?

15       A.    More than likely.

16       Q.    And others would vote for people who may have been

17   elected to office before; is that fair to say?

18       A.    Sure.  Who have established political careers,

19   uh-huh.

20            MR. LEHMANN:  One second, please.

21            (Pause)

22            Thank you.

23            THE WITNESS:  You're welcome.

24            MR. LEHMANN:  Mr. Castro may have some questions,

25   and counsel for the Attorney General may as well.

1           THE COURT:  Well, let's finish direct first and

2     then we'll do cross.

3           Does Mr. Scanlan have any questions?

4           MR. O'DONNELL:  No, your Honor.

5           THE COURT:  Does the party?

6           MR. GOULD:  No, your Honor.

7           THE COURT:  Cross-examination.

8                        CROSS-EXAMINATION

9     BY MR. CASTRO:

10          Q.    Good morning, Mr. Dennehy.

11          A.    Good morning.

12          Q.    Is it Dennehy?

13          A.    Yes, sir.

14          Q.    Okay.  Got it.  Okay.  I just have a few questions.

15                Who decides who gets included in a poll?

16          A.    You would have to ask the polling company, but one

17    can make an assumption that it's the candidates who have

18    active campaigns.  I think we've heard that from some of the

19    polling industries.

20          Q.    I'm sorry.  How long have you been a political

21    strategist?

22          A.    32 years.

23          Q.    32 years.  And you don't know how somebody is

24    included in a poll?

25          A.    I don't know how polling outfits choose their

1    candidates.  I don't run a polling firm.

2         Q.   No, but you've worked with campaigns to purchase

3    and pay for polls; is that correct?

4         A.   Of course.  Yes, I do.

5         Q.   Okay.  So you know that one of the ways to get a

6    poll is to purchase, buy a poll, correct?

7         A.   Say again.  I'm sorry?

8         Q.   One of the ways to get a poll done is to pay for

9    it; is that correct?

10        A.   Sure.  I'm sorry.  Was your question how -- a

11   campaign poll, how one is purchased by a candidate or one from

12   the public?  Because they're very separate.

13        Q.   Can you explain the difference for the Court?

14        A.   Sure.  So there's what's called an internal poll

15   which is purchased by a campaign, candidate, and then of

16   course that campaign would put whatever candidate they want in

17   their poll, it could be anyone they want, and they want to

18   test what their strength or weakness is among voters.

19             Now, a public vote, whether it's Saint Anselm

20   College, University of New Hampshire, in New Hampshire,

21   Suffolk University out of Massachusetts, reputable polling

22   industries, I don't know how they -- I have never talked to

23   their pollster this year to see how they chose their

24   candidates.  As I said, one can only make an assumption that

25   they choose the candidates who have active campaigns.

```
 1          Q.    Got it.  And have you seen any poll specifically
 2    showing how John Anthony Castro would perform, you know,
 3    against the other candidates, Donald John Trump, Vivek -- I
 4    can't pronounce his last name, I apologize, or any of the
 5    other candidates?
 6          A.    I have not.
 7          Q.    Okay.  So then you're speculating based on
 8    observation of campaign website and other activities, correct?
 9          A.    I'm speculating on active campaigns, correct.
10          Q.    Got it.  Okay.
11                And with regard to polls, what's the average margin
12    of error in a poll?
13          A.    Again, it varies.  It could be anywhere from 2.75
14    percent to 4.5 percent.
15          Q.    Okay.  So you're saying that somebody could
16    theoretically poll at zero percent but still end up at 4.75
17    percent?
18          A.    Absolutely.  Uh-huh.
19          Q.    Okay.  And are you aware that John Anthony Castro
20    has been featured in every major news outlet?
21          A.    No, I'm not.  I haven't seen it.
22          Q.    Okay.  All right.  What would you say of a
23    candidate that only had $677 in their account but was featured
24    in every major news outlet in the world?
25          A.    I would say it has absolutely no impact on whether
```

1    someone would vote for them because the whole premise behind a

2    campaign is what's called reach and frequency and the amount

3    of times you can put yourself in front of a voter.

4            So one time -- I mean, frankly it's one of my

5    arguments with candidates is that one time in the media will

6    be forgotten the next day.  You need a sustained effort over

7    time to have success with voters.

8        Q.   Okay.  So if a candidate could show sustained

9    exposure for multiple weeks in the media, you would say that

10   would make them a more viable candidate?

11       A.   Sure it would, yeah, if they have a sustained media

12   effort over a significant period of time.

13       Q.   Okay.  How significant?

14       A.   Oh, I mean probably weeks to months to develop some

15   kind of voter and name ID, name identification.

16       Q.   How many weeks would you say?

17       A.   I would say it would probably need to be somewhere

18   in the neighborhood of 16 to 20 weeks before an election.

19           MR. CASTRO:  16 to 20 weeks before an election.

20   Okay.  Got it.

21           All right.  I have no further questions.

22           THE COURT:  Thank you.  Any redirect?

23           MR. LEHMANN:  Yes.

24                      REDIRECT EXAMINATION

25   BY MR. LEHMANN:

1      Q.    In terms of the 20 polls that you said you reviewed

2  in forming your opinion about Mr. Castro's prospects, were

3  those public polls that were published by news agencies or

4  were they internals by a campaign?

5      A.    All public polls.  I have not seen any internal

6  polls for this election.

7      Q.    Are you aware of -- you in your 32 years of being

8  involved with political campaigns have spoken to pollsters who

9  run these polls from time to time, right?

10      A.    Yes.

11      Q.    Are you aware of any impediment to a campaign

12  contacting a pollster to complain that they're not being

13  included in polling data?

14      A.    I have.

15      Q.    Sorry.  The question is whether you're aware of any

16  impediment that would stop somebody like Mr. Castro from

17  contacting a pollster saying, hey, you should be including me

18  in your poll.

19      A.    No.  It's been done before.

20      Q.    That's something that a candidate who was concerned

21  about being left out of polls could do?

22      A.    Yes.

23      Q.    Now, in terms of sustained media exposure that you

24  were asked about on cross-examination, you actually ran a

25  campaign that was rather famous for what's called earned media

1    when you were with Senator McCain; is that fair?

2         A.    It is.

3         Q.    And am I correct that there was a period of time in

4    his campaign, the year he ultimately won the Republican

5    nomination, in which he was very low on funds but was able to

6    maintain a presence simply by being available to press and

7    doing a lot of media hits?

8         A.    That is correct.

9         Q.    And would it be fair to say that those media hits,

10   well, they were national, but there were a great deal of media

11   hits here in New Hampshire, right?

12        A.    That is correct.

13        Q.    So when you say there needs to be sustained

14   exposure, are you saying that -- I mean, if a candidate had

15   ten news articles written about them in national publications

16   once a week for ten weeks, is that what you're talking about,

17   sustained media exposure, or do you mean something more akin

18   to daily news articles by local New Hampshire papers?

19        A.    Yeah, more daily and more regular.

20             In the state of New Hampshire, for instance, if you

21   have a campaign that is in New Hampshire having press

22   conferences every week, if you are meeting voters every week,

23   then even without spending money you could make an impact in a

24   campaign.

25        Q.    So Senator McCain's campaign that you managed got a

1   lot of mileage out of town hall events as well; is that fair

2   to say?

3       A.   It is.

4       Q.   How many town hall events would Senator McCain do

5   at the height of primary season each week?

6       A.   Every day he was here he would do three to four

7   town hall meetings a day.

8       Q.   Okay.  And that's meeting thousands of voters every

9   day, right?

10       A.   That is correct.

11       Q.   And is it fair to say that those town hall events

12   were regularly covered by multiple New Hampshire news outlets

13   on a daily basis?

14       A.   Yes, sir.

15       Q.   So when you say that a candidate can make inroads

16   through sustained daily exposure, is that what you're talking

17   about?

18       A.   Yes.  Yes.

19            MR. LEHMANN:  Thank you.

20            THE COURT:  Anymore redirect by anybody?

21            MR. SHAW:  No thanks.

22            MR. GOULD:  Nothing, your Honor.

23            THE COURT:  Recross?

24            MR. CASTRO:  Yes.  Recross.

25                        RECROSS-EXAMINATION

```
 1   BY MR. CASTRO:
 2        Q.    I know the official date for the New Hampshire
 3   election hasn't been set, but more or less how many weeks are
 4   left before the primary election?
 5        A.    94 days.
 6        Q.    94 days.  Can you state that in weeks for the
 7   Court, please?
 8             THE COURT:  I can do the math.
 9        Q.    So it's safe to say that there's still plenty of
10   time for a candidate to make inroads, correct, not necessarily
11   to win the election but to obtain at least one delegate?
12        A.    Not, I don't believe, with a media presence.  I
13   don't believe just by earned media alone.  I do not believe
14   you can gain the threshold of 15 percent with just -- frankly,
15   to be honest, there's just not a lot of earned media to get
16   anymore.  So -- I mean in New Hampshire you have one of the
17   statewide newspapers, the Union Leader, and then you've got
18   WMUR TV which covers most of the state.  Beyond that there's
19   no media to get.  So I don't believe a candidate can get to 15
20   percent by New Hampshire media alone in 90 days' time.
21        Q.    Okay.  But in 90 days' time assuming there was
22   boots on the ground, employees, you know, full-blown campaign
23   activities, daily town halls, do you believe that would be
24   possible to reach 15 percent?
25        A.    I do.
```

1          MR. CASTRO:  Got it.  Okay.  No further questions.

2          THE COURT:  Thank you.  Sir, you're excused.

3          THE WITNESS:  Thank you, sir.

4          THE COURT:  Please call your next witness.

5          MR. LEHMANN:  That's all we have for evidence, your

6    Honor.

7          THE COURT:  Thank you.

8          Mr. Trump.  Please proceed whoever is Trump's

9    counsel.  Oh, that was Rick.  Sorry.

10          (Court reporter indicates she cannot see counsel to

11    determine who is speaking)

12          The reporter can't see over the massive structures

13    of this courtroom.  So I need you to stand up when you speak

14    and identify yourself.

15          Sorry about that little mix-up.

16          Does the Republican Party have any evidence to

17    present?

18          MR. GOULD:  No, your Honor.

19          THE COURT:  All right.  We haven't -- let me

20    just -- these documents that were not covered in the

21    testimony, but Exhibits 2 through 6, they were presented to me

22    by Mr. Trump.  You objected to them on the basis of relevance.

23          Is there any other basis for your objection?

24          MR. CASTRO:  Not that I can think of right now.

25    No, your Honor.

```
 1              THE COURT:  All right.  Well if that's the

 2    objection, it's overruled and they're admitted.

 3              (Defendants' Exhibits 2 through 6 Admitted)

 4              Okay.  So I guess we've finished evidence on the

 5    issue of standing.

 6              Now I'm going to let you argue if you want to argue

 7    more.  You've already made your argument I think as a part of

 8    your presentation, but you've heard more evidence now.  If

 9    there's other things you want to say to me about standing,

10    this is your opportunity.  Then I'm going to hear from counsel

11    on the other side.

12              After we do that, I'll hear your argument on the

13    political question doctrine, okay?

14              MR. CASTRO:  Got it, your Honor.

15              Yeah, so, I mean, pretty much what we've heard

16    today is that, again, there seems to be a misconception that

17    the injury is that I wouldn't obtain any delegates.  That's

18    not the inquiry.  The inquiry is whether the presence of a

19    constitutionally disqualified candidate results in a

20    diminution of votes.  If I lose one single vote, I have an

21    injury.

22              It's the same if I take one dollar from a person's

23    pocket.  I mean, that's not going to make them go broke, but

24    there's no question they have an injury.  They've taken

25    something from the person.
```

1          So, you know, as far as boots on the ground

2    campaign activities, as I mentioned before, I do have a tax

3    firm.  The tax deadline just passed on Monday, October 16th.

4    That was my threshold for saying, okay, the chains are off

5    now, you know --

6          THE COURT:  Please slow down.

7          MR. CASTRO:  Yes.  Sorry.

8          The business considerations are, you know, the

9    chains are off so now I'm more freely able to have more time

10   to do campaign activities.

11         So, yes, I do intend on establishing a campaign

12   office, hiring employees locally in the area, and to begin

13   substantive boots on the ground campaign activities.

14         MR. LEHMANN:  Your Honor, I object to the extent

15   that he's making factual arguments now that we're in the -- I

16   mean, he's alleging facts to you now that we're in the

17   argument section of the proceeding.

18         THE COURT:  I understand your point.  I am

19   distinguishing factual assertions from argument, but let me

20   say this to you.

21         When you say things like you're going to spend

22   money and hire employees, those are factual assertions, okay?

23   So I'm going to have to let them cross-examine you about that.

24   Do you understand that?

25         MR. CASTRO:  Yeah.

```
 1              THE COURT:  Okay.  So they're going to ask you
 2   questions like, with what funds are you going to pay these
 3   employees.  They're going to ask you questions like, what are
 4   their names.  So understand when you make an assertion like
 5   that, it's going to be subject to cross-examination.
 6              MR. CASTRO:  Yeah.  Absolutely.
 7              THE COURT:  All right.  You may continue.
 8              MR. CASTRO:  And other than that, like I said, the
 9   three elements for standing have clearly been established.
10              Again, you know, there's an injury.  The witness
11   admitted that.  He still admitted there's time to make
12   significant inroads.  And, again, at the end of the day if I
13   lose one vote, there's an injury.  You have traceability and
14   then you have redressability.
15              THE COURT:  All right.  But let me ask you this
16   question.  What evidence is there that -- what evidence is
17   there that Mr. Trump's candidacy would cost you a single vote?
18   Other than that he would get votes, which I'm with you that
19   far, but what evidence is there that any vote that would be
20   cast for Mr. Trump would otherwise have been cast for you?
21              MR. CASTRO:  Yes.  So the D.C. Circuit went into
22   this and what they explained was that it's akin to the
23   economic competitor injury, which is that if you have multiple
24   economic competitors all competing for the same pie, you know,
25   it's just -- by implication, you know, there's a very limited
```

1   finite number of potential clients, in this case a finite

2   number of voters, and so the presence of one party if that is

3   impermissible under the law for any reason is going to create

4   an implied injury in fact for all the others.

5           THE COURT:  An applied injury in fact and for all

6   the others?  But for one to be injured -- and I mean this

7   respectfully.  I'm not trying to play gotcha here.  But for

8   one to be injured one has to actually be a competitor.  Would

9   you agree?

10          MR. CASTRO:  Yes, your Honor.

11          THE COURT:  Okay.  Let me ask you this -- by the

12  way, you were just referencing the D.C. Circuit.  What case

13  were you referring to?

14          MR. CASTRO:  I don't have it off the top of my head

15  right now, but I can get that for you.

16          THE COURT:  Okay.  All right.

17          Anything else you want to say?

18          MR. CASTRO:  No, your Honor.

19          THE COURT:  All right.

20          Does the Secretary of State wish to cross-examine

21  Mr. Scanlan?  I mean, sorry, Mr. Castro.

22          MR. O'DONNELL:  No, your Honor.

23          THE COURT:  Does Mr. Trump wish to cross-examine

24  Mr. Castro?

25          MR. SHAW:  I think I do.  Yes, your Honor.

1          THE COURT:  Please take the witness stand, Mr.

2    Castro.

3          THE CLERK:  Your Honor, do you want me to give him

4    the oath again?

5          THE COURT:  He's been sworn.  Thank you.

6          MR. SHAW:  Mr. Castro, you may want to take your

7    copy of the exhibits.

8          THE COURT:  So, Mr. Castro, I want to just not

9    remind you but tell you -- you've sort of moved now from

10   counsel table to the witness stand.  It's a little bit of a

11   different role.  You're no longer the advocate.  Now you're a

12   witness.  So my reminder is you're still under oath.

13         MR. CASTRO:  Yes.

14         THE COURT:  You may proceed, counsel.

15         MR. SHAW:  Thank you, your Honor.

16         CROSS-EXAMINATION OF JOHN ANTHONY CASTRO

17   BY MR. SHAW:

18     Q.    Mr. Castro, my name is Jonathan Shaw.

19           Let's just begin by nailing down a couple things I

20   think we agree on, all right?

21           Your presidential campaign's campaign committee is

22   Castro for America, correct?

23     A.    Correct.

24     Q.    And that's the only presidential campaign committee

25   that you have, right?

1      A.    Yes.

2      Q.    And your campaign has not yet opened a campaign

3  office in New Hampshire, right?

4      A.    Correct.

5      Q.    Or in any other state, right?

6      A.    Correct.  Yes.

7      Q.    Your campaign doesn't have any employees in New

8  Hampshire, right?

9      A.    Correct.

10      Q.    Or in any other state, right?

11      A.    Correct.

12      Q.    In fact, you are the treasurer of your campaign

13  committee, right?

14      A.    I don't believe so.  I believe it's Alfonso Garza.

15      Q.    Well, let me direct your attention to Exhibit 6.

16          Do you recognize Exhibit 6 as a Form 3P which you

17  filed with the Federal Election Commission on October 12,

18  2023, a little over a week ago?

19      A.    Yes.

20      Q.    And that is a report of receipts and disbursements

21  by an authorized committee of a candidate for the office of

22  president or vice president; is that correct?

23      A.    Correct.  Yes.

24      Q.    Okay.  Now, if you look on the first page of that,

25  you will see here:  Type or print name of treasurer.

1          Right?  Near the bottom.

2     A.   Uh-huh.

3     Q.   It says Castro, John Anthony?

4     A.   Yes.

5     Q.   Does that refresh your recollection to the fact you
6  are the treasurer of your campaign?

7     A.   I believe that was a mistake.  I would have to make
8  sure that that's corrected.

9     Q.   Okay.  But it's either you or Mr. Garza, correct,
10  that's the treasurer?

11     A.   Correct.

12     Q.   And Mr. Garza is who?

13     A.   He is my office manager and my brother-in-law.

14     Q.   And do you pay him to be your treasurer?

15     A.   No.

16     Q.   So your business just makes him available to you
17  for serving as treasurer of your campaign?

18     A.   Oh, he's my brother-in-law, yes.

19     Q.   So your campaign hasn't run any advertisements in
20  New Hampshire; is that right?

21     A.   Not as of now, correct.

22     Q.   Okay.  And it hasn't run any advertisements in any
23  other state, correct?

24     A.   Correct.  Yes.

25     Q.   In fact, your campaign has not engaged in any

1  campaign activities in New Hampshire other than this lawsuit,

2  right?

3      A.   Correct.  Yes.

4      Q.   Okay.  Or in any other state, right, apart from

5  lawsuits?

6      A.   Correct.  Yes.

7      Q.   Now, in addition to yourself, you would acknowledge

8  there are a number of folks competing for0 the Republican

9  nomination who are better known among likely voters than you,

10  right?

11      A.   Yes.

12      Q.   People who have raised more money than you have,

13  right?

14      A.   Yes.

15      Q.   People who have track records of political

16  accomplishment that you don't have?

17      A.   I'm sorry.  Can you repeat the question?

18      Q.   Sure.  People who have track records of political

19  accomplishment that you don't have?

20      A.   Correct.  Yes.

21      Q.   Governors, senators, congresspeople?

22      A.   Yes.

23      Q.   Ambassadors?

24      A.   I'm not sure if you want me to say yes to each one.

25      Q.   Yes.

```
 1        A.    Okay.  Yes.
 2        Q.    People who have been spending significant time,
 3   effort, and money to compete with President Trump for the
 4   nomination of the Republican Party for the office of
 5   president, right?
 6        A.    Yes.
 7        Q.    In New Hampshire and in other states, right?
 8        A.    Yes.
 9        Q.    And unlike you those people have organizations on
10   the ground in the key primary states, right?
11        A.    Yes.
12        Q.    Okay.  And unlike you those people are running
13   advertisements in the key primary states, right?
14        A.    Yes.
15        Q.    Okay.  In fact, unlike you those people have booked
16   advertising time in those states running through the primary
17   elections in those states, right?
18        A.    Yes.
19        Q.    Okay.  So to the extent that advertising time is a
20   limited resource, they've already booked it and you haven't,
21   right?
22        A.    If your question is are they spending millions to
23   accomplish nothing, the answer is yes.
24        Q.    No, that's not my question, sir.
25              My question is to the extent that it was a limited
```

1   resource that you have to either book in advance or not have

2   the opportunity to book at all, they've already booked it,

3   right, and you haven't?

4        A.   Yes.

5        Q.   So whether or not President Trump is on the ballot

6   in New Hampshire, you acknowledge you are not going to get any

7   delegates in New Hampshire, rights?

8        A.   No, I disagree with that.

9        Q.   And the basis for your disagreement is that you

10  have a plan?

11       A.   Yes.

12       Q.   To ramp up your activities over the next 90 days,

13  right?

14       A.   Yes.

15       Q.   Okay.  And you're going to do that with what money,

16  sir?

17       A.   I can easily take a distribution from my firm.

18       Q.   You can take a distribution from your firm.

19            How much of a distribution could you take from your

20  firm?

21       A.   I would say upward of around maybe 100 to 250,000.

22       Q.   100 to $250,000?

23       A.   Uh-huh.

24       Q.   Okay.  And if President Trump were not on the

25  ballot, would it be fair to say that you would expect

1   Republican primary voters are much more likely to vote for one

2   of the other candidates who is more established than you, who

3   have campaign infrastructure, who have long-established

4   political track records, et cetera, rather than you, right?

5          A.   No.  I disagree with that statement.

6          Q.   Okay.  And what's the basis for your disagreement

7   with that?

8          A.   Personal confidence.

9          Q.   Personal confidence.  Anything else?

10         A.   No.

11         Q.   Okay.  And do you have any reason to believe that

12  if President Trump were not running, the people who would

13  donate money to him would divert those donations to you as

14  opposed to other candidates who are running against him?

15         A.   Oh, absolutely.  Yes.

16         Q.   What's the basis for that belief?

17         A.   Discussions with voters.

18         Q.   Name five.

19         A.   Do you want me to remember people's names?

20         Q.   Name one.

21         A.   I can't name one.

22         Q.   Okay.  Let's look at Exhibit 6 again, if you would.

23  Do you see near the bottom of the page it states:  I certify

24  that I have examined this report and to the best of my

25  knowledge and belief it is true, correct, and complete.

```
 1                 Right?
 2       A.    Yes.
 3       Q.    Okay.  And then you signed that as treasurer,
 4  right?
 5       A.    Correct.  Mistakenly, but yes.
 6       Q.    Okay.  But you signed it nonetheless?
 7       A.    Correct.  Yes.
 8       Q.    Okay.  And you stand behind it, right?
 9       A.    Yes.
10       Q.    Did you prepare it as well?
11       A.    I believe so, yes.
12       Q.    Okay.  Let's look at the third page of that
13  exhibit, the one that's headed Detailed Summary Page of
14  Receipts.
15       A.    Uh-huh.
16       Q.    Do you see that one?
17       A.    Yes.
18       Q.    Okay.  Now, you see there are three columns on that
19  page.  One, receipts, which contains a description of each
20  row.  Do you see that?
21       A.    Yes.
22       Q.    Okay.  Column A, total this period.  Do you see
23  that?
24       A.    Yes.
25       Q.    And column B, election cycle to date, right?
```

1      A.    Yes.

2      Q.    And you understand column B to be a summary column

3  for the entire election cycle, right?

4      A.    I do right now.  I don't think I understood that

5  when this was being prepared.

6      Q.    So what did you understand it to mean when this was

7  being prepared?

8      A.    I thought it was a quarterly report for the

9  activities happening that quarter.

10     Q.    So you thought column A and column B were

11  identical?

12     A.    Yes.  I would add I'm working with -- his name is

13  Patrick Harkin at the Federal Election Commission.  He reached

14  out to me because he understood and he saw some of the issues,

15  and we have a call scheduled I believe for mid next week to go

16  over some of the things.  He kind of wanted to help out

17  because he could see that we didn't really know what we were

18  doing.

19     Q.    So you were contacted by Mr. Harkin after he saw

20  this document?

21     A.    No.  I reached out to Mr. Harkin because there was

22  an issue with one of the filings not going through, and then

23  after he took a look at everything he said I think we should

24  schedule a call to go over everything.  He said I think you

25  guys are misunderstanding.  And I said, yeah, I think that

1    would be beneficial.  So yeah.

2         Q.   Let me ask you this.  Looking at this, are there

3    any receipts that should be listed on here, any money that

4    your campaign has received that should be listed in column B

5    of this report that are not listed on column B of this report?

6         A.   Are there any additional?  No.  As far as receipts,

7    like money coming in?

8         Q.   Money coming into your campaign from any source.

9         A.   No.  That's correct.

10              I think what was missed also was the -- like some

11   of the filing fees and things like that for the court, you

12   know, because that would technically be a part of the

13   campaign.  So I needed to go back and correct that to have

14   that properly included.

15        Q.   So there are some campaign expenditures that are

16   not properly reflected on this report, but in terms of income

17   this accurately reflects the total income for your campaign to

18   date?

19        A.   Oh, yes.  Correct.  Yeah.

20        Q.   Okay.  And that includes all the categories listed

21   in the receipts column, column 1 receipts, correct?

22        A.   Yes.  Correct.

23        Q.   Okay.  That includes federal funds?

24        A.   Yes.

25        Q.   It includes contributions other than loans?

```
 1          A.    Yes.

 2          Q.    It includes transfers from other authorized

 3   committees?

 4          A.    Yes.

 5          Q.    It includes loans received?

 6          A.    It includes everything.

 7          Q.    Okay.  And offsets to expenditures.  So everything?

 8          A.    Yes.

 9          Q.    Okay.  So you correctly certified that your

10   campaign has received as of 9-30-23, so September 30th of

11   2023, no loans, no offsets to expenditures, and no other

12   receipts throughout this entire campaign cycle, correct?

13          A.    Correct.  Yes.

14          Q.    Okay.

15                And going to the next page, we have a total of zero

16   dollars in disbursements for the entire campaign cycle, but

17   you think that needs to be corrected, correct?

18          A.    I'm sorry.  Can you repeat that one more time?

19          Q.    On the next page you show a total of zero dollars

20   in disbursements for the entire campaign cycle, correct?

21          A.    Are disbursements like expenditures?

22          Q.    Yes.  Disbursements are like expenditures.

23          A.    Oh.  Okay.  And what's your question?

24          Q.    It shows zero, but you've told us that that needs

25   to be corrected and updated, correct?
```

1    A.   Correct.  Yes.

2    Q.   Can you give us an order of magnitude of how much

3    needs to be added to that?

4    A.   Uh, whatever 27 times 402 is.

5    Q.   So your filing fees for these cases?

6    A.   Yes.

7    Q.   Anything else?

8    A.   Not that I can -- not that I can think of, no.

9    Q.   Things like your travel expenses for showing up at

10   this hearing today, that kind of thing?

11   A.   Yes.  Hence the call next week with Patrick Harkin.

12   Sorry.

13   Q.   But other than that, that's the kind of order of

14   magnitude we're talking about, correct?

15   A.   Correct.  Yes.

16   Q.   Let's take a quick look at Exhibit 4, please.

17        Now, do you recognize that as your campaign

18   committee's amended FEC Form 3P for April 2023?

19   A.   Correct.  Yes.

20   Q.   Okay.  And if you look on the first page, you'll

21   see that that's another one that you certified as the campaign

22   treasurer, correct?

23   A.   Yes.

24   Q.   Okay.  Did you personally prepare that filing as

25   well?

```
 1          A.    Yes.  Yeah, I was a part of the preparation of
 2    this.  Yes.
 3          Q.    Okay.  Was anyone else a part of the preparation of
 4    that?
 5          A.    Alfonso Garza, the treasurer.
 6          Q.    Your brother-in-law?
 7          A.    Correct.  Yes.
 8          Q.    And the reason it's an amended filing is that your
 9    committee had received a letter from the Federal Election
10    Commission asking you to confirm that your original April
11    filing was correct; is that right?
12          A.    Yes.  Correct.
13          Q.    And if you look at Exhibit 3 for a second, is that
14    a copy of the letter that you received from the Federal
15    Election Commission?
16          A.    Yes.
17          Q.    Okay.  And among other things, if you look down
18    towards the bottom of the first page of that letter, they warn
19    you that knowingly and willfully making any materially false,
20    fictitious, or fraudulent statements --
21               THE COURT:  Slow down.  When you read, it goes
22    fast.  So slow down.
23          Q.    Sorry.  I'm sorry.
24               They warn you that, additionally, knowingly and
25    wilfully making any materially false, fictitious, or
```

1    fraudulent statement or representation to a federal government

2    agency, including the Federal Election Commission, is

3    punishable, and then they cite various provisions of federal

4    law.  Do you see that?

5         A.   Correct.  Yes.

6         Q.   Okay.  So when you were making the amended

7    statement there, you had that in mind, right?

8         A.   Correct.  Yes.

9         Q.   Okay.  Now let's look at the amended filing, second

10   page, and you will see that on the second page on lines 7, 8,

11   10, and 12 the form shows a $20 million entry; is that

12   correct?

13        A.   Yes.

14        Q.   Okay.  And on the next page we have six places

15   where there is a $20 million entry showing up, including in

16   the entry for loans received from or guaranteed by the

17   candidate; is that correct?

18        A.   Yes.

19        Q.   Okay.  And then on the last page of this document

20   we have Schedule C-P loans, correct?

21        A.   Does it start on page 8?

22        Q.   It's page 9 of 9.

23        A.   Okay.  Yes.

24        Q.   Okay.  And that's Schedule C-P loans, correct?

25        A.   Correct.

1    Q.   Okay.  And that purports to show an unsecured loan

2    from the personal funds of the candidate, and that would be

3    you, right?

4    A.   Yes.  Correct.

5    Q.   Made on March 13, 2023, to your campaign in the

6    amount of $20 million at 3.71 percent interest, right?

7    A.   Yes.

8    Q.   Did you actually make a $20 million loan to your

9    campaign, sir?

10   A.   So what occurred and what I discussed with Patrick

11   Harkin is it was a -- we were in the middle of a capital raise

12   for a company called AI Tax.  I had secured four patents for

13   these of artificial intelligence in tax preparation.  And we

14   were in the middle of the capital raise and we had received a

15   valuation of roughly an estimated 180 million.  And so I got

16   20 million worth of that stock, and I wanted to give it to the

17   campaign in hopes that once the capital raise was completed I

18   would be able to sell the stock.  It would be then, you know,

19   cash in the campaign coffers, and that would kill two birds

20   with one stone.  We would complete the capital raise and then

21   I would have funds to launch a completely self-funded

22   campaign.  That didn't end up materializing.

23       And so it was maybe about two, three weeks ago I

24   reached out -- or I tried filing an amended FEC filing, but

25   Patrick Harkin said that due to the significance of the

1    changes that it required a special token.  He wanted to

2    schedule a call for last week, but that was in the rush to the

3    October 16th deadline.  So we scheduled a call for I believe

4    it's Tuesday or Wednesday to go over that.

5           But he basically said that he had to give me a

6    special token, and then I could go in there and amend it to

7    remove that loan since it never materialized.

8        Q.   Okay.  But the bottom line is there was never a $20

9    million loan, correct?

10       A.   No.  There was.  There was a promissory note.  It

11   was notarized and documented.  I provided a copy to the

12   Federal Election Commission.  I did tell them it was

13   contingent on a successful capital raise, which of course did

14   not end up materializing.  So we're in the process of undoing

15   that.

16       Q.   Okay.  But the bottom line is your campaign never

17   received an infusion of $20 million from you?

18       A.   It didn't receive $20 million in cash, but it did

19   receive 20 million worth of AI Tax stock which had a valuation

20   of $20 million.

21       Q.   All right.  Please turn to tab -- or rather Exhibit

22   1, sir.

23           Do you recognize that as a series of tweets that

24   you wrote and published on November 18, 2021?

25       A.   Yes.

1    Q.    Okay.  And on that day you were announcing your

2    intent to run for president of the United States, correct?

3    A.    Yes.

4    Q.    Okay.  And in the first tweet you began by stating

5    your belief that Section 3 of the Fourteenth Amendment

6    disqualified Donald Trump from holding public office, right?

7    A.    Yes.

8    Q.    But because you have a couple law degrees you

9    recognized there was a potential standing issue, right?

10   A.    I'm sorry?

11   Q.    Because you had had legal training you recognized

12   there was a potential standing issue, correct?

13   A.    Oh, yes.  Correct.

14   Q.    So you wrote:  But only a fellow Republican

15   presidential primary candidate has federal judicial standing

16   to sue Trump to remove him from the ballot.

17        You wrote that, right?

18   A.    Yes.

19   Q.    You also wrote:  I intend to pursue the Republican

20   nomination for the presidency of the United States in 2024.  I

21   intend to bring a federal lawsuit against Trump to disqualify

22   him from being on the ballot in every swing state, right?

23   A.    Yes.

24   Q.    And you so far filed, what was it, 32 lawsuits

25   against President Trump?

```
1          A.   I believe it's 27.

2          Q.   27?

3          A.   Right.

4          Q.   In an attempt to keep him off the ballot in various

5   states, right?

6          A.   Yes.

7               MR. SHAW:  I have no further questions for you at

8   this time, sir.  Thank you.

9               THE COURT:  Are there any questioning from -- any

10  other questioning from the Secretary of State?

11              MR. O'DONNELL:  No, your Honor.

12              THE COURT:  From the GOP?

13              MR. GOULD:  No, your Honor.

14              THE COURT:  You may be seated.

15              I have a couple questions.  I guess it's three

16  little areas.  I want to make sure I understood you correctly.

17              Did you say a moment ago that your plan was to --

18  you were doing a capital raise to fund some patents related to

19  the use of artificial intelligence for tax preparation, right?

20              THE WITNESS:  No.  So we had been -- I had been

21  working on this software since I started the owner/president

22  management program at Harvard Business School.  It was to

23  utilize artificial intelligence, and this is before all the

24  ChatGPT stuff, to utilize artificial intelligence, in

25  particular decisional intelligence, in tax planning and tax
```

```
 1   preparation.

 2           After those were awarded, a capital raising company

 3   reached out to us and they wanted to assist us in getting

 4   capital funds.  Because before that -- I mean, the firm

 5   generates usually between 2 to 4 million a year.  So I was

 6   just self-funding all of this.  All the research was all for

 7   me.

 8           But the next step was going to be the actual coding

 9   of the software, and that was going to require a lot more --

10   it was going to be more capital intensive.  And so they said,

11   well, you know, we can help you through that.  So the first

12   step is getting a valuation.

13           THE COURT:  You're talking about raising money from

14   investors into a business venture?

15           THE WITNESS:  Correct.  Yes.

16           THE COURT:  And you said you were going to use

17   investor funds to fund a political campaign?  Is that what

18   your testimony is?

19           THE WITNESS:  No, no, no.  The stock was going to

20   be sold.  So when the stock was sold, then the cash would be

21   available.

22           THE COURT:  Thank you.

23           THE WITNESS:  Yes.

24           THE COURT:  Second, you talked about a capital draw

25   as a way of funding your campaign, a capital draw from your
```

1    business.

2              THE WITNESS:  Yeah.

3              THE COURT:  What is the form of your business?  It

4    is a sole proprietorship or a corporation or a partnership or

5    what?

6              THE WITNESS:  It's a limited liability company

7    federally taxed as a small business corporation.  Also known

8    as an S-Corp.

9              THE COURT:  Are there any other shareholders beside

10   yourself?

11             THE WITNESS:  No.

12             THE COURT:  And then finally -- this is really I

13   guess focused on that last line of questioning from counsel.

14             I'm asking you this -- you know, you're here

15   litigating but you're educated.  I can't ask you this question

16   as an officer of the court because you're a party here, but I

17   guess I'm asking it as a lawyer who understands the process.

18             One might look at your campaign and say that its

19   main goal was to establish the impermissibility of Donald

20   Trump's candidacy.  Is that really a fair way to look at it?

21             THE WITNESS:  Primarily that's safe to say, yeah.

22             THE COURT:  Thank you.  You can step down.

23             Okay.  Any further evidence from Mr. Trump?

24             MR. SHAW:  No, your Honor.  Thank you.

25             THE COURT:  Is there any other evidence from the

1   GOP?

2           MR. GOULD:  No, your Honor.

3           THE COURT:  All right.  So I have the evidence.

4           Now we'll get back to the argument you were making.

5   You've made your argument on standing.  Is there anything you

6   want to add to your argument on standing before I hear from

7   counsel on the other side?

8           MR. CASTRO:  No, your Honor.

9           THE COURT:  Thank you.

10          We'll start with the Secretary of State.  Standing.

11          MR. O'DONNELL:  Thank you, your Honor.

12          What I didn't hear in the argument from the

13  plaintiff was that the injury he's alleged, and I think we

14  understand what he's alleged as an injury, which is the loss

15  of votes and/or fundraising donations as a result of Trump's

16  ongoing campaign, that that injury is traceable to the

17  complaint of conduct, what he is trying to enjoin the

18  Secretary of State from doing, which is accepting a

19  declaration of candidacy if and when Mr. Trump files one.

20          There is no evidence in the record that if the

21  Secretary of State is enjoined from accepting Mr. Trump's

22  declaration of candidacy that a single fundraising dollar

23  would go from anyone to Mr. Castro's campaign.  There is no

24  evidence in the record that a single vote would go from

25  someone who may have voted for Trump to Mr. Castro.

1          And those are both particularly relevant in that

2     they are not -- it is not a zero sum game in the sense that

3     there is any law requiring someone to vote or to vote in the

4     Republican primary or to vote for someone who's named on the

5     ballot.  Those are individual decisions of third parties that

6     they can choose not to do anything.

7          Similarly with donating to campaigns.  There's no

8     law requiring any person or corporation to donate any money.

9     If they don't want to donate to person A, they can choose not

10    to donate or they can donate to any other person.

11         So there's all of these independent acts of third

12    parties, voters, people who donate, all of the other people

13    running campaigns, and all of those stand in between his

14    alleged injury and the Secretary of State's conduct, which is

15    just accepting Mr. Trump's declaration and placing him on the

16    ballot along with all of the other candidates who filed a

17    declaration for candidacy.

18         THE COURT:  Why is that legally significant,

19    pointing to the necessity for third party action?

20         MR. O'DONNELL:  Well, in Dantzler, 958 F.3d, the

21    Court talks about the fact that if there is an independent

22    action of a third party, that that sort of defeats the idea

23    that causation exists between here the Secretary of State and

24    the alleged injury.

25         So put differently, his alleged injury requires all

1     of these other people to act in certain ways and these are all

2     independent acts that are outside the Secretary of State's

3     control.

4                THE COURT:  What if he had actually -- his argument

5     is based sort of on a legal theory that he attributes to the

6     D.C. Circuit Court of Appeals that just as a matter of

7     mathematics, right, the presence of Trump in a campaign that

8     he's also present in constitutes the likelihood of injury,

9     either funds or votes.

10               So his basic position is I don't need to present

11    evidence.  The fact that I'm in the campaign is enough.

12               What about that?

13               MR. O'DONNELL:  So in standing part of his burden

14    is to prove a tangible, nonspeculative injury.  Effectively,

15    that's just speculation.  It's speculation that all of these

16    other people will act differently.

17               It's also particularly noticeable here where he's

18    talking about Mr. Trump's campaign.  Under New Hampshire law

19    Mr. Trump could continue to run a write-in campaign.  We have

20    specific statutes allowing them if they receive a certain

21    amount of votes as write-in candidates to get their delegates

22    selected notwithstanding that they're not on the ballot.

23               So all we have I think from that argument is

24    speculation that somehow he stands to benefit and that he

25    would, actually.  He could have but didn't bring evidence of

1   specific people in New Hampshire who would have voted for him

2   if the Secretary of State kept Mr. Trump off the ballot.

3            He could have brought in evidence of particular

4   companies or people who would have donated to him if Mr. Trump

5   was kept off the ballot as a result of this injunctive relief

6   he wants.  We don't have that, and that was his burden to

7   produce that to show that his injury and the traceability to

8   the Secretary of State's conduct is not speculative.

9            It's I think very similar in terms of

10  redressability in that for the same reason that all of those

11  independent actions, they're not contingent on or related to

12  the Secretary of State's conduct.  There's no evidence that if

13  the Secretary of State keeps Mr. Trump off the ballot that any

14  of these people, these independent parties, will act in the

15  way that Mr. Castro believes they might act.

16            THE COURT:  Thanks.

17            Mr. Trump.

18            MR. LEHMANN:  Thank you, your Honor.

19            I'm going to do this somewhat backwards from the

20  way I had originally planned on because that's what happens

21  sometimes when you take evidence, but I want to call your

22  attention to a couple of cases.  One is cited on our request

23  for findings and rulings.  It has to do with the concept of

24  manufactured standing which was brought out from Mr. Castro in

25  the form of a concession that the real purpose for his

1    candidacy is to be able to challenge Mr. Trump's presence on
2    the ballot.
3            Cited in our filings, the request for findings and
4    rulings, is the case <u>Equal Means Equal versus Ferriero</u>, a
5    First Circuit case.  It has to do with organizational
6    standing, but the concern addressed is the continued
7    legitimacy of Article III limitations on federal courts.
8            In that case the First Circuit said that the
9    implication of allowing basically an advocacy group to
10   establish standing by spending money would be that any
11   individuals or organization wishing to be involved in a
12   lawsuit could create an organization for the purpose of
13   conferring standing and then spend its way into having
14   standing.
15           That cite comes from a Third Circuit case called
16   <u>Blunt</u> B-L-U-N-T, <u>versus Lower Merion School District</u>.  The
17   citation is 767 F.3d 247.  It's from 2014.  The quote is on
18   page 288, and the Blunt Court said that the Article III
19   concerns that animate the standing doctrine breath life into
20   the concerns, and they state that manufactured standing would
21   be a novel and vast expansion of associational liability, and
22   it also contradicts the prudential concerns behind the
23   standing doctrine that courts not become vehicles for the
24   advancement of ideological and academic agendas.
25           And I would submit to you, your Honor, that's

1    exactly what Mr. Castro conceded under cross-examination was

2    the purpose of this whole campaign that the evidence submitted

3    to you indicates really isn't a campaign.  It's something

4    else.

5            THE COURT:  But why does that amount to

6    manufactured standing?  I understand your point, but I don't

7    know if that makes the standing manufactured.

8            MR. LEHMANN:  Well, it makes it standing because we

9    still have the three-tier standing requirements of, you know,

10   a concrete injury, causation, fairly traceable, and

11   redressability.

12           There's no indication that any of those things

13   exist in this case, and the testimony was that in essence, the

14   way I would characterize it, is he thinks he's figured out how

15   to pick the lock to have standing to come before you in this

16   court to make challenges that ordinary voters couldn't.  And

17   all he has to do that is pay his thousand dollars to the

18   Secretary of State, sign on the dotted line, call himself a

19   candidate, and argue that now he's entitled to do what

20   ordinary voters couldn't.

21           And I would submit to you, your Honor, that Article

22   III standing requires more than a $1,000 check submitted to

23   the state of New Hampshire and a signature.  It would require

24   real participation and a real nonspeculative risk that he's

25   going to suffer a harm, that the harm is caused by the fact

1   that President Trump is going to remain on the ballot, and

2   that you ordering the Secretary of State to remove President

3   Trump from the ballot would solve this problem for him rather

4   than simply result in votes being scattered to other

5   legitimate and viable candidates.

6          So that's the first piece I wanted to address.

7          The second piece about standing that I wanted to

8   address is his claim that there's a D.C. Circuit case that

9   suggests that one vote switching from one to another is enough

10  to confer standing to constitute an injury.

11         I haven't seen that.  I'm not saying it doesn't

12  exist.  I've missed things in the past.  I'll miss them again.

13  I'm not aware of that fact, and I would equate it to

14  postelection challenges.  Now whenever a party brings a

15  postelection challenge, they have to prove that whatever the

16  issue being challenged is contains enough votes to more than

17  make up the margin of victory that the winning candidate had.

18  It's not one vote being in the wrong column to confer standing

19  to bring an election challenge.  It's a sufficient quantity of

20  votes to change the outcome of the election.

21         In this context the issue being decided at our

22  primary is not whether Mr. Castro gets 14 or 15 votes.  It's

23  whether he secures a delegate, which requires meeting the 15

24  percent threshold that Mr. Dennehy spoke about during his

25  testimony, and there's no indication that he's going to get

1   anywhere near that.

2          Now, in financial cases courts have held, yeah, one

3   dollar is enough, and certainly in tax challenges if the

4   government takes one dollar, that will give you standing to

5   challenge government action.

6          But in election law I'm not aware of any case law

7   that says one vote migrating from one candidate to another

8   creates standing.  The thing that determines standing is

9   whether you're going to win the prize.  In a general election,

10  it's the right to hold office.  In the New Hampshire primary

11  it's the right to win a delegate.  And there's just nothing to

12  suggest that some unidentified number of votes which are not

13  supported by any social -- you know, no polling.  He hasn't

14  presented any evidence to meet his burden of convincing you

15  that removing President Trump from the ballot is going to

16  result in this massive influx of votes to Mr. Castro, and of

17  course how could he?  He doesn't have a campaign here as he

18  conceded.

19         So switching now to the familiar test.  He has to

20  have a concrete injury.  This is -- the injury is counted in

21  delegates.  And he has to convince you.

22         We presented Mr. Dennehy not so much because you

23  have to believe him but because Mr. Dennehy said things that

24  are directly contrary to the suggestions that Mr. Castro is

25  making.  Completely unsupported by anything like that kind of

1  testimony.  He's just saying it.  He's not alleging any

2  expertise.  In fact, his cross-examination testimony that you

3  just heard suggests a very serious lack of expertise since he

4  seems to have struggled to fill out Federal Election

5  Commission reports, which is something that all candidates who

6  run for office either know how to do or get somebody to do.

7          But in order to meet the concrete injury prong of

8  the ordinary triple standing requirements the harm must

9  actually exist, and he hasn't given you anything that you can

10  rely on to believe that the harm of President Trump being on

11  the ballot is hurting him in any real way whatsoever.  He

12  simply hasn't moved anything forward that could support that

13  kind of a finding.  In fact, he's conceded in his filings

14  before this Court that those things don't exist.

15          In the stipulations he filed in paragraphs 12 and

16  14 he wrote -- Mr. Castro told you, your Honor, that he has no

17  prospects of getting any New Hampshire delegates to the

18  Republican National Convention, and that not any significant

19  number of votes that would otherwise have gone to Donald

20  Trump, nor any appreciable share of contributions.  That's

21  paragraph 12 of his stipulation.  And in paragraph 14 he

22  wrote:  The plaintiff understands the odds of a successful

23  campaign are low.

24          But to prove his case to you he has to prove that

25  it's more likely than not by a preponderance of the evidence.

1   And when he says it's low, low is less than 50 percent almost

2   by definition.  So in effect he's conceded away his whole case

3   by filing stipulations that say he's not really suffering an

4   injury because he really isn't going to win any delegates.

5           In order to try and get past all this he speculates

6   about the future, and of course you're not allowed to rely on

7   speculation in order to determine the existence of a concrete

8   injury for standing.

9           He says in paragraphs 8 through 11 he does not yet

10  have a campaign office, but he hasn't testified about his

11  plans to open one.  He says he does not yet have employees in

12  New Hampshire, and again he hasn't testified about his plans

13  to get any.  And he says he is not yet running ads.  And as

14  Attorney Shaw asked him on cross-examination, those ads are

15  bought up.  They're not as easy to get as we head into the

16  homestretch of the New Hampshire primary, and they aren't

17  going to be available even if he was able to make an effort to

18  purchase them.

19          But rather than go about the business of doing all

20  the campaign work that somebody would have to do in this final

21  sprint to the voting in the New Hampshire primary, Mr. Castro

22  is litigating in 26 other federal courts and is having

23  meetings with the FEC to amend his filings rather than being

24  out on the street, attending town halls, and doing all the

25  things that candidates here do that we're all familiar with.

1          He also cannot meet his burden of proving by a

2    preponderance of the evidence that if the Secretary of State

3    were to do what he asks and remove President Trump from the

4    ballot, that somehow that would cause any benefit to him

5    whatsoever, and that's been covered.  I don't think I need to

6    go into it in great detail.  It's pure speculation.  And it's

7    patently obvious that voters who would otherwise vote for

8    President Trump will vote for some other name-identifiable

9    candidate that they've seen on TV, seen at a town hall event,

10   met in person, and see as potential nominees of the Republican

11   Party.

12          Mr. Castro for his part could not identify when

13   asked a single voter in New Hampshire that he's spoken to.

14   The idea that removal of President Trump from the ballot is

15   somehow going to cause people to come to him is just simply

16   not supported.

17          So with that I would end.

18          We have one last bit of breaking evidence of law

19   for you to consider, and that was a decision out of the --

20          THE COURT:  Oh, from the Magistrate Judge from

21   California?

22          MR. LEHMANN:  The Magistrate Judge from California.

23   That's right.  Do you have that?

24          THE COURT:  I do.  Why don't you put it on the

25   record though.

```
 1              MR. LEHMANN:  Okay.  The case is Castro versus
 2   Secretary of State Shirley Weber and Donald John Trump.  It's
 3   from the Eastern District of California.  It's dated -- it was
 4   filed yesterday, October 19th, and its case 23-cv-2172-DAD-AC.
 5              THE COURT:  Document No. 8.
 6              MR. LEHMANN:  Document No. 8.  That's correct, your
 7   Honor.
 8              THE COURT:  Have you seen that, Mr. Castro?
 9              MR. CASTRO:  Yes, your Honor.
10              THE COURT:  Okay.
11              MR. CASTRO:  This morning for the first time.
12              THE COURT:  Okay.  All right.
13              MR. LEHMANN:  I would just like to check to see
14   if --
15              THE COURT:  Take your time.
16              (Pause)
17              MR. LEHMANN:  Thank you.
18              MR. GOULD:  Your Honor, very, very briefly.
19              THE COURT:  There's no need to be brief.  That's
20   why we're here.  Take your time and make your argument.
21              MR. GOULD:  Well, I think it's pretty much been
22   covered by the other parties, your Honor, but I do want to
23   draw attention to something that, because we're sort of late
24   to the party here having been granted intervention only this
25   week, was perhaps more apparent to me as I was watching this.
```

1          Your Honor made a point of telling Mr. Castro that

2    he was to present evidence.  Your Honor informed Mr. Castro

3    that his argument was not evidence.  And I think that's

4    important because under the test that the parties have

5    referred to there has to be traceability and redressability

6    for him to establish his standing.  That's his burden.  And

7    yet when he was making his presentation on those points he

8    simply said, to my recollection, so there's definitely

9    traceability and there's definitely redressability.

10         That's not evidence.  The fundamental point here is

11   he did not present evidence to address those elements of

12   standing.

13         I don't think you really need to go much beyond

14   that because without the evidence presented by the plaintiff

15   when it's his burden, that's the end of the inquiry.  So I

16   think the case can be resolved on that ground alone.

17         THE COURT:  I understand your point, but it's

18   interesting to me -- I mean -- but traceability and

19   redressability, two of the three elements, they overlap

20   somewhat.  Those seem to be -- those seem to be types of

21   issues the Court can actually sort of ascertain based on

22   argumentation as opposed to evidence.  It seems to me more

23   from the evidence, what evidence we've received, which is not

24   much I admit, is really more directed toward injury and fact,

25   and I'm just sort of -- I mean, it seems to -- like, on

1    traceability, you know, we have a letter from the Attorney

2    General regarding -- and it's part of the record.  It wasn't

3    presented here today.  It's part of the record.  That's

4    evidence on redressability and traceability.  I'm not sure

5    what other evidence Mr. Castro really would have been able to

6    present on that issue.  Can you give me an example?

7            MR. GOULD:  Well, can he show, for example, that --

8    I mean, the defendants have presented evidence that said that

9    he cannot establish those two elements and have given reasons

10   why.  For example, write-in candidacy.  That he could run a

11   write-in candidacy if he's removed that Mr. Trump has.

12   There's been no evidence introduced to contradict that.

13           And in terms of traceability, it seems to me that

14   that's a mixed question of fact of law where, you know, he

15   could have shown that the loss of votes, which also goes to

16   concrete injury, the loss of votes would be traceable to a

17   decision by the Secretary of State to accept Mr. Trump's

18   registration and to put him on the ballot.

19           There's been no showing of a factual basis for

20   that.  I understand what your Honor is saying is that it is to

21   some extent a question of logic and understanding the legal

22   framework within which the Secretary of State operates, but

23   what stood out to me in listening to Mr. Castro's presentation

24   is that he did not offer any evidence on those points.  I

25   think that that is fatal to his claim of standing.

```
 1              THE COURT:  Okay.  That's fair.

 2              MR. GOULD:  Thank you.

 3              THE COURT:  Mr. Castro, I'm going to give you the

 4   last word here --

 5              MR. CASTRO:  Yes, your Honor.

 6              THE COURT:  -- on standing, and then we're going to

 7   move to political question.

 8              Excuse me a second.

 9              (The Court confers with the court reporter)

10              MR. CASTRO:  Your Honor, so first I just wanted to

11   address the report and recommendation that came out.  I

12   literally just had about 20 minutes before you walked into the

13   courtroom to review it.

14              THE COURT:  Please slow down.

15              MR. CASTRO:  Oh.  I'm sorry.

16              I had about 20 minutes to review it before you

17   stepped into the --

18              THE COURT:  Yeah, I just read it once myself.

19              MR. CASTRO:  And already there are some glaring

20   issues that the Magistrate is clearly wrong on.

21              She cited Stencil v. Johnson and said that the

22   issue of Section 3 of the Fourteenth Amendment could only be

23   raised against the defendants in their capacity as candidates

24   for office in a proceeding brought under state ballot access

25   laws.  So that's a bit taken out of context because Stencil
```

1    was a private citizen.  And basically the legal theory was

2    that Stencil said, well, state law gives me a private cause of

3    action to challenge the qualifications of a candidate.  So I'm

4    going to bring that action in federal court because the state

5    created a cause of action.  And the federal court said, yeah,

6    that's not how it works.  There's still -- Article III

7    standing is independent.  The state created a cause of action

8    so that needs to be brought under state ballot access laws.

9              So, again, that's taken out of context here and

10   applied in a way that's just not correct.

11             THE COURT:  You'll be given an opportunity to

12   object to that, right, because that's a magistrate report.

13             MR. CASTRO:  Exactly.  Yes.  I just wanted to break

14   it down right now how easy it is to basically distinguish that

15   and then how that report and recommendation is wrong.  I'll

16   file an objection accordingly.

17             THE COURT:  Well, it might not be as easy as you

18   think.  I have to tell you I noticed in your papers you've

19   distinguished precedent with some frequency, but it's not

20   enough to distinguish precedent just to say, you know, the

21   case is different.  You've got to establish a limiting

22   principle and show why it's an important distinction, right?

23   I'm not going to give you legal advice, but I'm just saying

24   it's not enough just to say, oh, it's easy because this is

25   different.  It's got to be different in a way that matters.

1          MR. CASTRO:  Yes.

2          THE COURT:  And that's sort of what -- well,

3    anyway -- like, that's sort of what I was asking you before

4    when you were making the point that, well, the cases that are

5    out there are postconviction -- not postconviction --

6    postconvention, postnomination cases, and that's true, but I

7    have to tell you I'm not sure why that matters.  That to me

8    seems to be a -- you're distinguishing precedent but not in a

9    way that I think moves the needle on the analysis on standing.

10   That's just my observation.

11         Anyway, neither here nor there.  I've heard what I

12   need to hear about that California case.

13         MR. CASTRO:  Got it.  Okay.

14         Again, the defendants try to make it seem like a

15   lot of this is speculation regarding whether I would lose any

16   votes or whether there would be any significant impact.

17         You know, that's, again, the same as saying like

18   the sun will -- I mean, the sun will rise tomorrow.  I mean,

19   that's speculative that, you know, physics will continue to

20   work and there won't be some intervening event, but we can use

21   our common sense --

22         THE COURT:  That's what David Hume said, but I

23   think it's going to come up tomorrow.  But I think that's

24   different than you're going to establish a campaign in the

25   state of New Hampshire, don't you?

1        MR. CASTRO:  What I would argue, your Honor, is --

2   I am going to establish a campaign, but what I'll say is

3   that's not needed.  I'm on the ballot.  There will be a

4   diminution in votes.

5        And the quote from the U.S. Court of Appeals for

6   the D.C. Circuit was that:  If a person is a direct and

7   current competitor, then competitor standing is implied as a

8   matter of law.  And that was New World Radio versus F.C.C.,

9   294 F.3d 164, D.C. Circuit, 2002.

10       And so the legal rule from that is almost that it's

11  de jure injury, right?  We're going to go ahead and imply that

12  because you guys are obviously logical competitors.  The

13  presence or absence of either one of you is going to shift the

14  mathematics.  Regardless of how minute that might be, the

15  mathematics are going to be shifted.

16       So I believe that standing has been, you know,

17  clearly established.  To hold otherwise would require a

18  finding that I would not get a single additional vote in the

19  absence of Trump on the ballot, and that simply just flies in

20  the face of reality.

21       Moreover, what defendant Donald John Trump is

22  effectively asking the Court to do is to try to adjudicate the

23  bona fides of a person that is actually on the ballot, and

24  that is what I would argue would actually be a nonjusticiable

25  political question because there's a lack of judicial

1    manageable standards.  You know, does the person have to poll

2    at 0.5 percent, 1 percent, 5 percent, 10 percent?  We don't

3    really know, right?  Even with the debates it's arbitrary.

4    They keep kind of changing it every now and then.

5            But for the Court to -- I mean, that's the same

6    reason why the courts don't want to touch redistricting,

7    right, because it's really touchy and it's that lack of

8    judicially manageable standards.

9            So I would say the political question doctrine if

10   it applies to anything in this case would actually apply to

11   the question of the bona fides of a person's candidacy.

12           THE COURT:  Well, their argument about

13   nonjusticiability, right, it's under the first -- it appears

14   to be under the first Baker -- the six different ways a

15   question can be, political question, nonjusticiable.

16           And the first one is that the Constitution, right,

17   commits the question to one of the two political branches, the

18   executive or legislative, right?

19           That's your argument, right, defendants?

20           MR. SHAW:  Yes, your Honor.

21           THE COURT:  Yeah, you're the one making the

22   argument.  Trump, I mean.

23           Okay.  So isn't this question, right, directed to

24   the Congress under the Constitution?

25           MR. CASTRO:  No, your Honor.  Not until a political

1    decision has been made.

2            Once somebody has selected their nominee -- and

3    mind you that -- again, Trump isn't even on the ballot yet in

4    New Hampshire, but mind you that once the people have made a

5    political decision of one of the major political parties and

6    they've spoken, at that point that is what the courts defer

7    to, the will of the people, which represent roughly 90 to 95

8    percent of the entire voter electorate in the United States.

9    And that was what I was able to extrapolate from all of the

10   decisions.

11           THE COURT:  Okay.  Anything else you want to say on

12   justiciability?

13           MR. CASTRO:  No, your Honor.

14           THE COURT:  Thank you.  I appreciate your

15   presentation.

16           MR. CASTRO:  Oh, I'm so sorry, your Honor.  I only

17   brought the political question doctrine in the context of them

18   asking the Court to engage in analyzing the bona fides of my

19   candidacy.

20           THE COURT:  Do you want to say more about it then?

21   If you want to say more about nonjusticiability, let's move

22   into it.

23           MR. CASTRO:  Okay.  So we just move straight into

24   that?

25           THE COURT:  Sure.  We finished standing.  Let's

1    talk about nonjusticiability.  I thought you had done that,

2    but -- it sounds like you were just scratching the surface,

3    but go ahead.

4              MR. CASTRO:  Oh.  Okay.

5              Well, no, I don't think there's anything more other

6    than the cases, you know, to my mind the political -- you have

7    to be able to point to a political decision, and that's what I

8    was trying to wrap my head around when I was reading all these

9    cases, and, you know, thankfully it was all the Obama birther

10   cases that gave rise to this.  But in reading all of those

11   cases what I was trying to find is where's the political

12   decision, and I thought the Court was recognizing the

13   convention as the decision, but then I realized on this

14   glaring issue which is that the primary elections had already

15   taken place and because the people had already voted in favor

16   of that person that was the political decision that the Court

17   was identifying that needed to be respected.

18             THE COURT:  So you're saying that -- it sounds like

19   what you're saying is that the people's right to select their

20   candidate, right, is protected under the Constitution under

21   the political question doctrine but that the Court gets to

22   sort of come in, involve itself in the question, and remove

23   the right to people to select the candidate without any

24   restriction from the political question doctrine?

25             MR. CASTRO:  Yes.  That needs to occur before the

1    primaries take place because once the primaries -- if one

2    wanted to be -- like, if I was advocating on behalf of -- or I

3    would say if I was a Supreme Court justice, I would say the

4    earliest that you could legally justify the application of the

5    political question doctrine would be the first primary.  So

6    that would be I think here in New Hampshire late January,

7    early November.  I could see a few justices agreeing with that

8    because a decision is already in the process of being made.

9    It hasn't necessarily been made.

10             THE COURT:  Slow down.

11             MR. CASTRO:  Oh, sorry.

12             That a political decision is in the process of

13   being made but hasn't yet officially been made, but I can

14   still see the judiciary saying we need to defer to that

15   because the decision is in the process of already being made.

16             And so that's why I had identified that these cases

17   need to be brought early before any primary elections take

18   place because that would theoretically be the soonest that the

19   political question doctrine could apply.

20             THE COURT:  Okay.

21             MR. CASTRO:  And then the decision would be

22   finalized of course and formalized in July when the Republican

23   National Convention actually meets and formal ly nominates,

24   but I could still see the judiciary wanting to defer and just,

25   you know, say, hey, no nonjusticiable political question once

 1    the primaries had commenced.

 2                THE COURT:  Okay.  Thank you, sir.

 3                Mr. O'Donnell, this isn't really your issue in

 4    terms of what you briefed, but if you want to argue about it,

 5    I'm happy to hear.  Is there anything you want to say or you

 6    can defer to your co-counsel -- or co-defendant's counsel.

 7                MR. O'DONNELL:  Nothing from me, your Honor.

 8                THE COURT:  Thank you, sir.

 9                All right.  Who's arguing for Mr. Trump?

10                MR. SHAW:  Thank you, your Honor.  Jonathan Shaw.

11                Before I begin on this, I think there may be one

12    little clean-up thing.

13                THE COURT:  Please.

14                MR. SHAW:  I'm not sure that we ever got Exhibit 1

15    admitted.

16                THE COURT:  He didn't object to Exhibit 1.

17                MR. SHAW:  No, he did not.

18                THE COURT:  Right?  You don't object to Exhibit 1

19    for Mr. Trump?

20                MR. CASTRO:  No, your Honor.

21                THE COURT:  So it's admitted.

22                (Defendant's Exhibit No. 1 Admitted)

23                MR. SHAW:  Thank you.

24                THE COURT:  Thank you.  We've got to keep a clean

25    record, and I appreciate that.

```
1              MR. SHAW:  So the principle that the plaintiff just
2    enunciated, there is not -- he does not cite a case that
3    stands for that proposition.  There is no case that stands for
4    that proposition.  Every federal court to have reached this
5    issue has held that the political question doctrine applies
6    here and reserves the issue for Congress, the Constitution
7    clearly reserves the issue for Congress, and therefore the
8    courts ought not interfere with it.
9              And I would say as a practical matter, we have to
10   have the uniform single national rule because otherwise we
11   have just chaos where we have Mr. Castro and other plaintiffs
12   running into courts in 50 jurisdictions.  I literally have --
13   my firm literally has more than 50 cases pending around the
14   country right now, and that means that -- and given the
15   nature --
16             THE COURT:  I'm just curious.  Is this the first
17   time you two have been in a courtroom together?
18             MR. SHAW:  Yes, it is.
19             THE COURT:  Yeah.  I just figured why wait, right?
20             MR. SHAW:  Exactly.  And I appreciated the
21   opportunity to actually get to grips on this.
22             But given the nature of our federal presidential
23   elections in an electoral college, if you have an outlying
24   decision in one state or a partisan secretary of state in one
25   jurisdiction who takes it upon him or herself to decide this
```

 1   question, even if they're formally affecting only the ballot

 2   in one state, it affects the national presidential election

 3   because of the way the electoral college works.  And it

 4   deprives voters all over the country of a full and fair

 5   presidential election, which is why there has to be a single

 6   uniform national process, which is why the issue is reserved

 7   for Congress.

 8            And how that plays out at the end of the day, that

 9   will remain to be seen, but it is not something that each

10   individual court, federal or state, or each individual state,

11   secretary of state or any other state actor, or for that

12   matter individual plaintiffs like Mr. Castro have been

13   allocated the right to decide.

14            The Constitution says very clearly that this is

15   something that is up to the federal legislature to deal with.

16   And in that connection I would note as the Magistrate Judge

17   observed in the opinion handed up this morning, it is not that

18   Article III is not -- rather, Section 3 of the Fourteenth

19   Amendment is not self-executing.  Section 5 provides that

20   Congress may through legislation set up a process for

21   executing it.  They did from 1870 to 1925.  They repealed

22   that.

23            There was legislation introduced in 2021 which did

24   not pass.  So what the process is exactly for Congress will

25   remain to be seen, but right now there is no statute creating

```
 1    a federal right of action for anybody.

 2              And then in addition to that your Honor may have

 3    seen -- and I normally do not do this.  We raised the issue of

 4    ripeness in our papers.  I normally do not like to do things

 5    where I haven't previously briefed them, but because it's a

 6    jurisdictional issue and the Court has an independent

 7    obligation to look at jurisdictional issues, and frankly it

 8    just didn't occur to me on the rushed schedule that we were

 9    briefing this until later, but now that it has occurred to me

10    I did feel obliged to point it out to the Court.  There is a

11    substantial ripeness issue here because Section 3 of the

12    Fourteenth Amendment does not speak of --

13              THE COURT:  Oh, you mean -- I see what you're

14    saying, yeah.

15              MR. SHAW:  It does not speak of you can't run.  It

16    doesn't say people can't get elected.  It says you can't hold

17    office.

18              So even assuming that for the sake of argument

19    President Trump would potentially be disqualified, that is

20    something that -- he would only be potentially --

21              THE COURT:  Basically you're saying we either need

22    a declaration of ineligibility by the Congress or a successful

23    election.  Then it would be ripe.

24              MR. SHAW:  That's right.  Then it would be ripe.

25    Then -- it only becomes potentially ripe after a long series
```

1    of contingencies that don't occur until January 2025.

2              So that's essentially my argument on those three

3    really related points, ripeness --

4              THE COURT:  So do you think -- I'm just, you know,

5    thinking out loud.

6              MR. SHAW:  Sure.

7              THE COURT:  What if the Congress, you know,

8    tomorrow declared under the Fourteenth Amendment that Donald

9    Trump is ineligible to run for president?  Would it be ripe

10   then or would it still require that he be serving as opposed

11   to just disqualified?

12             MR. SHAW:  Well, I think if Congress were to enact

13   legislation pursuant to Section 5 of article 14 that

14   established a -- or, rather, the Fourteenth Amendment, that

15   established a procedure and that procedure were then followed,

16   then depending on the details of that it might well be ripe,

17   but we're not there.

18             THE COURT:  We're not.  Got it.  Is there anything

19   else you want to say?

20             MR. SHAW:  The only thing I guess I will say is

21   that obviously I would like to win this case on any ground,

22   but given --

23             THE COURT:  But you'll settle for jurisdiction?

24             MR. SHAW:  Well, no, I --

25             THE COURT:  Okay.  Do you want me to let it

1    proceed?

2              MR. SHAW:  No, no.  What I would like to say is --

3    I think obviously there's a fatal deficit on standing, and I

4    think were the Court to simply hold on standing that would be

5    unassailable.

6              I also would just point out to the Court that, as I

7    mentioned, there are 50 of these cases going on.  There is a

8    national conversation.

9              THE COURT:  Oh, there's a reason I decided to have

10   the hearing on both issues.  Message received.

11             MR. SHAW:  Thank you, your Honor.

12             THE COURT:  Yeah.

13             You know, I'm not going to tell you I'm concerned

14   about the other cases, but I do think to the extent that this

15   Court can make a contribution to it we ought to -- and one way

16   or the other on however the Court decides this question I

17   think it's probably a good idea.

18             So I didn't want to wait and let things languish in

19   the Magistrate Judge's chambers on preliminary review.  I just

20   thought, you know, let's get to court.

21             All right.  Mr. Gould?

22             MR. GOULD:  I have nothing to add to that argument,

23   your Honor.

24             THE COURT:  We're going to wrap this hearing up at

25   1 o'clock.

1          I'll give you the last word, Mr. Castro.  Go ahead.

2          MR. CASTRO:  Okay.  Just to say that every case

3     that he mentioned he said that they determined the political

4     question doctrine applied.  That's not true.  Every case

5     mentions the political question doctrine in dicta, and it was

6     not analyzed in any way, shape, or substantive form.  Every

7     case was dismissed for lack of standing because it was simple

8     voters bringing in the case.

9          The other thing is that the Electoral College Act

10    was specifically amended that objections cannot be made based

11    on a person's lack of qualification for public office.

12         THE COURT:  I did see that in your papers, yes.

13         MR. CASTRO:  So to even say that this has been

14    allocated to the electoral college, that was neutralized by

15    Congress.  So that's no longer applicable.  That would have

16    been a good argument four years ago but not today because

17    that's a dead end.

18         Also, they're saying that the case isn't ripe.  So

19    what they're effectively saying is that the threatened harm is

20    that he's going to hold public office, that's what it actually

21    prevents, and right now he's just campaigning for office.

22         But in the case that they've cited, Golden v.

23    Zwickler, the U.S. Supreme Court held that when a court is

24    determining a threatened or impending harm, you use the common

25    sense approach.

1          And the question is does the Court believe that

2     Donald J. Trump is actively campaigning to reclaim the

3     presidency of the United States.  Absolutely.  And so with

4     that the threat of the harm is there.  All these acts are in

5     furtherance of violating Section 3 of the Fourteenth

6     Amendment.

7          THE COURT:  Yeah.  Okay.  All right everybody.

8     Thank you.  I appreciate your presentations, including you,

9     Mr. Castro.

10          MR. CASTRO:  Thank you.

11          THE COURT:  I appreciate the way you conducted

12     yourself here.

13          MR. CASTRO:  Thank you.

14          THE COURT:  I plan to have an order out next week.

15     I'm not going to delay too much here because if I find that

16     the Court has jurisdiction, of course we're going to need to

17     get on to an injunction hearing which is going to be a whole

18     different kettle of fish, but one way or the other --

19     everybody sit -- I want to wrap this up.  The court reporter

20     has been going two hours, which is 30 minutes longer than we

21     usually go, without a break.

22          Let me say this -- as a matter of fact, this can be

23     off the record.

24          (Off the record)

25          THE COURT:  All right everybody.  We're adjourned.

1    I'll get an order out here shortly.

2              (Conclusion of hearing at 1:00 p.m.)

C E R T I F I C A T E

    I, Susan M. Bateman, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings to the best of my knowledge, skill, ability and belief.


Submitted:  10-25-23    /s/   Susan M. Bateman _____
                        SUSAN M. BATEMAN, RPR, CRR

# REPORT OF RECEIPTS AND DISBURSEMENTS

**FEC FORM 3P**

BY AN AUTHORIZED COMMITTEE OF A CANDIDATE
FOR THE OFFICE OF PRESIDENT OR VICE PRESIDENT



**EXHIBIT J**

Office Use Only

---

**1. NAME OF COMMITTEE** (in full, type or print)

Example: If typing, type over the lines. `12FE4M5`

BINKLEY FOR PRESIDENT 2024

ADDRESS (number and street)

6841 VIRGINIA PARKWAY

SUITE 103-190

◄ Check if different than previously reported. (ACC)

MCKINNEY | TX | 75071 | –
CITY | STATE | ZIP CODE

**2. FEC IDENTIFICATION NUMBER** ▶ C | C00836544

---

**3. TYPE OF REPORT** *(Choose One)*

Check here if this is a Termination Report (TER) ☐

Quarterly Reports:

☐ April 15 (Q1)  ☒ October 15 (Q3)
☐ July 15 (Q2)  ☐ January 31 Year-End Report (YE)

Monthly Reports:

☐ Feb 20 (M2)  ☐ May 20 (M5)  ☐ Aug 20 (M8)  ☐ Nov 20 (M11)
☐ Mar 20 (M3)  ☐ Jun 20 (M6)  ☐ Sep 20 (M9)  ☐ Dec 20 (M12)
☐ Apr 20 (M4)  ☐ Jul 20 (M7)  ☐ Oct 20 (M10)  ☐ Jan 31 (YE)

☐ 12-Day Pre-Election Report for the Election on

M M / D D / Y Y Y Y  in the State of ☐

☐ 30-Day Post-Election Report for the General Election on

M M / D D / Y Y Y Y

---

**4. IS THIS REPORT AN AMENDMENT?** ☐ yes  ☒ no

---

**5. COVERING PERIOD** M M / `01` D D / `2023` Y Y Y Y  **THROUGH** M M `09` / D D `30` / Y Y Y Y `2023`

---

I certify that I have examined this Report and to the best of my knowledge and belief it is true, correct and complete.

Type or Print Name of Treasurer    FLOCK, HEATH, , ,

Signature of Treasurer    *FLOCK, HEATH, , ,*    Date  M M `10` / D D `15` / Y Y Y Y `2023`

NOTE: Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. §30109.
All previous versions of this form are obsolete and should no longer be used.

Office Use Only

FEC **Form 3P** (Rev. 05/2016)

Write or Type Committee Name

# BINKLEY FOR PRESIDENT 2024

Report Covering the Period:    From:    M M `07` / D D `01` / Y Y Y Y `2023`    To:    M M `09` / D D `30` / Y Y Y Y `2023`

## SUMMARY

| | | |
|---|---|---|
| 6. | CASH ON HAND AT BEGINNING OF REPORTING PERIOD .......................................................... | **611079.19** |
| 7. | TOTAL RECEIPTS THIS PERIOD<br>(From Line 22, Column A, Page 3) ....................................................................................... | **4990943.89** |
| 8. | SUBTOTAL<br>(Lines 6 and 7) ................................................................................................................. | **5602023.08** |
| 9. | TOTAL DISBURSEMENTS THIS PERIOD<br>(From Line 30, Column A, Page 4) ....................................................................................... | **5590586.00** |
| 10. | CASH ON HAND AT CLOSE OF THE REPORTING PERIOD<br>(Subtract Line 9 from 8)................................................................................................. | **11437.08** |
| 11. | DEBTS AND OBLIGATIONS OWED TO THE COMMITTEE<br>(Itemize All on Schedule C-P or Schedule D-P)........................................................................ | **0.00** |
| 12. | DEBTS AND OBLIGATIONS OWED BY THE COMMITTEE<br>(Itemize All on Schedule C-P or Schedule D-P)........................................................................ | **6664174.79** |
| 13. | EXPENDITURES SUBJECT TO LIMIITATION<br>(Use the worksheet on Page 8 to calculate this amount.) ....................................................... | **0.00** |

## NET ELECTION CYCLE-TO-DATE CONTRIBUTIONS AND EXPENDITURES

| | | |
|---|---|---|
| 14. | NET CONTRIBUTIONS (Other than Loans)<br>(Subtract Line 28d, Column B on Page 4 from 17e, Column B on Page 3).................................... | **751370.46** |
| 15. | NET OPERATING EXPENDITURES<br>(Subtract Line 20a, Column B on Page 3 from 23, Column B on Page 4) ..................................... | **7074933.74** |

# DETAILED SUMMARY PAGE

FEC **Form 3P** (Rev. 05/2016)          of Receipts

NAME OF COMMITTEE (in Full)

BINKLEY FOR PRESIDENT 2024

Report Covering the Period:   From:   M M 07 / D D 01 / Y Y Y Y 2023        To:   M M 09 / D D 30 / Y Y Y Y 2023

| I. RECEIPTS | COLUMN A Total This Period | COLUMN B Election Cycle-to-Date |
|---|---|---|
| 16.  FEDERAL FUNDS (Itemize on Schedule A-P) ............ | 0.00 | 0.00 |
| 17.  CONTRIBUTIONS (other than loans) FROM: | | |
| (a)  Individuals/Persons Other Than Political Committees | | |
| (i) itemized ..................................... | 30710.91 | 223486.30 |
| (ii) unitemized ................................. | 107840.94 | 107840.94 |
| (iii) Total contributions ..................... | 138551.85 | 331327.24 |
| (b)  Political Party Committees .............................. | 0.00 | 0.00 |
| (c)  Other Political Committees .............................. | 0.00 | 0.00 |
| (d)  The Candidate ............................................... | 102391.68 | 420043.22 |
| (e)  TOTAL CONTRIBUTIONS (other than loans) (Add 17(a), 17(b), 17(c) and 17(d)) .................... | 240943.53 | 751370.46 |
| 18.  TRANSFERS FROM OTHER AUTHORIZED COMMITTEES ................. | 0.00 | 0.00 |
| 19.  LOANS RECEIVED: | | |
| (a)  Loans Received From or Guaranteed by Candidate ..... | 4750000.00 | 6335000.00 |
| (b)  Other Loans ................................................. | 0.00 | 0.00 |
| (c)  TOTAL LOANS (Add 19(a) and 19(b) ................. | 4750000.00 | 6335000.00 |
| 20.  OFFSETS TO EXPENDITURES (Refunds, Rebates, etc.): | | |
| (a)  Operating ................................................... | 0.00 | 0.00 |
| (b)  Fundraising ................................................. | 0.00 | 0.00 |
| (c)  Legal and Accounting ................................... | 0.00 | 0.00 |
| (d)  TOTAL OFFSETS TO EXPENDITURES (Add 20(a), 20(b) and 20(c)) ...................... | 0.00 | 0.00 |
| 21.  OTHER RECEIPTS (Dividends, Interest, etc.) ............. | 0.36 | 0.36 |
| 22.  TOTAL RECEIPTS (Add 16, 17(e), 18, 19(c), 20(d) and 21) ...................... | 4990943.89 | 7086370.82 |

# DETAILED SUMMARY PAGE
FEC **Form 3P** (Rev. 05/2016)    of Disbursements and Contributed Items

NAME OF COMMITEE (in Full)

**BINKLEY FOR PRESIDENT 2024**

Report Covering the Period:    From: 07 / 01 / 2023    To: 09 / 30 / 2023

| II. DISBURSEMENTS | COLUMN A Total This Period | COLUMN B Election Cycle-to-Date |
|---|---|---|
| 23. OPERATING EXPENDITURES | 5590586.00 | 7074933.74 |
| 24. TRANSFERS TO OTHER AUTHORIZED COMMITTEES | 0.00 | 0.00 |
| 25. FUNDRAISING DISBURSEMENTS | 0.00 | 0.00 |
| 26. EXEMPT LEGAL AND ACCOUNTING DISBURSEMENTS | 0.00 | 0.00 |
| 27. LOAN REPAYMENTS MADE: | | |
| (a) Repayments of Loans made or Guaranteed by Candidate | 0.00 | 0.00 |
| (b) Other Repayments | 0.00 | 0.00 |
| (c) TOTAL LOAN REPAYMENTS MADE (Add 27(a) and 27(b)) | 0.00 | 0.00 |
| 28. REFUNDS OF CONTRIBUTIONS TO: | | |
| (a) Individuals/Persons Other Than Political Committees | 0.00 | 0.00 |
| (b) Political Party Committees | 0.00 | 0.00 |
| (c) Other Political Committees | 0.00 | 0.00 |
| (d) TOTAL CONTRIBUTION REFUNDS (Add 28(a), 28(b) and 28(c)) | 0.00 | 0.00 |
| 29. OTHER DISBURSEMENTS | 0.00 | 0.00 |
| 30. TOTAL DISBURSEMENTS (Add 23, 24, 25, 26, 27(c), 28(d) and 29) | 5590586.00 | 7074933.74 |

## III. CONTRIBUTED ITEMS
### (Stock, Art Objects, Etc.)

| | | |
|---|---|---|
| 31. ITEMS ON HAND TO BE LIQUIDATED (Attach List) | | |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA



EXHIBIT
K

| | |
|---|---|
| JOHN ANTHONY CASTRO<br>12 Park Place, Mansfield, TX 76063<br><br>    Plaintiff and Third-Party Defendant,<br><br>*v.*<br><br>SECRETARY OF STATE, ADRIAN FONTES<br>1700 W Washington Street, Floor 7, Phoenix,<br>AZ 85007<br><br>DONALD J. TRUMP<br>1100 S. Ocean Blvd, Palm Beach, FL 33480<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 2:23-cv-01865 |

**AFFIDAVIT OF BALLOT PLACEMENT AND ARIZONA EXPENSES**

I, John Anthony Castro, declare as follows:

*1.* I am now ballot-placed in the State of Arizona. See Exhibit A, Arizona Ballot Access Documentation.

*2.* As stated in my previous affidavit filed before the November 14, 2023, hearing, "I have also incurred expenses associated with campaigning in this state." To supplement this statement, I am providing a contract between Castro for America and Outfront Media evidencing a digital billboard in downtown Phoenix only 3 blocks from the federal courthouse. See Exhibit B, Outfront Media Contract.

*3.* To further supplement ECF 53, I am including a dated photograph of the billboard in downtown Phoenix. See Exhibit C, Outfront-provided Photo of Billboard.

4. I personally went 50 West Jefferson Street in Phoenix, Arizona, and witnessed the digital billboard that appears every 60 seconds. It is directly above the Five Guys restaurant and currently being viewed by thousands of Arizona voters.

5. I have personal first-hand knowledge of all factual matters set forth in this document, and, if called upon to testify or give oral arguments, I would competently do so.

6. Pursuant to 28 U.S.C. § 1746 and state, I verify under penalty of perjury that the entirety of the foregoing document is true and correct.

Executed on November 16, 2023.


/s/ John Anthony Castro
John Anthony Castro

EXHIBIT L



The New York Times

SUBSCRIBE FOR $1/WEEK     LOG IN

| (Asked of potential Republican primary voters) What single news source do you turn to most often? | ALL | MEN | WOMEN | 18-29 | 30-44 | 45-64 | 65+ | WHITE | BLACK | HISPANIC | OTH. | WHITE | HISPANIC | OTH. | B.A.+ | NO B.A. | WHITE COLLEGE | WHITE NO COLLEGE | NON-WHITE COLLEGE | NON-WHITE NO COLLEGE | MIDWEST | NORTH-EAST | SOUTH | WEST | CITY | SUBURB | RURAL | CATHOLIC | PROT | NONE | OTH. | YES | NO | UNDER $50K | $50-100K | OVER $100K | DEM | REP | IND. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [VOL] Fox News | 26% | 24% | 29% | 16% | 15% | 25% | 34% | 28% | 23% | 24% | 14% | 28% | 24% | 16% | 23% | 28% | 24% | 30% | 22% | 18% | 33% | 27% | 28% | 13% | 17% | 26% | 28% | 25% | 28% | 15% | 39% | 30% | 25% | 21% | 25% | 25% | 17% | 31% | 14% |
| [VOL] CNN | 2% | 2% | 3% | 7% | 2% | 3% | 1% | 2% | 9% | 4% | 5% | 2% | 4% | 6% | 3% | 2% | 3% | 1% | 4% | 5% | 1% | 2% | 3% | 3% | 2% | 3% | 2% | 4% | <1% | 6% | <1% | <.5% | 4% | 4% | 1% | 2% | 14% | 2% | 3% |
| [VOL] MSNBC | <1% | 1% | <1% | 0% | <1% | 1% | <1% | <1% | 3% | 0% | 0% | <1% | 0% | <1% | 2% | 0% | 3% | 0% | 1% | 0% | 3% | 0% | <.5% | 0% | 0% | <.5% | 1% | 0% | 1% | 0% | 0% | 0% | 1% | 0% | 1% | 1% | 11% | <1% | <1% |
| [VOL] Public Radio/NPR/PBS | <1% | <.5% | 2% | 0% | 2% | 1% | <1% | <1% | 12% | 0% | 0% | <1% | 0% | 3% | 2% | <1% | 1% | <1% | 5% | 0% | 2% | 1% | <1% | <.5% | <.5% | <1% | 2% | <1% | <1% | 4% | 0% | <.5% | 2% | 0% | <.5% | 2% | 7% | <1% | 2% |
| [VOL] Talk radio/conservative personality | 2% | 1% | 3% | 0% | <1% | 3% | 2% | 2% | 0% | 0% | 0% | 2% | 0% | 0% | 2% | 2% | 2% | 2% | 0% | 0% | 2% | 0% | 2% | 4% | 2% | 2% | 2% | 3% | 2% | <.5% | 0% | 3% | <1% | 2% | 2% | 1% | 0% | 2% | 3% |
| [VOL] National television networks, like CBS, NBC or ABC | 11% | 11% | 11% | 4% | 3% | 11% | 16% | 10% | 2% | 22% | 11% | 10% | 22% | 9% | 10% | 11% | 9% | 11% | 13% | 15% | 11% | 10% | 9% | 13% | 16% | 10% | 10% | 11% | 11% | 12% | 8% | 7% | 12% | 17% | 12% | 7% | 11% | 10% | 12% |
| [VOL] Local broadcast news (includes non-talk, non-public local radio) | 6% | 4% | 8% | 4% | 2% | 6% | 8% | 7% | 4% | 1% | 5% | 7% | 1% | 5% | 5% | 7% | 6% | 7% | <1% | 4% | 6% | 12% | 5% | 5% | <1% | 8% | 6% | 9% | 6% | 5% | 3% | 6% | 6% | 10% | 9% | 3% | 9% | 6% | 6% |
| [VOL] National print or online news organizations, like The New York Times or The Wall Street Journal | 3% | 3% | 2% | 2% | 5% | 3% | 2% | 3% | 0% | 2% | 7% | 3% | 2% | 5% | 4% | 2% | 4% | 2% | 4% | 3% | 3% | 4% | 2% | 3% | 4% | 4% | 1% | 4% | 2% | 4% | 3% | 2% | 4% | 3% | <.5% | 5% | 9% | 2% | 5% |
| [VOL] Local print or online news organizations | <1% | <.5% | 1% | 0% | <.5% | <1% | <.5% | <.5% | 0% | 0% | 3% | <.5% | 0% | 3% | <1% | <.5% | <1% | <.5% | 0% | 2% | <1% | 1% | <.5% | <1% | 2% | <1% | <.5% | 0% | <1% | <1% | 0% | 0% | <1% | <1% | <.5% | <1% | 0% | <.5% | 1% |
| [VOL] Social media | 12% | 14% | 9% | 22% | 27% | 11% | 4% | 11% | 12% | 15% | 15% | 11% | 15% | 14% | 13% | 11% | 14% | 9% | 10% | 17% | 8% | 9% | 13% | 16% | 21% | 11% | 10% | 8% | 11% | 17% | 16% | 10% | 12% | 11% | 9% | 15% | 17% | 11% | 13% |
| [VOL] Friends and family | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| [VOL] International news sources (such as the BBC, Al Jazeera and The Guardian) | 2% | 2% | 2% | 0% | 5% | 2% | <.5% | 2% | 0% | 3% | <1% | 2% | 3% | <.5% | 4% | <1% | 4% | <1% | 2% | 1% | 2% | 1% | 2% | 2% | 3% | 4% | <.5% | 3% | 1% | 3% | 0% | 2% | 2% | 1% | 0% | 4% | 0% | 2% | 2% |
| [VOL] Aggregation sites (such as Bing, Google, Yahoo News or Apple News) | 6% | 5% | 7% | 8% | 6% | 5% | 7% | 5% | 6% | 4% | 15% | 5% | 4% | 13% | 7% | 5% | 6% | 5% | 7% | 9% | 4% | 5% | 6% | 9% | 10% | 7% | 5% | 4% | 7% | 5% | 3% | 5% | 6% | 6% | 7% | 6% | 3% | 6% | 6% |
| [VOL] Conservative news sites | 5% | 6% | 4% | 10% | 8% | 5% | 2% | 5% | 4% | 9% | 3% | 5% | 9% | 3% | 6% | 4% | 5% | 4% | 6% | 6% | 4% | 6% | 4% | 7% | 2% | 5% | 5% | 5% | 5% | 5% | 2% | 6% | 4% | 4% | 4% | 5% | 0% | 5% | 5% |
| [VOL] Newsmax | 6% | 8% | 4% | 0% | <.5% | 6% | 10% | 7% | 5% | 0% | 0% | 7% | 0% | 1% | 4% | 7% | 5% | 9% | 2% | 0% | 4% | 8% | 7% | 4% | 5% | 5% | 7% | 6% | 7% | 4% | 3% | 11% | 4% | 2% | 11% | 5% | 0% | 7% | 4% |
| [VOL] Liberal news sites (Such as Mother Jones and Occupy Democrats) | <.5% | 0% | <.5% | 0% | <1% | 0% | 0% | <.5% | 0% | 0% | 0% | <.5% | 0% | 0% | <.5% | 0% | <.5% | 0% | 0% | 0% | 0% | <1% | 0% | 0% | 0% | <.5% | 0% | 0% | <.5% | 0% | 0% | 0% | <.5% | 0% | 0% | <.5% | 0% | <.5% | 0% |
| [VOL] Doesn't consume news | 2% | 4% | 1% | 6% | 4% | 3% | 1% | 3% | 0% | 0% | 3% | 3% | 0% | 3% | 2% | 3% | 2% | 3% | 2% | 1% | 1% | 2% | 3% | 4% | 1% | 2% | 3% | 2% | 3% | 3% | 3% | 4% | 2% | 3% | 4% | 2% | 0% | 2% | 2% |
| [VOL] Other (includes no preference and the internet) | 7% | 8% | 7% | 7% | 6% | 9% | 4% | 7% | 5% | 7% | 10% | 7% | 7% | 8% | 7% | 7% | 8% | 7% | 7% | 8% | 8% | 4% | 6% | 10% | 9% | 5% | 8% | 10% | 6% | 7% | 9% | 7% | 8% | 7% | 7% | 7% | 0% | 7% | 7% |
| [VOL] Don't know/Refused | 8% | 9% | 7% | 15% | 12% | 6% | 7% | 7% | 17% | 9% | 8% | 7% | 9% | 10% | 4% | 10% | 3% | 9% | 14% | 8% | 6% | 8% | 10% | 7% | 5% | 7% | 9% | 7% | 7% | 10% | 10% | 8% | 7% | 7% | 7% | 9% | 0% | 6% | 13% |
| Number of respondents | 932 | 402 | 429 | 78 | 190 | 335 | 301 | 728 | 25 | 88 | 64 | 728 | 88 | 89 | 391 | 537 | 308 | 417 | 67 | 109 | 198 | 172 | 352 | 212 | 125 | 364 | 443 | 190 | 501 | 158 | 61 | 279 | 605 | 212 | 263 | 358 | 25 | 562 | 275 |
| Percent of G.O.P electorate | 100% | 51% | 48% | 6% | 15% | 37% | 38% | 83% | 2% | 6% | 6% | 83% | 6% | 8% | 56% | 63% | 31% | 52% | 4% | 10% | 25% | 16% | 46% | 20% | 12% | 37% | 51% | 19% | 58% | 15% | 6% | 34% | 61% | 23% | 28% | 37% | 2% | 68% | 24% |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
ALBANY DIVISION

U.S. DISTRICT COURT - N.D. OF N.Y.

**FILED**

NOV 0 8 2023

AT _____ O'CLOCK _____
John M. Domurad, Clerk - Albany

JOHN ANTHONY CASTRO )
12 Park Place, Mansfield, TX 76063 )
)
    Plaintiff, )
)
)
v. )
)
) Case No. 1:23-cv-01223
)
NEW YORK STATE BOARD OF )
ELECTIONS )
40 North Pearl Street, Suite 5, Albany, NY )
12207-2729 )
)
)
DONALD JOHN TRUMP )
1100 S. Ocean Blvd, Palm Beach, FL 33480 )
)
)
    Defendants. )

**EXHIBIT**
**M**

### VERIFIED RESPONSE IN OPPOSITION TO
### DEFENDANT DONALD JOHN TRUMP'S MOTION TO DISMISS

Plaintiff John Anthony Castro, *pro se*, files this response in opposition to Defendant Donald

John Trump's Motion to Dismiss for Improper Service of Process, Lack of Subject Matter

Jurisdiction, and Failure to State a Claim Upon Which Relief Can Be Granted.

### SERVICE WAS COMPLETED ON AN AGENT

Fed. R. Civ. P. 4(e)(1) states that service may be effectuated by "following state law for

serving a summons in an action brought in courts of general jurisdiction in the state where the

district court is located or where service is made." In other words, Plaintiff can follow New York

state law or Florida state law. However, Fed. R. Civ. P. 4(e)(2)(C) provides for three methods of

service directly under the Federal Rules of Civil Procedure: delivering a copy of the summons and

complaint to the individual personally, leaving a copy at the individual's dwelling or regular place

of abode with an adult resident, or delivering a copy to their authorized agent or agent-in-fact.

1

But who is a legally recognized agent?  The Supreme Law of the Land has answered that question.

In *Nat'l Equip. Rental, Ltd. v. Szukhent*, the U.S. Supreme Court held that a purported agent's prompt acceptance and transmittal to defendants of a summons and a complaint pursuant to authorization was sufficient to validate the agency.[1]  "Under well-settled general principles of the law of agency, [an individual]'s prompt acceptance and transmittal to the respondents of the summons and complaint pursuant to the authorization was itself sufficient to validate the agency." *Id.* at 316.  In other words, the conduct of the person was sufficient to imply agency.

In this case, the same individual has signed multiple times for Certified Mail filings to Defendant Donald John Trump.  *See* Exhibit A, CMRRR with Agent Box Checked.  In each of these cases, there was no question that this person was authorized to accept service of process.  In accordance with the doctrine of the presumption of regularity, the U.S. postal service delivered the summons and complaint to an authorized individual, this person signed the return receipt, checked the box that identified him or her as Defendant Donald John Trump's "Agent," and promptly forwarded the documentation to Defendant Donald John Trump whose lawyers thereafter replied to Plaintiff and filed the motion to dismiss.

As the Southern District of New York explained, "it makes little sense" to construe the rule so "technically when actual notice has been received; to do so would be inconsistent with the spirit of the federal rules."[2]  Defendant Donald John Trump is aware of this case, which has received global news coverage.  *See* Exhibit B, Affidavit of Media Coverage.  There are no due process concerns.  The U.S. Supreme Court has spoken: valid service of process was effectuated.  Period.

---

[1] 375 U.S. 311 (1964).

[2] *Santiago v. New York State Dep't of Corr. Servs.*, 725 F. Supp. 780, 783 (S.D.N.Y. 1989), *rev'd on other grounds*, 945 F.2d 25 (2d Cir. 1991).

This is nothing more than a cowardice and frivolous attempt by Defendant Donald John Trump to distract the Court and delay accountability. Motion to dismiss for improper service of process must be denied.[3]

To be clear, it is not service of process via Certified Mail Return Receipt Requested (CMRRR) that qualifies; it is simply the fact that the "Agent" box is checked that satisfies service on an agent per Fed. R. Civ. P. 4(e)(2)(C).

### PLAINTIFF IS A WRITE-IN CANDIDATE WITH SUBSTANCE

The U.S. Constitution explains that the "judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."[4] More specifically, the "judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution."[5] This was codified at 28 U.S.C. § 1331: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution." In this case, there is a controversy between two candidates that arises under the Constitution. Jurisdiction could not possibly be more clear.

Although Plaintiff is a write-in candidate, he is not like previous write-in candidates that lacked any campaign activity. Although Plaintiff is not on the ballot in California, he is on the ballot in New Hampshire and Nevada. Moreover, next week, he will be filing to be on the ballot in Arizona. Plaintiff will also be on the ballot in West Virginia. In addition to ballot placement is states critical to Plaintiff's campaign strategy, Plaintiff's novel campaign strategy has been to utilize earned media to build a following that can impact the nomination process at the Republican National Convention as well the General Election results, which has worked. As proof of this

---

[3] *Also see Durbin Paper Stock Co. v. Hossain*, 97 F.R.D. 639 (S.D. Fla. 1982) (an employee or business agent is a recognized agent under Florida law).
[4] U.S. Const. art. III, § 1.
[5] U.S. Const. art. III, § 2, cl. 1.

novel campaign strategy, Plaintiff has received global media coverage of his campaign. *See* Exhibit B, Affidavit of Media Coverage. The extensive amount of media coverage is proof of Plaintiff's viability. Furthermore, the unpaid media coverage that Plaintiff has earned through his campaign efforts to utilize the federal judiciary to disqualify Defendant Donald John Trump is valued at over $5 million and has been viewed by millions of California voters. It is only because of the pay-to-play polling system that Plaintiff's true amount of public support is unknown. Plaintiff has contacted polling companies who refuse to include him in their polls for fear of losing business from the Republican National Committee. Nevertheless, Plaintiff's extensive media coverage speaks for itself. Plaintiff's novel campaign strategy of utilizing civil actions to earn millions of dollars in free media coverage is evidence of his active courting of political support from the American populace. This is not merely a self-declared write-in with no actual substance or injury. Plaintiff has incurred thousands of dollars in campaign expenses, including yard signs, billboards, travel expenses, and civil action filing fees for civil actions like these across the several states. Plaintiff is actively campaigning in areas where he has a chance of courting moderates and independents.

Long story short: this case involves a write-in candidate with actual substance and millions of dollars worth of earned media coverage evidencing the seriousness with which Plaintiff is approaching his campaign.

POLITICAL QUESTION DOCTRINE DOES NOT APPLY TO PRIMARY ELECTION

The *Political Question Doctrine* is an affirmative defense to subject matter jurisdiction that Defendant Donald John Trump bears the burden of proving.[6]

---

[6] *See U.S. v. Kellogg Brown & Root Servs., Inc.*, 856 F. Supp. 2d 176, 179 (D.D.C. 2012) ("The government asserts a number of independent barriers to KBR's counterclaim and affirmative defense, including judicial estoppel, the political question doctrine, failure to exhaust administrative remedies, and failure to state a claim."); *Fed. Republic of Yugoslavia v. Park-71st Corp.*, 913 F. Supp. 191, 193 (S.D.N.Y. 1995) ("Defendant… asserts, as an affirmative

Defendant Donald John Trump's basis for raising the affirmative defense of the *Political Question Doctrine* is that there is a "textually demonstrable constitutional commitment of the issue to a coordinate political department."[7]  As such, Defendant Donald John Trump must cite a provision of the U.S. Constitution that clearly and convincingly demonstrates that there is text therein that reserves the determination of constitutional qualifications and eligibility to the legislative or executive branches of the federal or state government (*i.e.*, the "political" branches). In support of this, Defendant Donald John Trump inartfully cites Article II, Section 1, Clause 2, of the U.S. Constitution as well as the 12th Amendment to the U.S. Constitution.  However, those provisions only apply to a General Election and governs electors and the manner by which they ultimately convene as the Electoral College to select the next President of the United States.  This is not the General Election.  This is a Primary Election.  A Primary Election is *not* governed by the U.S. Constitution.  A Primary Election is governed by *state law*.  As such, Defendant Donald John Trump has failed to show a textually demonstrable *constitutional* commitment of this matter to one of the coordinate political branches of government.  *See* Exhibit C, Appellant's Opening Brief to the 1st Circuit.

---

defense, that Plaintiff lacks standing and that this matter presents a non-justiciable political question."); *Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1148 (N.D. Ga. 2022) ("Defendants presented the following affirmative defenses... Political Question Doctrine."); *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19MD2885, 2021 WL 1600487, at *2 (N.D. Fla. Apr. 23, 2021) ("the affirmative defense based on the political question doctrine"); *Cassirer v. Thyssen-Bornemisza Collection Found.*, No. CV 05-03459 GAF EX, 2014 WL 5510996, at *6 (C.D. Cal. Oct. 31, 2014) ("Political Question Affirmative Defense"); *U.S. v. Washington*, 19 F. Supp. 3d 1317, 1338 (W.D. Wash. 2000) ("political question affirmative defense"); *Seneca Nation of Indians v. State*, No. 93-CV-688A, 1994 WL 688262, at *1 (W.D.N.Y. Oct. 28, 1994) ("The affirmative defenses raised by defendants' answers include... political question."); *U.S. v. Hempfling*, No. CVF05-594LJOSMS, 2007 WL 1299262, at *2 (E.D. Cal. May 1, 2007) ("Affirmative Defense: The political question doctrine"); *Caliste v. Cantrell*, No. CV 17-6197, 2017 WL 6344152, at *1 (E.D. La. Dec. 12, 2017) ("Defendant also alleges twenty-eight affirmative defenses including... non-justiciable political question."); *Simon v. Republic of Hungary*, No. CV 10-01770 (BAH), 2012 WL 13069771, at *6 (D.D.C. Sept. 30, 2012) ("The Court concludes that RCH has asserted meritorious defenses, insofar as it is has asserted six affirmative defenses... The claims against RCH constitute non-justiciable political questions.").
[7] *See Baker v. Carr*, 369 U.S. 186, 217 (1962).

With that in mind, you can now properly read and comprehend all of the post-primary court cases cited by Defendant Donald John Trump where judges applied the *Political Question Doctrine*. However, Plaintiff maintains that the amendments to the Electoral Count Act effectively neutralized the application of the *Political Question Doctrine* to the General Election.

CASES CITED BY DEFENDANT DONALD JOHN TRUMP

Defendant Donald John Trump cites *Berg v. Obama* for the proposition that Presidential qualifications are nonjusticiable political questions because the Court mentioned what it "seemed" like in *dicta*.[8] However, *Berg v. Obama* was initiated on August 21, 2008, which was four (4) days before the Democratic National Convention wherein Barack Obama was formally nominated to be the Democratic Nominee for the Presidency of the United States. Moreover, the case was not decided until October 24, 2008, which was only twelve (12) days before the general election. In most states, early voting had already started. As Plaintiff explained earlier, this case proves that the political question doctrine applies only *after* the major political parties hold their conventions and submit the nomination paperwork to the state for placement on the general election ballot. On the merits, *Berg v. Obama* was dismissed for lack of standing; all else means *dicta*.

Defendant Donald John Trump then cites *Robinson v. Bowen* for the proposition that Presidential qualifications are nonjusticiable political questions because a district court mentioned the Electoral College Act in *dicta*.[9] First, Congress has revised the Electoral College Act to limit objections only on the basis that either electors were not lawfully certified or that the vote count was irregular, so the *dicta* of that district court is not even applicable anymore.[10] Defendant Donald John Trump clearly lacks even the most basic elementary understanding of the Electoral College

---

[8] 586 F.3d 234, 238 (3d Cir. 2009).
[9] 567 F. Supp. 2d 1144 (N.D. Cal. 2008).
[10] *See* 3 U.S.C. § 15(d)(2)(B)(ii)(I)-(II).

6

Act and its recent amendments. Second and more importantly, this case was filed 22 days before the Republican National Convention wherein John McCain was formally nominated to be the Republican Nominee for the Presidency of the United States. Moreover, the case was not decided until September 16, 2008, which was only fifty (50) days before the general election. As Plaintiff explained earlier, this case proves that the political question doctrine applies only *after* the major political parties hold their conventions and submit the nomination paperwork to the state for placement on the general election ballot. On the merits, *Robinson v. Bowen* was dismissed for lack of standing; all else means *dicta*.

Defendant Donald John Trump then cites *Grinols v. Electoral College* for the proposition that Presidential qualifications are nonjusticiable political questions.[11] First, this case was initiated on December 12, 2012, after the general election. Second, it applied to the sitting President. As Plaintiff explained earlier, this case proves that the political question doctrine applies only *after* the major political parties hold their conventions and submit the nomination paperwork to the state for placement on the general election ballot. On the merits, *Grinols v. Electoral College* was dismissed for lack of standing; all else means *dicta*.

Defendant Donald John Trump then cites *Kerchner v. Obama* for the proposition that Presidential qualifications are nonjusticiable political questions.[12] First, this case was initiated on the afternoon of January 20, 2009, after the general election and after Barack Obama had been inaugurated as President of the United States. Hence and second, it applied to the sitting President. As Plaintiff explained earlier, this case proves that the political question doctrine applies only *after* the major political parties hold their conventions and submit the nomination paperwork to the state

---

[11] *See* No. 2:12-CV-02997-MCE, 2013 WL 2294885 (E.D. Cal. May 23, 2013), aff'd, 622 F. App'x 624 (9th Cir. 2015).
[12] *See* 669 F. Supp. 2d 477 (D.N.J. 2009), aff'd, 612 F.3d 204 (3d Cir. 2010).

7

for placement on the general election ballot. On the merits, *Kerchner v. Obama* was dismissed for lack of standing; all else means *dicta*.

Defendant Donald John Trump then cites *Taitz v. Democrat Party of Mississippi* for the proposition that Presidential qualifications are nonjusticiable political questions.[13] First, this case was a frivolous civil action accusing Barack Obama and Nancy Pelosi of a "conspiracy violating the federal Racketeer Influenced and Corrupt Organizations Act."[14] Defendant Donald John Trump filed a similar RICO civil action against Hillary Clinton that resulted in a $50,000 sanction on Defendant Donald John Trump's attorney in that case. Plaintiff need not give this unreported case any more attention than it deserves. As Plaintiff explained earlier, this case proves that the political question doctrine applies only **after** the major political parties hold their conventions and submit the nomination paperwork to the state for placement on the general election ballot. On the merits, *Taitz v. Democrat Party of Mississippi* was dismissed for lack of standing; all else means *dicta*.

Defendant Donald John Trump then gets desperate and starts to cite state cases. The first state case is *Strunk v. New York State Bd. of Elections*, which the Court, in its official ruling, described as a "movie script" that should be called "The Manchurian Candidate Meets The Da Vinci Code" and then went on to ridicule the plaintiff's complaint as "a rambling, forty-five page variation on 'birther' cases."[15] Because the U.S. Constitution, Article 1, Section 4, states that the "Times, Places and Manner of holding Elections for **Senators and Representatives** [no reference to Presidential elections], shall be prescribed in each State by the Legislature thereof," the Court was partially correct in holding that if "a state court were to involve itself in the eligibility of a

---

[13] *See* No. 3:12-CV-280-HTW-LRA, 2015 WL 11017373 (S.D. Miss. Mar. 31, 2015).
[14] *Id.* at *1.
[15] 950 N.Y.S.2d 722 (Sup. Ct. 2012), *order aff'd*, 5 N.Y.S.3d 483 (2015)

candidate to hold the office of President... it may involve itself in national political matters for which it is institutionally ill-suited."[16]  However, the Court's references to the Electoral College were wrong, and, as mentioned before, the changes to the Electoral College Act no longer allow for objections based on qualifications, so even the mere inapplicable *dicta* in this case has been superseded and rendered obsolete by statute.  On the merits, *Strunk v. New York State Bd. of Elections* was dismissed for lack of standing; all else means *dicta*.

Defendant Donald John Trump then cites the California state case of *Keyes v. Bowen*; a case initiated on November 13, 2008, after the general election.[17]  Moreover, an amended complaint was filed after the Electoral College certified the results (at that time permitting objections based on qualifications) and then-President Barack Obama had already been inaugurated, so it applied to a sitting President. As Plaintiff explained earlier, the political question doctrine does not apply until *after* the major political parties hold their conventions and submit the nomination paperwork to the state for placement on the general election ballot.  On the merits, *Keyes v. Bowen* was dismissed for mootness; all else means *dicta*.

Defendant Donald John Trump then cites the Washington state case of *Jordan v. Secretary of State Sam Reed*; a case initiated on August 29, 2012, twenty-seven days before the Democratic National Convention.[18]  This case was dismissed because the Court found that an "analysis of *Indispensible Party* under CR 19 leads only to the conclusion that this case must be dismissed because plaintiff has failed to join President Obama as a party."[19]  On the merits, *Jordan v. Secretary of State Sam Reed* was dismissed for failing to include an indispensable party; all else means *dicta*. The ability to object to electoral college votes based on qualifications is no longer

---

[16] *Id.*
[17] *See* 189 Cal. App. 4th 647 (2010).
[18] *See* No. 12-2-01763-5, 2012 WL 4739216, at *1 (Wash.Super. Aug. 29, 2012)
[19] *Id.*

9

permitted, so any reference to that is superseded by statutory amendments to the Electoral College Act.

The *Political Question Doctrine* does not apply. Defendant Donald John Trump was able to convince a boxing referee turned federal judge, but his decision will be swiftly reversed by the U.S. Court of Appeals for the 1st Circuit because he did not even properly grasp that Defendant Donald John Trump bore the burden of proving the applicability of the *Political Question Doctrine* since it's an affirmative defense.

### CONSTITUTIONAL QUALIFICATIONS ARE SELF-EXECUTING

This is the part that many scholars get lost in over-analyzation. Section 3 of the 14th Amendment merely supplemented the original constitutional qualifications for public office, which were that one had to be born a citizen of the U.S. as well as 35 years old and 14 years a resident of the U.S. by Inauguration Day. The 14th Amendment to the U.S. Constitution added another constitutional qualification: that one must have never provided aid or comfort to an insurrection. Hollywood actor Arnold Schwarzenegger is an immensely popular Republican, but he was not born a U.S. citizen. No one questions that he cannot run for President, but if he did, the federal judiciary would have to determine who has standing to sue to establish his ineligibility. The answer is a fellow primary candidate whose campaign would be politically injured due to Mr. Schwarzenegger's unconstitutional pursuit of an office for which he is not qualified to hold. Now, let's assume the Republican National Convention decided to nominate him despite the U.S. Supreme Court's holding that he is not qualified. Would we argue that the people should decide? If they voted overwhelming in favor of him, would we argue that the Electoral College is the only recourse? Of course not. The federal judiciary would prevent the states from printing his name on the ballots and enjoin secretaries of state from counting votes in his favor.

10

Defendant Donald John Trump argues that no one has the authority to enforce any of the U.S. Constitution's qualifications to hold the Presidency of the United States because Congress has created no cause of action. Basic qualifications to hold office as outlined in the U.S. Constitution do not need enforcement legislation. It is the U.S. Constitution that imposes the qualifying requirement that an individual never has provided air or comfort to an insurrection; not the states. Plaintiff is not asking the state to impose any new qualifications. Plaintiff is asking a federal court to enforce a constitutional qualification that is resulting in a political competitive injury.

The 1870 Enforcement Act was created to grant individuals that otherwise did not have a direct injury with standing to remove public officials holding office in violation of Section 3 of the 14th Amendment. If an individual does not otherwise have an injury traceable to a defendant that is redressable by a Court, then they need Congress to grant them authority to bring the cause of action. This has no bearing on Plaintiff who has a concrete and particularized political competitive injury. Plaintiff, in a Verified Complaint, explained that hundreds of voters have said they would support him but for Defendant Donald John Trump being a candidate. Plaintiff has made clear that the source of the competitive injury is the unconstitutional candidacy of Defendant Donald John Trump. For purposes of a motion to dismiss, all allegations must be accepted as true. Period. If Defendant Donald John Trump wants to disprove a fact or show that the injury is from another source, he must do so at trial.

Defendant Donald John Trump then tries to distinguish a general election from a primary election even though both involve state action; state action of possibly placing a constitutionally ineligible candidate on the ballot. State action contrary to the U.S. Constitution. Unconstitutional state action subject to injunction. More frivolity by Defendant Donald John Trump.

11

## PLAINTIFF HAS STATED A CLAIM

This is a civil action that encompasses a controversy between two candidates for the Republican nomination for the Presidency of the United States that arises under the Constitution. The law is clear: Plaintiff has stated a claim. Plaintiff is being politically injured. The Court can remedy this injury by interpreting the U.S. Constitution and enjoining state action that would conflict with its interpretation. It's that simple.

### REQUESTED RELIEF

Plaintiff requests that this Court deny Defendant Donald John Trump's Motions to Dismiss.

Dated: November 7, 2023.

Respectfully submitted,

By: /s/ John Anthony Castro
John Anthony Castro
12 Park Place
Mansfield, TX 76063
(202) 594 – 4344
J.Castro@JohnCastro.com
**Plaintiff *Pro Se***

### **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, John Anthony Castro, verify, under criminal penalty of perjury, that the entirety of the foregoing document, including any and all accompanying exhibits, are unequivocally true and correct.

Executed on November 7, 2023.

/s/ John Anthony Castro
John Anthony Castro

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed with the Court on November 7, 2023. I further certify that a true and accurate copy of the foregoing document was served via CM/ECG on all parties; all of whom are registered with CM/ECF.

/s/ John Anthony Castro
John Anthony Castro

# Exhibit A

# CMRRR with Agent Checked

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

DONALD JOHN TRUMP
1100 S. OCEAN BLVD
PALM BEACH, FL 33480

9590 9402 7882 2234 9026 03

2. Article Number (Transfer from service label)

7022 0410 0000 9397 8389

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____ ☐ Agent ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery

10/10/23

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Restricted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- ☑ Complete items 1, 2, and 3.
- ☑ Print your name and address on the reverse so that we can return the card to you.
- ☑ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Donald J. Trump
1100 S. Ocean Blvd
Palm Beach, FL 33480

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☑ Agent  ☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery
BHArek

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:          ☐ No

3. Service Type
- ☐ Adult Signature
- ☐ Adult Signature Restricted Delivery
- ☐ Certified Mail®
- ☐ Collect on Delivery
- ☐ Collect on Delivery Restricted Delivery
- ☐ Insured Mail
- ☐ ...Mail Restricted Delivery ($500)
- ☐ Priority Mail Express®
- ☐ Registered Mail™
- ☐ Registered Mail Restricted Delivery
- ☐ Signature Confirmation™
- ☐ Signature Confirmation Restricted Delivery

9590 9402 6830 1074 8195 91

2. Article Number (Transfer from service label)
7022 0410 0001 0548 1654

PS Form 3811, July 2020 PSN 7530-02-000-9053     Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- ☑ Complete items 1, 2, and 3.
- ☑ Print your name and address on the reverse so that we can return the card to you.
- ☑ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

DONALD JOHN TRUMP
1100 S. OCEAN BOULEVARD
PALM BEACH, FL 33480

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☑ Agent  ☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery
BHArek                            10/10/23

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:          ☐ No

3. Service Type
- ☑ Adult Signature
- ☐ Adult Signature Restricted Delivery
- ☑ Certified Mail®
- ☐ Collect on Delivery
- ☐ Collect on Delivery Restricted Delivery
- ☐ ...Mail Restricted Delivery
- ☐ Priority Mail Express®
- ☐ Registered Mail™
- ☐ Registered Mail Restricted Delivery
- ☐ Signature Confirmation™
- ☐ Signature Confirmation Restricted Delivery

9590 9402 7882 2234 9027 19

2. Article Number (Transfer from service label)
7022 0410 0000 9397 8402

PS Form 3811, July 2020 PSN 7530-02-000-9053     Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- ☑ Complete items 1, 2, and 3.
- ☑ Print your name and address on the reverse so that we can return the card to you.
- ☑ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

DONALD JOHN TRUMP
1100 S. OCEAN BLVD
PALM BEACH, FL 33480

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☑ Agent  ☐ Addressee

B. Received by (Printed Name)     C. Date of Delivery
BHArek                            10/10/23

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:          ☐ No

3. Service Type
- ☑ Adult Signature
- ☐ Adult Signature Restricted Delivery
- ☐ Certified Mail®
- ☐ Certified Mail Restricted Delivery
- ☐ Collect on Delivery
- ☐ Collect on Delivery Restricted Delivery
- ☐ ...Mail Restricted Delivery
- ☐ Priority Mail Express®
- ☐ Registered Mail™
- ☐ Registered Mail Restricted Delivery
- ☐ Signature Confirmation™
- ☐ Signature Confirmation Restricted Delivery

9590 9402 7882 2234 9025 80

2. Article Number (Transfer from service label)
7022 0410 0000 9397 8365

PS Form 3811, July 2020 PSN 7530-02-000-9053     Domestic Return Receipt

# Exhibit B

# Affidavit of Media Coverage

15

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF NEW YORK

## ALBANY DIVISION

JOHN ANTHONY CASTRO )
12 Park Place, Mansfield, TX 76063 )
)
    Plaintiff, )
)
v. )
)
NEW YORK STATE BOARD OF )
ELECTIONS )      Case No. 1:23-cv-01223
40 North Pearl Street, Suite 5, Albany, NY )
12207-2729 )
)
DONALD JOHN TRUMP )
1100 S. Ocean Blvd, Palm Beach, FL 33480 )
)
    Defendants. )

## AFFIDAVIT OF CANDIDACY AND MEDIA COVERAGE

I, John Anthony Castro, declare as follows:

1. I am the plaintiff in the present case, a U.S. citizen, and an FEC-registered Republican primary presidential candidate (Candidate FEC ID Number P40007320) for the 2024 Presidential Election.

2. I am a ballot-placed Republican Primary Presidential candidate in New Hampshire and Nevada. Arizona law confirms I will be on the ballot once I file on Monday, November 13, 2023.

1

3.  I have also incurred expenses associated with campaigning in this state, launched my own online show called the Truth Addict, and have digitally targeted voters in this state. As such, I will maintain "standing" throughout the course of this litigation.

4.  I intend to pay a nominal fee to appear on the ballots of Montana (only $4000), West Virginia (only $2500), and Kansas (only $4000).

5.  This is a portion of the unpaid *earned* media coverage my campaign activities have received to-date:

    a.  Associated Press: https://apnews.com/article/new-hampshire-presidential-primary-2024-5bd66ceac3df40f3b0ec7676422f40bc

    b.  Reuters: https://www.reuters.com/world/us/us-supreme-court-rebuffs-long-shot-candidates-bid-disqualify-trump-2024-2023-10-02/

    c.  Boston Globe: https://www.bostonglobe.com/2023/10/30/metro/judge-dismisses-lawsuit-that-sought-block-trump-nh-ballot/

    d.  NBC News: https://www.nbcnews.com/politics/donald-trump/live-blog/live-updates-trump-indictment-classified-documents-rcna88494

    e.  NBC News: https://www.nbcnews.com/politics/2024-election/big-names-perennial-candidates-mix-new-hampshires-presidential-filing-rcna119994

    f.  CNN: https://www.cnn.com/2023/10/02/politics/donald-trump-fourteenth-amendment-ballot-case-supreme-court/index.html

    g.  CNN: https://edition.cnn.com/politics/live-news/trump-fraud-trial-new-york-10-02-23/h_d677487e65da843f8d1cc988015786cf

2

h. Fox News: https://www.foxnews.com/politics/push-block-trump-new-hampshire-ballot-received-coldly-state-gop-leaders

i. ABC News: https://abcnews.go.com/Politics/group-sues-block-trump-2024-ballot-citing-14th/story?id=102964534

j. ABC News: https://abcnews.go.com/Politics/wireStory/groups-seek-constitutions-insurrection-clause-block-trump-2024-102823096

k. ABC News: https://abcnews.go.com/Politics/wireStory/filing-period-new-hampshire-presidential-primary-opens-103883184

l. New York Times: https://www.nytimes.com/2023/08/30/us/politics/trump-14th-amendment.html

m. New York Times: https://www.nytimes.com/2023/09/06/us/politics/trump-colorado-lawsuit-14-amendment.html

n. New York Times: https://www.nytimes.com/2023/09/18/us/politics/trump-california-ballot.html

o. PBS: https://www.pbs.org/newshour/politics/liberal-groups-seek-to-use-the-14th-amendment-to-block-trump-from-2024-ballots

p. Politico: https://www.politico.com/news/2023/09/01/fourteenth-amendment-insurrection-clause-trump-00113790

q. Politico: https://www.politico.com/newsletters/politico-nightly/2023/09/07/the-battle-thats-tearing-the-texas-gop-apart-00114616

r.  The Hill: https://thehill.com/homenews/ap/ap-politics/ap-filing-period-for-new-hampshire-presidential-primary-opens/

s.  Newsweek: https://www.newsweek.com/republican-threatens-trump-legal-hell-that-could-kick-him-off-ballot-1824471

t.  Newsweek: https://www.newsweek.com/republican-warns-trump-removed-ballot-john-anthony-castro-1829913

u.  Newsweek: https://www.newsweek.com/donald-trump-gets-good-news-supreme-court-1831419

v.  Newsweek: https://www.newsweek.com/supreme-court-decide-whether-kick-trump-off-ballot-1824577

w.  Newsweek: https://www.newsweek.com/trump-challenger-has-backup-plan-if-supreme-court-wont-kick-him-off-ballot-1829821

x.  Newsweek: https://www.newsweek.com/trump-tries-silence-member-his-inner-circle-colorado-ballot-case-1837968

y.  Newsweek: https://www.newsweek.com/donald-trump-ballot-access-legal-challenge-republican-claims-1830624

z.  Newsweek: https://www.newsweek.com/donald-trump-14th-amendment-taint-jury-pool-1825246

aa. Newsweek: https://www.newsweek.com/full-list-states-trying-kick-trump-off-ballot-where-cases-stand-1837398

bb. Newsweek: https://www.newsweek.com/donald-trump-14th-amendment-jan6-2024-election-1824937

cc. Vox: https://www.vox.com/politics/23880607/trump-14th-amendment-lawsuits-federalist-society

dd. New York Post: https://nypost.com/2023/10/02/supreme-court-declines-to-hear-bid-to-disqualify-trump-from-2024-election/

ee. Washington Times: https://www.washingtontimes.com/news/2023/sep/5/john-anthony-castro-write-gop-presidential-candida/

ff. Washington Times: https://www.washingtontimes.com/news/2023/aug/31/liberal-groups-seek-to-use-constitutions-insurrect/

gg. Washington Times: https://www.washingtontimes.com/news/2023/oct/11/new-hampshires-presidential-primary-filing-period-/

hh. American Military News: https://americanmilitarynews.com/2023/10/supreme-court-rejects-case-to-disqualify-trump-in-2024-presidential-race/

ii. The New York Sun: https://www.nysun.com/article/effort-to-disqualify-trump-will-soon-get-court-hearing-as-adversary-seeks-to-make-him-go-begging-to-supreme-court

jj. The Arizona Republic: https://www.azcentral.com/story/news/politics/arizona/2023/10/06/arizona-law-could-guarantee-trump-on-2024-ballot-if-qualified/71077077007/

5

kk. ABA Law Journal: https://www.abajournal.com/news/article/candidate-with-2-law-degrees-files-suits-to-keep-trump-off-the-ballot-a-different-challenge-is-tossed

ll. CBC (C.anada): https://www.cbc.ca/news/world/trump-14th-amendment-challenges-1.7012321

mm. Portland Press Herald: https://www.pressherald.com/2023/09/07/texas-republican-files-suit-in-effort-to-keep-trump-off-maines-presidential-ballot/

nn. The Oklahoman:
https://www.oklahoman.com/story/news/politics/government/2023/10/12/donald-trump-oklahoma-disqualification-lawsuit-dismissed/71147982007/

oo. Pennsylvania Capital Star: https://www.penncapital-star.com/campaigns-elections/trump-can-run-in-nh-primary-despite-jan-6-involvement-ag-and-secretary-of-state-say/

pp. Ballot Access News: https://ballot-access.org/2023/10/12/john-anthony-castro-dismisses-his-idaho-lawsuit-on-trump-ballot-access/

qq. Ballot Access News: https://ballot-access.org/2023/10/12/john-anthony-castro-files-brief-in-eleventh-circuit-in-florida-trump-ballot-access-case/

rr. The Providence Journal:
https://www.providencejournal.com/story/news/politics/2023/10/28/trump-battles-lawsuit-to-keep-him-off-rhode-island-presidential-ballot/71362011007/

ss. Las Vegas Sun: https://lasvegassun.com/news/2023/oct/10/trump-to-participate-in-nevada-gop-caucus-bypass-p/

tt. Fox News 13 Utah: https://www.fox13now.com/news/local-news/lawsuit-seeks-to-keep-trump-off-the-ballot-in-utah

uu. KOAT: https://www.koat.com/article/federal-lawsuit-remove-donald-trump-new-mexico-ballots/45102809

vv. KGET: https://www.kget.com/news/politics/ap-filing-period-for-new-hampshire-presidential-primary-opens/

ww. WBOY: https://www.wboy.com/news/west-virginia/west-virginia-politics/wvgop-wants-to-intervene-in-effort-to-remove-trump-from-ballot/amp/

xx. WTRF: https://www.wtrf.com/top-stories/capito-calls-lawsuit-to-keep-trump-off-west-virginia-ballot-ridiculous-and-says-its-bound-to-lose-in-court/amp/

yy. WMUR: https://www.wmur.com/amp/article/presidential-candidate-from-texas-sues-to-keep-trump-off-nh-ballot/45601317

zz. WMUR: https://www.wmur.com/amp/article/new-hampshire-donald-trump-ballot-lawsuit-dismiss/45682757

aaa. KOCO ABC News 5: https://www.koco.com/amp/article/oklahoma-republican-party-lawyers-up-trump-presidential-ballot/45273414

bbb. Bangor Daily News: https://www.bangordailynews.com/2023/09/07/politics/john-anthony-castro-trump-ballot-challenge/

ccc. WV News: https://www.wvnews.com/news/wvnews/republican-candidate-files-lawsuit-to-remove-donald-trump-from-presidential-ballot-in-west-virginia-and/article_739765f8-fe36-5ea2-bc15-bb05857abb77.html

ddd.　Nebraska Examiner: https://nebraskaexaminer.com/2023/09/13/trump-can-run-in-nh-primary-despite-jan-6-involvement-ag-and-secretary-of-state-say/

eee.　The State: https://www.thestate.com/news/politics-government/article279511574.html

fff. Scripps News: https://scrippsnews.com/stories/new-mexico-lawsuit-joins-other-bids-to-keep-trump-off-state-ballots/

ggg.　19FortyFive: https://www.19fortyfive.com/2023/10/he-could-be-disqualified-donald-trump-has-a-14th-amendment-problem/

hhh.　19FortyFive: https://www.19fortyfive.com/2023/10/not-disqualified-yet-donald-trump-was-just-saved-by-the-supreme-court/

iii. 19FortyFive: https://www.19fortyfive.com/2023/09/justices-to-decide-whether-to-take-the-trump-14th-amendment-case/

I have personal first-hand knowledge of all factual matters set forth in this document, and, if called upon to testify or give oral arguments, I would competently do so.

Pursuant to 28 U.S.C. § 1746 and state, I verify under penalty of perjury that the entirety of the foregoing document is true and correct.

Executed on November 7, 2023.

/s/ John Anthony Castro
John Anthony Castro

8

# Exhibit C

# Opening Brief to First Circuit

# No. 23-1902

## In the United States Court of Appeals for the First Circuit

**JOHN ANTHONY CASTRO,**

*Plaintiff - Appellant,*

*v.*

**DAVID SCANLAN, NEW HAMPSHIRE SECRETARY OF STATE; DONALD J. TRUMP; NEW HAMPSHIRE REPUBLICAN STATE COMMITTEE,**

*Defendants - Appellees.*

APPEAL FORM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE, CONCORD
ORIGINATING CIVIL CASE NO.: 1:23-CV-00416
Honorable Joseph Normand LaPlante, U.S. District Judge

## APPELLANT'S OPENING BRIEF

Respectfully submitted:
John Anthony Castro
Appellant
12 Park Place
Mansfield, TX 76063
Tel. (202) 594 - 4344

*Pro Se*

**JOHN ANTHONY CASTRO, APPELLANT,**
*v.*
**NEW HAMPSHIRE SECRETARY OF STATE DAVID SCANLAN**
*and* **DONALD JOHN TRUMP, APPELLEES.**

**No. 23-1902**

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record hereby certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Castro, John Anthony, Appellant.

2. New Hampshire Secretary of State David Scanlan, Appellee.

3. Donald John Trump, Appellee.

4. Jonathan Mark Shaw, Counsel for Appellee Donald John Trump.

5. Mark Meuser, Counsel for Appellee Donald John Trump.

6. Morgan Tanafon, Counsel for Appellee Donald John Trump.

7. Richard J. Lehmann, Counsel for Appellee Donald John Trump.

8. David Warrington, Counsel for Appellee Donald John Trump.

9. Bryan K. Gould, Counsel for Appellee Donald John Trump.

10. Brendan Avery O'Donnell, Counsel for Appellee NH Secretary of State.

11. Joseph LaPlante, United States District Judge.

*/s/ John Anthony Castro*
John Anthony Castro

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................. i

TABLE OF CITATIONS ........................................................................ iv

REASONS WHY ORAL ARGUMENT NEED NOT BE HEARD ...................... vii

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION ... 1

STATEMENT OF THE ISSUES ............................................................ 2

STATEMENT OF THE CASE ............................................................... 3

    *Restatement of Facts Relevant to Standing* ...................................... 10

    *Statement of the Facts Relevant to the Political Question Doctrine* ............... 11

SUMMARY OF THE ARGUMENT ........................................................ 13

STANDARD OF REVIEW .................................................................. 14

ARGUMENT ................................................................................... 15

I.  PLAINTIFF HAS POLITICAL COMPETITOR STANDING GRANTING THE DISTRICT COURT SUBJECT MATTER JURISDICTION OVER THIS CASE ................................................................................... 15

    A.  Castro's Injury-in-Fact ............................................................ 17

        1.  Diminution of Votes ...................................................... 17

    B.  Traceability ......................................................................... 19

        1.  Appellant's Injury to Traceable to Conduct of Both Appellees ........... 19

    C.  Redressability ...................................................................... 20

ii

II. THERE IS NO TEXTUALLY DEMONSTRABLE CONSTITUTIONAL COMMITMENT TO A POLITICAL BRANCH OF THE FEDERAL OR STATE GOVERNMENT ............................................................. 21

CONCLUSION ............................................................................ 23

CERTIFICATE OF COMPLIANCE ............................................ 24

CERTIFICATE OF SERVICE .................................................... 25

ADDENDUM

# TABLE OF CITATIONS

**Cases**

*Caliste v. Cantrell,*
No. CV 17-6197, 2017 WL 6344152 (E.D. La. Dec. 12, 2017)..........................22

*Cassirer v. Thyssen-Bornemisza Collection Found.,*
No. CV 05-03459 GAF EX, 2014 WL 5510996 (C.D. Cal. Oct. 31, 2014) .......22

*Competitive Enter. Inst. v. NHTSA,*
901 F.2d 107 (D.C. Cir. 1990)........................................................................20

*Conforti v. Hanlon,*
No. CV2008267ZNQTJB, 2022 WL 1744774 (D.N.J. May 31, 2022) ..............18

*Cooper v. Tokyo Elec. Power Co., Inc.,*
860 F.3d 1193 (9th Cir. 2017) ........................................................................14

*Fair Fight Action, Inc. v. Raffensperger,*
634 F. Supp. 3d 1128 (N.D. Ga. 2022)...........................................................22

*Fed. Republic of Yugoslavia v. Park-71st Corp.,*
913 F. Supp. 191 (S.D.N.Y. 1995) ................................................................22

*Fulani v. Brady,*
935 F.2d 1324 (D.C. Cir. 1991)............................................................. 16, 18, 19

*Gottlieb v. FEC,*
143 F.3d 618 (D.C. Cir. 1998)........................................................................16

*Grinols v. Electoral Coll.,*
No. 2:12-CV-02997-MCE, 2013 WL 2294885
(E.D. Cal. May 23, 2013), *aff'd,* 622 F. App'x 624 (9th Cir. 2015) .....................8

*Hassan v. FEC,*
893 F. Supp. 2d 248 (D.D.C. 2012), *aff'd,*
No. 12-5335, 2013 WL 1164506 (D.C. Cir. 2013)..............................................16

*In re 3M Combat Arms Earplug Prod. Liab. Litig.*,
No. 3:19MD2885, 2021 WL 1600487 (N.D. Fla. Apr. 23, 2021) ........................22

*Kerin v. Titeflex Corp.*,
770 F.3d 978 (1st Cir. 2014) ................................................................14

*Liberty Legal Found. v. Nat'l Democratic Party of the USA, Inc.*,
875 F. Supp. 2d 791 (W.D. Tenn. 2012) ...................................................9

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ............................................................................15

*New World Radio, Inc. v. FCC*,
294 F.3d 164 (D.C. Cir. 2002) ..............................................................16

*Raines v. Byrd*,
521 U.S. 811 (1997) ............................................................................15

*Schroder v. Bush*,
263 F.3d 1169 (10th Cir. 2001) ............................................................14

*Seneca Nation of Indians v. State*,
No. 93-CV-688A, 1994 WL 688262 (W.D.N.Y. Oct. 28, 1994) ......................22

*Shays v. FEC*,
414 F.3d 76 (D.C. Cir. 2005) .......................................................... 16, 17

*Simon v. Republic of Hungary*,
No. CV 10-01770 (BAH), 2012 WL 13069771 (D.D.C. Sept. 30, 2012) ...........22

*Spectrum Stores, Inc. v. Citgo Petroleum Corp.*,
632 F.3d 938 (5th Cir. 2011) ................................................................14

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ............................................................................15

*Starr Int'l Co., Inc. v. U.S.*,
910 F.3d 527 (D.C. Cir. 2018) ..............................................................14

*U.S. Liab. Ins. Co. v. Selman,*
    70 F.3d 684 (1st Cir. 1995) ..................................................................23

*U.S. v. Hempfling,*
    No. CVF05-594LJOSMS, 2007 WL 1299262 (E.D. Cal. May 1, 2007) ...........22

*U.S. v. Kellogg Brown & Root Servs., Inc.,*
    856 F. Supp. 2d 176 (D.D.C. 2012) ........................................................22

*U.S. v. Washington,*
    19 F. Supp. 3d 1317 (W.D. Wash. 2000) ..................................................22

**Constitution**

U.S. Const. amend XIV, § 3 ....................................................................19

U.S. Const. art. III, § 2 ..........................................................................15

**Statutes**

28 U.S.C. § 1291 .....................................................................................1

28 U.S.C. § 1294 .....................................................................................1

28 U.S.C. § 1331 .....................................................................................1

28 U.S.C. § 1746 ..................................................................................6, 7

**Other Authorities**

https://www.doj.nh.gov/news/2023/documents/20230913-section-3-14th-
    amendment-guidance.pdf ....................................................................4

vi

## REASONS WHY ORAL ARGUMENT NEED NOT BE HEARD

Pursuant to Fed. R. App. P. 34(a)(2)(C), oral argument need not be heard because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

## STATEMENT OF SUBJECT-MATTER AND
## APPELLATE JURISDICTION

Jurisdiction for this civil action was proper in the United States District Court for the District of New Hampshire pursuant to 28 U.S.C. § 1331 because Appellant John Anthony Castro's claim arose under Section 3 of the 14th Amendment to the United States Constitution.

The district court entered final judgment against Appellant as to all claims on October 27, 2023, on the basis he lacked standing and that the issues presented a nonjusticiable political question. On October 27, 2023, Appellant filed a timely notice of appeal.

Jurisdiction in this Honorable Court of Appeals is proper under 28 U.S.C. §§ 1291 and 1294.

1

# STATEMENT OF THE ISSUES

1.   Does a New Hampshire ballot-placed Republican Presidential candidate who filed before other candidates have Article III standing to challenge the constitutional qualifications and eligibility of another New Hampshire ballot-placed Republican Presidential candidate based on a political competitive injury in the form a diminution of votes and/or dilution of position due to the entrance of a new unlawful competitor?

2.   Can the *Political Question Doctrine* be applied to a primary election legal challenge to a candidate's constitutional qualifications, which is wholly unrelated to the general election's competition for electoral votes governed by the U.S. Constitution and the Electoral Count Act?

## STATEMENT OF THE CASE

On September 5, 2023, Appellant John Anthony Castro filed the civil action at issue in this case before the U.S. District Court for the District of New Hampshire[1] in an effort to disqualify Appellee Donald John Trump for having provided aid and comfort to the insurrectionists that attacked the United States Capitol on January 6, 2021.[2]

In his Verified Complaint, Appellant John Anthony Castro expressed his intent, subject to the penalty of perjury, to file his New Hampshire Declaration of Candidacy with the $1,000 filing fee.[3] In doing so, Appellant John Anthony Castro would be in direct competition against Appellee Donald John Trump in

---

[1] See A9.

[2] On January 6, 2021, after witnessing a large group of Trump supporters violently attacking the United States Capitol to prevent the lawful certification of the 2020 election results, Appellee Donald John Trump stated on live television, "we love you, you're very special" to the insurrectionists. Appellee Donald John Trump provided the insurrectionists with comfort in the form of words of sympathy. On January 29, 2022, Appellee Donald John Trump publicly stated, "If I run and if I win, we will treat those people from January 6 fairly. We will treat them fairly. And if it requires pardons, we will give them pardons." Appellee Donald John Trump promised the insurrectionists aid in the form of executive pardons for their criminal attempt to unlawfully overturn the 2020 election results. On November 15, 2022, Appellee Donald John Trump publicly announced his candidacy for the Presidency of the United States. On January 30, 2022, Appellant John Anthony Castro filed his FEC Form 2, Statement of Candidacy, as a Republican candidate for the Presidency of the United States. On June 22, 2023, Appellee Donald John Trump hosted a fundraiser for the January 6 insurrectionists thereby assisting in the acquisition of financial aid for their legal bills.

[3] See A9.

New Hampshire for the Republican Nomination for the Presidency of the United States.

On September 13, 2023, New Hampshire Attorney General John Formella issued an advisory opinion to New Hampshire Secretary of State David Scanlan concluding that New Hampshire law "does not give the Secretary of State discretion to decline to place a presidential primary candidate's name on the ballot based on alleged Section Three [of the 14th Amendment] disqualification."[4]

On September 29, 2023, Appellee Donald John Trump filed a Motion to Dismiss wherein he argues that Section 3 of the 14th Amendment is not "self-executing" since that is part of the standing analysis with regard to redressability.[5]

On October 2, 2023, Appellant John Anthony Castro was the first Republican to file his Nevada Declaration of Candidacy in-person at the Reno, Nevada, office of the Secretary of State.[6]

On October 11, 2023, Appellant John Anthony Castro was the first Republican to file his New Hampshire Declaration of Candidacy in-person at the Concord, New Hampshire, office of the Secretary of State and paid the $1,000

---

[4]      https://www.doj.nh.gov/news/2023/documents/20230913-section-3-14th-amendment-guidance.pdf

[5] See A35.

[6] See A51.

4

filing fee, which he personally handed to New Hampshire Secretary of State David Scanlan.[7]

On October 20, 2023, the lower court held an evidentiary hearing to decide whether it had subject matter jurisdiction.[8] At that hearing, Appellant John Anthony Castro testified that due to substantial global media coverage of his pursuit of the Republican nomination for the Presidency of the United States, his ground campaign in New Hampshire was set to begin in a matter of days.[9] Appellant only admitted that his current prospects were dim but that his novel campaign strategy of capitalizing on earned media coupled with a grassroots campaign set to begin was about to turn the tide.[10] At the conclusion of the hearing, the lower court stated it would need two weeks to make a ruling, which indicated a decision would be rendered on or before Friday, November 3, 2023.[11]

---

[7] See A51.

[8] See A49.

[9] See ECF 58.

[10] Appellee Donald John Trump had previously argued in Florida that Appellant John Anthony Castro was unlikely to actually be on the ballot of any state to pursue the Republican Nomination. Appellee Donald John Trump then argued in New Hampshire that Appellant was unlikely to follow-through with filing his New Hampshire Declaration of Candidacy. At the hearing, Appellee Donald John Trump then argued that although Appellant John Anthony Castro was now on the ballot in New Hampshire, he was unlikely to actually campaign. At some point, the federal judiciary needs to respect that Appellant John Anthony Castro is credible and follows through with his statements.

[11] See ECF 58.

At the close of business on that day, Appellee Donald John Trump had still not yet filed his New Hampshire Declaration of Candidacy.[12]  As such, the lower court still had time to prevent the entrance of a new unlawful competitor.

On October 23, 2023, Appellee Donald John Trump filed his Declaration of Candidacy in-person at the Concord, New Hampshire, office of the Secretary of State and paid the $1,000 filing fee.[13]  The lower court's inaction allowed for new unlawful competition against Appellant John Anthony Castro that, according to Appellant's Verified Complaint, was in violation of Section 3 of the 14th Amendment to the United States Constitution.  This crystallized the injury in the form of dilution of political market position that is mathematically certain to ultimately materialize in a diminution of votes that can still be prevented. Moreover, the unconstitutional presence of Appellee Donald John Trump on the ballot chills Appellant's plans to incur campaign expenditures.

Nevertheless, on October 26, 2023, Appellant John Anthony Castro dispatched campaign staffers to New Hampshire to knock on doors and place

---

[12] This statement is verified pursuant to 28 U.S.C. § 1746.

[13] This statement is verified pursuant to 28 U.S.C. § 1746.

6

hundreds of campaign signs.[14]  In addition, thousands of postcards were purchased and scheduled to be delivered in November.[15]

On October 27, 2023, the lower court rushed the publication of its ruling in bad faith and found that Appellant was not engaged in any actual competition in New Hampshire despite paying $1,000 to be a ballot-placed candidate and incurring travel and lodging expenses to travel to the state, which generated significant national media coverage.[16]  Taking into account Appellant's testimony under oath that he was about to launch an aggressive ground campaign in New Hampshire, the lower court could have reserved ruling on jurisdiction to allow the facts that materialize.

Instead, in the ruling, the lower court mischaracterized Appellant's lack of current paid advertising prior to the hearing with a baseless assumption that Appellant would never engage in *any* campaign activity in New Hampshire.[17]

The lower court ignored the expert witness' admission that Appellant John Anthony Castro would lose some votes to Appellee Donald John Trump and

---

[14] This statement is verified pursuant to 28 U.S.C. § 1746.

[15] This statement is verified pursuant to 28 U.S.C. § 1746.

[16] See Add.1, Add.21.

[17] See Footnote 2 regarding Appellant's credibility in following through with statements.  Questions of fact are to be construed in favor of a plaintiff. Nevertheless, the lower court resolved all undeveloped questions of fact in favor of Appellee Donald John Trump.  This was contrary to law.

instead viewed the primary as a competition for delegates rather than votes and political support that could be leveraged.[18]  Moreover, the lower court claimed that because Appellant admitted his primary goal was to challenge Appellee Donald John Trump's constitutional qualifications, standing was being manufactured.[19]

More importantly, the lower rested its standing ruling on two cases that involved post-primary third-party candidates that were not actually on the general election ballot; hence, they were not actual current competitors.[20]

---

[18] See ECF 58. All swing states in the 2020 General Election turned on less than 3%. Arizona turned on 0.4%. Georgia turned on 0.3%. Michigan turned on 2.8%. Pennsylvania turned on 1.2%. Wisconsin turned on 0.6%. Even without delegates, Appellant will have a significant impact on the general election. Nevertheless, it is not the province of the federal judiciary to compel a ballot-placed candidate to explain their strategy to determine their *bona fides*.

[19] See ECF 58. Appellant only admitted that challenging Appellee Donald John Trump's constitutional qualification was initially his primary goal. Appellant is now attempting to pursue delegates to have influence at the Republican National Convention as well as pursuing a loyal following to influence the general election. Nevertheless, it is not the province of the federal judiciary to judge the *bona fides* of a ballot-placed candidate's political goals. That would be what is truly a nonjusticiable political question. Many candidates launch campaigns with the intent of being a running mate, negotiating a cabinet-level position or ambassadorship. Courts should not compel ballot-placed candidates to reveal the details of the campaign and candidacy's political goals and strategy. Appellant urges this Court to consider the grave danger that the lower court ruling poses. Based on the judge's ruling, former New Jersey Governor Chris Christie is self-harming since his polling indicates he will not secure a single delegate and admitted his candidacy too was intended to challenge Appellee Donald John Trump.

[20] See ECF 58 (citing *Grinols v. Electoral Coll.*, No. 2:12-CV-02997-MCE, 2013 WL 2294885, at *9 (E.D. Cal. May 23, 2013), *aff'd*, 622 F. App'x 624 (9th Cir. 2015) ("There is no evidence that Noonan or MacLearan appeared on any state's

The lower rested its application of the *Political Question Doctrine* on the unanalyzed grounds that the adjudication of a candidate's constitutional qualifications was entrusted to Congress and the Electoral College, which the lower court shockingly admitted to in a footnote stating "It bears noting that courts dealing with this justiciability question have not undertaken a searching analysis of the text and history of, for example, the Electoral Count Act and the Twentieth Amendment, which potentially impacts the proper application of the political question doctrine." The lower court admitted that it could not identify a "textually demonstrable constitutional commitment" to a political branch. However, the lower court bizarrely argued that because Appellant John Anthony Castro failed to explain the absence of such non-existent text, the lower court would presume the doctrine applied based on the unanalyzed *dicta* from other courts.

Nine minutes after the lower court published its opinion, Appellant filed his Notice of Appeal.[21]

---

2012 general presidential election ballot."). *Also see Liberty Legal Found. v. Nat'l Democratic Party of the USA*, Inc., 875 F. Supp. 2d 791, 800–01 (W.D. Tenn. 2012) ("Neither Plaintiff has alleged that... his name will appear on the ballot")). Of course, the lower court conveniently ignored the actual substance of the cases it cited and cherry-picked *dicta* out-of-context to invent a new approach to the injury analysis. It was the lower court, not Appellant, engaged in manufacturing grounds to manipulate the federal judiciary.

[21] See A52.

9

On October 28, 2023, former Vice President Mike Pence announced the suspension of his Presidential campaign, which proved that Appellant John Anthony Castro's strategy of waiting to aggressively campaign until the final weeks before the election can prove to be an effective campaign strategy.

*Restatement of Facts Relevant to Standing*

Appellant John Anthony Castro is a New Hampshire ballot-placed Republican Presidential candidate actively campaigning and pursuing the nomination of the Republican Party to pursue the Office of the Presidency of the United States.

Appellee Donald John Trump is a New Hampshire ballot-placed Republican Presidential candidate actively campaigning and pursuing the nomination of the Republican Party to pursue the Office of the Presidency of the United States.

Appellee New Hampshire Secretary of State David Scanlan's acceptance and processing of Appellee Donald John Trump's Declaration of Candidacy and Filing Fee is state action in furtherance of aiding a violation of Section 3 of the 14th Amendment to the United States Constitution.

Appellee Donald John Trump's submission of his Declaration of Candidacy and the filing fee are acts in furtherance of his intent to violate Section 3 of the 14th Amendment.

10

As such, Appellant's political competitive injury is traceable to the direct actions of Appellee Donald John Trump as well as the supporting state acts of Appellee New Hampshire Secretary of State David Scanlan.

*Pro se* Appellant's inartful statement that Appellee Donald John Trump was a "nominal defendant" must be disregarded under the liberal *pro se* standard. Appellee Donald John Trump aggressively pursued dismissal, so this misclassification was harmless and non-prejudicial.

### Statement of the Facts Relevant to the Political Question Doctrine

Appellant John Anthony Castro and Appellee Donald John Trump are both New Hampshire ballot-placed Republican Presidential candidates competing for votes in the state's 2024 primary election.

The outcome of the primary election dictates to whom delegates are awarded for the purpose of competing for the Republican nomination to be that party's official candidate to pursue the Office of the Presidency of the United States in the general election. Appellant will capitalize on political support from voters to control the outcome of the general election as well as to achieve other political goals that is outside the concern of the federal judiciary.

Nevertheless, the outcome of the primary election is not related in any way to the outcome of the general election that results in the awarding of electors who

11

will ultimately convene as the Electoral College to select the next President of the United States.

The U.S. Constitution and Electoral Count Act have absolutely no bearing on the primary election.

## SUMMARY OF THE ARGUMENT

Because Appellant John Anthony Castro was a New Hampshire ballot-placed Republican Presidential candidate before Appellee Donald John Trump, Appellee New Hampshire Secretary of State David Scanlan's acceptance and processing of Appellee Donald John Trump's Declaration of Candidacy and filing fee created a new ballot-based competitor that diluted Appellant John Anthony Castro's political position thereby injuring Appellant John Anthony Castro.

Because Appellant John Anthony Castro's injury is mathematically certain to ultimately materialize in a diminution of votes as a direct result of Appellee Donald John Trump's unlawful candidacy, further injury is traceable to Appellee Donald John Trump and preventable with injunctive relief in the form of enjoining the state from printing ballots with Appellee Donald John Trump's name and not counting votes in favor of Appellee Donald John Trump since those acts would be in furtherance of a violation of Section 3 of the 14th Amendment to the U.S. Constitution.

Because Appellant John Anthony Castro's claim of injury is redressable with judicial relief, Appellant John Anthony Castro has stated a claim upon which relief can be granted.

Because the U.S. Constitution and the Electoral Count Act are unrelated to the process and functions of a primary election, there was no showing of a

textually demonstrable constitutional commitment to either the legislative or executive branches of the federal or state governments regarding the determination of whether Appellee Donald John Trump is constitutionally disqualified from holding office for having provided aid and comfort to an insurrection.

Because the Court had subject matter jurisdiction and Appellant John Anthony Castro stated a claim upon which relief could be granted, the case must be remanded back to the district court for a trial on the merits.

## STANDARD OF REVIEW

"The existence of standing is a legal question, which [Courts] review *de novo*."[22]

Appellate courts review *de novo* a district court's determination whether the political question doctrine applies since it is a question of law.[23]

---

[22] *See Kerin v. Titeflex Corp.*, 770 F.3d 978, 981 (1st Cir. 2014).

[23] *See Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 948 (5th Cir. 2011); *Cooper v. Tokyo Elec. Power Co., Inc.*, 860 F.3d 1193, 1212 (9th Cir. 2017); *Schroder v. Bush*, 263 F.3d 1169, 1173 (10th Cir. 2001); *Starr Int'l Co., Inc. v. U.S.*, 910 F.3d 527, 533 (D.C. Cir. 2018).

# ARGUMENT

## I. PLAINTIFF HAS POLITICAL COMPETITOR STANDING GRANTING THE DISTRICT COURT SUBJECT MATTER JURISDICTION OVER THIS CASE

The Constitution limits the jurisdiction of the federal courts to actual cases or controversies.[24] "One element of the case-or-controversy requirement is that [plaintiffs], based on their complaint, must establish that they have standing to sue."[25] The doctrine of standing, "rooted in the traditional understanding of a case or controversy… developed… to ensure that federal courts do not exceed their authority as it has been traditionally understood."[26] "[T]he 'irreducible constitutional minimum' of standing consists of three elements."[27] The "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[28]

The United States Court of Appeals for the D.C. Circuit has recognized the concept of *Political Competitor Standing* on the basis that an injury would logically be diminution of votes traceable to the political competitor and

---

[24] U.S. Const. art. III, § 2, cl. 1, *see also Raines v. Byrd*, 521 U.S. 811, 818 (1997).

[25] *Raines*, 521 U.S. at 818.

[26] *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016).

[27] *Id*. (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

[28] *Id*.

redressable by a court.[29]  Political Competitor Standing, however, is only available to plaintiffs who can show that they "personally compete[] in the same arena with the same party."[30]  The D.C. Circuit has also held that if a plaintiff can show that he is a "direct and current competitor," then competitor standing must be recognized as a matter of law.[31]  The federal judiciary has recognized that a candidate, as opposed to "individual voters and political action groups" would have "standing based upon a 'competitive injury'" if, again, the candidate can show that he "personally competes in the same arena with the same party."[32]

Appellant John Anthony Castro is a New Hampshire ballot-placed Republican Presidential candidate and is currently directly competing against Appellee Donald John Trump for the Republican nomination for the Presidency of

---

[29] *See Shays v. FEC*, 414 F.3d 76, 87 (D.C. Cir. 2005).

[30] *Gottlieb v. FEC*, 143 F.3d 618, 621 (D.C. Cir. 1998) (internal quotation marks omitted); *see also Fulani v. Brady*, 935 F.2d 1324, 1327-28 (D.C. Cir. 1991) (holding that presidential candidate did not have "competitor standing" to challenge CPD's tax-exempt status where the candidate was not eligible for tax exempt status); *Hassan v. FEC*, 893 F. Supp. 2d 248, 255 (D.D.C. 2012), *aff'd*, No. 12-5335, 2013 WL 1164506 (D.C. Cir. 2013) ("Plaintiff cannot show that he personally competes in the same arena with candidates who receive funding under the Fund Act because he has not shown that he is or imminently will be eligible for that funding.").

[31] *New World Radio, Inc. v. FCC*, 294 F.3d 164, 170 (D.C. Cir. 2002)

[32] *Hassan*, 893 F. Supp. 2d at 255 n.6 (D.D.C. 2012) (emphases added) (quoting *Gottlieb*, 143 F.3d at 621)

16

the United States. As such, Appellant John Anthony Castro has political competitor standing to bring this suit. Period.

### A. Castro's Injury-in-Fact

To establish standing, a plaintiff must show that the plaintiff has suffered an "injury in fact caused by the challenged conduct [of the defendant] and redressable through relief sought from the court."[33]

Despite Appellant John Anthony Castro's clear allegations contained in his Verified Complaint, the lower court concluded that he voluntarily incurred a self-inflicted injury to "manufacture" standing. According to the lower court, the Reverend Dr. Martin Luther King would not have had standing to claim an injury since he voluntarily went into a "whites only" restaurant to effectively self-inflict injury to manufacture standing. The lower court fails to understand that some Americans are brave enough to do the right thing while 300 million other Americans do nothing. Some Americans are willing to put our lives, fortunes, and sacred honor on the line.

### 1. Diminution of Votes

Appellant John Anthony Castro and Appellee Donald John Trump are not only competing for the same political position within the same political party but are also appealing to the same voter base. Appellant John Anthony Castro has the

---

[33] *Shays*, 414 F.3d at 83 (internal citation omitted).

support of union members across the United States as the only Republican primary candidate who is a former certified union organizer that is appealing to working class Americans.

In fact, throughout his campaigning efforts to date, Appellant John Anthony Castro has spoken to thousands of voters who have expressed that they would vote for Castro *only if* Trump is not a presidential candidate as they maintain political loyalty to Trump.[34]

A primary candidate has judicial standing to bring a claim challenging the eligibility of a fellow primary candidate for competitive injury in the form of a diminution of votes if the primary candidate believes that the fellow primary candidate is ineligible to hold public office and to prevent actions irreconcilable with the U.S. Constitution.[35]

Appellant John Anthony Castro will *further* suffer *irreparable* competitive injuries if Appellee Donald John Trump, who is constitutionally ineligible to hold office, is able to attempt to secure votes in primary elections. Appellee Donald John Trump's constitutionally unauthorized undertaking will put Castro at both a voter and donor disadvantage.

---

[34] *See Conforti v. Hanlon*, No. CV2008267ZNQTJB, 2022 WL 1744774, at *12 (D.N.J. May 31, 2022).

[35] *See Fulani*, 882 F.2d at 628.

Appellee Donald John Trump, without judicial relief to Appellant John Anthony Castro, will siphon off votes in violation of Section 3 of the 14th Amendment to the U.S. Constitution.[36] In fact, Trump conceded in his motion to dismiss that there are only "162 Republican Party candidates" for the Presidency of the United States thereby identifying the actual named individuals with particularity that his candidacy is injuring.[37] By definition, this "particularizes" the injury.

## B. Traceability

### 1. Appellant's Injury to Traceable to Conduct of Both Appellees

It is undisputed that Appellant John Anthony Castro's injury-in-fact is traceable to Appellee Donalde John Trump. However, the lower court made it a point to claim that the injury is not traceable to Appellee New Hampshire Secretary of State David Scanlan despite the fact that his actions created a new competitor diluting Appellant John Anthony Castro's political market position and further actions of printing ballots and counting votes in favor of a constitutionally

---

[36] U.S. Const., amend. XIV, § 3 "No person shall be a[n]...elector of President...or hold any office... under the United States,...who,...shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof."

[36] *See Fulani*, 882 F.2d at 628.

[37] *See* A33, MTD p.12.

19

disqualified individual would be in furtherance of a violation of the U.S. Constitution.

The lower court's claim that the injury is not traceable to the conduct of Appellee New Hampshire Secretary of State David Scanlan is patently frivolous.

### C. Redressability

"Plaintiffs need not prove that granting the requested relief is certain to redress their injury, especially where some uncertainty is inevitable."[38] Nevertheless, Appellant John Anthony Castro has made it clear that injunctive relief would certainly redress his injuries. More specifically, specific performance to refund Appellee Donald John Trump the filing fee, enjoining Appellee New Hampshire Secretary of State David Scanlan from printing ballots with Appellee Donald John Trump's name on it, and/or enjoining Appellee New Hampshire Secretary of State David Scanlan from counting ballot or write-in votes in favor of Appellee Donald John Trump.

There is no question injunctive relief and remedy Appellant John Anthony Castro's political competitive injury.

---

[38] *Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 118 (D.C. Cir. 1990).

20

## II. THERE IS NO TEXTUALLY DEMONSTRABLE CONSTITUTIONAL COMMITMENT TO A POLITICAL BRANCH OF THE FEDERAL OR STATE GOVERNMENT

The lower rested its application of the *Political Question Doctrine* on the unanalyzed *dicta* of other courts that the adjudication of a candidate's constitutional qualifications in a primary election were somehow entrusted to Congress and the Electoral College by operation of the 12th, 20th, and 25th Amendment coupled with the Electoral Count Act without analysis or explanation. However, the lower court then shockingly admitted to in a footnote that it "bears noting that courts dealing with this justiciability question have not undertaken a searching analysis of the text and history of, for example, the Electoral Count Act and the Twentieth Amendment, which potentially impacts the proper application of the political question doctrine."

In other words, the lower court arbitrarily applied the political question doctrine based on unanalyzed dicta from other courts and its own unsubstantiated belief that it applied.

To make matters worse, the Court then stated that because "Castro has not referred to, much less argued for, the *inapplicability* of the doctrine on these grounds, this court deems these arguments waived." The lower court was under the mistaken belief that Appellant John Anthony Castro bore the burden of

21

dispelling every possible application of the *Political Question Doctrine* imaginable.

The Political Question Doctrine is an affirmative defense to jurisdiction.[39] The U.S. Court of Appeals for the First Circuit adopts the rule "to place the burden

---

[39] *See U.S. v. Kellogg Brown & Root Servs., Inc.*, 856 F. Supp. 2d 176, 179 (D.D.C. 2012) ("The government asserts a number of independent barriers to KBR's counterclaim and affirmative defense, including judicial estoppel, the political question doctrine, failure to exhaust administrative remedies, and failure to state a claim."); *Fed. Republic of Yugoslavia v. Park-71st Corp.*, 913 F. Supp. 191, 193 (S.D.N.Y. 1995) ("Defendant... asserts, as an affirmative defense, that Plaintiff lacks standing and that this matter presents a non-justiciable political question."); *Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1148 (N.D. Ga. 2022) ("Defendants presented the following affirmative defenses... Political Question Doctrine."); *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19MD2885, 2021 WL 1600487, at *2 (N.D. Fla. Apr. 23, 2021) ("the affirmative defense based on the political question doctrine"); *Cassirer v. Thyssen-Bornemisza Collection Found.*, No. CV 05-03459 GAF EX, 2014 WL 5510996, at *6 (C.D. Cal. Oct. 31, 2014) ("Political Question Affirmative Defense"); *U.S. v. Washington*, 19 F. Supp. 3d 1317, 1338 (W.D. Wash. 2000) ("political question affirmative defense"); *Seneca Nation of Indians v. State*, No. 93-CV-688A, 1994 WL 688262, at *1 (W.D.N.Y. Oct. 28, 1994) ("The affirmative defenses raised by defendants' answers include... political question."); *U.S. v. Hempfling*, No. CVF05-594LJOSMS, 2007 WL 1299262, at *2 (E.D. Cal. May 1, 2007) ("Affirmative Defense: The political question doctrine"); *Caliste v. Cantrell*, No. CV 17-6197, 2017 WL 6344152, at *1 (E.D. La. Dec. 12, 2017) ("Defendant also alleges twenty-eight affirmative defenses including... non-justiciable political question."); *Simon v. Republic of Hungary*, No. CV 10-01770 (BAH), 2012 WL 13069771, at *6 (D.D.C. Sept. 30, 2012) ("The Court concludes that RCH has asserted meritorious defenses, insofar as it is has asserted six affirmative defenses... The claims against RCH constitute non-justiciable political questions."). The lower court should take note that Appellant was not "quibbl[ing] without reason" as it rudely held in its Order; the lower court simply did not properly comprehend the law.

of proving affirmative defenses on the party asserting them."[40]   Appellee Donald

John Trump bore the burden of proving its application.

Because the lower court, by its own admission, incorrectly applied the

*Political Question Doctrine* on the basis that Appellant failed to argue for its

inapplicability, Appellant need not further address it.   Nevertheless, since this

matter goes to the jurisdiction of the lower court, this Honorable Court is free to

explore it further *sua sponte*.   However, such an exercise is futile since any

argument in favor of its application is patently frivolous.

## CONCLUSION

The judgment below should be vacated, and the case remanded for trial.


Respectfully submitted,

Dated: November 1, 2023.

By: */s/ John Anthony Castro*

John Anthony Castro
12 Park Place
Mansfield, TX  76063
Tel. (202) 594 – 4344
J.Castro@JohnCastro.com

*Appellant Pro Se*

---

[40] *U.S. Liab. Ins. Co. v. Selman*, 70 F.3d 684, 691 (1st Cir. 1995).

## CERTIFICATE OF COMPLIANCE

1.     I certify that this filing complies with the type-volume limitations of the Fed. R. App. P. 32(a)(7)(B) because, excluding the parts exempted by the Fed. R. App. P. 32(f), the Brief contains 4,736 words.

2.     I also certify that this filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

                                              /s/ John Anthony Castro
                                              John Anthony Castro

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2023, a true and accurate copy of the foregoing Appellant's Opening Brief with accompanying attachments (if any) was electronically filed. It is further certified that all other parties are CM/ECF users and that service of this motion was made on Appellees via CM/ECF.

*/s/ John Anthony Castro*
John Anthony Castro

FOR DOMESTI

PLACE I



- Guaranteed
- Guaranteed
- USPS Tracki
and many int
- Pick up avail
- Domestic shi
(restrictions a
- Signature inc

\* Money Back Guara
select International
See DMM and IMM

† Money Back Guara

‡ Insurance does not
Domestic Mail Manu

WHEN USED INTERNATIONALL



U.S. DISTRICT COURT
JOHN M. DOMURAD, CLERK

NOV 0 8 2023

RECEIVED

E

US POSTAGE & FEES PAID
PRIORITY MAIL EXPRESS
ZONE 7 FLAT-RATE ENVELOPE
ComBasPrice

062S0001443340
9800532
FROM 75240

stamps
endicia
11/07/2023

## PRIORITY MAIL EXPRESS 1-DAY™

John Castro
Castro & Co.
13155 Noel Road, Suite 900
Dallas TX 75240-6882

0007
(202) 594-4344

SIGNATURE REQUIRED

SHIP TO:

US District Clerk
445 Broadway Ste 509
Albany NY 12207-2925



### USPS SIGNATURE TRACKING #

9481 7112 0620 4803 4478 76



## VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

  

UNITED STATES
POSTAL SERVICE®





Republican Nomination ⌄     Democratic Nomination ⌄     Quick Links 

# 2024 Republican Presidential Nomination

2024 Democratic Presidential Nomination

National | Iowa | N. Hampshire | S. Carolina | Nevada

**November 20, 2007, '11, '15:** 2015 Trump +2.8 | 2011 Romney +0.4 | 2007 Giuliani +13.0

## Polling Data

| Poll | Date | Trump | DeSantis | Haley | Ramaswamy | Christie | Scott | Burgum | Hutchinson | Spread |
|------|------|-------|----------|-------|-----------|----------|-------|--------|------------|--------|
| **RCP Average** | **11/2 - 11/16** | **58.9** | **14.4** | **10.7** | **4.7** | **2.3** | **2.3** | **0.8** | **0.4** | **Trump +44.5** |
| NBC News | 11/10 - 11/14 | 58 | 18 | 13 | 3 | 3 | 1 | 1 | 1 | Trump +40 |
| Harvard-Harris | 11/15 - 11/16 | 67 | 9 | 8 | 5 | 3 | -- | 1 | -- | Trump +58 |
| Economist/YouGov | 11/11 - 11/14 | 57 | 19 | 9 | 4 | 0 | 3 | 0 | 0 | Trump +38 |
| FOX News | 11/10 - 11/13 | 62 | 14 | 11 | 7 | 3 | -- | 0 | 1 | Trump +48 |
| Quinnipiac | 11/9 - 11/13 | 64 | 16 | 9 | 4 | 2 | -- | 1 | 0 | Trump +48 |
| Yahoo News | 11/9 - 11/13 | 54 | 15 | 10 | 5 | 2 | 2 | 0 | 0 | Trump +39 |
| Morning Consult | 11/10 - 11/12 | 64 | 14 | 9 | 6 | 2 | 2 | 1 | 1 | Trump +50 |
| Marquette | 11/2 - 11/7 | 54 | 12 | 12 | 4 | 1 | 2 | 0 | -- | Trump +42 |
| Trafalgar Group (R) | 11/3 - 11/5 | 50 | 13 | 15 | 4 | 5 | 4 | 3 | 0 | Trump +35 |

**All 2024 Republican Presidential Nomination Polling Data**



RCP POLL AVERAGE
### 2024 Republican Presidential Nomination

| 58.9 | Trump | +44.5 | 14.4 | DeSantis | 10.7 | Haley | 4.7 |
| 2.3 | Christie | | 2.3 | Scott | 0.8 | Burgum | 0.4 |
| -- | Pence | | | | | | |



| Poll | Date | Trump | DeSantis | Haley | Ramaswamy | Christie | Scott | Burgum | Hutchinson | Spread |
|------|------|-------|----------|-------|-----------|----------|-------|--------|------------|--------|
| RCP Average | | | | 4 | 10.7 | 4.7 | 2.3 | 2.3 | | |
| NBC News | | | | | | | | | | |
| Harvard-Harris | 11/15 - 11/16 | 67 | 9 | 8 | 2023 5 | 3 | – | April – | | Trump +58 |
| Economist/YouGov | 11/11 - 11/14 | 57 | 19 | 9 | 4 | 0 | 3 | 0 | 0 | Trump +38 |
| FOX News | 11/10 - 11/13 | 62 | 14 | 11 | 7 | 3 | -- | 0 | 1 | Trump +48 |
| Quinnipiac | 11/9 - 11/13 | 64 | 16 | 9 | 4 | 2 | -- | 1 | 0 | Trump +48 |
| Yahoo News | 11/9 - 11/13 | 54 | 15 | 10 | 5 | 2 | 2 | 0 | 0 | Trump +39 |
| Morning Consult | 11/10 - 11/12 | 64 | 14 | 9 | 6 | 2 | 2 | 1 | 1 | Trump +50 |
| Marquette | 11/2 - 11/7 | 54 | 12 | 12 | 4 | 1 | 2 | 0 | -- | Trump +42 |
| Trafalgar Group (R) | 11/3 - 11/5 | 50 | 13 | 15 | 4 | 5 | 4 | 3 | 0 | Trump +35 |
| Morning Consult | 11/3 - 11/5 | 63 | 15 | 8 | 7 | 3 | 2 | 0 | 0 | Trump +48 |
| I&I/TIPP | 11/1 - 11/3 | 60 | 13 | 5 | 7 | 3 | 2 | 1 | 0 | Trump +47 |
| CBS News | 10/31 - 11/3 | 61 | 18 | 9 | 5 | 2 | 4 | 1 | 1 | Trump +43 |
| The Messenger/HarrisX | 10/30 - 11/1 | 62 | 12 | 7 | 6 | 1 | 1 | 1 | 1 | Trump +50 |
| CNN | 10/27 - 11/2 | 61 | 17 | 10 | 4 | 2 | 3 | 0 | 1 | Trump +44 |
| Economist/YouGov | 10/28 - 10/31 | 56 | 17 | 8 | 5 | 1 | 1 | 0 | 1 | Trump +39 |
| Rasmussen Reports | 10/26 - 11/2 | 50 | 12 | 9 | 3 | 5 | 2 | 0 | 0 | Trump +38 |
| Morning Consult | 10/27 - 10/29 | 61 | 13 | 7 | 7 | 3 | 2 | 1 | 0 | Trump +48 |
| Quinnipiac | 10/26 - 10/30 | 64 | 15 | 8 | 3 | 3 | 3 | 1 | 0 | Trump +49 |
| The Messenger/HarrisX | 10/16 - 10/23 | 61 | 11 | 6 | 5 | 2 | 1 | 1 | 0 | Trump +50 |
| USA Today/Suffolk | 10/17 - 10/20 | 58 | 12 | 11 | 3 | 1 | 3 | 1 | 1 | Trump +46 |
| Morning Consult | 10/20 - 10/22 | 62 | 13 | 7 | 6 | 2 | 2 | 0 | 0 | Trump +49 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Harvard-Harris | 10/18 - 10/19 | 60 | 11 | 7 | 6 | 2 | 2 | 0 | 0 | Trump +49 |
| Emerson | 10/16 - 10/17 | 59 | 8 | 8 | 3 | 4 | 1 | 1 | 1 | Trump +51 |
| Yahoo News | 10/12 - 10/16 | 56 | 16 | 9 | 2 | 3 | 1 | 1 | 0 | Trump +40 |
| Morning Consult | 10/13 - 10/15 | 59 | 14 | 7 | 7 | 3 | 2 | 1 | 1 | Trump +45 |
| FOX News | 10/6 - 10/9 | 59 | 13 | 10 | 7 | 3 | 1 | 0 | 1 | Trump +46 |
| CNN | 10/4 - 10/9 | 58 | 17 | 8 | 4 | 2 | 2 | 1 | 0 | Trump +41 |
| The Messenger/HarrisX | 10/4 - 10/7 | 58 | 14 | 6 | 7 | 2 | 2 | 1 | 0 | Trump +44 |
| Morning Consult | 10/6 - 10/8 | 61 | 12 | 6 | 9 | 3 | 2 | 1 | 0 | Trump +49 |
| SurveyUSA | 9/30 - 10/3 | 65 | 9 | 5 | 8 | 3 | 2 | 1 | -- | Trump +56 |
| Economist/YouGov | 9/30 - 10/3 | 58 | 13 | 7 | 4 | 1 | 2 | 1 | 0 | Trump +45 |
| Morning Consult | 9/29 - 10/1 | 61 | 13 | 7 | 7 | 3 | 1 | 1 | 0 | Trump +48 |
| InsiderAdvantage | 9/29 - 8/30 | 50 | 15 | 14 | 3 | 5 | 2 | 1 | 1 | Trump +35 |
| The Messenger/HarrisX | 9/28 - 9/29 | 56 | 11 | 7 | 8 | 1 | 1 | 1 | 0 | Trump +45 |
| I&I/TIPP | 9/27 - 9/29 | 54 | 13 | 6 | 7 | 3 | 2 | 0 | 1 | Trump +41 |
| New York Post | 9/27 - 9/28 | 62 | 10 | 6 | 7 | -- | 3 | -- | -- | Trump +52 |
| Morning Consult | 9/28 - 9/28 | 63 | 12 | 5 | 7 | 3 | 2 | 1 | 0 | Trump +51 |
| Economist/YouGov | 9/23 - 9/26 | 53 | 14 | 7 | 5 | 2 | 3 | 0 | 0 | Trump +39 |
| Morning Consult | 9/22 - 9/24 | 58 | 15 | 7 | 9 | 2 | 2 | 1 | 1 | Trump +43 |
| Marquette | 9/18 - 9/25 | 56 | 12 | 6 | 4 | 1 | 2 | 0 | -- | Trump +44 |
| Monmouth** | 9/19 - 9/24 | 55 | 17 | 7 | 4 | 2 | 5 | 1 | 1 | Trump +38 |
| Trafalgar Group (R) | 9/19 - 9/21 | 56 | 14 | 4 | 6 | 3 | 3 | 3 | 0 | Trump +42 |
| ABC News/Wash Post | 9/15 - 9/20 | 54 | 15 | 7 | 3 | 3 | 4 | 0 | 0 | Trump +39 |
| NBC News | 9/15 - 9/19 | 59 | 16 | 7 | 2 | 4 | 3 | 0 | 1 | Trump +43 |
| Emerson | 9/17 - 9/18 | 59 | 12 | 3 | 7 | 5 | 2 | 1 | 1 | Trump +47 |
| The Messenger/HarrisX | 9/13 - 9/19 | 56 | 14 | 5 | 5 | 2 | 2 | 1 | 0 | Trump +42 |
| Yahoo News | 9/14 - 9/18 | 59 | 13 | 5 | 5 | 1 | 1 | 1 | 0 | Trump +46 |
| Morning Consult | 9/15 - 9/17 | 59 | 13 | 6 | 10 | 2 | 2 | 0 | 1 | Trump +46 |
| Harvard-Harris | 9/12 - 9/14 | 57 | 10 | 6 | 8 | 2 | 2 | 0 | 0 | Trump +47 |
| Economist/YouGov | 9/10 - 9/12 | 55 | 16 | 6 | 6 | 2 | 3 | 0 | 0 | Trump +39 |
| Reuters/Ipsos | 9/8 - 9/14 | 51 | 14 | 4 | 13 | 2 | 2 | 3 | 0 | Trump +37 |
| FOX News | 9/9 - 9/12 | 60 | 13 | 5 | 11 | 2 | 3 | 0 | 1 | Trump +47 |
| Quinnipiac | 9/7 - 9/11 | 62 | 12 | 5 | 6 | 2 | 3 | 0 | 1 | Trump +50 |
| The Messenger/HarrisX | 9/6 - 9/11 | 59 | 11 | 4 | 7 | 2 | 2 | 0 | 0 | Trump +48 |
| Morning Consult | 9/8 - 9/10 | 57 | 14 | 6 | 9 | 2 | 2 | 0 | 1 | Trump +43 |
| I&I/TIPP | 8/30 - 9/1 | 60 | 11 | 3 | 9 | 3 | 2 | 1 | 0 | Trump +49 |
| Rasmussen Reports | 8/29 - 8/31 | 45 | 9 | 7 | 5 | 9 | 4 | 0 | 0 | Trump +36 |
| CNN | 8/25 - 8/31 | 52 | 18 | 7 | 6 | 2 | 3 | 1 | 0 | Trump +34 |
| Wall Street Journal | 8/24 - 8/30 | 59 | 13 | 8 | 5 | 3 | 2 | 1 | 1 | Trump +46 |
| Morning Consult | 9/2 - 9/4 | 60 | 15 | 5 | 8 | 3 | 2 | 0 | 1 | Trump +45 |
| Economist/YouGov | 8/26 - 8/29 | 52 | 16 | 4 | 6 | 2 | 2 | 0 | 0 | Trump +36 |
| Morning Consult | 8/25 - 8/27 | 58 | 14 | 5 | 10 | 3 | 2 | 0 | 1 | Trump +44 |
| Emerson | 8/25 - 8/26 | 50 | 12 | 7 | 9 | 5 | 2 | 1 | 1 | Trump +38 |

| Pollster | Date | | | | | | | | | Result |
|---|---|---|---|---|---|---|---|---|---|---|
| The Messenger/HarrisX | 8/24 - 8/26 | 59 | 14 | 3 | 8 | 2 | 2 | 0 | 0 | Trump +45 |
| Reuters/Ipsos | 8/24 - 8/25 | 52 | 13 | 4 | 5 | 1 | 1 | 0 | 0 | Trump +39 |
| InsiderAdvantage | 8/24 - 8/24 | 45 | 18 | 11 | 7 | 4 | 3 | 1 | 1 | Trump +27 |
| Morning Consult | 8/24 - 8/24 | 58 | 14 | 3 | 11 | 4 | 3 | 0 | 0 | Trump +44 |
| New York Post | 8/23 - 8/24 | 61 | 9 | 2 | 5 | 1 | 3 | -- | -- | Trump +52 |
| Yahoo News | 8/17 - 8/21 | 52 | 12 | 3 | 8 | 2 | 4 | 1 | 0 | Trump +40 |
| InsiderAdvantage | 8/19 - 8/20 | 51 | 10 | 5 | 6 | 4 | 3 | 1 | 2 | Trump +41 |
| Morning Consult | 8/18 - 8/20 | 58 | 14 | 3 | 10 | 3 | 3 | 0 | 1 | Trump +44 |
| CBS News/YouGov | 8/16 - 8/18 | 62 | 16 | 2 | 7 | 3 | 3 | 1 | 1 | Trump +46 |
| Emerson | 8/16 - 8/17 | 56 | 10 | 2 | 10 | 3 | 2 | 1 | 1 | Trump +46 |
| FOX News | 8/11 - 8/14 | 53 | 16 | 4 | 11 | 3 | 3 | 1 | 0 | Trump +37 |
| Trafalgar Group (R) | 8/14 - 8/16 | 55 | 17 | 4 | 4 | 5 | 4 | 0 | 1 | Trump +38 |
| Economist/YouGov | 8/12 - 8/15 | 55 | 16 | 3 | 4 | 2 | 3 | 0 | 1 | Trump +39 |
| Quinnipiac | 8/10 - 8/14 | 57 | 18 | 3 | 5 | 3 | 3 | 0 | 1 | Trump +39 |
| Morning Consult | 8/11 - 8/13 | 57 | 16 | 3 | 9 | 3 | 3 | 1 | 1 | Trump +41 |
| I&I/TIPP | 8/2 - 8/4 | 57 | 12 | 4 | 8 | 1 | 2 | 0 | 0 | Trump +45 |
| Reuters/Ipsos | 8/2 - 8/3 | 47 | 13 | 5 | 7 | 0 | 2 | 0 | 1 | Trump +34 |
| Fairleigh Dickinson* | 7/31 - 8/7 | 58 | 15 | 3 | 3 | 5 | 2 | 1 | 0 | Trump +43 |
| Cygnal (R)* | 8/1 - 8/3 | 53 | 10 | 3 | 11 | 2 | 3 | 0 | 0 | Trump +42 |
| Morning Consult | 8/4 - 8/6 | 59 | 16 | 3 | 8 | 3 | 3 | 0 | 1 | Trump +43 |
| Morning Consult | 7/28 - 7/30 | 58 | 15 | 3 | 9 | 3 | 3 | 1 | 0 | Trump +43 |
| NY Times/Siena | 7/23 - 7/27 | 54 | 17 | 3 | 2 | 2 | 3 | 0 | 0 | Trump +37 |
| Economist/YouGov | 7/22 - 7/25 | 54 | 18 | 3 | 6 | 1 | 3 | 0 | 0 | Trump +36 |
| Morning Consult | 7/21 - 7/23 | 59 | 16 | 4 | 8 | 2 | 2 | 1 | 0 | Trump +43 |
| Rasmussen Reports | 7/18 - 7/20 | 57 | 13 | 4 | 3 | 5 | 4 | -- | 4 | Trump +44 |
| Harvard-Harris | 7/19 - 7/20 | 52 | 12 | 4 | 10 | 2 | 2 | 1 | 1 | Trump +40 |
| Monmouth** | 7/12 - 7/19 | 54 | 22 | 3 | 5 | 3 | 3 | 1 | 0 | Trump +32 |
| Quinnipiac | 7/13 - 7/17 | 54 | 25 | 4 | 2 | 3 | 3 | 0 | 0 | Trump +29 |
| Yahoo News | 7/13 - 7/17 | 48 | 23 | 3 | 3 | 1 | 4 | 1 | 0 | Trump +25 |
| Morning Consult | 7/14 - 7/16 | 55 | 20 | 4 | 8 | 3 | 2 | 0 | 0 | Trump +35 |
| Reuters/Ipsos | 7/11 - 7/17 | 47 | 19 | 3 | 9 | 3 | 2 | 0 | 0 | Trump +28 |
| Marquette | 7/7 - 7/12 | 46 | 22 | 6 | 1 | 1 | 4 | 1 | 1 | Trump +24 |
| Economist/YouGov | 7/8 - 7/11 | 48 | 22 | 3 | 2 | 2 | 3 | 0 | 0 | Trump +26 |
| I&I/TIPP | 7/5 - 7/7 | 53 | 14 | 3 | 7 | 2 | 3 | 0 | 1 | Trump +39 |
| Morning Consult | 7/7 - 7/9 | 56 | 17 | 3 | 8 | 3 | 3 | 0 | 1 | Trump +39 |
| FOX News | 6/23 - 6/26 | 56 | 22 | 3 | 5 | 1 | 4 | 0 | 1 | Trump +34 |
| Emerson | 6/19 - 6/20 | 59 | 21 | 4 | 2 | 2 | 2 | 1 | 1 | Trump +38 |
| NBC News | 6/16 - 6/20 | 51 | 22 | 4 | 3 | 5 | 3 | 0 | 2 | Trump +29 |
| Yahoo News | 6/16 - 6/20 | 48 | 24 | 2 | 2 | 3 | 4 | 0 | 0 | Trump +24 |
| Harvard-Harris | 6/14 - 6/15 | 59 | 14 | 4 | 3 | 2 | 2 | 0 | 0 | Trump +45 |
| CNN | 6/13 - 6/17 | 47 | 26 | 5 | 1 | 3 | 4 | 0 | 0 | Trump +21 |
| The Messenger/HarrisX | 6/14 - 6/15 | 53 | 17 | 3 | 2 | 2 | 4 | 0 | 1 | Trump +36 |
| Economist/YouGov | 6/10 - 6/13 | 51 | 21 | 4 | 1 | 2 | 3 | -- | -- | Trump +30 |
| Reuters/Ipsos | 6/9 - 6/12 | 43 | 22 | 3 | 3 | 2 | 2 | 1 | 0 | Trump +21 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Quinnipiac | 6/8 - 6/12 | 53 | 23 | 4 | 3 | 4 | 4 | 0 | 1 | Trump +30 |
| CBS News | 6/7 - 6/10 | 61 | 23 | 3 | 1 | 1 | 4 | 1 | 1 | Trump +38 |
| USA Today/Suffolk | 6/5 - 6/9 | 48 | 23 | 4 | -- | 2 | 6 | 0 | 1 | Trump +25 |
| I&I/TIPP | 5/31 - 6/2 | 55 | 19 | 3 | 2 | 1 | 3 | -- | 1 | Trump +36 |
| FOX News | 5/19 - 5/22 | 53 | 20 | 4 | 4 | 0 | 2 | -- | 0 | Trump +33 |
| Quinnipiac | 5/18 - 5/22 | 56 | 25 | 3 | 1 | 2 | 2 | -- | 0 | Trump +31 |
| CNN | 5/17 - 5/20 | 53 | 26 | 6 | 1 | 2 | 2 | 1 | 1 | Trump +27 |
| Harvard-Harris | 5/17 - 5/18 | 58 | 16 | 4 | -- | 1 | -- | 1 | Trump +42 |
| Marquette | 5/8 - 5/18 | 46 | 25 | 5 | 3 | 0 | 1 | -- | 0 | Trump +21 |
| Rasmussen Reports | 5/11 - 5/15 | 62 | 17 | 5 | 2 | 1 | 1 | -- | 3 | Trump +45 |
| Reuters/Ipsos | 5/9 - 5/15 | 49 | 21 | 4 | 4 | 1 | 1 | -- | 0 | Trump +28 |
| I&I/TIPP | 5/3 - 5/5 | 55 | 17 | 4 | 4 | 0 | 2 | -- | 1 | Trump +38 |
| ABC News/Wash Post | 4/28 - 5/3 | 53 | 25 | 6 | -- | -- | 4 | -- | 1 | Trump +28 |
| CBS News | 4/27 - 4/29 | 58 | 22 | 4 | 5 | 2 | 1 | -- | 1 | Trump +36 |
| Emerson | 4/24 - 4/25 | 62 | 16 | 3 | 3 | 2 | -- | -- | 2 | Trump +46 |
| FOX News | 4/21 - 4/24 | 53 | 21 | 4 | 3 | 1 | 2 | -- | 0 | Trump +32 |
| Reuters/Ipsos | 4/21 - 4/24 | 49 | 23 | 3 | 2 | 0 | 1 | -- | 0 | Trump +26 |
| Cygnal (R)* | 4/18 - 4/20 | 46 | 26 | 5 | 2 | -- | 2 | -- | 1 | Trump +20 |
| Harvard-Harris | 4/18 - 4/19 | 55 | 20 | 4 | 2 | -- | 1 | -- | 0 | Trump +35 |
| NBC News | 4/14 - 4/18 | 46 | 31 | 3 | 2 | -- | 3 | -- | 3 | Trump +15 |
| Wall Street Journal | 4/11 - 4/17 | 48 | 24 | 5 | 2 | 0 | 3 | -- | 0 | Trump +24 |
| Reuters/Ipsos | 4/5 - 4/6 | 58 | 21 | 1 | 1 | 0 | 1 | -- | 1 | Trump +37 |
| Reuters/Ipsos | 3/31 - 4/3 | 48 | 19 | 6 | -- | 2 | 1 | -- | -- | Trump +29 |
| Trafalgar Group (R) | 3/31 - 4/2 | 56 | 23 | 4 | 1 | -- | 1 | -- | -- | Trump +33 |
| InsiderAdvantage | 3/31 - 4/1 | 57 | 24 | 5 | 1 | 2 | 0 | -- | -- | Trump +33 |
| Yahoo News** | 3/30 - 3/31 | 52 | 21 | 5 | 1 | 2 | 1 | -- | -- | Trump +31 |
| I&I/TIPP | 3/29 - 3/31 | 47 | 23 | 4 | 1 | 1 | -- | -- | -- | Trump +24 |
| Cygnal (R)* | 3/26 - 3/27 | 42 | 29 | 4 | 1 | -- | 1 | -- | -- | Trump +13 |
| FOX News | 3/24 - 3/27 | 54 | 24 | 3 | 1 | 1 | 0 | -- | 1 | Trump +30 |
| Quinnipiac | 3/23 - 3/27 | 47 | 33 | 4 | 1 | 1 | 1 | -- | 0 | Trump +14 |
| Harvard-Harris | 3/22 - 3/23 | 50 | 24 | 5 | 0 | -- | 2 | -- | -- | Trump +26 |
| Trafalgar Group (R) | 3/22 - 3/25 | 44 | 30 | 5 | 0 | -- | 1 | -- | -- | Trump +14 |
| Marquette | 3/12 - 3/22 | 40 | 35 | 5 | -- | 0 | 0 | -- | 0 | Trump +5 |
| Monmouth | 3/16 - 3/20 | 44 | 36 | 6 | -- | -- | -- | -- | -- | Trump +8 |
| Yahoo News** | 3/16 - 3/20 | 44 | 28 | 5 | -- | 1 | -- | -- | -- | Trump +16 |
| Reuters/Ipsos | 3/14 - 3/20 | 44 | 30 | 3 | -- | -- | -- | -- | -- | Trump +14 |
| Trafalgar Group (R) | 3/14 - 3/19 | 44 | 32 | 5 | 1 | -- | 2 | -- | -- | Trump +12 |
| Quinnipiac | 3/9 - 3/13 | 46 | 32 | 5 | 0 | 1 | 1 | -- | 0 | Trump +14 |
| CNN | 3/8 - 3/12 | 37 | 39 | 7 | -- | -- | 2 | -- | 1 | DeSantis +2 |
| I&I/TIPP | 3/1 - 3/3 | 51 | 22 | 4 | 1 | 0 | -- | -- | -- | Trump +29 |
| Yahoo News** | 2/23 - 2/27 | 45 | 29 | 4 | -- | -- | 1 | -- | -- | Trump +16 |
| Emerson | 2/24 - 2/25 | 55 | 25 | 5 | -- | -- | -- | -- | -- | Trump +30 |
| Susquehanna | 2/19 - 2/26 | 29 | 27 | 10 | -- | -- | 1 | -- | -- | Trump +2 |
| FOX News | 2/19 - 2/22 | 43 | 28 | 7 | -- | -- | 1 | -- | 0 | Trump +15 |
| Harvard-Harris | 2/15 - 2/16 | 46 | 23 | 6 | -- | -- | 1 | -- | -- | Trump +23 |

11/20/2023, 3:46 PM

| Poll | Date | | | | | | | | Result |
|---|---|---|---|---|---|---|---|---|---|
| Quinnipiac | 2/9 - 2/14 | 42 | 36 | 5 | -- | -- | 1 | -- | 0 | Trump +6 |
| Reuters/Ipsos | 2/6 - 2/13 | 43 | 31 | 4 | -- | -- | -- | -- | -- | Trump +12 |
| Economist/YouGov | 2/4 - 2/7 | 42 | 32 | 5 | -- | -- | -- | -- | -- | Trump +10 |
| Yahoo News** | 2/2 - 2/6 | 37 | 35 | 5 | -- | 2 | -- | -- | -- | Trump +2 |
| I&I/TIPP | 2/1 - 2/3 | 50 | 27 | 1 | -- | 1 | -- | -- | -- | Trump +23 |
| Emerson | 1/19 - 1/21 | 55 | 29 | 3 | -- | -- | -- | -- | -- | Trump +26 |
| Harvard-Harris | 1/18 - 1/19 | 48 | 28 | 3 | -- | -- | 1 | -- | -- | Trump +20 |
| Economist/YouGov | 1/14 - 1/17 | 44 | 32 | 4 | -- | -- | -- | -- | -- | Trump +12 |
| Yahoo News** | 1/12 - 1/16 | 37 | 36 | 1 | -- | 3 | -- | -- | -- | Trump +1 |
| Cygnal (R)* | 12/12 - 12/14 | 40 | 35 | 4 | -- | 1 | 1 | -- | -- | Trump +5 |
| Harvard-Harris | 12/14 - 12/15 | 48 | 25 | 4 | -- | -- | 1 | -- | -- | Trump +23 |
| Economist/YouGov | 11/26 - 11/29 | 36 | 30 | 3 | -- | -- | -- | -- | -- | Trump +6 |
| Politico/Morning Consult | 11/18 - 11/20 | 45 | 30 | 2 | -- | 0 | 0 | -- | -- | Trump +15 |
| Emerson | 11/18 - 11/19 | 55 | 25 | 3 | -- | -- | -- | -- | -- | Trump +30 |
| Harvard-Harris | 11/16 - 11/17 | 46 | 28 | 2 | -- | -- | 1 | -- | -- | Trump +18 |
| Politico/Morning Consult | 11/10 - 11/14 | 47 | 33 | 1 | -- | 0 | 0 | -- | -- | Trump +14 |
| Politico/Morning Consult | 10/28 - 10/31 | 49 | 24 | 3 | -- | 1 | 0 | -- | -- | Trump +25 |
| Harvard-Harris | 10/12 - 10/13 | 55 | 17 | 2 | -- | -- | 1 | -- | -- | Trump +38 |
| NY Times/Siena | 10/9 - 10/12 | 49 | 26 | 3 | -- | -- | -- | -- | -- | Trump +23 |
| Politico/Morning Consult | 9/16 - 9/18 | 52 | 19 | 2 | -- | 1 | 1 | -- | -- | Trump +33 |
| I&I/TIPP | 9/7 - 9/9 | 54 | 15 | 2 | -- | 0 | 1 | -- | -- | Trump +39 |
| Harvard-Harris | 9/7 - 9/8 | 59 | 17 | 2 | -- | -- | 1 | -- | -- | Trump +42 |
| Politico/Morning Consult | 8/19 - 8/21 | 57 | 18 | 3 | -- | 1 | 1 | -- | -- | Trump +39 |
| Politico/Morning Consult | 8/10 - 8/10 | 56 | 18 | 2 | -- | 1 | 1 | -- | -- | Trump +38 |
| I&I/TIPP | 8/2 - 8/4 | 53 | 17 | 1 | -- | 2 | 0 | -- | -- | Trump +36 |
| Harvard-Harris | 7/27 - 7/28 | 52 | 19 | 5 | -- | -- | 1 | -- | -- | Trump +33 |
| USA Today/Suffolk | 7/22 - 7/25 | 43 | 34 | 3 | -- | 1 | -- | -- | -- | Trump +9 |
| Politico/Morning Consult | 7/15 - 7/17 | 53 | 23 | 2 | -- | 0 | 1 | -- | -- | Trump +30 |
| Politico/Morning Consult | 7/8 - 7/10 | 52 | 21 | 3 | -- | 1 | 0 | -- | -- | Trump +31 |
| NY Times/Siena | 7/5 - 7/7 | 49 | 25 | 6 | -- | -- | -- | -- | -- | Trump +24 |
| Harvard-Harris | 6/28 - 6/29 | 56 | 16 | 4 | -- | -- | 2 | -- | -- | Trump +40 |
| Emerson | 6/28 - 6/29 | 55 | 20 | 3 | -- | -- | -- | -- | -- | Trump +35 |
| Politico/Morning Consult | 6/24 - 6/26 | 51 | 23 | 2 | -- | 1 | 0 | -- | -- | Trump +28 |
| Politico/Morning Consult | 6/4 - 6/5 | 51 | 18 | 4 | -- | 1 | 1 | -- | -- | Trump +33 |
| Harvard-Harris | 5/18 - 5/19 | 41 | 12 | 4 | -- | -- | 1 | -- | -- | Trump +29 |
| I&I/TIPP | 4/4 - 4/6 | 49 | 15 | 3 | -- | -- | 1 | -- | -- | Trump +34 |
| Harvard-Harris | 4/20 - 4/21 | 58 | 13 | 3 | -- | -- | 1 | -- | -- | Trump +45 |
| Harvard-Harris | 3/23 - 3/24 | 59 | 10 | 3 | -- | -- | 2 | -- | -- | Trump +48 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Politico/Morning Consult | 3/18 - 3/21 | 54 | 14 | 5 | -- | -- | 0 | -- | -- | Trump +40 |
| Rasmussen Reports | 2/21 - 2/22 | 47 | 20 | 3 | -- | -- | -- | -- | -- | Trump +27 |
| Politico/Morning Consult | 1/22 - 1/23 | 49 | 14 | 2 | -- | 1 | 1 | -- | -- | Trump +35 |
| Harvard-Harris | 1/19 - 1/20 | 57 | 12 | -- | -- | -- | -- | -- | -- | Trump +45 |
| Reuters/Ipsos | 12/13 - 1/17 | 54 | 11 | 4 | -- | 2 | -- | -- | -- | Trump +43 |
| I&I/TIPP | 12/1 - 12/4 | 60 | 11 | 3 | -- | 1 | 1 | -- | -- | Trump +49 |
| Harvard-Harris | 11/30 - 12/2 | 67 | 8 | 4 | -- | -- | 1 | -- | -- | Trump +58 |
| Harvard-Harris | 10/27 - 10/28 | 47 | 10 | 6 | -- | -- | 3 | -- | -- | Trump +37 |
| Politico/Morning Consult | 10/8 - 10/11 | 47 | 12 | 3 | -- | -- | 1 | -- | -- | Trump +35 |
| Harvard-Harris | 9/15 - 9/16 | 58 | 9 | 3 | -- | -- | 1 | -- | -- | Trump +45 |
| Emerson | 8/30 - 9/1 | 67 | 10 | 7 | -- | -- | -- | -- | -- | Trump +57 |
| Politico/Morning Consult | 5/14 - 5/17 | 48 | 8 | 4 | -- | -- | 2 | -- | -- | Trump +35 |
| Harvard-Harris | 2/23 - 2/25 | 42 | -- | 8 | -- | -- | 3 | -- | -- | Trump +24 |
| Politico/Morning Consult | 2/14 - 2/15 | 53 | -- | 6 | -- | -- | -- | -- | -- | Trump +41 |
| Politico/Morning Consult | 1/8 - 1/11 | 42 | -- | 5 | -- | -- | 1 | -- | -- | Trump +26 |
| Politico/Morning Consult | 11/21 - 11/23 | 54 | -- | 4 | -- | -- | 1 | -- | -- | Trump +42 |

Advertisement



Get our best deal of the year! ✦✨ Subscribe for 99¢ every 4 weeks

**EXHIBIT O**

DEMOCRACY IN AMERICA

# Trump can appear on 2024 primary ballot in Minnesota, state Supreme Court rules

 By Patrick Marley

Updated November 8, 2023 at 6:33 p.m. EST  |  Published November 8, 2023 at 5:14 p.m. EST

The Minnesota Supreme Court ruled Wednesday that former president Donald Trump can appear on the primary ballot next year but left open the possibility he could be struck from the general election ballot because of the Jan. 6, 2021, attack on the U.S. Capitol.

The ruling offered both a setback and a glimmer of hope to those trying to remove Trump from ballots around the country. The Minnesota case is one of several interlocking challenges that argue Trump cannot serve again under Section 3 of the U.S. Constitution's 14th Amendment, which bars insurrectionists from holding office. Those bringing the lawsuits contend Trump incited an insurrection by urging his supporters to come to Washington and then telling them to go to the Capitol to "fight like hell" while Congress was meeting to certify Joe Biden's victory.

In a short court order, Minnesota Chief Justice Natalie E. Hudson said the justices are dismissing the case because the state's March 5 primary is "an internal party election to serve internal party purposes" that does not provide the final determination of who appears on the ballot for the general election in November 2024.

"And there is no state statute that prohibits a major political party from placing on the presidential nomination primary ballot, or sending delegates to the national convention supporting, a candidate who is ineligible to hold office," Hudson wrote.

Those who filed the lawsuit can later bring a new one to challenge whether Trump can appear on the ballot for the general election, according to the ruling. There were no noted dissents in the ruling, but two of the seven justices did not participate in the case.

Trump praised the ruling in a statement posted on his Truth Social platform: "Congratulations to all who fought this HOAX!" Trump campaign spokesman Steven Cheung in a separate statement called the cases "nothing more than strategic, un-Constitutional attempts to interfere with the election" by people who fear Trump will beat Biden next year.

A former Minnesota Supreme Court justice, a former co-chairman of a county Republican Party and others brought the lawsuit with the help of the election reform group Free Speech for People. In a statement, the group noted the court had not ruled on substantive issues, such as whether candidates for president are subject to Section 3 and

Get our best deal of the year! ✨

"We are disappointed by the court's decision," the group's legal director, Ron Fein, said in the statement. "However, the Minnesota Supreme Court explicitly recognized that the question of Donald Trump's disqualification for engaging in insurrection against the U.S. Constitution may be resolved at a later stage."

The 14th Amendment was adopted in 1868, three years after the end of the Civil War, to confer citizenship on those born or naturalized in the United States and to protect the civil rights of all Americans, including those who were formerly enslaved. The amendment also included the provision on insurrectionists to ensure members of the Confederacy did not take government positions.

Those who have brought lawsuits in Minnesota, Michigan and Colorado argue Trump can't run again because he fomented an insurrection. Trump disputes those claims, saying that the events of Jan. 6 did not amount to an insurrection and that he did not incite any unlawful activity that day. In addition, Trump has argued that Congress, not the judiciary, should be the one to determine who can serve as president.

Legal scholars are divided over whether Trump can be removed from the ballot and say the U.S. Supreme Court is likely to get involved if any state removes Trump from the ballot. A decision from the U.S. Supreme Court would resolve the issue for all states.

All sides have hoped the cases would be decided quickly because states will begin holding primaries and caucuses in January. The cases are politically and legally complicated, and they become increasingly fraught as Election Day approaches. The cases raise novel questions about the intentions of those who adopted the 14th Amendment, the power of courts and free-speech rights.

The Minnesota court's decision raised the possibility the matter would not be resolved quickly because it found the issue will not be ripe until after the primaries. The court kept Wednesday's order short so it could release it promptly because Minnesota's primary ballot needs to be finalized in January, Hudson wrote. A fuller opinion will be issued later.

Minnesota Secretary of State Steve Simon (D) in a statement said he was grateful the court ruled quickly. "We respect this decision and will uphold the outcome," he said.

Last week, a Colorado judge held a week-long hearing to determine whether Trump can appear on the ballot, and a Michigan judge is holding arguments Thursday to consider the same issue. Both judges are expected to issue rulings soon, and their decisions almost surely will be appealed to their states' top courts.

In addition, Texas tax consultant and long-shot presidential candidate John Anthony Castro has brought lawsuits across the country seeking to knock Trump off the ballot. On Tuesday, a federal magistrate judge in South Carolina recommended that the court throw out his lawsuit in that state.

Get our best deal of the year! ✦

rule Trump can appear on the ballot in some states but not others. The order on Wednesday did not wade into that issue, and the court may have to revisit it if anyone files a new challenge over Trump's ability to appear on the November 2024 ballot. By then, other courts probably will have ruled on the issues at the heart of the cases.



**EXHIBIT P**

SUNSET ROPER :: TAN RANCH
/ D / C + 2

$595

SHOP NOW

 Washington Examiner   *Follow*

## Trump can remain on Colorado primary ballot after 14th Amendment challenge, judge rules

Story by Kaelan Deese • 3h



Trump can remain on Colorado primary ballot after 14th Amendment challenge, judge rules
© Provided by Washington Examiner

Former President Donald Trump can appear on Colorado's 2024 election ballot, a state judge ruled Friday evening, siding against plaintiffs who said the Constitution forbids those who "engaged in insurrection" from holding office.

Colorado District Judge Sarah Wallace held that Section 3 of the 14th Amendment "did not intend to include the President as "an officer of the United States," according to her 102-page ruling.

**Massachusetts Will Cover Cost To Install Solar In These Zip Codes**

Ad  Homesolar Tips



**TRUMP'S BIGGEST ACCOMPLISHMENT COULD ALSO FUEL HIS 2024 DEFEAT**

Feedback

© 2023 Microsoft     Your Privacy Choices     Privacy & Cookies   Terms of use   Advertise

place Donald J. Trump on the presidential primary ballot when it certifies the ballot on January 5, 2024," Wallace wrote.

Similar lawsuits challenging Trump's ballot eligibility under the 14th Amendment have been stalled recently in Minnesota, Michigan, and New Hampshire.

The Minnesota Supreme Court evaded the question of whether Section 3 applies to Trump, who is so far dominating the Republican presidential primary. It dismissed a lawsuit to toss him off that state's primary ballot by saying that political parties can allow whomever they want to qualify for primaries but left the door open for a general election challenge if Trump becomes the GOP nominee.

A Michigan judge also dismissed another lawsuit seeking to bounce







▶ **Related video**: Judge rules Trump can be on 2024 Colorado ballot (KOAA Colorado Springs, CO)



Up next in 4...

KMGH Denver, CO

Judge rules Trump is eligible to appear on the...

**CLICK HERE TO READ MORE FROM THE WASHINGTON EXAMINER**

A similar lawsuit in New Hampshire, filed by lesser-known Republican candidate John Anthony Casey, was dismissed last month.

*This is a developing story and will be updated.*

**Tags:** 14th Amendment, January 6, Colorado, 2024 Elections, News

**Original Author:** Kaelan Deese

**Original Location:** Trump can remain on Colorado primary ballot after 14th Amendment challenge, judge rules

**Sponsored Content**

📧 Feedback

# REPORT OF RECEIPTS AND DISBURSEMENTS

**FEC FORM 3P**

BY AN AUTHORIZED COMMITTEE OF A CANDIDATE
FOR THE OFFICE OF PRESIDENT OR VICE PRESIDENT



EXHIBIT
**Q**

Office Use Only

---

**1. NAME OF COMMITTEE** (in full, type or print)

Example: If typing, type over the lines.  `12FE4M5`

Doug Burgum for America, Inc.

ADDRESS (number and street)     824 Milledge Cir

◄ Check if different than previously reported. (ACC)     Ste 101

Athens     CITY          GA  STATE      30606  ZIP CODE  –

**2. FEC IDENTIFICATION NUMBER** ▶   **C**   C00842302

---

**3. TYPE OF REPORT** (Choose One)

Check here if this is a Termination Report (TER) ☐

**Quarterly Reports:**

☐ April 15 (Q1)      ☒ October 15 (Q3)

☐ July 15 (Q2)      ☐ January 31 Year-End Report (YE)

**Monthly Reports:**

☐ Feb 20 (M2)    ☐ May 20 (M5)    ☐ Aug 20 (M8)    ☐ Nov 20 (M11)

☐ Mar 20 (M3)    ☐ Jun 20 (M6)    ☐ Sep 20 (M9)    ☐ Dec 20 (M12)

☐ Apr 20 (M4)    ☐ Jul 20 (M7)    ☐ Oct 20 (M10)    ☐ Jan 31 (YE)

☐ 12-Day Pre-Election Report for the Election on

M M / D D / Y Y Y Y   in the State of ____

☐ 30-Day Post-Election Report for the General Election on

M M / D D / Y Y Y Y

**4. IS THIS REPORT AN AMENDMENT?**   ☒ yes   ☐ no

**5. COVERING PERIOD**   M M / D D 01 / Y Y Y Y 2023   THROUGH   M M 09 / D D 30 / Y Y Y Y 2023

---

I certify that I have examined this Report and to the best of my knowledge and belief it is true, correct and complete.

Type or Print Name of Treasurer     Kilgore, Paul, , ,

Signature of Treasurer     *Kilgore, Paul, , ,*     Date   M M 10 / D D 20 / Y Y Y Y 2023

NOTE: Submission of false, erroneous, or incomplete information may subject the person signing this Report to the penalties of 52 U.S.C. §30109.
All previous versions of this form are obsolete and should no longer be used.

Office Use Only

FEC **Form 3P** (Rev. 05/2016)

Write or Type Committee Name

# Doug Burgum for America, Inc.

Report Covering the Period:    From:    M M `07` / D D `01` / Y Y Y Y `2023`    To:    M M `09` / D D `30` / Y Y Y Y `2023`

## SUMMARY

| | | |
|---|---|---:|
| 6. | CASH ON HAND AT BEGINNING OF REPORTING PERIOD ................................................ | **3653939.12** |
| 7. | TOTAL RECEIPTS THIS PERIOD <br> (From Line 22, Column A, Page 3) ....................................................................................... | **3411364.84** |
| 8. | SUBTOTAL <br> (Lines 6 and 7) ........................................................................................................................ | **7065303.96** |
| 9. | TOTAL DISBURSEMENTS THIS PERIOD <br> (From Line 30, Column A, Page 4) ....................................................................................... | **4742727.75** |
| 10. | CASH ON HAND AT CLOSE OF THE REPORTING PERIOD <br> (Subtract Line 9 from 8) ........................................................................................................ | **2322576.21** |
| 11. | DEBTS AND OBLIGATIONS OWED TO THE COMMITTEE <br> (Itemize All on Schedule C-P or Schedule D-P) ...................................................................... | **0.00** |
| 12. | DEBTS AND OBLIGATIONS OWED BY THE COMMITTEE <br> (Itemize All on Schedule C-P or Schedule D-P) ...................................................................... | **12200652.81** |
| 13. | EXPENDITURES SUBJECT TO LIMIITATION <br> (Use the worksheet on Page 8 to calculate this amount.) ......................................................... | **0.00** |

## NET ELECTION CYCLE-TO-DATE CONTRIBUTIONS AND EXPENDITURES

| | | |
|---|---|---:|
| 14. | NET CONTRIBUTIONS (Other than Loans) <br> (Subtract Line 28d, Column B on Page 4 from 17e, Column B on Page 3) .................................... | **2971890.91** |
| 15. | NET OPERATING EXPENDITURES <br> (Subtract Line 20a, Column B on Page 3 from 23, Column B on Page 4) .................................... | **12846967.51** |

# DETAILED SUMMARY PAGE

FEC **Form 3P** (Rev. 05/2016)  of Receipts

NAME OF COMMITEE (in Full)

## Doug Burgum for America, Inc.

Report Covering the Period:  From: M M 07 / D D 01 / Y Y Y Y 2023   To: M M 09 / D D 30 / Y Y Y Y 2023

| I. RECEIPTS | COLUMN A<br>Total This Period | COLUMN B<br>Election Cycle-to-Date |
|---|---|---|
| 16.  FEDERAL FUNDS (Itemize on Schedule A-P)............ | 0.00 | 0.00 |
| 17.  CONTRIBUTIONS (other than loans) FROM: | | |
| (a)  Individuals/Persons Other Than Political Committees | | |
| (i) itemized ......................................... | 944739.22 | 2341935.69 |
| (ii) unitemized ..................................... | 409278.57 | 593430.22 |
| (iii) Total contributions ........................ | 1354017.79 | 2935365.91 |
| (b)  Political Party Committees............................. | 0.00 | 0.00 |
| (c)  Other Political Committees ........................... | 39300.00 | 40600.00 |
| (d)  The Candidate.......................................... | 0.00 | 0.00 |
| (e)  TOTAL CONTRIBUTIONS (other than loans)<br>(Add 17(a), 17(b), 17(c) and 17(d)) .................... | 1393317.79 | 2975965.91 |
| 18.  TRANSFERS FROM OTHER AUTHORIZED COMMITTEES ................................................. | 0.00 | 0.00 |
| 19.  LOANS RECEIVED: | | |
| (a)  Loans Received From or Guaranteed by Candidate ............................................. | 2015000.00 | 12200652.81 |
| (b)  Other Loans............................................. | 0.00 | 0.00 |
| (c)  TOTAL LOANS (Add 19(a) and 19(b) ................ | 2015000.00 | 12200652.81 |
| 20.  OFFSETS TO EXPENDITURES<br>(Refunds, Rebates, etc.): | | |
| (a)  Operating ............................................... | 3047.05 | 3047.05 |
| (b)  Fundraising............................................. | 0.00 | 0.00 |
| (c)  Legal and Accounting ............................... | 0.00 | 0.00 |
| (d)  TOTAL OFFSETS TO EXPENDITURES<br>(Add 20(a), 20(b) and 20(c)) ......................... | 3047.05 | 3047.05 |
| 21.  OTHER RECEIPTS (Dividends, Interest, etc.)............ | 0.00 | 0.00 |
| 22.  TOTAL RECEIPTS<br>(Add 16, 17(e), 18, 19(c), 20(d) and 21) ..................... | 3411364.84 | 15179665.77 |

# DETAILED SUMMARY PAGE
of Disbursements and Contributed Items

FEC **Form 3P** (Rev. 05/2016)

NAME OF COMMITEE (in Full)

Doug Burgum for America, Inc.

Report Covering the Period:   From: **07** / **01** / **2023**   To: **09** / **30** / **2023**

| II. DISBURSEMENTS | COLUMN A<br>Total This Period | COLUMN B<br>Election Cycle-to-Date |
|---|---|---|
| 23. OPERATING EXPENDITURES | 4735652.75 | 12850014.56 |
| 24. TRANSFERS TO OTHER AUTHORIZED COMMITTEES | 0.00 | 0.00 |
| 25. FUNDRAISING DISBURSEMENTS | 0.00 | 0.00 |
| 26. EXEMPT LEGAL AND ACCOUNTING DISBURSEMENTS | 0.00 | 0.00 |
| 27. LOAN REPAYMENTS MADE: | | |
| (a) Repayments of Loans made or Guaranteed by Candidate | 0.00 | 0.00 |
| (b) Other Repayments | 0.00 | 0.00 |
| (c) TOTAL LOAN REPAYMENTS MADE (Add 27(a) and 27(b)) | 0.00 | 0.00 |
| 28. REFUNDS OF CONTRIBUTIONS TO: | | |
| (a) Individuals/Persons Other Than Political Committees | 475.00 | 475.00 |
| (b) Political Party Committees | 0.00 | 0.00 |
| (c) Other Political Committees | 3600.00 | 3600.00 |
| (d) TOTAL CONTRIBUTION REFUNDS (Add 28(a), 28(b) and 28(c)) | 4075.00 | 4075.00 |
| 29. OTHER DISBURSEMENTS | 3000.00 | 3000.00 |
| 30. TOTAL DISBURSEMENTS (Add 23, 24, 25, 26, 27(c), 28(d) and 29) | 4742727.75 | 12857089.56 |

## III. CONTRIBUTED ITEMS
### (Stock, Art Objects, Etc.)

| | | |
|---|---|---|
| 31. ITEMS ON HAND TO BE LIQUIDATED (Attach List) | 0.00 | |



EXHIBIT
**R**

# Everything You Need to Know About How the Iowa Caucuses Work

BY **LISSANDRA VILLA / DES MOINES, IOWA**

UPDATED: FEBRUARY 3, 2020 11:23 PM ET | ORIGINALLY PUBLISHED: FEBRUARY 2, 2020 7:00 AM EST

The 2020 presidential election officially kicked off on Monday night as Iowans headed to nearly 1,700 local caucus sites spread across the state to select their preference for President.

The first-in-the-nation caucuses are among the most important events in the Democratic nominating contest, with a wide-open field of candidates vying for victory in a state that can sink candidates' chances or slingshot them to the top of the field.

**Watch more from TIME**

Most of the frontrunners in this packed Democratic field have been locked in a tight race for more than a year, with campaigns and other organizations spending tens of millions on political ads, outreach campaigns and events—all in service of a single goal: getting Iowa voters to caucus on their behalf.

The results of the caucuses were badly delayed Monday night, reportedly due to a problem with a phone app used for the first time in 2020 to report results. As the night dragged on and uncertainty mounted, campaign representatives were summoned to an emergency meeting with the state party, according to a senior aide from Joe Biden's campaign. Campaigns were not told in advance about what the meeting was about.

"The integrity of the results is paramount. We have experienced a delay in the results due to quality checks and the fact that the [Iowa Democratic Party] is reporting out three data sets for the first time," Iowa Democratic Party communications director Mandy McClure said in a statement.

While the Iowa Democratic Party has been using the caucus system since the 1970s, this year will be slightly different. The party has changed some of the rules in an effort to make the caucuses more efficient and cut down on gamesmanship. "These are the most progressive changes we've made to our caucuses since they were created," said Troy Price, chair of the Iowa Democrats, in an interview with TIME at the party's headquarters this week.

Here is TIME's guide to the Iowa caucuses:

## What's a caucus?

A caucus is in effect a community meeting where neighbors show up to express their presidential preferences—and try to convince one another to take their side. Some states, like Iowa and Nevada, hold caucuses instead of primaries. The concepts are similar, but the mechanisms are different: caucus-goers make a presidential selection but, unlike in primaries, they do not cast a vote. (Caucuses are also run by state political parties, while primaries are run by state election officials.)

Like Democrats, the Iowa Republican Party will host a caucus on Feb. 3, too, but since President Donald Trump is largely uncontested, it will be much less of a spectacle this cycle.

## Who participates in caucuses?

All caucus-goers must be eligible to vote and registered for the party whose caucus they're attending. They also must be 18 years-old by Election Day (November 3, 2020); they need not be 18 on the day of the caucus.

The Iowa Democratic Party will host 1,678 precinct caucuses across the state. Caucuses are held in all kinds of locations, including school gymnasiums, churches, libraries, and union halls. For the most part, people participate in the caucus in the precinct in which they live, but this year, the Iowa Democrats are also offering close to 100 "satellite caucuses," in an effort to facilitate access for people.

## So, how does it work?

Generally, doors open by 6:30 Central Standard Time and the caucuses begin at 7 p.m., sharp. Once everyone arrives and checks in, all eligible participants are counted, and the games begin.

The process seems complicated from afar, but it's fairly intuitive: caucus-goers simply walk over and stand in the part of the room designated to their first-choice candidate. Once everyone has chosen a candidate (or chosen to remain undecided) caucus leaders count everyone and do a little math. Those

participants whose first-choice candidates fail to reach what's known as the "viability threshold"—typically 15% of the total present — must decide which candidate to support next, in a process called "realignment."

In years past, realignment was fraught, as caucus-goers would (often loudly) cajole and speechify in an effort to convince their friends and neighbors to join their preferred candidate. Since all caucus-goers were free agents—i.e. anyone could back any candidate they wanted during realignment—debate sometimes stretched late into the night.

But this year, the rules are a little different. In almost all instances, once someone has expressed her preference for a viable candidate, her selection is locked in. Caucus leaders will use "preference cards" to keep track of caucus-goers' choices, so a viable candidate's total number of supporters never drops below what it was on first alignment. In other words, when someone shows up and supports a viable candidate, that's it. She doesn't have to stick around for the next round.

Only those who support a candidate who did not reach the viability threshold are free agents. During the realignment, they have three main choices: they can support one of the already-viable candidates, try to convince other free agents to cluster together to push a previously-nonviable candidate over the viability threshold, or join an undecided group. (There are scenarios where multiple alignments are necessary, but mostly it's just the first and then the final.)

At the end of the night, state delegates are allocated to the candidates, according to the number of people who caucused for each.

## How do you know who wins?

This is where it could get confusing. The Iowa Democratic Party says it won't declare a winner; it will just report the results: first alignment numbers, final alignment numbers, and state delegate equivalent. The "winner" is usually considered the candidate who receives the most state delegates, because that's what actually matters in securing the nomination. But this year, those three

numbers could look very different, leading multiple candidates to attempt to claim victory. Some experts are preparing for mass confusion.

"It's going to be a disaster—you could conceivably have three different results at the end of the night," said Grant Woodard, a Des Moines attorney with experience as a Democratic strategist. He understands why the Iowa Democratic Party is releasing those numbers, but worries that people will want clarity: "It could just be confusing as all hell."

## What happens next?

The precinct-level delegates who were apportioned on the night of the caucuses will go on to county conventions in March. The delegates from the county conventions will go on to the congressional district conventions in April, as well as the state convention in June. Along the way, 27 district-level national delegates and four national alternates will emerge, as well as nine at-large national delegates and five Party Leaders and Elected Official (PLEO) delegates. This is a long, drawn-out process, but the upshot is that Iowa will send delegates supporting various presidential candidates to the Democratic National Convention in July.

## Why does Iowa always caucus first?

Mostly because it insists on it. And that's come under criticism. Why, one former presidential candidate argued, should a state that doesn't reflect the diversity of the nation at large repeatedly get outsized say in who the Democratic nominee is? There's also an argument that caucuses can be inherently undemocratic because of how difficult it is for people to attend. Caucus-goers must be available, sometimes for hours, on caucus night, which can present conflicts for people with disabilities, or who work irregular hours, or can't afford childcare. But for now, both Iowa Democrats and Republicans agree that they'll work to retain their first-in-nation status.

"It all starts with Iowa. Iowa is the moment where you first get judged. It is an assessment of your ability to organize voters in each of these individual caucus

locales, it is a test of your appeal and your message," said Scott Mulhauser, a longtime national Democratic strategist. "It all starts now."

## Read TIME's coverage of the Iowa caucuses

- Meet the Unofficial Iowa Caucus Whisperer Helping to Shape the Race
- Disability Advocates Push to Make the Iowa Caucuses More Accessible
- As Democratic Primaries Kick Off, President Trump Launches His Own Show
- Facing First 2020 Test, Joe Biden Is Doing Things His Way
- Joe Biden Positions Himself as the Anti-Bernie Sanders in Iowa and Beyond
- How the Democratic Party Missed the Power of Bernie Sanders—Again
- Inside Bernie Sanders' Iowa Ground Game
- How Pete Buttigieg's Sexuality Shaped His Campaign
- Pete Buttigieg's Closing Argument in Iowa is All About Tone
- Why Elizabeth Warren Connects With Young Girls in Iowa
- Elizabeth Warren Is Stranded in Washington. Can Her Iowa Ground Game Lift Her to Victory?
- Amy Klobuchar Distances Herself From Her Progressive Rivals, Emphasizes Kitchen Table Issues in Closing Iowa Pitch
- 'Who Better to Talk About My Mom?' Amy Klobuchar's Daughter Takes on the Iowa Campaign Trail
- Andrew Yang Considers Who His Supporters Will Back if He's Not Viable in Iowa



**WRITE TO LISSANDRA VILLA AT** LISSANDRA.VILLA@TIME.COM.

# Who's running for president in 2024? Here's a rundown of the candidates



EXHIBIT
S

Updated: 11:22 AM CST Nov 14, 2023

**DES MOINES, Iowa —**

Here's the list of competing for the Republican and Democratic nominations:

## Who's running for president in 2024?

Advertisement

## Democrats*

- Joe Biden
- Dean Phillips
- Marianne Williamson

**More political coverage from KCCI**

## Republicans*

- Doug Burgum
- Chris Christie
- Ron DeSantis
- Nikki Haley
- Asa Hutchinson
- Vivek Ramaswamy
- David Stuckenberg
- Donald Trump

## Third party

- Robert F. Kennedy Jr.

*— Candidates listed in alphabetical order*

## LAS VEGAS SUN

# 2024 presidential primary field set in Nevada with GOP honoring caucus

**By Casey Harrison (contact)**

Tuesday, Oct. 17, 2023 | 4:40 p.m.

EXHIBIT
T

The field is set for Nevada's several presidential nominating conventions.

President Joe Biden leads a field of 13 Democratic candidates while Republican notables like former Vice President Mike Pence, former United Nations ambassador Nikki Haley and South Carolina U.S. Sen. Tim Scott comprise the seven-person field for their respective party's Presidential Preference Primary scheduled for Feb. 6, 2024.

That's in addition to six other Republicans who have opted to bypass the state-run primary in favor of the Nevada Republican Party's Feb. 8 caucuses, the latter of which chairman Michael McDonald has asserted would be the method in which the state's delegates will be awarded at the Republican National Convention July 15-18 in Milwaukee. Leading the caucus field is former President Donald Trump — the perceived front-runner for the GOP nomination — as well as Florida Gov. Ron DeSantis, Ohio businessman Vivek Ramaswamy, former New Jersey Gov. Chris Christie, North Carolina Gov. Doug Burgum, and business advisor Ryan Binkley.

Filing periods for both the state-run primaries and the state GOP-backed caucuses ran from Oct. 2 through Monday. The Sun reported in August that candidates must pay $55,000 to participate in the caucuses, of which $20,000 can be rebated if the candidate campaigns with the Nevada GOP.

"All serious candidates are participating in the First in the West Caucus, as it is the only contest under party rules that allows candidates to earn delegates to the Republican National Convention," read a Tuesday news release from the Nevada GOP. "We invite all Nevadans to participate in the First in the West Caucus and look forward to informative discussions that will help us select the candidates who will best represent the values and interests of our great state."

Like the Nevada GOP's caucuses, the primaries are a closed election for major parties in Nevada, meaning only voters who are registered with the corresponding party will only be able to participate. In a separate release Monday, the Nevada Secretary of State's office urged Nevada voters to check that their registration information is up to date ahead of the 2024 election cycle.

The caucuses are also only open to members of the Nevada Republican Party, and party officials have said they prefer running their own nominating convention because officials can require voter identification, use paper ballots, tabulate results the night of the caucuses and not use mail-in ballots or deal with same-day voter registration. Registered voters participating in the primaries, meanwhile, will be able to utilize early voting from Jan. 27 through Feb. 2.

Same-day registration is also available up until the close of polls on Election Day, according to the Secretary of State's office, allowing those with outdated registrations to update their party affiliation

Those interested in registering to vote or updating their registration can visit RegisterTo a mail-in registration form, or register at any Nevada Department of Motor Vehicles off office, or certain social service agencies or college campuses. The Secretary of State's C

**DINING:** The legendary Peter Luger Steak House lands in Las Vegas

Nevadans who are active registered voters — unless they've opted out — will receive a ballot for the Presidential Preference Primary by mail.

Democratic Presidential Preference Primary candidates

Joseph Biden
Gabriel Cornejo
Superpayaseria Crystalroc
Brent Foutz
John Haywood
Stephen Leon
Stephen Lyons
Jason Palmer
Mark Prascak
Armando Perez-Serrato
Donald Picard
Marianne Williamson
Republican Presidential Preference Primary candidates

John Castro
Heath Fulkerson
Nikki Haley
Donald Kjornes
Michael Pence
Timothy Scott
Hirsh Singh
Republican "First in the West" Caucus candidates

Donald Trump
Vivek Ramaswamy
Ron DeSantis
Chris Christie
Doug Burgum
Ryan Binkley

## Most Popular

| 1 | Formula One could have done better communicating with Las Vegans, CEO says |
|---|---|
| 2 | Golden Knights blanked by Pittsburgh, 3-0 |
| 3 | Rosalynn Carter, outspoken former first lady, dead at 96 |
| 4 | Bishop Gorman grad Dorian Thompson-Robinson rallies Browns to win |
| 5 | Reactions to the death of Rosalynn Carter, former first lady and global humanitarian |

## Scene on the Sun





[Featured Galleries](#)



[Raiders fall to Dolphins](#)



[Max Verstappen Wins Las Vegas Grand Prix](#)

[Formula 1 at The Sphere](#)
[More photos »](#)

AP Headlines

UN report says world is racing to well past warming limit as carbon emissions rise instead of plunge
November 20, 2023, 8:19 a.m.

Marlo Thomas celebrates Thanks and Giving's 20th year and $1 billion raised for St. Jude hospital
November 20, 2023, 8:17 a.m.

AP-Scorecard
November 20, 2023, 8:15 a.m.

Stock market today: Wall Street drifts higher at the start of a holiday-shortened week
November 20, 2023, 8:12 a.m.

Grains, Livestock mixed
November 20, 2023, 8:06 a.m.

Former British Prime Minister Boris Johnson 'bamboozled' by science, COVID-19 inquiry told
November 20, 2023, 8:05 a.m.

A dozen fresh-picked holiday gift ideas for gardeners
November 20, 2023, 7:58 a.m.



Locally owned and independent since 1950; Winner of the <u>Pulitzer Prize for Public Service</u>, <u>best news website in the nation</u> & <u>DuPont Award for broadcast journalism</u>

Follow us:



© Las Vegas Sun, 2023, All Rights Reserved



**The Republican Party in the Virgin Islands**

About Our Party     2024 Virgin Islands Caucus     Contact

EXHIBIT
U



# 2024 Virgin Islands Republican Caucus

As part of the campaign for the Republican presidential nomination in 2024, the Republican Party in the Virgin Islands will hold a caucus using ranked-choice voting to give Virgin Islanders a say in the nomination campaign.

The caucus will also serve as the regularly scheduled election of certain party leadership and officer positions.

Separate from the caucus, six delegates and six alternate delegates to the 2024 Republican National Convention will be chosen to represent the territory at the convention that formally nominates the candidates for president and vice president, adopts a national platform and approves national rules for the party.

To conduct the 2024 Virgin Islands caucus, a set of rules was adopted to govern the caucus and delegate selection process. The key dates and points are as follows:

- Administering the caucus is the Caucus Committee.
- The caucus date is February 8, 2024 with voting precincts on St. Croix, St. John and St. Thomas.
- The caucus ballot will include four contests: the Republican nomination for president of the United States, national committeewoman, national committeeman, five members of the Republican State Committee from the electoral district of St. Croix, and five members of the Republican State Committee from the electoral district of St. Thomas-St. John.
- Chris Christie, Nikki Haley, Doug Burgum, Ron DeSantis, Perry Johnson, Vivek Ramaswamy, Tim Scott, and Donald J. Trump qualified for the ballot before the September 30, 2023, filing deadline. Additional candidates may qualify after September 30, 2023, and before January 1, 2024, with payment of a $50,000 fee.
- Candidates for national committeewoman and national committeeman must file by the ninetieth calendar day preceding the caucus.
- Candidates for Republican State Committee must file by the sixtieth calendar day preceding the caucus.
- In the election for the Republican nomination for president of the United States, the caucus will utilize preferential voting, also known as ranked-choice voting. For more information on preferential voting, visit this website.
- Absentee and mail-in voting is generally not allowed. Active-duty military stationed outside the Virgin Islands may be granted an absentee ballot.
- The six delegates and six alternate delegates representing the Virgin Islands at the 2024 Republican National Convention will be elected by the Delegate Selection Committee. The committee consists of the party's chairman, the national committeewoman elected in the 2024 caucus, the national committeeman elected in the 2024 caucus, the party's executive director, and the party's Finance Committee chairman.
- The six elected delegates and three automatic delegates (party chairman, national committeeman, and national committeewoman) will be awarded proportionally, unless a candidate receives more than 50 percent of the vote. A candidate receiving more than 50 percent will receive all nine delegates. The nine delegates are bound through to the first round of voting.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

2023 NOV 15 AM 8: 09

JOHN ANTHONY CASTRO )
12 Park Place, Mansfield, TX 76063 )
                )
    Plaintiff, )
                )
*v.* )
                )
SC ELECTIONS COMMISSION, )
EXECUTIVE DIRECTOR HOWARD M. )
KNAPP )
State Election Commission )
1122 Lady Street, Suite 500 )
Columbia, SC 29201 )
                )
SOUTH CAROLINA REPUBLICAN PARTY )
1913 Marion Street, Columbia, SC 29201 )
                )
DONALD JOHN TRUMP )
1100 S. Ocean Blvd, Palm Beach, FL 33480 )
                )
    Defendants. )

Case No. 3:23-cv-04501

**EXHIBIT
V**

## PLAINTIFF'S VERIFIED OBJECTION TO THE
## MAGISTRATE JUDGE'S RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), Plaintiff John Anthony Castro, *pro se*, submits this objection, which is verified pursuant to 28 U.S.C. § 1746.

### THE BALLOT CLAIM

The crux of the U.S. Magistrate's ruling on the Ballot Claim rests entirely on an out-of-context statement from the U.S. Court of Appeals for the Fourth Circuit in *Goldman v. Brink.* In that case, the Fourth Circuit found that Goldman did not have standing because he "did not demonstrate that he intends or intended to run for the House of Delegates."[1] Plaintiff agrees that

---

[1] *Goldman v. Brink*, 41 F.4th 366, 369 (4th Cir. 2022),

1

if one is not, at minimum, intending to run, then one does not have standing. Nevertheless, the U.S. Magistrate Judge ignored the substance of the Fourth Circuit's ruling and instead misleadingly and deceptively only quoted the preceding sentence: that Goldman "failed to show that the defendants' actions have harmed his chances of winning." Of course he was unable to show that: because he was ***not a candidate***. Goldman had no intention of running. Goldman did not declare he was running. Goldman certainly had not applied to be on the ballot.

In fact, Plaintiff argues that this *Goldman v. Brink* does the exact opposite of what the U.S. Magistrate argues: it proves that because, in this case, Plaintiff has declared his candidacy and applied to be on the ballot pending the constitutional challenge to the fee, he has Article III standing in accordance with Fourth Circuit jurisprudence.

More importantly, the U.S. Supreme Court has spoken on this precise issue in *U.S. v. SCRAP*. In that case, the U.S. Supreme Court thoroughly explained and refuted the U.S. Magistrate's fabricated heightened injury requirement for Article III standing:

> "[Defendant] urges us to limit standing to those who have been 'significantly' affected by [state] action. But, even if we could begin to define what such a test would mean, we think it ***fundamentally misconceived***. 'Injury in fact' reflects the statutory requirement that a person be 'adversely affected' or 'aggrieved,' and it serves to distinguish a person with a direct stake in the outcome of a litigation — ***even though small*** — from a person with a mere interest in the problem. We have allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a ***fraction of a vote***, *see Baker v. Carr… **a $5 fine** and costs, see McGowan v. Maryland…* and ***a $1.50 poll tax***, *Harper v. Virginia Bd. of Elections…* As Professor Davis has put it: 'The basic idea that comes out in numerous cases is that an ***identifiable trifle*** is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation.'"[2]

Utilizing out-of-context quotes from the Fourth Circuit while ignoring the on-point substance of the Fourth Circuit that directly contradicted her assertion, the U.S. Magistrate attempts to pull the wool over the U.S. District Judge's eyes by manufacturing a heightened injury

---

[2] *U.S. v. SCRAP*, 412 U.S. 669, 690 (1973).

standard that the Fourth Circuit has never asserted and that the U.S. Supreme Court expressly and unambiguously rejected a half-century ago.[3]

## OBJECTIONS TO OTHER ASPECTS OF THE RULING

The U.S. Magistrate again cherry-picks out-of-context quotes from *Drake v. Obama* for the proposition that one must prove a "potential loss of an election." That was not the Ninth Circuit's holding. The Ninth Circuit found that the plaintiffs in that case were not candidates at the time the case was filed because the election was already over:

> "The original complaint was filed on January 20, 2009, at 3:26 p.m. Pacific Standard Time, *after* President Obama was officially sworn in as President. The First Amended Complaint was filed on July 14, 2009. Whichever complaint is considered, the 2008 general election was over when it was filed. Once the 2008 election was over and the President sworn in, [Plaintiffs] were no longer "candidates" for the 2008 general election. Moreover, they have not alleged any interest in running against President Obama in the future. Therefore, none of the plaintiffs could claim that they would be injured by the 'potential loss of an election.'"[4]

As the U.S. District Judge can see from the full wording of the Ninth Circuit case, the U.S. Magistrate's recommendation is reckless at best and knowingly deceptive at worst.

The U.S. Magistrate also resolves factual ambiguities in favor of Defendants when she found that Plaintiff was "stating vaguely that he has spoken to thousands of voters who are presumably located somewhere in the United States." Not only has Plaintiff spoken to thousands of South Carolina voters,[5] Plaintiff has received global media coverage that has been viewed by

---

[3] The U.S. Magistrate does the same when she asserts that Plaintiff's union support is irrelevant because the state's unionization rate is only 1.7%. The irony is that engaging in this kind of inquiry regarding the level of support of a candidate to discredit him from the bench violates the Political Question Doctrine since there is a lack of judicially manageable standards. That is why the U.S. Supreme Court passed on the issue in *U.S. v. SCRAP* and emphasized that a fraction of a vote or $1 poll tax was enough to create an injury-in-fact. Plaintiff asserts the Political Question Doctrine applies to that analysis making any ruling on that basis invalid as a matter of law to preserve that issue for appellate review.

[4] *Drake v. Obama*, 664 F.3d 774, 783–84 (9th Cir. 2011).

[5] Verified statement pursuant to 28 U.S.C. § 1746.

3

hundreds of thousands of South Carolina Republican voters. *See* Exhibit A, Affidavit of Candidacy and Media Coverage.

The U.S. Magistrate then cherry-picks out-of-context again with Plaintiff's testimony in New Hampshire. Plaintiff merely acknowledged that, at the time the case was originally filed several months ago, he was a "longshot." However, since then, the Washington Post, Newsweek, and other news agencies agreed to stop referring to Plaintiff as a longshot since he now has more name recognition than Asa Hutchison and Doug Burgum among Republican voters.

The U.S. Magistrate then distinguishes Plaintiff's supporting case law on the facts rather than the law, which is not the proper manner by which to dismantle an opponent's supporting case law.

<u>EQUAL PROTECTION CLAIM</u>

The U.S. Magistrate misses the mark entirely on this analysis by conflating a due process challenge based on burdensomeness with an equal protection challenge based on lack of uniformity.

To refute the equal protection challenge, the U.S. Magistrate first cites *Anderson v. Celebrezze*. While Plaintiff commends the U.S. Magistrate for at least identifying a case that dealt with an *Equal Protection* challenge, it misses the point. *Anderson v. Celebrezze* was about having different deadlines for major party candidates versus independent candidates. Mr. Anderson complained that the earlier deadline for his independent candidacy was unfair, but the state had legitimate grounds for treating independent differently due to the known operational mechanics of the major parties who hold their conventions in late summer and early fall. Because the state had a rational explanation for the difference in treatment, it was upheld. In a Fourteenth Amendment Equal Protection challenge, a rational state interest suffices to uphold a statute against a non-

suspect class. Thereafter, however, the U.S. Magistrate then goes astray and cites a litany of cases where state Presidential ballot access laws were upheld based on due process burdensome challenges.

A more on-point case is *Bush v. Gore* where the U.S. Supreme Court found that the differences in recounting methods among the various Florida counties violated Bush's right to equal protection under the Fourteenth Amendment. The U.S. Supreme Court found that the Fourteenth Amendment required a state to have uniform ballot and recounting procedures to satisfy Fourteenth Amendment Equal Protection.

Plaintiff is, in essence, making the same argument but stating that the various methods of accessing the Presidential ballot among the states violates his substantive right to due process and equal protection under the Fifth Amendment, which applies at the federal level.

In other words, Plaintiff's legal theory is identical to that of *Bush v. Gore* except that it does not rely on the Fourteenth Amendment Equal Protection, which requires intra-state consistency in rules; it relies on the Fifth Amendment Equal Protection, which requires national consistency in the rules among all states.[6] In fact, as before, a case cited by the U.S. Magistrate Judge actually supports Plaintiff's position. The Magistrate cited *William v. Rhodes* that held "a number of facially valid election laws may operate in tandem to produce impermissible barriers."

---

[6] A favorable ruling would require the federal government to enact Presidential ballot access laws and regulations to create national uniformity consistent with the Fifth Amendment. This is why Plaintiff cited the Election Clause in the U.S. Constitution to dispel the myth that each state can have its own separate and distinct Presidential ballot access laws. There can and should be laws and regulations governing Presidential ballot access, but the inconsistency among the states violates Plaintiff's Fifth Amendment right to due process and equal protection. As such, they should be struck down until such time that the federal government creates laws and rules in their place. This is an unprecedented legal theory of first impression, but it is, in fact, indisputably supported by the clear text of the U.S. Constitution. Plaintiff understands the impact this could have. It would create a path for independent candidates to compete. Of course, the *status quo* would be fiercely opposed to this as they are the beneficiaries of the 50-state mismatch system that only the established political parties' national infrastructures can efficiently compete within. In other words, the *status quo* prefers the system that is violative of equal protection because it perpetuates the duopolized two-party system. Any conclusion that the inconsistency of state Presidential ballot access laws do not violate Equal Protection and are permissible rests solely in case law rather than constitutional text because there is no textual constitutional basis upon which to base a contrary conclusion.

Now, in that case, the U.S. Supreme Court was analyzing California's election laws and finding that, although each one analyzed separately in a vacuum were valid, when viewed as a whole, they were violative of the U.S. Constitution. The same here. Each state's Presidential ballot access laws, when analyzed separately in a vacuum, are facially valid; however, when viewed as a whole and taking into account the gross inconsistencies from state-to-state, are violative of Plaintiff's Fifth Amendment Right to Equal Protection. No one ever having the wisdom or intellect to spot this and challenge it is no excuse for a court to say it does not violate the U.S. Constitution when it very clearly violates the U.S. Constitution.

This is what happens when power is abused. SCGOP decided to abuse its power and set a $50,000 ballot access fee. Now, Plaintiff is pursuing a legal strategy to completely upend the entire duopolized political system. This could have all been avoided if power had not been abused.

It should also be noted that Plaintiff has not paid the $50,000 ballot access fee. After the judge in New Hampshire ruled that Plaintiff did not have standing despite having paid the ballot access fee, Plaintiff put a stop payment on the check. As such, Plaintiff's request for emergency injunctive relief is not moot.

## REQUESTED RELIEF

Plaintiff requests the U.S. District Court Judge to deny Defendant Donald John Trump's motion to dismiss and to find Plaintiff has an injury-in-fact bestowing upon him Article III standing to bring this cause of action.

Moreover, Plaintiff requests the U.S. District Court Judge to find that, although this state's Presidential ballot access laws, aside from the challenged fee, are facially valid, that there exists inconsistency among the several states that warrants this Court exploring the Fifth Amendment Equal Protection claim further and denying any motion to dismiss that claim as well.

6

Lastly, Plaintiff requests the U.S. District Court Judge to find that, because the $50,000 ballot access fee is unconstitutionally burdensome, the state should be directed to print Plaintiff's name on the South Carolina ballot pending resolution of this case. There is no harm to Defendant SCGOP in doing so.

Dated: November 12, 2023.

Respectfully submitted,

By: /s/ John Anthony Castro
John Anthony Castro
12 Park Place
Mansfield, TX 76063
(202) 594 – 4344
J.Castro@JohnCastro.com
**Plaintiff *Pro Se***

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I John Anthony Castro, verify under penalty of perjury, that the all of the statements of fact and law herein are true and correct.

Executed on November 12, 2023.

/s/ John Anthony Castro
John Anthony Castro

## **CERTIFICATE OF SERVICE**

On November 12, 2023, I submitted the foregoing document with the Clerk of this Court either by mail, email, or CM/ECF. It is further certified that all other parties are registered CM/ECF users and will be served via that system.

/s/ John Anthony Castro
John Anthony Castro

7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

JOHN ANTHONY CASTRO                )
12 Park Place, Mansfield, TX 76063         )
                                                             )
     Plaintiff,                                  )
                                                             )
v.                                                          )
                                                             )
SC ELECTIONS COMMISSION,            )
EXECUTIVE DIRECTOR HOWARD M.     )
KNAPP                                               )    Case No. 3:23-cv-04501
State Election Commission                    )
1122 Lady Street, Suite 500               )
Columbia, SC 29201                           )
                                                             )
SOUTH CAROLINA REPUBLICAN PARTY  )
1913 Marion Street, Columbia, SC 29201  )
                                                             )
DONALD JOHN TRUMP                   )
1100 S. Ocean Blvd, Palm Beach, FL 33480  )
                                                             )
     Defendants.                               )

**AFFIDAVIT OF CAMPAIGN EXPENSES AND MEDIA COVERAGE**

I, John Anthony Castro, declare as follows:

1. I am the plaintiff in the present case, a U.S. citizen, a 2024 Republican Presidential Primary Candidate, and am ballot-placed in Nevada and New Hampshire. Arizona law confirms I will be on the ballot once I file on Monday, November 13, 2023.

2. I have also incurred expenses associated with campaigning in this state, launched my own online show called the Truth Addict, have digitally targeted voters in this state, and have had online interactions with thousands of voters in this state. To the extent the state permits a failed primary candidate to run as an independent in the general election, I intend to do

1

so or challenge as unconstitutional the prohibition against such. As such, I will maintain "standing" throughout the course of this litigation.

3. I intend to pay a nominal fee to appear on the ballots of Montana (only $4000), West Virginia (only $2500), Delaware (only $12,000), and Kansas (only $4000) as well as every other state that permits a simple payment to access the ballot.

4. This is a portion of the unpaid *earned* media coverage my campaign activities have received to-date:

    a. Associated Press: https://apnews.com/article/new-hampshire-presidential-primary-2024-5bd66ceac3df40f3b0ec7676422f40bc

    b. Reuters: https://www.reuters.com/world/us/us-supreme-court-rebuffs-long-shot-candidates-bid-disqualify-trump-2024-2023-10-02/

    c. Boston Globe: https://www.bostonglobe.com/2023/10/30/metro/judge-dismisses-lawsuit-that-sought-block-trump-nh-ballot/

    d. NBC News: https://www.nbcnews.com/politics/donald-trump/live-blog/live-updates-trump-indictment-classified-documents-rcna88494

    e. NBC News: https://www.nbcnews.com/politics/2024-election/big-names-perennial-candidates-mix-new-hampshires-presidential-filing-rcna119994

    f. CNN: https://www.cnn.com/2023/10/02/politics/donald-trump-fourteenth-amendment-ballot-case-supreme-court/index.html

    g. CNN: https://edition.cnn.com/politics/live-news/trump-fraud-trial-new-york-10-02-23/h_d677487e65da843f8d1cc988015786cf

h. Fox News: https://www.foxnews.com/politics/push-block-trump-new-hampshire-ballot-received-coldly-state-gop-leaders

i. ABC News: https://abcnews.go.com/Politics/group-sues-block-trump-2024-ballot-citing-14th/story?id=102964534

j. ABC News: https://abcnews.go.com/Politics/wireStory/groups-seek-constitutions-insurrection-clause-block-trump-2024-102823096

k. ABC News: https://abcnews.go.com/Politics/wireStory/filing-period-new-hampshire-presidential-primary-opens-103883184

l. New York Times: https://www.nytimes.com/2023/08/30/us/politics/trump-14th-amendment.html

m. New York Times: https://www.nytimes.com/2023/09/06/us/politics/trump-colorado-lawsuit-14-amendment.html

n. New York Times: https://www.nytimes.com/2023/09/18/us/politics/trump-california-ballot.html

o. PBS: https://www.pbs.org/newshour/politics/liberal-groups-seek-to-use-the-14th-amendment-to-block-trump-from-2024-ballots

p. Politico: https://www.politico.com/news/2023/09/01/fourteenth-amendment-insurrection-clause-trump-00113790

q. Politico: https://www.politico.com/newsletters/politico-nightly/2023/09/07/the-battle-thats-tearing-the-texas-gop-apart-00114616

r. The Hill: https://thehill.com/homenews/ap/ap-politics/ap-filing-period-for-new-hampshire-presidential-primary-opens/

s. Newsweek: https://www.newsweek.com/republican-threatens-trump-legal-hell-that-could-kick-him-off-ballot-1824471

t. Newsweek: https://www.newsweek.com/republican-warns-trump-removed-ballot-john-anthony-castro-1829913

u. Newsweek: https://www.newsweek.com/donald-trump-gets-good-news-supreme-court-1831419

v. Newsweek: https://www.newsweek.com/supreme-court-decide-whether-kick-trump-off-ballot-1824577

w. Newsweek: https://www.newsweek.com/trump-challenger-has-backup-plan-if-supreme-court-wont-kick-him-off-ballot-1829821

x. Newsweek: https://www.newsweek.com/trump-tries-silence-member-his-inner-circle-colorado-ballot-case-1837968

y. Newsweek: https://www.newsweek.com/donald-trump-ballot-access-legal-challenge-republican-claims-1830624

z. Newsweek: https://www.newsweek.com/donald-trump-14th-amendment-taint-jury-pool-1825246

aa. Newsweek: https://www.newsweek.com/full-list-states-trying-kick-trump-off-ballot-where-cases-stand-1837398

bb. Newsweek: https://www.newsweek.com/donald-trump-14th-amendment-jan6-2024-election-1824937

cc. Vox: https://www.vox.com/politics/23880607/trump-14th-amendment-lawsuits-federalist-society

dd. New York Post: https://nypost.com/2023/10/02/supreme-court-declines-to-hear-bid-to-disqualify-trump-from-2024-election/

ee. Washington Times: https://www.washingtontimes.com/news/2023/sep/5/john-anthony-castro-write-gop-presidential-candida/

ff. Washington Times: https://www.washingtontimes.com/news/2023/aug/31/liberal-groups-seek-to-use-constitutions-insurrect/

gg. Washington Times: https://www.washingtontimes.com/news/2023/oct/11/new-hampshires-presidential-primary-filing-period-/

hh. American Military News: https://americanmilitarynews.com/2023/10/supreme-court-rejects-case-to-disqualify-trump-in-2024-presidential-race/

ii. The New York Sun: https://www.nysun.com/article/effort-to-disqualify-trump-will-soon-get-court-hearing-as-adversary-seeks-to-make-him-go-begging-to-supreme-court

jj. The Arizona Republic: https://www.azcentral.com/story/news/politics/arizona/2023/10/06/arizona-law-could-guarantee-trump-on-2024-ballot-if-qualified/71077077007/

.

kk. ABA Law Journal: https://www.abajournal.com/news/article/candidate-with-2-
law-degrees-files-suits-to-keep-trump-off-the-ballot-a-different-challenge-is-
tossed

ll. CBC (Cancada): https://www.cbc.ca/news/world/trump-14th-amendment-
challenges-1.7012321

mm.        Portland Press Herald: https://www.pressherald.com/2023/09/07/texas-
republican-files-suit-in-effort-to-keep-trump-off-maines-presidential-ballot/

nn. The Oklahoman:
https://www.oklahoman.com/story/news/politics/government/2023/10/12/donald-
trump-oklahoma-disqualification-lawsuit-dismissed/71147982007/

oo. Pennsylvania Capital Star: https://www.penncapital-star.com/campaigns-
elections/trump-can-run-in-nh-primary-despite-jan-6-involvement-ag-and-
secretary-of-state-say/

pp. Ballot Access News: https://ballot-access.org/2023/10/12/john-anthony-castro-
dismisses-his-idaho-lawsuit-on-trump-ballot-access/

qq. Ballot Access News: https://ballot-access.org/2023/10/12/john-anthony-castro-
files-brief-in-eleventh-circuit-in-florida-trump-ballot-access-case/

rr. The Providence Journal:
https://www.providencejournal.com/story/news/politics/2023/10/28/trump-
battles-lawsuit-to-keep-him-off-rhode-island-presidential-ballot/71362011007/

ss. Las Vegas Sun: https://lasvegassun.com/news/2023/oct/10/trump-to-participate-
in-nevada-gop-caucus-bypass-p/

tt. Fox News 13 Utah: https://www.fox13now.com/news/local-news/lawsuit-seeks-to-keep-trump-off-the-ballot-in-utah

uu. KOAT: https://www.koat.com/article/federal-lawsuit-remove-donald-trump-new-mexico-ballots/45102809

vv. KGET: https://www.kget.com/news/politics/ap-filing-period-for-new-hampshire-presidential-primary-opens/

ww. WBOY: https://www.wboy.com/news/west-virginia/west-virginia-politics/wvgop-wants-to-intervene-in-effort-to-remove-trump-from-ballot/amp/

xx. WTRF: https://www.wtrf.com/top-stories/capito-calls-lawsuit-to-keep-trump-off-west-virginia-ballot-ridiculous-and-says-its-bound-to-lose-in-court/amp/

yy. WMUR: https://www.wmur.com/amp/article/presidential-candidate-from-texas-sues-to-keep-trump-off-nh-ballot/45601317

zz. WMUR: https://www.wmur.com/amp/article/new-hampshire-donald-trump-ballot-lawsuit-dismiss/45682757

aaa. KOCO ABC News 5: https://www.koco.com/amp/article/oklahoma-republican-party-lawyers-up-trump-presidential-ballot/45273414

bbb. Bangor Daily News: https://www.bangordailynews.com/2023/09/07/politics/john-anthony-castro-trump-ballot-challenge/

ccc. WV News: https://www.wvnews.com/news/wvnews/republican-candidate-files-lawsuit-to-remove-donald-trump-from-presidential-ballot-in-west-virginia-and/article_739765f8-fe36-5ea2-bc15-bb05857abb77.html

ddd.      Nebraska Examiner: https://nebraskaexaminer.com/2023/09/13/trump-can-run-in-nh-primary-despite-jan-6-involvement-ag-and-secretary-of-state-say/

eee.      The State: https://www.thestate.com/news/politics-government/article279511574.html

fff. Scripps News: https://scrippsnews.com/stories/new-mexico-lawsuit-joins-other-bids-to-keep-trump-off-state-ballots/

ggg.      19FortyFive: https://www.19fortyfive.com/2023/10/he-could-be-disqualified-donald-trump-has-a-14th-amendment-problem/

hhh.      19FortyFive: https://www.19fortyfive.com/2023/10/not-disqualified-yet-donald-trump-was-just-saved-by-the-supreme-court/

iii. 19FortyFive: https://www.19fortyfive.com/2023/09/justices-to-decide-whether-to-take-the-trump-14th-amendment-case/

5.   I have personal first-hand knowledge of all factual matters set forth in this document, and, if called upon to testify or give oral arguments, I would competently do so.

6.   Pursuant to 28 U.S.C. § 1746 and state, I verify under penalty of perjury that the entirety of the foregoing document is true and correct.

Executed on November 12, 2023.

/s/ John Anthony Castro
John Anthony Castro

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

PRIORITY MAIL EXPRESS
LEGAL FLAT RATE ENVELOPE
POSTAGE REQUIRED

# PRIORITY
# MAIL
# EXPRESS®

## LEGAL FLAT
## RATE ENVELOPE

ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP



PS10001000059



EP13L July 2022
OD: 15 x 9.5

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

11/14/23 4:40 pm
DR

FOR DOMESTIC AND
PLACE MAILI

- Guaranteed delivery
- Guaranteed delivery
- USPS Tracking® serv
  and many internation
- Pick up available.
- Domestic shipments
  (restrictions apply).‡
- Signature included u

* Money Back Guarantee to U.S
  select international destinatio
  See DMM at pe.usp
† Money Back Guarantee for U.
‡ Insurance does not cover cer
  Domestic Mail Manual at http

WHEN USED INTERNATIONALLY, A CUST



US POSTAGE & FEES PAID
PRIORITY MAIL EXPRESS
ZONE 5 FLAT-RATE ENVELOPE
ComBasPrice
9900532
FROM 75240
0429001490531
stamps endicia
1/16/2023

## PRIORITY MAIL EXPRESS 1-DAY™

John Castro
Castro & Co.
13155 Noel Road, Suite 900
Dallas TX 75240-6882

**0007**
(202) 594-4344

WAIVER OF SIGNATURE

SHIP
TO:   U.S. Federal District Clerk
      901 Richland St
      Columbia SC 29201-2328

**USPS TRACKING #**



9470 1112 0620 4888 0429 06



UNITED STATES
POSTAL SERVICE.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express® shipments.
Misuse may be a violation of federal law. This package is not for resale. EP13L © U.S. Postal Service; July 2022; All rights reserved.



**UNITED STATES POSTAL SERVICE**®

**PRIORITY**
**MAIL**
**EXPRESS**®

EGAL FLAT RATE ENVELOPE

RATE ■ ANY WEIGHT

chedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP

SIT US AT USPS.COM®

DER FREE SUPPLIES ONLINE



PS10001000059

EP13L July 2022
OD: 15 x 9.5

**GUARANTEED\* ▪ TRACKED ▪ INSURED**



**SOS**



# Secretary Benson releases 2024 presidential primary candidate list

November 13, 2023

**Media Contact:**

> ## Cheri Hardmon
>
> Senior Press Secretary
>
> HardmonC@Michigan.gov
>
> 517-643-7236

**LANSING, Mich. –** Secretary of State Jocelyn Benson today released the 2024 presidential primary candidate list as required by Michigan law.

Under state law, the Secretary of State is required to issue a list of individuals "generally advocated by the national news media to be potential presidential candidates" for the Republican and Democratic parties for the presidential primary election.

The Secretary of State has identified the following candidates (listed alphabetically) as potential presidential candidates in 2024:

## Democratic Party

- Joe Biden
- Dean Phillips
- Marianne Williamson

## Republican Party

- Doug Burgum

- Chris Christie

- Ron DeSantis

- Nikki Haley

- Asa Hutchinson

- Vivek Ramaswamy

- Donald Trump

"Two months ago, I made clear that under Michigan law, anyone generally advocated by the national news media to be a candidate for the Republican or Democratic nomination for president is listed on the ballot for the February 2024 primary unless a court rules otherwise," **Secretary Benson said**. "Accordingly, today, as required by statute, we are publicly posting the names of the candidates who qualify under Michigan law to be listed on the ballot as a candidate for president in their respective party's primary. Barring a court order, these candidates will be included on Michigan's presidential primary ballot in 2024 unless they withdraw their names from consideration."

The chairs of the Michigan Democratic and Republican parties now have until 4 p.m. Nov. 14 to add names of other candidates to the candidate list for their party. A candidate identified on either the Secretary of State's list or the party chairperson's candidate listing who wishes either to designate a different political party or to withdraw as a candidate has until 4 p.m. Dec. 8 to notify the Michigan Bureau of Elections of that decision.

Candidates not placed on the list by the Secretary of State or the party chairs may gain access to the Michigan presidential primary ballot if they file a nominating petition with the Secretary of State no later than 4 p.m. Dec. 8.

The Michigan presidential primary will be Feb. 27, 2024. Along with the candidates listed on the ballot, voters also may choose "uncommitted" as an option. The deadline for primary election ballots to be sent to military and overseas voters is Jan. 13, 2024, and absent voter ballots must be printed by Jan. 18, 2024.

More information on **ballot access for presidential candidates** and other issues related to the 2024 elections is available on the Michigan Department of State website at **Michigan.gov/Elections**.

# # #

MI Newswire          Secretary of State          Elections

Secretary of State          News Article

# Related News

## Secretary of State hosts final Road to Restoration driver's license clinic of 2023 in Dearborn Heights

The Michigan Department of State (MDOS) joined partners at Hype Athletics in Dearborn Heights on Thursday for the final Road to Restoration driver's license clinic of 2023.

## Statement of Secretary Benson on Michigan primary ballot rulings issued today

Today, Secretary of State Jocelyn Benson made the following statement regarding the Michigan Court of Claims' rulings in three lawsuits regarding Donald Trump's eligibility to appear on the 2024 Presidential Primary ballot in Michigan

## Secretary Benson calls for federal, state laws to protect elections at bipartisan U.S. Senate AI Insight Forum

Michigan Secretary of State Jocelyn Benson today represented the nation's secretaries of state at U.S. Senate Majority Leader Chuck Schumer's bipartisan AI Insight Forum on Democracy and Elections.

## Early voting period complete in participating communities, polls open tomorrow for local elections

Secretary of State Jocelyn Benson announced the successful conclusion of the early voting period at jurisdictions that conducted early voting pilots ahead of elections tomorrow, Nov. 7, 2023.

## Department of State takes action against Dearborn driver education provider



**EXHIBIT X**

**Chairwoman Kristina Karamo**

November 14, 2023
Mr. Jonathan Brater
Michigan Bureau of Elections
Richard Austin Building
1st Floor
430 W. Allegan
Lansing, MI 48918

Dear Mr. Brater,

Per MCL 168.614a the Michigan Republican Party chair is to submit "a list of individuals whom they consider to be potential presidential candidates". Below is that list of individuals.

| Candidate | Committee Name | Address |
|-----------|----------------|---------|
| Ryan Binkley | Binkley for President | 6841 Virginia Parkway Suite 103-190 McKinney, TX 75071 |
| Doug Burgum | Doug Burgum for America | 824 S. Milledge Ave. Ste. 101 Athens, GA 30605 |
| Chris Christie | Chris Christie for President, Inc. | 613 Washington Blvd., #1381 Jersey City, NJ 07301 |
| Ron Desantis | Ron Desantis for President | PO Box 3696 Tallahassee, FL 32315 |
| Nikki Haley | Nikki Haley for President | 186 Seven Farms Dr. Ste. F-370 Daniel Island, SC 29492 |
| Vivek Ramaswamy | Vivek 2024 | PO Box 20209 Columbus, OH 43220 |
| Donald J. Trump | Donald J. Trump for President | PO Box 13570 Arlington, VA 22219 |

Kristina E. Karamo

Kristina Karamo

Chairwoman

Michigan Republican Party



EXHIBIT
**Y**

# Ballot Access Information for Presidential Candidates Seeking Office in 2024

[Public Act 2 of 2023/Senate Bill 13](#), signed into law in 2023, moved the presidential primary date from the current statutory date of March 12, 2024, to February 27, 2024. The Act will take effect after 90 days have passed from the date of the legislature's adjournment for the year on November 14, 2023, which is February 13, 2024.

Michigan election law governs the ballot access procedures for candidates who seek the office of U.S. President. As these procedures are subject to change by the State Legislature, presidential candidates interested in participating in Michigan's February 27, 2024, primary election or November 5, 2024, general election are encouraged to consult our website, [Michigan.gov/Elections](#), for updates.

## February 27, 2024 Presidential Primary

Michigan's February 27, 2024, Presidential Primary is limited to eligible candidates who affiliate with the two major political parties, the Democratic and Republican Parties. MCL 168.613a. The Secretary of State is required to issue a "list of the individuals generally advocated by the national news media to be potential candidates" for each major political party's nomination by 4:00 p.m. on November 13, 2023.[1] MCL 168.614a(1). Thereafter, the state chairperson of each major political party must file a "list of individuals whom they consider to be potential presidential candidates for that political party" with the Secretary of State no later than 4:00 p.m. on November 14, 2023. MCL 168.614a(2).

The Secretary of State shall make both lists available to the public and shall notify the candidates identified on each list of the provisions of the Michigan

---

[1] Deadlines falling on a Saturday, Sunday or legal holiday are automatically moved to the next business day.  MCL 168.13.



election law that govern the Presidential Primary. MCL 168.614a(3). Candidates identified on either list who wish to participate in Michigan's Presidential Primary are not required to do anything further to secure a place on the ballot. MCL 168.615a(1). The ballot will include each major party's candidates appearing on either list and an option for voters to select "uncommitted." MCL 168.615a(3).

A person identified on either the Secretary of State's or party chairperson's candidate listing may withdraw from Michigan's Presidential Primary or designate a different political party by filing an affidavit with the Secretary of State no later than 4:00 p.m. on <u>December 8, 2023,</u> stating that:

- "(Candidate's name) is not a presidential candidate."  In these circumstances, the Secretary of State will not allow the candidate's name to be printed on the February 27, 2024, Primary Ballot; or

- The candidate's party preference is different than the party listed in the Secretary of State's notice to the candidate. In these circumstances, the Secretary of State will: (1) cause the candidate's name to be printed on the appropriate primary ballot, if the preferred party is a major political party, or (2) not permit the candidate's name to be printed on the presidential primary ballot if the candidate's preferred party is not a major political party. MCL 168.615a(1).

An individual who is **not** listed as a potential presidential candidate by the Secretary of State or a state party chairperson who wishes to appear on Michigan's Presidential Primary ballot must file a nominating petition with the Secretary of State no later than 4:00 p.m. on <u>December 8, 2023</u>. MCL 168.615a(2). Petitions cannot be circulated prior to <u>October 1, 2023</u>. *Id.*  The number of valid signatures required on a nominating petition for a candidate is "not less than ½ of 1% of the total votes cast in the state at the previous presidential election for the presidential candidate of the political party for which the individual is seeking nomination." *Id.* The minimum number of valid signatures required on a nominating petition for a Democratic Party candidate is 14,020; for a Republican Party candidate, the minimum number of valid signatures is 13,249.

# November 5, 2024 General Election

The November general election ballot will combine the major party presidential nominees, presidential nominees named by the minor parties qualified to appear on Michigan's general election ballot, and presidential candidates who choose to run without political party affiliation. Write-in candidates who seek the office of U.S. President are also eligible to participate in the general election.

# Presidential Candidates Affiliated with a Major Party

The names and addresses of the Democratic and Republican Parties' nominees for offices of president and vice-president must be certified by the chairperson and the secretary of the party's state central committee to the Secretary of State within one business day after the conclusion of the party's state convention or national convention (whichever is later).

In addition, the chairperson and secretary of the party's state central committee must forward to the Secretary of State a certificate containing the names and addresses of the party's presidential electors. (The qualifications that candidates for presidential elector must satisfy are described below.) The certificate must be hand-delivered or sent to the Secretary of State by certified or registered mail within one business day after the conclusion of the party's state convention. (MCL 168.42, 591, and 686).

# Presidential Candidates Affiliated with a Minor Party

For minor parties who are qualified to appear on the general election ballot in Michigan[2], the names, and addresses of the party's nominees for the

---

[2] The minor political parties currently qualified to appear on the November 2024 General Election ballot are: Libertarian, U.S. Taxpayers, Green, Natural Law, and Working Class parties.

offices of president and vice-president must be certified by the chairperson and secretary of the party's state central committee to the Secretary of State within one business day after the conclusion of the party's state convention or national convention (whichever is later).

In addition, the chairperson and secretary of the party's state central committee must forward to the Department of State, Bureau of Elections a certificate containing the names and addresses of the party's presidential electors. (The qualifications that candidates for presidential elector must satisfy are described below.) The certificate must be hand-delivered or sent to the Secretary of State by certified or registered mail within one business day after the conclusion of the party's state convention. (MCL 168.42 and 686).

A political party may appear on the general election ballot in Michigan by virtue of the voter support accorded the party at the last general election or by filing a "new political party" petition. For further information on the procedures which govern political party ballot access, see the publication, New Political Party Qualification (January 2019).

## Presidential Candidates without Political Party Affiliation

A presidential candidate without political party affiliation must submit a qualifying petition bearing a sufficient number of valid signatures, the name and address of his or her running mate, and the names, and addresses of his or her presidential electors. The qualifying petition must be filed no later than 4:00 p.m. on July 18, 2024. MCL 168.590c. The name and address of the candidate's running mate and the names and addresses of his or her presidential electors must be filed no later than August 31, 2024. MCL 168.590d. All documents must be filed with the Department of State's Bureau of Elections.

- The minimum number of valid signatures required on the qualifying petition is 30,000; up to 60,000 signatures can be submitted to cover the minimum number of valid signatures required. MCL 168.544f. Of



the signatures submitted on the petition, there must be at least 100 signatures from each of at least ½ of the congressional districts in the state. MCL 168.590b.

- Any signatures appearing on the qualifying petition which are dated more than 180 days prior to the date the petition is filed are invalid. MCL 168.590b.

- A candidate who wishes to withdraw his or her petition must submit a written notice of withdrawal to the Department of State's Bureau of Elections no later than <u>4:00 p.m. on July 21, 2024</u>. MCL 168.590c.

- A person who files a qualifying petition cannot appear on the ballot as a partisan candidate for any office for the remainder of the calendar year. MCL 168.590g. In addition, a person who files a partisan nominating petition or filing fee as a candidate of a political party or who is nominated by a political party convention, committee, or caucus and accepts the nomination cannot file a qualifying petition for the remainder of the calendar year. MCL 168.692a.

## Write-in Candidates for President

Write-in votes cast for a candidate for president are tallied and certified as votes for the candidate's presidential electors only if the candidate forwards the name of his or her running mate, a list of presidential electors, and a "Declaration of Intent" form to the Department of State's Bureau of Election by <u>August 31, 2024</u>.  Write-in votes cast for an individual seeking the office of U.S. President who fails to file all of the required documents are not counted. MCL 168.590d.

## Presidential Electors:  Qualifications and Eligibility

- A presidential candidate's slate of electors must equal the number of U.S. House members and U.S. Senators elected in Michigan.

- Michigan election law, MCL 168.41, provides the following:

No person shall be eligible to be an elector of president and vice-president who shall not have been a citizen of the United States for at least 10 years and a resident and registered elector of the congressional district for an elector representing a congressional district, or of the state, for an elector representing the state at large for at least 1 year prior to the election. No senator or representative, or person holding an office of trust or profit under the United States, shall be appointed an elector, as provided in section 1 of article 2 of the United States constitution.

# Additional Information

If you have questions regarding the information presented here, please contact this office. Answers to your questions will also be found in the Michigan election law, which may be viewed at legislature.mi.gov.

Michigan Department of State
Bureau of Elections
P.O. Box 20126
Lansing, MI 48901-0726
Phone: (517) 335-3234 or (800) 292-5973
Fax: (517) 335-3235
Email:  Elections@Michigan.gov
Web:  Michigan.gov/Elections



**IDAHO**
PRESIDENTIAL CAUCUS

Counties | Presidential Candidates

EXHIBIT
**Z**



# Idaho Republican Party
# Presidential Caucus

March 2, 2024        Statewide in Idaho        RSVP

# The 2024 Caucus

### Idaho Republican Presidential Caucus        Saturday        March 2, 2024

Idaho Republican State Central Committee overwhelmingly voted to choose delegates for the 2024 Republican National Convention's Presidential Nominating contest through a caucus system, adopting a caucus proposal at our summer meeting in Challis, Idaho.

This vote moves Idaho into the early stages of the Republican Presidential nominating fight — allowing Idaho Republicans to vote before Super Tuesday.

Commentators and political pundits expect this coming year's race for the Republican nomination to be hotly contested, with every delegate selected playing a key role in the ultimate outcome.

Recognizing the importance of voter participation and accessibility, the State Central Committee has also



# REPUBLICAN PRESIDENTIAL CANDIDATE DECLARATION OF CANDIDACY

For a candidate to be placed on the official ballot for the Idaho Republican Presidential Caucus, he or she shall submit a $50,000.00 filing fee and declaration of candidacy to the Idaho Republican Party no later than 90 days prior to the caucus date.
*(Rules of the Idaho Republican Party, Article V, Section 2)*

The Idaho Republican Presidential Caucus will be held the first Saturday in March of a Presidential election year (March 2, 2024).

## Oath of Candidacy

I, _____ hereby declare that I intend to be a candidate for President of the United States on the 2024 Republican Presidential Caucus ballot in the State of Idaho. I further declare that I am legally qualified to serve under the provisions of the United States Constitution.

I further declare that I reside at _____
in the City of _____, State of _____.


_____          _____
Signature                                                                        Date

## Filing Fee

A filing fee of $50,000.00 is required for candidates filing to be on the Idaho Republican Presidential Caucus ballot. Submit filing fee and Declaration of Candidacy form to:

> Idaho Republican Party
> P.O. Box 2267
> Boise, ID 83701

## Notary Public or Authorized Officer

State of _____

County of _____

Signed and sworn to before me this _____ day of _____, 20_____, by

(SEAL/STAMP)

_____
*Printed Name of Candidate*

_____
*Signature of Notary or Public Official*
*My commission expires _____*



**IDAHO**
PRESIDENTIAL CAUCUS

Counties | Presidential Candidates | RSVP | News

Presidential Candidates



# About the Caucus

## What is a Caucus?

The first Saturday in March, the day of Idaho's Republican Presidential Caucus, every county in the state will hold a County Caucus. The counties will invite Republican candidates and voters to attend and participate. Voting will be conducted by secret ballot. Delegates for the Republican National Convention will be awarded proportionally according to the outcome of the statewide votes in the Idaho Republican Presidential Caucus with the provison that any candidate who receives more than 50% of the statewide vote total will be awarded all the Idaho delegates for the Republican National Convention.

The 2024 Idaho Republican Presidential Nominating Caucus is a Firehouse Caucus. A Firehouse Caucus is one round of voting, not multiple rounds of voting, so it will be a more efficient process than the caucus in 2012.

The Idaho Republican Presidential Nomination Caucus will result in 32 pledged delegates to the Republican National Convention, allocated according to the County Caucus voting—possibly with all delegates pledged to one Presidential candidate.

# 2024 Republican Presidential Candidates



| Counties | Presidential Candidates | RSVP | News |







### Donald J. Trump

Donald John Trump is an American politician, media personality, and businessman who served as the 45th president of the United States from 2017 …

### Ron DeSantis

Ron DeSantis is an American politician, U.S. Navy officer, and former Congressman of Florida's 6th congressional district. He currently serves as Florida's 46th governor.

### Candidate Placeholder

## Resources for Presidential Candidate Campaigns

Information for Presidential Campaigns and Declaration of Candidacy form

DECLARATION OF CANDIDACY FORM            IDGOP PRESIDENTIAL CAUCUS RULES

https://www.columbiamissourian.com/news/elections/missouri-gop-to-choose-presidential-pick-by-caucus-in-2024-heres-how-that-works/article_4b20436a-62df-11ee-81ae-d787873a04cc.html

# Missouri GOP to choose presidential pick by caucus in 2024. Here's how that works

BY SKYE LUCAS
Oct 4, 2023

Missouri joined a small pool of states this week that select presidential nominees by a process known as caucuses instead of the more traditional primaries.

Because of a failure to set up a presidential primary during its last legislative session, Missouri Republicans must now arrange a caucus system to select a GOP nominee for the 2024 election.

Missouri Republicans can participate in the GOP county caucuses at 10 a.m. March 2 in the county where they are registered to vote.

Iowa is the most well-known state with the caucus selection system, and it applies to both parties. Because it is the first state to winnow presidential candidates to one Republican and one Democratic nominee, it gets quite a bit of national attention.

Other states with caucus systems include Idaho, Nevada, Wyoming, North Dakota, and the U.S. territories of American Samoa, Guam and the Virgin Islands.

One reason the caucus system has such a small following is the process that asks voters to show up in large venues rather than precincts during a small window of time to choose a nominee.

Here's how it works:

A caucus is a local gathering of voters for a given party, often in a school, library, church, fire station or even a private home. Their job is to choose delegates to represent the party's selected presidential nominee.

EXHIBIT
AA

Any voter who is registered with the party can participate. Some voters have already decided on their favorite candidate, while others show up to be convinced. There are no polling booths to protect voters' privacy.

Campaigns either supply volunteers or paid staffers to help herd supporters through the process. These "precinct captains" can make a pitch for their respective presidential campaign, and voters will then commit to the candidate they support.

Support for a candidate may be indicated by a show of hands or a gathering in groups around a preferred candidate. Procedural tactics vary state by state, and even among the political parties.

For the Iowa caucuses, a viability threshold of no less than 15% of attendees is needed to remain a potential nominee in a series of voting rounds. Candidates who do not hit the threshold are knocked out.

Their supporters are then recruited into other groups as precinct captains try to persuade them to commit to their candidate. Multiple rounds are likely when there are several presidential candidates to choose from.

Voters will choose delegates they trust to represent their views later at the national party conventions. Elected delegates generally act as campaign leaders for their party in their various districts.

Missouri sends 54 delegates to the Republican National Convention. An estimated 2,467 delegates are needed to win the Republican presidential nomination.

SUBSCRIBE

SUBSCRIBE          SUBSCRIBE      **BP**      DONATE          DONATE

×

**Ballotpedia on Facebook**

Share this page

Follow Ballotpedia

×

**Ballotpedia on Twitter**

Share this page

Follow Ballotpedia

Email *

First Name *

Last Name



### Would you support Kamala for president if Joe Biden is unable to run?

Yes   No   Not sure

81,647 Votes



### Who is a classier First Lady?

Melania Trump   Jill Biden

20,645 Votes

Sponsored Ad

Click here for Nov. 7 election results

# Ballot access requirements for presidential candidates in Washington, D.C.

**In order to get on the ballot in Washington, D.C., a candidate for president of the United States must meet a variety of state-specific filing requirements and deadlines.** These regulations, known as ballot access laws, determine whether a candidate or party will appear on an election ballot. These laws are set at the state level. A presidential candidate must prepare to meet ballot access requirements in advance of primaries, caucuses, and the general election.

There are three basic methods by which an individual may become a candidate for president of the United States.



EXHIBIT
BB

1. An individual can seek the **nomination of a political party**. Presidential nominees are selected by delegates at national nominating conventions. Individual states conduct caucuses or primary elections to determine which delegates will be sent to the national convention.[1]
2. An individual can run as **an independent**. Independent presidential candidates typically must petition in each state in order to have their names printed on the general election ballot.[1]
3. An individual can run as **a write-in candidate**.[1]

The information on this page applies only to presidential candidates. For additional information about ballot access requirements for state and congressional candidates, see **this page**.

<div style="border: 2px solid yellow">

**HIGHLIGHTS**

- In Washington, D.C., a presidential candidate seeking the nomination of a qualified party must petition for placement on the primary ballot. At least 1 percent of the district's qualified voters must sign the petition, or 1,000 qualified voters, whichever is less. An independent candidate must petition to get on the general election ballot. This petition must contain signatures equaling at least 1 percent of the district's qualified voters. A write-in candidate must file a form no later than seven days following the election in order to assume office if he or she is elected.

</div>

*Note: States are still in the process of planning their presidential nominating events. This page will be updated as information becomes available. See something we missed?* **Email us**.

**Ballot access for major and minor party candidates**

**Ballot access for presidential candidates**

**List of political parties in the United States**

**Methods for signing candidate nominating petitions**

**Ballotpedia's Election Administration Legislation Tracker**

PUBLICPOLICY

**Note:** This article is not intended to serve as an exhaustive guide to running for public office. Individuals should contact their state election agencies for further information.

# Year-specific filing information

## 2024

The tables below detail filing requirements for presidential candidates in Washington, D.C., in the 2024 election cycle. For additional information on candidate ballot access requirements in Washington, D.C., click **here**.

### Presidential primary candidates

| Filing requirements for presidential primary candidates in Washington, D.C., 2024 | | | | | | | |
|---|---|---|---|---|---|---|---|
| State | Party | Signatures required | Signature formula | Filing fee | Filing fee formula | Filing deadline | Source |
| Arkansas | Democratic | TBD | TBD | TBD | TBD | 3/6/2024 | Source |
| Arkansas | Republican | TBD | TBD | TBD | TBD | 12/1/2023 | Source |

### Independent presidential candidates

| Filing requirements for independent candidates in Washington, D.C., 2024 | | | | | | |
|---|---|---|---|---|---|---|
| State | Signatures required | Signature formula | Filing fee | Filing fee formula | Filing deadline | Source |
| Arkansas | 1,000 | Fixed by statute | N/A | N/A | 8/7/2024 | Source |

For filing information from previous years, click "[Show more]" below.

**Show more**

# Qualifications

**Article 2, Section 1**, of the **United States Constitution** sets the following qualifications for the presidency:[2]

> No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President; neither shall any Person be eligible to that Office who shall not have attained to the Age of thirty five Years, and been fourteen Years a Resident within the United States.[3]
>
> —United States Constitution

**Article 2, Section 4**, of the **United States Constitution** says an individual can be disqualified from the presidency if impeached and convicted:

> The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors.[3]
>
> —United States Constitution



# Former South Carolina Governor and UN Ambassador Nikki Haley Fifth Presidential Candidate to Make DC Republican Presidential Primary Ballot



**FOR IMMEDIATE RELEASE:**

**Washington, DC – (November 17, 2023)** On Thursday November 16, 2023, Former South Carolina Governor and UN Ambassador Nikki Haley became the fifth Republican candidate for President of the United States to qualify for the ballot at the March 1-3, 2024, District of Columbia Republican state party primary. The DC Republican Party issued the following statement on Former Governor Haley's entry into the race:

DC Republican Party Chairman Patrick Mara stated, "The District of Columbia Republican Party is excited to announce our fifth candidate on our presidential primary ballot. Today, Governor Nikki Haley filed as the fifth candidate to appear on the ballot as part of the District of Columbia Republican primary. DC Republican voters will be participating in the fifth primary in the nation and will have a considerable impact on nominating the eventual Republican presidential nominee. Congratulations to Governor Nikki Haley and her campaign for being the fifth to make the ballot in DC. It will be a highly anticipated primary as we follow the early states and vote fifth in the nation, and immediately before Super Tuesday."

The District of Columbia Republican Party Presidential Primary will be held on Friday, March 1, Saturday, March 2, and Sunday, March 3, 2024, at the Marriott Madison Hotel in Washington, DC. During the pre-Super Tuesday DC Primary, Presidential candidates will compete for 19 proportionally allocated Delegates and 16 Alternate Delegates to the Republican National Convention in Milwaukee, Wisconsin, where Delegates from across the country will convene to select the Republican nominee for President of the United States. National Republican Party rules necessitated that the DC GOP move the primary from the District-scheduled primary on June 4 to the earlier dates in March. Other candidates who have already filed to appear on the ballot include

former President Donald Trump, businessman Vivek Ramaswamy, Governor Ron DeSantis and businessman Ryan Binkley. It is anticipated that up to three more Republicans could make the Presidential Primary ballot in DC.

For further information, please contact Nicole M. McClure, Executive Director of the DC Republican Committee, at nicole@dcgop.com

The DC Republican Committee is composed of registered Republicans living throughout the District of Columbia in all eight wards nominated and elected to serve as members.

### 

← Previous Post

Candidates, Presidential Primary, VOTE




53°
Bismarck, ND

☰  Weather  Watch Live  Video

ADVERTISEMENT

# Burgum and other Republican presidential candidates meet requirements for North Dakota caucus in March



By Justin Gick
Published: Nov. 6, 2023 at 6:46 PM EST

BISMARCK, N.D. (KFYR) - The North Dakota GOP announced Monday three candidates met the requirements for the 2024 North Dakota Presidential Caucus on March 4.

Former President Donald Trump, former U.N. Ambassador Nikki Haley, and Governor Doug Burgum have qualified for the caucus.

The North Dakota Republican party has hosted the caucus several times in past presidential election cycles.

Robert Harms, the chairman of the presidential caucus committee, says any member of the Republican party can participate in the presidential caucus. The winner of the caucus gets all of the votes from North Dakota's 38 delegates at the national convention.




EXHIBIT
CC



Harms says all of the candidates that have participated in the debates have reached out to the caucus to seek the forms and learn about the qualifications.

"They have to be registered with the FEC, number one. Number two, they have to have ten signatures from members of the state Republican committee, and they pay a fee of $20,000 to the Republican party," said Harms.

Harms says he thinks Burgum will have the advantage because North Dakota is his home state. He says the state committee chose March 4 because it is the evening before Super Tuesday, and it could influence other votes across the country.

Candidates must meet all three requirements by December 31 to participate in the caucus.

*Copyright 2023 KFYR. All rights reserved.*

**Kenneth Cole Reaction Men Slim-Fit Stretch Corduroy Pants - Charcoal**

$39.99 - Macy's | Sponsored

Shop now

**1-2 days - all it takes to replace your old asphalt roof with a breathtaking metal roof**
See why over 100,000+ Americans have chosen these stone-coated metal roofs

Metal Roof Nation | Sponsored

Learn More

**The 21 Most Beautiful Women Of All-Time, Ranked In Order**

YourDIY | Sponsored

**You're One Step Away from Saving a Life**
As the conflict continues, UNICEF remains on the ground in Gaza, working to save children's lives and protect them from lasting psychological damage.

UNICEF USA | Sponsored

Donate now

**Amazon Hates When You Do This, But They Can't Stop You (It's Genius)**
This simple trick can save tons of money on Amazon, but most Prime members are ignoring it.

Online Shopping Tools | Sponsored

**How Long Does $1 Million Last After 60?**
For those with a $500k+ portfolio, download The Definitive Guide to Retirement Income to learn ways to grow your wealth and generate income from your portfolio when it matters most.

Fisher Investments | Sponsored

Learn More

**Children Trapped in Gaza Face Generational Trauma**
You're one step away from saving a life. UNICEF remains in Gaza, working to save children's lives and protect them from lasting psychological damage.

UNICEF USA | Sponsored

Donate now

**Angus T. Jones said this about Two and a Half Men:**
The reason why when he grew up, Angus T. Jones completely abandoned the character of Jake Harper, while the show was still airing its last seasons.

TheDancingCucumber | Sponsored

Read More

**Passing This 1950s Quiz Is Not Going To Happen. Dare To Try?**

Quizscape | Sponsored



# 2024 Presidential Election Calendar

**Some of these dates are subject to change, while some locations do not yet have a date.** The latter group is listed separately at the bottom of the calendar.

The 2024 presidential election will take place on November 5. This will be preceded by nominating contests in each state and territory. Those will begin early in the year and wrap up in June. The Republican and Democratic conventions will take place in July and August, respectively.

New Hampshire has had the first primary in the nation since 1920. Iowa has gone even earlier, with its caucuses, since 1972. It looks like that is going to change in 2024, although some of the dates have not yet been finalized.

What won't change is the importance of Super Tuesday, scheduled for March 5, when over a dozen states, including California and Texas, will hold their primaries. By the end of March, events covering well over 50% of each party's delegates will have taken place.

Select an event in the calendar for more detail. This will include available polling and delegate allocation methods, as well as a link to live results when the event occurs. For a look at the whole country, including national polls, see the Democratic and Republican nomination home pages.

Finally, note that many states hold their regular statewide primary on a later date than the presidential contest. Where you see a '1' by the state name, the date is the same. For a more complete look, see the 2024 State Primary Calendar.

| Date | State | Democratic | Republican |
|---|---|---|---|
| January 15 | Iowa | | Caucus |
| January 23 | New Hampshire | Primary | Primary |
| February 3 | South Carolina | Primary | |
| February 6 | Nevada | Primary | |
| February 8 | Nevada | | Caucus |
| | Virgin Islands | | Caucus |
| February 24 | South Carolina | | Primary |
| February 27 | Michigan | Primary | Primary |
| March 2 | Idaho | | Caucus |
| | Missouri | | Caucus |
| March 3 | District of Columbia | | Primary |
| March 4 | North Dakota | | Caucus |





EXHIBIT
DD

| Date | State | Democratic | Republican |
|------|-------|------------|------------|
| March 5 | Alabama[1] | Primary | Primary |
| | Alaska | | Caucus |
| | American Samoa | Caucus | |
| | Arkansas[1] | Primary | Primary |
| | California[1] | Primary | Primary |
| | Colorado | Primary | Primary |
| | Iowa | Caucus | |
| | Maine | Primary | Primary |
| | Massachusetts | Primary | Primary |
| | Minnesota | Primary | Primary |
| | North Carolina[1] | Primary | Primary |
| | Oklahoma | Primary | Primary |
| | Tennessee | Primary | Primary |
| | Texas[1] | Primary | Primary |
| | Utah | Primary | Caucus |
| | Vermont | Primary | Primary |
| | Virginia | Primary | Primary |
| March 12 | Democrats Abroad | Primary | |
| | Georgia | Primary | Primary |
| | Hawaii | | Caucus |
| | Mississippi[1] | Primary | Primary |
| | Northern Mariana | Primary | |
| | Washington | Primary | Primary |
| March 19 | Arizona | Primary | Primary |
| | Florida | Primary | Primary |
| | Illinois[1] | Primary | Primary |
| | Kansas | Primary | Primary |
| | Ohio[1] | Primary | Primary |
| March 23 | Louisiana | Primary | Primary |
| | Missouri | Primary | |
| April 2 | Connecticut | Primary | Primary |
| | Delaware | Primary | Primary |
| | New York | Primary | Primary |
| | Rhode Island | Primary | Primary |

| Date | State | Democratic | Republican |
|---|---|---|---|
| April 6 | Alaska | Primary | |
| | Hawaii | Primary | |
| | North Dakota | Primary | |
| April 13 | Wyoming | Caucus | |
| April 23 | Pennsylvania[1] | Primary | Primary |
| April 28 | Puerto Rico | Primary | |
| May 7 | Indiana[1] | Primary | Primary |
| May 14 | Maryland[1] | Primary | Primary |
| | Nebraska[1] | Primary | Primary |
| | West Virginia[1] | Primary | Primary |
| May 21 | Kentucky[1] | Primary | Primary |
| | Oregon[1] | Primary | Primary |
| May 25 | Idaho | Caucus | |
| June 4 | District of Columbia | Primary | |
| | Montana[1] | Primary | Primary |
| | New Jersey[1] | Primary | Primary |
| | New Mexico[1] | Primary | Primary |
| | South Dakota[1] | Primary | Primary |
| June 8 | Guam | Caucus | |
| | Virgin Islands | Caucus | |
| July 15 - 18 | Republican Convention (Milwaukee, WI) | | |
| August 19 - 22 | Democratic Convention (Chicago, IL) | | |
| November 5 | 2024 Presidential Election | | |
| December 17 | Electors Cast Their Votes | | |

**Date Unknown:** These locations will be added to the calendar once a specific date can be projected. Where a (month) is shown, that represents our best guess of when the contest will be held.

American Samoa (March)
Guam (March)
Northern Mariana (March)
Puerto Rico (March)
Wyoming (March)

[1] *Same date as the primary for other offices (e.g., Congress, Governor, Legislature), as applicable.*

**Here is a 2024 calendar with event dates highlighted.**

The election calendar below includes dates for presidential primary and caucus events, party conventions and

### January 2024

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    | 1  | 2  | 3  | 4  | 5  | 6  |
| 7  | 8  | 9  | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |    |    |    |

### February 2024

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    |    | 1  | 2  | 3  |
| 4  | 5  | 6  | 7  | 8  | 9  | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 |    |    |

### March 2024

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    |    |    | 1  | 2  |
| 3  | 4  | 5  | 6  | 7  | 8  | 9  |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 |    |    |    |    |    |    |

### April 2024

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    | 1  | 2  | 3  | 4  | 5  | 6  |
| 7  | 8  | 9  | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 |    |    |    |    |

### May 2024

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    | 1  | 2  | 3  | 4  |
| 5  | 6  | 7  | 8  | 9  | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | 31 |    |

### June 2024

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    |    |    |    | 1  |
| 2  | 3  | 4  | 5  | 6  | 7  | 8  |
| 9  | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 |    |    |    |    |    |    |

### July 2024

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    | 1  | 2  | 3  | 4  | 5  | 6  |
| 7  | 8  | 9  | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |    |    |    |

### August 2024

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    |    | 1  | 2  | 3  |
| 4  | 5  | 6  | 7  | 8  | 9  | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

### September 2024

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
| 1  | 2  | 3  | 4  | 5  | 6  | 7  |
| 8  | 9  | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 |    |    |    |    |    |

### October 2024

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    | 1  | 2  | 3  | 4  | 5  |
| 6  | 7  | 8  | 9  | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |    |    |

### November 2024

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
|    |    |    |    |    | 1  | 2  |
| 3  | 4  | 5  | 6  | 7  | 8  | 9  |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

### December 2024

| Su | Mo | Tu | We | Th | Fr | Sa |
|----|----|----|----|----|----|----|
| 1  | 2  | 3  | 4  | 5  | 6  | 7  |
| 8  | 9  | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 |    |    |    |    |

## Related Content

Republican Nomination Home

Democratic Nomination Home

1 Braxton Way Suite 125 | Glen Mills, PA 19342
ssrs.com | @ssrs_research

```
CNN/SSRS Poll -- October 27, 2023 to November 02, 2023
TABLE 017
Question FV1_DJT
FV1_DJT. We'd like to get your overall opinion of some people and groups in the news. For each, please indicate if
you have a favorable or unfavorable opinion of these people or groups - or if you have never heard of them. /
Donald Trump
Base: Total Respondents
```

| | Total | Men | Women | White | Ppl of Color | Biden Approve | Biden Disapprove |
|---|---|---|---|---|---|---|---|
| Favorable opinion | 38% | 42% | 33% | 42% | 29% | 6% | 58% |
| Unfavorable opinion | 56% | 53% | 59% | 55% | 61% | 90% | 35% |
| Never heard of | 1% | 1% | 1% | * | 2% | 2% | 1% |
| No opinion (Net) | 5% | 3% | 7% | 4% | 7% | 3% | 6% |
| Heard of, no opinion | 5% | 3% | 7% | 4% | 7% | 3% | 6% |
| Refused | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Sampling Error (+/-) | 3.1 | 4.7 | 4.1 | 3.8 | 5.4 | 4.9 | 3.9 |

| | Total | 18-34 | 35-49 | 50-64 | 65+ | <45 | 45+ |
|---|---|---|---|---|---|---|---|
| Favorable opinion | 38% | 30% | 43% | 43% | 35% | 34% | 40% |
| Unfavorable opinion | 56% | 60% | 51% | 52% | 62% | 57% | 56% |
| Never heard of | 1% | 4% | 0% | 0% | 0% | 2% | 0% |
| No opinion (Net) | 5% | 6% | 6% | 4% | 2% | 7% | 4% |
| Heard of, no opinion | 5% | 6% | 6% | 4% | 2% | 7% | 4% |
| Refused | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Sampling Error (+/-) | 3.1 | 6.1 | 5.9 | 6.0 | 6.5 | 4.6 | 4.1 |

| | Total | <$50K | $50K+ | Non-coll. grad. | Coll. grad. | White Non-coll. grad. | White coll. grad. |
|---|---|---|---|---|---|---|---|
| Favorable opinion | 38% | 38% | 37% | 44% | 27% | 51% | 29% |
| Unfavorable opinion | 56% | 52% | 60% | 48% | 69% | 44% | 69% |
| Never heard of | 1% | 2% | 1% | 1% | 1% | 0% | * |
| No opinion (Net) | 5% | 8% | 2% | 6% | 3% | 5% | 2% |
| Heard of, no opinion | 5% | 8% | 2% | 6% | 3% | 5% | 2% |
| Refused | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Sampling Error (+/-) | 3.1 | 4.9 | 4.4 | 4.1 | 4.4 | 5.3 | 5.3 |

| | Total | Democrat | Independent Other | Republican | Liberal | Moderate | Conservative |
|---|---|---|---|---|---|---|---|
| Favorable opinion | 38% | 7% | 28% | 79% | 9% | 26% | 71% |
| Unfavorable opinion | 56% | 89% | 62% | 16% | 89% | 65% | 24% |
| Never heard of | 1% | 1% | 3% | 0% | * | 2% | 0% |
| No opinion (Net) | 5% | 3% | 7% | 5% | 2% | 7% | 5% |
| Heard of, no opinion | 5% | 3% | 7% | 5% | 2% | 7% | 5% |
| Refused | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Sampling Error (+/-) | 3.1 | 5.2 | 5.5 | 5.2 | 6.4 | 4.6 | 5.4 |

| | Total | Lean Democrat | Lean Republican | Reg. Voter | Extr. Motivated | Less Motivated |
|---|---|---|---|---|---|---|
| Favorable opinion | 38% | 7% | 73% | 39% | 45% | 28% |
| Unfavorable opinion | 56% | 89% | 20% | 57% | 53% | 62% |
| Never heard of | 1% | 1% | 1% | 1% | * | 1% |
| No opinion (Net) | 5% | 3% | 6% | 4% | 2% | 8% |
| Heard of, no opinion | 5% | 3% | 6% | 4% | 2% | 8% |
| Refused | 0% | 0% | 0% | 0% | 0% | 0% |
| Sampling Error (+/-) | 3.1 | 4.6 | 4.6 | 3.3 | 4.1 | 5.7 |

EXHIBIT

EE



redefining research

1 Braxton Way Suite 125 | Glen Mills, PA 19342
ssrs.com | @ssrs_research

```
CNN/SSRS Poll -- October 27, 2023 to November 02, 2023
Question RP1
RP1. Here is a list of people who are running for the Republican nomination for president in 2024. Please indicate
which of those candidates you would be most likely to support for the Republican nomination for president in 2024,
or if you would support someone else.
Base: Total Republicans/Republican-leaning independents who are registered to vote
```

|  | Total | Men | Women | White | Ppl of Color | Reg. voter |
|---|---|---|---|---|---|---|
| Former President Donald Trump | 61% | 64% | 58% | 56% | 76% | 61% |
| Florida Governor Ron DeSantis | 17% | 14% | 21% | 18% | 13% | 17% |
| Former U.N. Ambassador Nikki Haley | 10% | 10% | 8% | 11% | 3% | 10% |
| Businessman Vivek Ramaswamy | 4% | 6% | 2% | 4% | 4% | 4% |
| South Carolina Senator Tim Scott | 3% | 1% | 4% | 3% | 2% | 3% |
| Former New Jersey Governor Chris Christie | 2% | 2% | 2% | 2% | 1% | 2% |
| Former Arkansas Governor Asa Hutchinson | 1% | 1% | 1% | 1% | 1% | 1% |
| North Dakota Governor Doug Burgum | * | * | 0% | * | 0% | * |
| Someone else | 2% | 2% | 3% | 3% | 1% | 2% |
| Don't know/Refused/Web blank | 1% | * | 1% | 1% | 0% | 1% |
| Sampling Error (+/-) | 4.8 | 6.8 | 7.0 | 5.5 | 11.3 | 4.8 |

|  | Total | 18-49 | 50-64 | 65+ | <45 | 45+ |
|---|---|---|---|---|---|---|
| Former President Donald Trump | 61% | 64% | 60% | 57% | 64% | 60% |
| Florida Governor Ron DeSantis | 17% | 17% | 14% | 19% | 18% | 16% |
| Former U.N. Ambassador Nikki Haley | 10% | 7% | 10% | 13% | 7% | 11% |
| Businessman Vivek Ramaswamy | 4% | 5% | 4% | 2% | 5% | 4% |
| South Carolina Senator Tim Scott | 3% | 2% | 4% | 2% | * | 3% |
| Former New Jersey Governor Chris Christie | 2% | 1% | 2% | 3% | 1% | 2% |
| Former Arkansas Governor Asa Hutchinson | 1% | 2% | 1% | * | 2% | 1% |
| North Dakota Governor Doug Burgum | * | 0% | 0% | 1% | 0% | * |
| Someone else | 2% | 1% | 3% | 2% | 2% | 2% |
| Don't know/Refused/Web blank | 1% | * | 1% | * | * | 1% |
| Sampling Error (+/-) | 4.8 | 7.6 | 8.3 | 9.5 | 8.6 | 5.9 |

|  | Total | <$50K | $50K+ | Non-coll. | College grad. | White non-coll. | White coll. grad. |
|---|---|---|---|---|---|---|---|
| Former President Donald Trump | 61% | 73% | 55% | 71% | 45% | 67% | 40% |
| Florida Governor Ron DeSantis | 17% | 12% | 20% | 12% | 25% | 14% | 24% |
| Former U.N. Ambassador Nikki Haley | 10% | 5% | 12% | 7% | 14% | 7% | 17% |
| Businessman Vivek Ramaswamy | 4% | 2% | 5% | 4% | 4% | 5% | 3% |
| South Carolina Senator Tim Scott | 3% | 1% | 3% | 2% | 3% | 2% | 4% |
| Former New Jersey Governor Chris Christie | 2% | 2% | 2% | 1% | 3% | 1% | 4% |
| Former Arkansas Governor Asa Hutchinson | 1% | 1% | 1% | 1% | 2% | 1% | 2% |
| North Dakota Governor Doug Burgum | * | * | * | * | 0% | * | 0% |
| Someone else | 2% | 3% | 2% | 1% | 4% | 1% | 5% |
| Don't know/Refused/Web blank | 1% | 0% | 1% | 1% | * | 1% | 1% |
| Sampling Error (+/-) | 4.8 | 8.8 | 5.8 | 6.4 | 7.2 | 7.2 | 8.3 |

|  | Total | Republican | Independnt Other | Conservative | Moderate/Liberal | Trump | Non-Trump |
|---|---|---|---|---|---|---|---|
| Former President Donald Trump | 61% | 65% | 46% | 63% | 55% | 100% | 0% |
| Florida Governor Ron DeSantis | 17% | 16% | 20% | 18% | 14% | 0% | 43% |
| Former U.N. Ambassador Nikki Haley | 10% | 8% | 17% | 8% | 14% | 0% | 25% |
| Businessman Vivek Ramaswamy | 4% | 3% | 7% | 3% | 6% | 0% | 10% |
| South Carolina Senator Tim Scott | 3% | 3% | 2% | 3% | 1% | 0% | 6% |
| Former New Jersey Governor Chris Christie | 2% | 2% | 2% | 1% | 3% | 0% | 5% |
| Former Arkansas Governor Asa Hutchinson | 1% | 1% | 0% | 1% | 1% | 0% | 3% |
| North Dakota Governor Doug Burgum | * | * | 1% | 0% | 1% | 0% | * |
| Someone else | 2% | 1% | 5% | 2% | 3% | 0% | 5% |
| Don't know/Refused/Web blank | 1% | 1% | 0% | * | 1% | 0% | 1% |
| Sampling Error (+/-) | 4.8 | 5.4 | 10.8 | 5.9 | 8.2 | 6.5 | 7.2 |



1 Braxton Way Suite 125   Glen Mills, PA 19342
ssrs.com | @ssrs_research

CNN/SSRS Poll -- October 27, 2023 to November 02, 2023

TABLE 010
Question 4_B
4_B. When it comes to dealing with the nation's issues, do you think Donald Trump is more a part of the problem,
or more a part of the solution?
Base: Total Respondents

|  | Total | Men | Women | White | Ppl of Color | Biden Approve | Biden Disapprove |
|---|---|---|---|---|---|---|---|
| More a part of the problem | 57% | 54% | 61% | 57% | 59% | 90% | 37% |
| More a part of the solution | 42% | 46% | 38% | 42% | 40% | 10% | 63% |
| Don't know/Refused | * | * | 1% | * | 1% | 0% | 1% |
| Sampling Error (+/-) | 3.1 | 4.7 | 4.1 | 3.8 | 5.4 | 4.9 | 3.9 |

|  | Total | 18-34 | 35-49 | 50-64 | 65+ | <45 | 45+ |
|---|---|---|---|---|---|---|---|
| More a part of the problem | 57% | 60% | 54% | 53% | 62% | 58% | 56% |
| More a part of the solution | 42% | 40% | 45% | 46% | 37% | 41% | 43% |
| Don't know/Refused | * | 0% | 1% | * | * | * | 1% |
| Sampling Error (+/-) | 3.1 | 6.1 | 5.9 | 6.0 | 6.5 | 4.6 | 4.1 |

|  | Total | <$50K | $50K+ | Non-coll. grad. | Coll. grad. | White Non-coll. grad. | White coll. grad. |
|---|---|---|---|---|---|---|---|
| More a part of the problem | 57% | 53% | 61% | 49% | 71% | 47% | 71% |
| More a part of the solution | 42% | 47% | 38% | 51% | 28% | 52% | 28% |
| Don't know/Refused | * | 1% | * | * | * | * | * |
| Sampling Error (+/-) | 3.1 | 4.9 | 3.9 | 4.1 | 4.4 | 5.3 | 5.3 |

|  | Total | Democrat | Independent Other | Republican | Liberal | Moderate | Conservative |
|---|---|---|---|---|---|---|---|
| More a part of the problem | 57% | 87% | 63% | 20% | 87% | 67% | 27% |
| More a part of the solution | 42% | 13% | 36% | 79% | 13% | 33% | 72% |
| Don't know/Refused | * | 0% | 1% | * | 1% | * | 1% |
| Sampling Error (+/-) | 3.1 | 5.2 | 5.5 | 5.2 | 6.4 | 4.6 | 5.4 |

|  | Total | Lean Democrat | Lean Republican | Reg. Voter | Extr. Motivated | Less Motivated |
|---|---|---|---|---|---|---|
| More a part of the problem | 57% | 87% | 24% | 58% | 54% | 63% |
| More a part of the solution | 42% | 13% | 75% | 42% | 45% | 36% |
| Don't know/Refused | * | 0% | * | * | * | 1% |
| Sampling Error (+/-) | 3.1 | 4.6 | 4.6 | 3.3 | 4.1 | 5.7 |