IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

JOHN ANTHONY CASTRO,

    *Plaintiff*,                                            Civil Action No. 2:23-cv-00598

    v.                                                  Honorable Irene C. Berger

SECRETARY OF STATE
ANDREW WARNER and
DONALD JOHN TRUMP,

    *Defendants*.

WEST VIRGINIA REPUBLICAN PARTY
and STATE OF WEST VIRGINIA,

    *Intervenors.*

**STATE OF WEST VIRGINIA'S SUPPLEMENTAL
BRIEF REGARDING STANDING**

Plaintiff John Anthony Castro is not a real presidential candidate—just ask him. "I'm not going to lie and pretend my candidacy is anything more than trying to enforce the United States Constitution, and that's what I'm here to do," he said recently, explaining why he filed paperwork to run in the presidential primary in New Hampshire. Holly Ramer, *New Hampshire's Presidential Primary Filing Period Opens with Candidates Critical of Biden and Trump*, AP NEWS (Oct. 11, 2023, 11:46 AM EDT), https://bit.ly/47HPtzE. "The fight's going to be in the courtroom. I'm going to do my best to try to get people to see the light. But at the end of the day, I don't need the people to see the light, I need the courts to see the light." *Id.* Castro, in short, doesn't hide what he's up to here. Quite the opposite: his Affidavit of Candidacy and Media Coverage proudly and repeatedly cites online publications in which these comments appear. ECF No. 68 ¶¶ 5(a), (k), (r), (gg), and (vv); ECF No. 71-2 ¶¶ 5(a), (l), (s), (ii), and (xx) ("Castro Affidavit").

1

But in court filings, Castro tells a different tale. There, Castro does "pretend" his campaign is something "more than" a litigation tactic. Indeed, when he needs to, he claims that he is truly "competing [with President Trump] for the same political position within the same political party" and "appealing to the same voter base." ECF No. 1 ¶ 24. In other words, the whole premise of this suit is that Castro's campaign would be successful both in fundraising and at the ballot box if only Trump would step aside. Other than that ostensible campaign, Castro stands in the same position as any other interested voter.

Truth is, Castro had no campaign to speak of when he filed this action, and he's no one's competitor for the President of the United States. That's true even if paying a filing fee lands him on the ballot in a handful of states or earns him a little press along the way. After all, if paying a filing fee—to a court or a secretary of state—is enough to show political competitor standing, then political-competitor standing belongs to any gadfly with an axe to grind and some money to spend. Yet Castro "cannot manufacture standing merely by inflicting harm on [himself] based on [his] fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). At the same time, media mentions prove nothing when the reporters covering his "long-shot" presidential campaign do so only because he's filed "dozens" of suits like this one. *See, e.g.*, ECF No. 71-2 ¶ 5(b).

Castro's campaign is a sham. Although his own words are enough to say that with certainty, other evidence confirms it. His most recent Federal Election Commission filing shows, for instance, that he hadn't spent a dime on his campaign for months when he filed this case. Certainly, he hasn't spent any apparent time or money in this State. So the State of West Virginia merely asks this Court to take Castro at his word. It should dismiss this case for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(h)(3).

## BACKGROUND

Castro seeks to enjoin the West Virginia Secretary of State from "accept[ing] and/or processing . . . any ballot access documentation" from President Trump due to President Trump's alleged attempt to "thwart the peaceful transfer of power" after the 2020 election. ECF No. 1 ¶ 18. President Trump's alleged insurrectionist activities, according to Castro, disqualify President Trump from further office. *Id.* (invoking U.S. Const. amend XIV, § 3).

But the Constitution requires a plaintiff to have "a 'personal stake' in the case[,]" *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023), and a "generalized interest . . . in constitutional governance" isn't enough "to confer standing on . . . [a] citizen[,]" *Sibley v. Obama*, 866 F. Supp. 2d 17, 20 (D.D.C. 2012), *aff'd*, No. 12-5198, 2012 WL 6603088 (D.C. Cir. Dec. 6, 2012). Perhaps unsurprisingly, then, courts have often dismissed attempts to challenge the qualifications of presidential candidates from members of the public. *See, e.g.*, *Wagner v. Cruz*, 662 F. App'x 554, 555 (10th Cir. 2016); *Kerchner v. Obama*, 612 F.3d 204, 208 (3d Cir. 2010); *Berg v. Obama*, 586 F.3d 234, 239-42 (3d Cir. 2009).

Castro hopes to find his "personal stake" in his supposed status as President Trump's competitor. ECF No. 1 ¶ 21. Castro's Verified Complaint alleges that he "is an FEC-registered 2024 Republican Presidential candidate[,]" *id.* at ¶ 22, who is "actively competing against Defendant Donald John Trump for the nomination of the Republican Party[,]" *id.* at ¶ 18. His pleading alleges that Castro and President Trump "appeal[] to the same voter base" and predicts that Castro "will allocate a significant portion of his campaign finances to [this] cause." *Id.* at ¶ 24. Indeed, he touts his "active campaign website[,]" *id.* at ¶ 24, and alleges that he "is currently directly competing against Trump for the Republican nomination[,]" *id.* at ¶ 22. Castro boasts that, "throughout his campaigning efforts to date, [he] has spoken to thousands of voters who have

3

expressed that they would vote for Castro only if Trump is not a presidential candidate as they maintain political loyalty to Trump[,]" *id.* at 25. Although "162 Republican Party candidates for the Presidency" were running when he filed this case, *id.* at ¶ 28, President Trump's campaign efforts are said to be uniquely responsible for "taking . . . slices of the voter and donor pie" and "reduc[ing] the available pie left for Castro[.]" *id.* at 30. In short, Castro's argument rests on an assumption that President Trump's loyal followers will flock to Castro, if only he wins this fight to keep President Trump off the ballot.

But "money talks"—and Castro's finances tell the real story. According to his most recent SEC filing, Castro's campaign had $678 on hand as of September 30, 2023. Castro FEC Form 3P at 1-3 (Oct. 12, 2023), https://bit.ly/47GybD8 (Exhibit B). Of that amount, $677 arrived on September 30, 2023, *id.* at 8, which means that Castro's war chest had $1.00 when he filed the Verified Complaint in September 2023. That's not because he'd spent so much money campaigning. Between July 1, 2023, and September 30, 2023, he reports that he spent zero dollars campaigning in Iowa, zero dollars campaigning in New Hampshire, and zero dollars campaigning in West Virginia. Castro FEC Form 3P (Oct. 12. 2023) at 6-8. In fact, he reports that, as of September 30, 2023, he hadn't spent a nickel anywhere. *Id.* at 5-8. According to the report, he hadn't spent *any* money on *any* campaign activity *anywhere* during the entire election cycle. *Id.* at 4-8.[1]

---

[1] The Court should take judicial notice of this filing and its contents. *See* Fed. R. Evid. 201(b)(2). Under this rule, "courts may properly take judicial notice of information on state and federal government websites and frequently do." *Straw v. North Carolina*, No. 7:18-CV-00074-M, 2020 WL 1042141, at *7 (E.D.N.C. Mar. 3, 2020); *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (authorizing district courts to "take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC"). Although courts are sometimes careful about taking judicial notice of public documents because they can constitute hearsay, Castro can't raise that objection as to the FEC filing here. He signed it, Castro FEC Form 3P (Oct. 12, 2023) at 1, and he has vouched for its contents under oath, Castro Stipulation, *infra*, at ¶¶ 6-7,

Recently, a U.S. District Court in New Hampshire saw Castro's illusory efforts for what they are. Castro filed the same suit there, seeking "an injunction preventing Defendant Secretary of State from accepting and/or processing Defendant Donald John Trump's ballot access documentation" and alleging that President Trump's supposed insurrectionist activities rendered him "constitutionally ineligible to pursue or hold any public office in the United States." *Castro v. New Hampshire Sec'y of State*, No. 23-CV-416-JL, 2023 WL 7110390, at *1 (D.N.H. Oct. 27, 2023). The New Hampshire federal court dismissed Castro's suit last month, after an evidentiary hearing, *id.*, finding "that Castro is not competing and will not compete with Trump to win the New Hampshire primary," *id.* at 6. In fact, the court went so far as to find that "Castro is creating his own injury in order to manufacture standing to challenge Trump's eligibility to run for president." *Id.* at 5.

The court had good reasons for that finding. According to Castro's sworn stipulation, his "campaign ha[d] no serious prospect of getting any New Hampshire delegates to the Republican National Convention, nor any significant number of votes that would otherwise have gone to Donald Trump, nor any appreciable share of donations that otherwise would have gone to Donald Trump"—at least not "as of right now." Plaintiff's Verified Stipulation to Certain Facts ¶ 12 ("Castro Stipulation") (Exhibit A). He further stipulated that he was "not yet engaging in campaign activities in New Hampshire other than th[at] lawsuit[.]" *Id.* at ¶ 11  Indeed, he confessed that he had no campaign office, no employees in the state and wasn't "yet running any advertisements[.]" *Id.* at ¶¶ 8-10. He even agreed that "the odds of a successful campaign are low[.]" *Id.* at ¶ 14.

Castro's New Hampshire stipulation backstops his October 2023 FEC filing, agreeing that the filing "reported total contributions of $678" from January to September 2023—though he

---

15. A statement "made by a[n] [opposing] party in an individual or representative capacity" "is not hearsay" when it is "offered against" that party. Fed R. Civ. P. 801(d)(2)(A).

5

appears to clarify that "[t]hese were [actually] small contributions" from others, "all less than $50." Castro Stipulation at ¶ 6. His stipulation further agrees that his FEC filing for the same period "reported total expenditures of $0." *Id.* at ¶ 7. Nowhere does the stipulation allege that these amounts are inaccurate, though Castro may be confused about whether his campaign has $678 in the bank or $677. *Cf. id.* ¶¶ 6,7, and 15.

The New Hampshire evidentiary hearing further confirmed that Castro's campaign is illusory. He agreed that his campaign "hasn't run any advertisements in any . . . state[.]" *Castro*, 2023 WL 7110390, at *2 n.13 ("Q. So your campaign hasn't run any advertisements in New Hampshire; is that right? A. Not as of now, correct. Q. Okay. And it hasn't run any advertisements in any other state, correct? A. Correct. Yes."). Not surprisingly, he couldn't "identify" a single "New Hampshire voter to whom he ha[d] spoken for purposes of his campaign (although he testified that he had '[d]iscussions with voters')." *Id.* at 3. He further "confirmed that his FEC filings show that his campaign has no contributors, other than himself, and almost no money" and that "a primary goal of his candidacy is to establish the impermissibility of Trump's presidency[.]" *Id.*

Castro presumably tried to make his best case for competitor status in New Hampshire—but it was a poor one. Although it was Castro's burden to show standing, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021), the court found that he provided no "evidence suggesting that he has voters or contributors in New Hampshire *or elsewhere.*" *Castro*, 2023 WL 7110390, at *5 (emphasis added). Beyond that, Castro had summoned no evidence that he would "benefit from voter or contributor defections from Trump to himself." *Id.* Indeed, the court found that he "ma[de] no attempt to demonstrate that he is actually competing with Trump for votes and contributions[.]" *Id.* Far from proving Castro's bona fide competitor status, what the evidence

6

showed was "that Castro ha[d] not campaigned in New Hampshire or elsewhere." *Id.* Castro was a paper candidate and nothing more.

After his loss in New Hampshire, Castro filed a new-and-improved affidavit before this Court. ECF No. 68 at 8. He reported that he was a "ballot-placed" presidential primary candidate in two states (New Hampshire and Nevada) and that he would be "on the ballot" in two more states (Arizona and Michigan) when their filing periods open. ECF No. 68 ¶ 2. He further assured the Court that he "intend[s] to pay a nominal fee to appear on the ballots of" three more states (Montana, West Virginia, and Kansas), *id.* at ¶ 4—though he does not explain how winning seven states could clinch the Republican presidential nomination. He also claimed that he's "incurred expenses associated with campaigning in this state, launched [his] own online show called the Truth Addict, and [has] digitally targeted voters in this state." *Id.* at ¶ 3. These nebulous assertions, he assumed, prove that he "will maintain 'standing' throughout the course of this litigation." *Id.*

But apparently those facts weren't quite right. He later filed a newer-and-more-improved affidavit omitting the reference to the Michigan ballot, *compare* ECF No. 68 ¶ 2 and ECF No. 71-2 ¶ 2, and omitting his contingent intent "to be a formally recognized write-in candidate" in West Virginia, *compare* ECF No. 68 ¶ 3 and ECF No. 71-2 ¶ 3. And though he still intends to "pay a nominal fee" to get on the Montana, West Virginia, and Kansas primary ballots, now he's also planning to pay the $12,000 fee to appear on the ballot in Delaware. *Compare.* ECF No. 68 ¶ 4 and ECF No. 71-2 ¶ 4. After subtracting Michigan and adding Delaware, that still leaves him appearing in only seven states.

Yet Castro's two affidavits are most striking for what they don't say. They don't say what expenses he incurred to campaign in West Virginia, when he incurred them, or how much he spent. They don't say how he "digitally targeted" West Virginia voters, much less whether his efforts

7

reached a single voter. They don't say when he's met with West Virginia voters in person. Most importantly, they don't furnish any reason to suppose that removing President Trump from the ballot would shift a single vote or contribution to Castro. To the contrary, the affidavits show that Castro had no semblance of a presidential campaign when he filed this case, and he has no semblance of a presidential campaign two months later.

## STANDARD

The Court has converted West Virginia's motion to dismiss for lack of standing to a motion for summary judgment. *See* ECF No. 55 at 5.

Ordinarily, the moving party "bears the initial burden of showing the absence of a genuine issue of material fact." *Wise v. E.I. DuPont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). The burden remains with the moving party until it has been met, only then "shift[ing] to the nonmoving party to show . . . that genuine issues of material fact remain to be resolved." *Id.* This approach favors the nonmoving party, especially because "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).

But different rules apply when a party challenges the Court's jurisdiction. The United States Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion*, 141 S. Ct. at 2203 (quoting U.S. Const. art. III, § 2.). Thus, "[f]ederal courts are courts of limited jurisdiction" and may not presume to have subject matter jurisdiction in any case. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). In fact, the Constitution requires this Court to presume the opposite—that is, that Castro's "cause lies outside [the Court's] limited jurisdiction[.]" *Id.* Hence, "the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.* And for that party, there's no "rest[ing] on mere

8

allegations" "at the summary judgment stage[.]" *Clapper*, 568 U.S. at 412 (cleaned up). Rather, Castro must "set forth by affidavit or other evidence specific facts" that establish the court's jurisdiction. *Id.* (cleaned up); *see also* ECF No. 66 at 3-4.

## ARGUMENT

Castro's affidavits and other evidence "must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 141 S. Ct. at 2203. But he has not made any of those required showings.

Castro's "concrete" injury must be '*de facto*'; that is, it must actually exist." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016), *as revised* (May 24, 2016). And since his injury must also be "actual or imminent[,]" *id.*, "federal jurisdiction ordinarily depends on the facts as they exist *when the complaint is filed*[,]" *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989); *see also Ramirez v. Sanchez Ramos*, 438 F.3d 92, 97 (1st Cir. 2006) (stating that "standing must be based on the facts as they existed when the action was commenced"). Even the "somewhat elastic concept" of imminence may not "be stretched beyond its purpose, which is to ensure . . . that the injury is certainly impending." *Clapper*, 568 U.S. at 409 (quoting *Lujan*, 504 U.S. at 564 n.2).

Thus, Castro's standing may not rest on speculative "[a]llegations of possible future injury[.]" *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). And Castro "cannot manufacture standing merely by inflicting harm on" himself. *Clapper*, 568 U.S. at 416; *see also Castro*, 2023 WL 7110390, at *5 (stating that Castro's "practice of manufacturing standing to pursue a cause through litigation is not supported by the law"); *In Def. of Animals v. Sanderson Farms, Inc.*, No. 20-CV-05293-RS, 2021 WL 4243391, at *4 (N.D. Cal. Sept. 17, 2021) (stating that "an individual cannot gin up standing by researching and tweeting about something that indirectly makes his or

9

her life harder"). Either Castro had an *extant* injury when he filed the Verified Complaint—or at least an injury that was *certainly* impending—or his case should be dismissed.

In trying to establish his "certain and impending injury," Castro leans on his purported run for President. The Verified Complaint says Castro was suffering "competitive injury in the form of a diminution of votes and/or fundraising[.]" ECF No. 1 at 10. "[A]t th[at] very moment," the Forty-Fifth President of the United States was stealing "slices of the voter and donor pie" that might otherwise go to Castro—or so he alleges. *Id.* at ¶ 30. Castro does not explain how President Trump is stealing votes before any of them have ever been cast. Nor does he explain why President Trump's potential placement on a West Virginia presidential primary ballot provides the key fact enabling President Trump to take dollars away that were otherwise destined for Castro.

At least in some places, political competitive injury could furnish a basis for standing in the right case. That's not true everywhere—the Fourth Circuit, for instance, most recently declined to address "the so-called doctrine of competitive standing" in a political case, *Nelson v. Warner*, 12 F.4th 376, 385 n.9 (4th Cir. 2021), and even the D.C. Circuit (a circuit friendlier to political challenges) has not yet fully "resolve[d] the thorny issue of 'political competitor' standing," *Common Cause v. FEC*, 108 F.3d 413, 419 n.1 (D.C. Cir. 1997). *See also 24th Senatorial Dist. Republican Comm. v. Alcorn,* 820 F.3d 624, 33 (4th Cir. 2016) (finding that political candidate lacked standing despite dissent's contrary observation that victory would increase his prospects of winning, providing an injury). But some "courts have held that a candidate or his political party has standing to challenge the inclusion of an allegedly ineligible rival on the ballot, on the theory that doing so hurts the candidate's or party's own chances of prevailing in the election." *Hollander v. McCain*, 566 F. Supp. 2d 63, 68 (D.N.H. 2008).

Yet "[f]or the competitive standing theory to apply, . . . a competitor must have a chance of prevailing in the election." *Grinols v. Electoral Coll.*, No. 2:12-CV-02997-MCE, 2013 WL 2294885, at *8 (E.D. Cal. May 23, 2013), *aff'd*, 622 F. App'x 624 (9th Cir. 2015); *accord Castro*, 2023 WL 7110390, at *5 (quoting *Grinols* and stating that "plaintiff must show that he has 'a chance of prevailing in the election'"). In other words, Castro must show that winning the Republican nomination is possible for him. *See Grinols*, 2013 WL 2294885, at *8 (noting that "[a] chance is 'the possibility of a particular outcome in an uncertain situation'"). He must be President Trump's real-world "'competitor' or 'rival'" for the GOP nomination. *Id.* That requirement makes sense when one remembers that political-competitor standing is an extension of economic-competitor standing cases like disappointed-bidder challenges. In those earlier cases, too, "[t]here could be no real injury ... unless the plaintiff would have had some chance of prevailing in a bidding free of the alleged illegalities." *Energy Transportation Group, Inc. v. Maritime Admin.*, 956 F.2d 1206, 1211 (D.C. Cir. 1992).

That's not to say that Castro must show that he will win the nomination—but his chances of prevailing must have substance. In *Grinols*, for example, a competitor was able to get over the standing hump because he had "received over 40,000 votes in West Virginia's 2012 Democratic Party Primary" the year before. *Grinols*, 2013 WL 2294885, at *10. Even with those thousands of votes, the court was skeptical about the candidate's "ability to demonstrate that President Obama's participation in the 2012 election hurt [the candidate's] chances of prevailing in the election" (cleaned up)). What's more, it's not enough for Castro to have "his name … on the … primary ballot[.]" *Castro*, 2023 WL 7110390, at *6. Again, he has to "show[] that he is suffering or would suffer an actual, competitive injury if Trump's name is listed on the [West Virginia] Presidential primary ballot." *Id.* The challenged "state action"—permitting Trump to run—must

11

"lead to the potential loss of an election." *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1003 (D. Nev. 2020).

Castro hasn't made that showing—which, again, is his burden to carry. *Clapper*, 568 U.S. at 412. In fact, he hasn't shown that, when he filed this suit, he was even competing for the GOP nomination. Despite "publicly declar[ing] his candidacy before Trump," ECF No. 1, at ¶ 36, Castro's campaign hadn't spent anything in 2023, Castro Stipulation ¶ 7—hadn't spent a dime during this entire election cycle, Castro FEC Form 3P (Oct. 12, 2023) at 4-7—when he filed this lawsuit. And though he touts his status as "an FEC-registered Republican primary presidential candidate[,]" ECF No. 72-1 ¶ 1, it's doubtful he even qualified as a "candidate" under the Federal Election Campaign Act. *See Castro v. Fed. Election Comm'n*, No. CV 22-2176 (RC), 2022 WL 17976630, at *2 (D.D.C. Dec. 6, 2022), *aff'd*, No. 22-5323, 2023 WL 2899541 (D.C. Cir. Apr. 10, 2023) (describing candidacy requirements under FECA, which Castro has not met). If Castro's receipts and expenditures, at the time of filing, weren't enough to trigger that almost-subterranean FECA threshold for candidacy, it's difficult to comprehend how he was (or is) a political "rival" to a former president. *See, e.g.*, *Sibley*, 916 F. Supp. 2d at 61 (finding that a plaintiff's "status as a write-in candidate [wa]s insufficient to confer standing because there [wa]s no evidence … that the electors would otherwise have cast their votes for him"). Just compare Castro's efforts with Vice President Mike Pence—who has since left the race—who spent more than $3.3 million between July 1, 2023, and September 30, 2023. *See* Pence FEC Form 3P at 3, https://bit.ly/3GbITpz.

Even if we stretch the concept of *imminent* harm to cover the upcoming primary season, Castro hasn't shown "that he is truly in competition with" President Trump for the Republican nomination. *Liberty Legal Found. v. Nat'l Democratic Party of the USA, Inc.*, 875 F. Supp. 2d

791, 801 (W.D. Tenn. 2012). He only professes an intent to appear on the primary ballot in seven states—Arizona, Kansas, Michigan, Montana, Nevada, New Hampshire, and West Virginia. ECF No. 68 ¶¶ 2 and 4. (Or is it Arizona, Delaware, Kansas, Montana Nevada, New Hampshire, and West Virginia? ECF No. 71-2 ¶ 2 and 4.) Apparently—for it's his duty to say otherwise—Castro does not intend participate in any presidential caucuses and does not intend to compete for delegates in any of the *dozens* of other presidential primaries to be held next year. And indeed, he has already missed the deadline to file in several states. Yet a candidate in just seven states is no candidate at all. *See Drake v. Obama*, 664 F.3d 774, 784 n.4 (9th Cir. 2011) (noting that no "candidate plaintiffs were in any position to win a majority of the 270 electoral votes required to win the election"); *cf. Bognet v. Sec'y Commonwealth of Penn.*, 980 F.3d 336, 351–52 (3d Cir. 2020), *vacated as moot sub. nom*, *Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021) ("[F]or Bognet to have standing to enjoin the counting of ballots arriving after Election Day, such votes would have to be sufficient in number to change the outcome of the election to Bognet's detriment.").

Most importantly, Castro makes no real showing as to West Virginia—the only State that this suit implicates—other than announcing future intentions. "The desire to run for office, when not accompanied with concrete steps[,] … does not establish an injury-in-fact." *Law v. Gast*, 641 F. Supp. 3d 580, 594 (S.D. Iowa 2022). Certainly, Castro has not shown any of the ordinary indicators of a viable primary candidate in this State: broad, pre-existing name recognition; a significant home-state constituency; sizable support in national opinion polls; endorsements by elite party officials; pervasive network television coverage; or healthy campaign finances. *See generally* Andrew Dowdle, et al., *The Viability Primary: Modeling Candidate Support Before The Primaries*, 62 POL. RES. Q. 77 (2009); *see also generally* Wayne P. Steger, *Who Wins Nominations and Why?: An Updated Forecast of the Presidential Primary Vote*, 60 POL. RES. Q. 91 (2007).

From all indications, Castro has no money, does not appear in polls, lacks endorsements, and only earns the occasional press when he files lawsuits.

At best, Castro has shown that he will likely appear on the ballot in seven states, simply because he filed a form or paid a fee. ECF No. 68 ¶¶ 2 and 4; ECF No. 71-2 ¶¶ 2 and 4. Again, there's no evidence that he'd "campaigned for the presidency anywhere in the country, or that a single registered voter intended to vote for" him when he filed this case. *Grinols*, 2013 WL 2294885, at *9. Paying filing fees doesn't prove Castro's bona fides as a candidate. It proves that he's "creating his own injury in order to manufacture standing to challenge Trump's eligibility to run for president." *Castro*, 2023 WL 7110390, at *5. The same goes for whatever nebulous "expenses" he's "incurred . . . associated with campaigning in this state," ECF No. 71-2 ¶ 3, after months of spending no money anywhere, Castro FEC Form 3P (Oct. 12, 2023) at 5-7. And Castro's "unpaid *earned* media coverage[,]" ECF No. 71-2 ¶ 5, is just more of the same: an attempt to gin up standing from the numerous filing fees he's paid to courts around the country. Truth is, Castro had no competitive injury—and no prospect of one—when he filed this action. He's like "a soccer player who falls to the ground but stops writhing when the referee looks away." *Sanderson Farms*, 2021 WL 4243391, at *6.

But the problem isn't merely that he had no injury; it's also that his supposed injury cannot be traced to the West Virginia Secretary of State or redressed by this Court. *Lujan*, 504 U.S. at 560–61 (requiring plaintiff's "injury . . . to be fairly traceable to the challenged action of the defendant" and "likely, as opposed to merely speculative, . . . [to] be redressed by a favorable decision" (cleaned up)). Castro says he brought this case to enjoin the Secretary of State from "accepting and/or processing" President "Trump's ballot access documentation[.]" ECF No. 1 ¶ 16. President Trump, he claims, is just "a nominal defendant." *Id.* at ¶ 5. So the question is only

whether the Secretary's supervisory actions really stand between Castro and winning the presidential election.

Castro has no competitive injury if, in President Trump's absence, voters and donors won't flow to Castro. His supposed injury "depends on what voters and contributors—independent, third parties—may do if Trump's name is not listed on the [West Virginia] primary ballot." *Castro*, 2023 WL 7110390, at *5. In other words, Castro is asking this Court to keep President Trump off the ballot based on "unfettered choices . . . by independent actors" who aren't before this Court "and whose exercise of broad and legitimate discretion th[is] court[] cannot presume either to control or to predict." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989). Trump could keep campaigning and keep soliciting donations, and voters and donors could keep right on supporting him.

If Castro is intent on involving these third-party choices in his theory of standing, then "it becomes [his] burden . . . to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562. But he hasn't done that. He's offered no reason to suppose that President Trump's voters and donors will migrate to Castro if he keeps President Trump off the primary ballot. With so many candidates to choose from—allegedly "162 Republican Party candidates for the Presidency" when this case was filed, ECF No. 1 ¶ 28—there's no reason to suppose that Castro would benefit from President Trump's departure. GOP voters could always choose someone else. *See Liberty Legal*, 875 F. Supp. 2d at 801 n. (rejecting presumption that "enjoin[ing] President Obama from appearing on the ballot in the November 2012 election" would not lead "the Democratic Party . . . [to] nominate another candidate to be its standard bearer"). Indeed, logic and recent experience suggest that Castro is the *last person* President Trump's followers will support if Castro prevails in this case.

In the end, Castro's alleged injury "rests on gross speculation and is far too fanciful to merit treatment as an 'injury in fact.'" *Gottlieb v. Fed. Election Comm'n*, 143 F.3d 618, 621 (D.C. Cir. 1998). Reality suggests that "the obvious lack of any support for [Castro] … [is] directly responsible for the claimed deprivations." *Christian Populist Party of Arkansas v. Sec'y of State of State of Ark.*, 650 F. Supp. 1205, 1215 (E.D. Ark. 1986). Worse yet, there's no reason to suppose that the Secretary of State bears any responsibility for Castro's alleged injury or that an order from this Court could possibly redress it.

## CONCLUSION

For all these reasons, the Court should grant summary judgment to the State and dismiss Castro's case for lack of jurisdiction.[2]

Respectfully submitted,

**THE STATE OF WEST VIRGINIA**

PATRICK MORRISEY
ATTORNEY GENERAL

*/s/ Michael R. Williams*
Michael R. Williams (WV Bar # 14148)
 *Principal Deputy Solicitor General*
David E. Gilbert (WV Bar # 12157)
 *Deputy Attorney General*
State Capitol Complex
Building 1, Room E-26
michael.r.williams@wvago.gov
dgilbert@wvago.gov
Telephone: (304) 558-2021
Dated: November 21, 2023            Facsimile: (304) 558-0140

---

[2] As the Court instructed, the State focuses here on standing alone. Bu if the Court finds that Castro does have standing, the Court should still dismiss this suit for the other reasons described in the State's Memorandum of Law in Support of its Motion to Dismiss. *See* ECF No. 44.

16